**UNITED STATES BANKRUPTCY COURT**      Chapter 11
**SOUTHERN DISTRICT OF NEW YORK**

In re:

                                             Case No. 21-12139

78-80 ST. MARK'S PLACE, LLC

                    Debtor.

### DECLARATION OF LAWRENCE OTWAY PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Lawrence V. Otway, hereby declare under penalty of perjury:

#### Qualifications

1.      I am the Manager and Sole Member of 78-80 St. Mark's Place, LLC ("SMP," the "Debtor" or the "Company"), the fee owner and operator of a building known as 80 St. Mark's Place in New York City.

2.      I hold a Juris Doctor from New York University School of Law and a Bachelor of Arts degree from New York University. I was born into a family with a generational history of involvement in theater. In 1964, when I was nine years old, my father bought 78-80 Saint Marks Place and we began building Theatre 80 Saint Marks ("Theatre 80"). I worked with my father excavating the auditorium, by hand, and building the forms for the concrete. During the summers, I worked full time in the theater and during the school year I worked evening shifts learning each job in theater management and technical operations. In my mid-teens I became a member of the IATSI union and filled a union position as well as a management position at Theatre 80. I worked as theater management, full time, at Theatre 80, including while at NYU undergraduate and NYU Law. After the death of my father, we brought in a theatrical tenant for 20 years while I pursued a career in human rights law while helping my mother with the physical tasks or running the building

and maintaining the theater. As a result of certain poor financial decisions made by brother, on behalf of our mother, the late Florence Otway, the theater and building were financially underperforming. Subsequently, my mother asked me to take on management of Theatre 80 and the building at 78-80 Saint Marks Place thereafter. Over the next decade, I turned around the losses and restored and improved the theater's branding and income.

3. As Manager, I am responsible for collecting rents and overseeing the Company's day-to-day operations and financial activities, including, but not limited to operational planning, employee matters, business relationships, and financial planning.

4. I submit this declaration (this "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist the Court and parties in interest in understanding the facts and circumstances requiring the commencement of these chapter 11 cases and in support of the Debtor's voluntary petition for relief under chapter 11 title 11 of the United States Code (the "Bankruptcy Code").

5. Except as otherwise noted, I have personal knowledge of the matters set forth in this Declaration or have gained knowledge of such matters from my discussions with the Debtor's retained advisors, and/or my review of relevant documents and information concerning the Debtor's operations and financial affairs in the ordinary course of my responsibilities as an officer of the Debtor. All references to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding in reliance on the explanations provided by, and the advice of, counsel.

6. I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently as to the facts set forth herein.

7.     This Declaration is divided into three parts. Part I of this Declaration provides an overview of the Debtor's business and operations, including its corporation and capital structure. Part II describes the circumstances leading to the commencement of these chapter 11 cases and the Debtor's restructuring plans. Part III provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I: THE DEBTOR'S BUSINESSES AND OPERATIONS

### A.     The Chapter 11 Filings

8.     On December 29, 2021 (the "Petition Date"), the above-captioned Debtor filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtor will continue operations and manage their businesses as Debtor in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

### B.     Overview of the Company's Businesses and Operations

9.     The Debtor is the fee owner of real property located at 78-80 St Mark's Place (the "Property"). The Property is a mixed use property which houses three (3) residential units, meeting and storage space and four (4) operating businesses. The Debtor itself does not operate any business other than ownership and maintenance of the Property. However, the Property is an integral part of a larger consolidated enterprise which includes the Theatre 80, the Tavern and the Museum (all as defined below) which are all owned by me personally and all rely on each other for income and support. For example, the largest tenant in the Property is the Tavern, which subleases space to Theatre 80. I believe it can be properly asserted that income derived by the Debtor is derivatively through the other Businesses (also defined below).

10.     Unlike many businesses in New York, the Property and three of the four businesses operating from the Property are owned by my family. These businesses include: (a) Theatre 80–

3

which became a famous off-Broadway theater in the 1960s and 1970s, with "You're A Good Man Charlie Brown" opening there and the careers of Gary Burghoff (Radar in M*A*S*H), Bob Balaban and Billy Crystal beginning there (Billy Crystal as an usher) and is an important bastion of the New York theater community after the closing of over seventy (70) New York City theaters before and during the Coronavirus pandemic; (b) the William Barnacle Tavern (a/k/a Scheib's Place), a restored tap room of the former speakeasy that served as a "clubhouse" for the New York City Council (the "Tavern"); and (c) the Exhibition of the American Gangster museum which illustrates the history of organized crime in the United States, from the smuggling gangs of the Revolutionary War period, through the Underground Railroad, which aided people who had freed themselves from slavery, to the Prohibition period (the "Museum," and collectively with Theatre 80 and the Tavern, the "Businesses") and the building itself.

11.     A letter dated November 4, 2021 (annexed hereto as Exhibit A) from Andrew Berman, the Executive Director of the Greenwich Village Society for Historic Preservation (the "Greenwich Village Society") describes the historic importance and significance of Theatre 80 housed on the Property. As Mr. Berman states, Theatre 80 plays an "important role as a bastion of culture and pillar of our community. Theatre 80 at 80 St. Mark's Place is a unique East Village treasure in that it is both architecturally and culturally significant to the story of New York City." Ex. A at pg. 1.

12.    Mr. Berman continues:

During prohibition, 80 St. Mark's Place was known as "Scheib's Place" and was the favored speakeasy of the New York City Council. The interior of the bar at Theatre 80, now called the William Barnacle Tavern, boasts historic iron fittings that held steel plates over the windows to hide the bar from law enforcement and even remnants of bomb triggers in the basement–the last resort if the club was raided. The building houses the Museum of the American Gangster to further elaborate on this history. From 1959 until 1964, a music club called Jazz Gallery, owned by brothers Joe and Iggy Termini, was located at 80 St. Mark's. The Thelonious Monk Quartet, the John Coltrane Quartet, Lord Buckley, Harry "Sweets" Edison, and Frank Sinatra, among many others, performed at this venue.

In the 1960s, Theatre 80 began to make its mark in the New York City theater world. It was here that Clark Gesner's You're a Good Man, Charlie Brown premiered in 1967 and ran until 1971. When Theatre 80 was converted into a revival movie house with double features of old Hollywood films showing every day, Theatre 80 further solidified its standing in the community as a gathering spot for those interested in all aspects of theater, performance, and film. In 1994, the Pearl Theatre Company took up residence at Theatre 80 and staged numerous performances here until 2009. The mini-Off-Broadway Walk of Fame, consisting of handprints, footprints, and signatures from some celebrated 20th–century actors and actresses such as Gloria Swanson, Joan Crawford, Myrna Loy, Ruby Keeler, Joan Blondell, Kitty Carlisle, Allan Jones, Winnie Shaw, Fifi D'Orsay, Joan Rivers, and many more, is a testament to the cultural value of Theatre 80 in the community.

*Id.*

13.    Mr. Berman concludes that Theatre 80s cultural contribution "has helped make the East Village what it is today" and congratulates the Otway family who, over the past 57 years, has "turned Theatre 80 into a pillar of the community by providing space for community meetings, local filmmakers, playwrights, 12 Step meetings, and memorials, as well as hosting fundraisers such as those to benefit victims of the 2015 East Village gas explosion. Independent theaters like Theatre 80 are at the heart of what makes New York City a thriving world cultural center and the continued existence is crucial to maintaining outlets for avant-garde creativity." Ex. A at pg. 2.

14.    The Property was appraised by a licensed appraiser as of August 1, 2021 and valued at fifteen million dollars ($15,000,000). The appraisal is annexed hereto as Exhibit B.

### C.  Corporate Organization

15.  The Debtor is a sole member, New York limited-liability company. I am the sole member of the Debtor and 100% of membership interests therein are held in my name personally.

### D.  Capital Structure

16.  The Debtor's capital structure is simple. The Debtor has one secured creditor which is an assignee of a loan made by 80 St. Marks Place Funding LLC (the "Original Creditor") to the Debtor on or about November 12, 2019, in the principal amount of six million one hundred thousand dollars ($6,100,000) (the "2019 Loan"). The 2019 Loan was evidenced by a Promissory Note given by the Debtor in favor of the Original Creditor (the "2019 Note"). The Note is secured by that certain Mortgage and Security Agreement (the "2019 Mortgage") of even date with the Note executed by the Debtor, as Mortgagor, to the Original Creditor, as Mortgagee, encumbering (among other things) the Property; and an Assignment of Leases and Rents (the "2019 ALR") of even date therewith.

17.  On or about the same date, I personally guaranteed the obligations under the Loan (the "2019 Guarantee") and executed a Pledge and Security Agreement (the "2019 Pledge Agreement") in favor of the Original Creditor. Pursuant to the Pledge Agreement, I pledged all rights, title and interests in, to and under 100% of the limited-liability company membership interests in the Debtor to the Original Creditor.[1] The Loan, Note, the Guarantee, the Pledge Agreement, and all other documents evidencing the Loan are collectively referred to herein as the "2019 Loan Agreements."

18.  The Original Creditor perfected its security interest in the Collateral (as defined in the 2019 Loan Agreements) by taking possession of certificate of membership interests (the

---

[1] Considering the exigent circumstanced of this case, I filled a personal case concurrently herewith to protect the membership interest in the Debtor.

"Certificated Interest") in the Debtor and filing UCC-1 financing statements describing the Collateral, with the New York State Department of State on December 4, 2019 and December 18, 2019.

19.     On the maturity date of the 2019 Loan, December 1, 2020, the Original Creditor assigned the 2019 Loan Agreements, and the obligations thereunder, to St. Mark's Mixed Use LLC, ("SM Mixed Use"), owned by Maverick Real Estate Partners (together with SM Mixed Use, "Maverick"). Neither the Debtor nor I were informed of this assignment.

20.     The Debtor has approximately $112,827.35 in unsecured debt. The overwhelming bulk of this debt is owed to various professional firms who have provided services for the Debtor to help keep the Property in the name of the Debtor.

## PART II: EVENTS LEADING TO THESE CHAPTER 11 CASES AND CHAPTER 11 GOALS

**A.     Events Leading to Filing These Chapter 11 Cases**

21.     The Property and Theatre 80 have been owned by and run by my family for over fifty-five (55) years. My family and I required minimal funding to run Theatre 80 and the Property up until 2010.[2] In the ten (10) years prior to executing the 2019 Loan Agreements, I was able to increase the value of the Debtor and brand considerably through developing and marketing the Businesses. In those ten years, my wife and I expanded the gross revenue of the Property and the Businesses from tens of thousands of dollars in annual gross revenue to approximately $800,000 in annual gross revenue.

22.     In early 2020, we were on the verge of enacting a new facet of our business plan which we believed would increase revenue even further. This new facet of the business plan

---

[2] Any outstanding senior debt at the time was repaid from the proceeds of the 2019 Loan.

includes re-branding Theatre 80 as a "cabaret" style theater while retaining the seating flexibility to maintain its status as an Off-Broadway theater[3], publishing a book offering a solution to a double murder connected to 80 St Marks Place which led to my father acquiring the building and his role in revitalizing the East Village neighborhood of New York City and releasing of a one-hour documentary on the same subject.

23.    All of that forward progress was halted by the nationwide shutdowns necessitated by the COVID-19 pandemic. In mid-March when Governor Cuomo declared a state of emergency for the State of New York all of the businesses–the Museum, the Tavern and Theatre 80–were ordered closed.[4]

24.    As a result of the prolonged shutdown of Theatre 80 and the Museum, combined with the Tavern operating under harsh restrictions, we were unable to enter into any transaction to refinance the 2019 Loan before its maturity on December 1, 2020 despite a concerted effort.

25.    As stated, on or about the 2019 Loan's maturity date, the Original Creditor, without informing my counsel, or me, sold the debt to St. Marks Mixed Use LLC, owned by Maverick.

26.    On December 1, 2020, the Loan matured, and the principal balance and accrued interest became due and payable.

27.    Less than one week after purchasing the Loan, Maverick sent a letter, dated December 7, 2020, to the Debtor and me (as Guarantor) notifying us, among other things, (i) that on December 1, 2020, the Loan matured by its terms and the entirety of the indebtedness became immediately due and payable pursuant to the Note and the Mortgage, (ii) that the Borrower failed to pay the entire indebtedness within five (5) days of when it became due, constituting an Event

---

[3] This necessitated certain cosmetic changes to Theater 80 for funded by the 2019 Loan.
[4] *See e.g.,* New York State Executive Order No. 202, dated March 7, 2020.

of Default under both the Note and the Mortgage, and (iii) interest on the indebtedness began to accrue at the "Default Rate" as defined in the Note and Mortgage from and after December 2, 2020.[5]

28.     In January 2021, Plaintiffs and Defendant entered into a Forbearance Agreement (the "Forbearance Agreement") wherein the Debtor and I acknowledged the Obligations and Maverick, and St. Marks Mixed Use LLC, for consideration including a release, agreed to extend certain Obligations under the Loan Agreements.[6]

29.     As is evident by its terms, the Forbearance Agreement was designed to force a sale. Under the Forbearance Agreement, the Debtor was required, among other things, to pay the principal and accrued interest on the Loan in less than four (4) months, with the majority of New York State and New York City COVID restrictions still in effect. Broadway shows did not reopen until mid-September 2021. Failing such repayment, the Debtor was required to list the Property for sale at $11,000,000 with the price decreasing each month through July 15, 2021 to a final listing price of $8,500,000. If the Property were not sold (under a contract acceptable to Maverick) by August 15, 2021, Maverick would have the right to foreclose without opposition. At the time of the execution of the Forbearance Agreement a government mandated moratorium existed on commercial foreclosures related to the COVID-19 pandemic. This protection remained in place on August 15, 2021 and is mostly in place through at least January 15, 2022.[7] The Debtor and I reserve all rights regarding the Forbearance Agreement, the assignment of the 2019 Loan and all transactions associated therewith.

---

[5] The Default rate under the Note is 24% per annum.

[6] A copy of the Forbearance Agreement is annexed hereto as Exhibit C.

[7] *See* Chapter 417 of the Laws of 2021, effective September 2, 2021; Administrative Order AO/262/21

30.     The Debtor has not, to date, made all payments to Maverick. Upon information and belief, the amount outstanding under the Loan is approximately $7.98 million.

31.     The Property was not sold by August 15, 2021. On September 3, 2021, Maverick forwarded a Notice of Disposition of Collateral under sections 9-611 and 9-612 of the New York State Uniform Commercial Code (the "Notice of Disposition") that set forth Maverick's intention to conduct a public auction of all of right, title and interest in my membership interests in the Debtor on November 18, 2021, at 1:00 p.m. eastern time (the "UCC Sale").

32.     On November 11, 2021, the Debtor, myself, my wife and the Businesses brought an action in New York State Supreme Court seeking a preliminary injunction to stop any foreclosure or sale under the UCC (the "NYS Case"). That action was pending in New York County under index number 65446/2021. On November 17, 2021, the Honorable Justice Ostrager, entered an Order to Show Cause on the docket of the NYS Case, staying the UCC Sale and scheduling an evidentiary hearing on the request for a preliminary injunction for December 3, 2021. [NYS ECF Case Docket. No 25]. That case was voluntarily dismissed upon entry of a second Forbearance Agreement in the form of a stipulation (the "Second Forbearance Agreement") by which Maverick agreed to forbear from exercising remedies through December 30, 2021.[8]

**B.      Goals of the Chapter 11 Process**

33.     This chapter 11 case, and the personal case I filed contemporaneously herewith, are intended to provide the Debtor with the breathing spell afforded by the automatic stay under Section 362 of the Bankruptcy Code, which will allow the Debtor to obtain financing to repay the 2019 Loan and to protect and preserve the financial and historical value of the Property.

---

[8] A copy of the Second Forbearance Agreement is annexed hereto as Exhibit D.

34. As stated, there is substantial equity in the Property (approximately $7.0 million). Through these cases, the Debtor intends to access the options made available upon application of the automatic stay. The Debtor's main goal is refinancing the 2019 Loan in an amount that will pay all of its creditors in full and provide operating capital to continue operations and leave the Businesses housed in the Property. The Debtor's business and the operations of the Businesses are fundamentally sound. However, the Debtor cannot shoulder its crippling debt burden which adds interest at $4,600 each day.

35. This case will serve the dual purposes of allowing the Debtor an opportunity to restructure and protecting the equity value in the Property for the benefit of stakeholders including creditors. The automatic stay will prevent foreclosure (should the Debtor fall outside the protections of the current law) and, along with the personal case I filed today, prevent the UCC Sale. As is obvious by the terms of the Forbearance Agreements, along with its intent to conduct the UCC Sale, Maverick has no intention of maximizing the value of the Property for the benefit of stakeholders other than itself.[9] Worse yet, creditors at the Businesses would be irreparably harmed by such a sale because the entity with which they transact would no longer have a space in which to operate.

36. Maverick is taking advantage of a global pandemic and an unprecedented industry shut down to reap a windfall. They stand to gain a huge profit through ostensibly buying the Note at a discount and collection of over $1.4 million in default interest.[10] Maverick intends to take over

---

[9] *See* Forbearance Agreement § 2.

[10] I believe Maverick purchased the Note at a discount upon information and belief. It makes little sense that they would pay par or better for the Note to take on the burden and risk of collection. Original interest under the Note was set at 10.25% per year. Over the course of the year Maverick has held the Note, they have charge approximately $1 million in interest over the contract rate.

the Property and have it vacant.[11] This is obviously a precursor to a sale which, since the Property is not landmarked, would allow Maverick or any third party to pursue any course of action (including development) and Maverick to retain amounts received in excess of their debt for themselves. At a minimum, Maverick's foreclosure or UCC Sale would mean that the Businesses would lose their operating space and my wife, and I, would lose our home. Put simply, allowing Maverick to take over the Debtor would deny current "in the money" equity holders and creditors their right to be paid from any value in the Property and would destroy the historical value of the Property and the Businesses which, once lost, would be gone forever.

### PART III: INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

37.     Local Bankruptcy Rule 1007-2 requires that the Debtor provide certain information, which is set forth below.

38.     As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, there have been no committees organized prior to the Petition Date.

39.     As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit E lists the following information with respect to each of the holders of the Debtor's 20 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtor's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit E are estimated and subject to verification. In addition, the Debtor reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

---

[11] *See* Forbearance Agreement § 10(b).

40. As required under Local Bankruptcy Rule 1007-2(a)(5), the Debtor hereby provides the following information with respect to the holder of the only known secured claims against the Debtor on a consolidated basis: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description of the claim, and whether the claim or lien is disputed.

| Name/Address | Claim | Disputed |
|---|---|---|
| St. Mark's Mixed Use LLC<br>100 Park Avenue, Suite 2805<br>New York, New York 10017 | Secured Debt–Real Estate<br>$7,980,855.65<br><br>Principal: $6,100,000<br>Interest: $1,484,333.33<br>(a/o 11/29)<br>Advances: $202,121.59<br>Legal Fees: $194,400.73 | All rights reserved |

41. As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtor submit that as of September 30, 2021, the Debtor's unaudited consolidated financial statements aggregated $15,012,427.00 in total assets and approximately $8,172,472.90 in total liabilities.

42. As required under Local Bankruptcy Rule 1007-2(a)(7), the Debtor have no publicly held shares.

43. As required under Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtor's knowledge and belief, the Debtor have $12,000.00 in the possession of Abstracts Incorporated, with offices at 100 Garden City Plaza, Suite 201 Garden City, NY 11530 and the Certificated Shares showing the membership interests in the Debtor, last held by the Original Creditor. The Debtor has no knowledge of information as to whether the Certificated Shares were transferred to Maverick or St Marks Mixed Use LLC.

44.     As required under Local Bankruptcy Rule 1007-2(a)(9), the Property is the only premises owned, leased, or held under other arrangement from which the Debtor operate their business.

45.     As required under Local Bankruptcy Rule 1007-2(a)(10), the location of the Debtor's substantial assets, the location of their books and records is at the Property. There are no assets held by the Debtor outside the territorial limits of the United States.

46.     As required under Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtor's knowledge and belief, the only action or proceeding, pending or threatened, against the Debtor or their property where a judgment against the Debtor or a seizure of the Debtor's property may be imminent is the Notice of Disposition listed above.

47.     As required under Local Bankruptcy Rule 1007-2(a)(12), I am the only member and manager of the Debtor.

48.     As required under Local Bankruptcy Rule 1007-2(b)(1), the Debtor has no employees which require payment within the next thirty (30) days. The Debtor pays me approximately $850.00 on a weekly basis, as an independent contractor, to manage the Property and pays another independent contractor $610.00 on a monthly basis to act as a superintendent for the building.

49.     As required under Local Bankruptcy Rule 1007-2(b)(2), other than stated above, the Debtor does not propose making any payments to individuals or members in the next thirty (30) days and has not retained a financial consultant. Any such consultant shall only be paid upon approval of its retention and fee by the Court.

50.     As required under Local Bankruptcy Rule 1007-2(b)(3), attached as Exhibit F is a schedule, for the thirty (30) day period following the filing of the chapter 11 petition, of estimated

cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 29, 2021

_/s/ Lawrence V. Otway_
Name: Lawrence v. Otway
Title: Sole Member and Manager

**Exhibit A**



**EXECUTIVE DIRECTOR**
Andrew Berman

**BOARD OF TRUSTEES**
**PRESIDENT**
Trevor Stewart

**VICE PRESIDENTS**
Kyung Choi Bordes
Jessica Davis

**SECRETARY / TREASURER**
Allan G. Sperling

**PRESIDENT EMERITUS**
Arthur Levin

**TRUSTEES**
Mary Ann Arisman
Tom Birchard
Richard Blodgett
Blaine Birchby
David Hottenroth
Anita Isola
Jeanne Krier
John Lamb
Justine Leguizamo
Leslie Mason
Ruth McCoy
Katherine Schoonover
Marilyn Sobel
Judith Stonehill
Linda Yowell
F. Anthony Zunino

**232 EAST 11TH STREET**
**NEW YORK NY 10003**
**212-475-9585**
**VILLAGEPRESERVATION.ORG**

November 4, 2021

Mr. Lorcan Otway
Theatre 80
80 St. Mark's Place
New York, NY 10003

RE: Support for the Cultural Importance of Theatre 80

Dear Mr. Otway:

I write on behalf of Village Preservation to express our admiration for Theatre 80 and its important role as a bastion of culture and pillar of our community. Theatre 80 at 80 St. Mark's Place is a unique East Village treasure in that it is both architecturally and culturally significant to the story of New York City. Originally constructed as two separate Anglo-Italianate row houses in 1845 for William Bollman, 80 St. Mark's Place still retains the row houses' original facades including lintels, sills, cornice, and even the stoop and multi-paned sash on the side of the building that was once 78 St. Mark's Place.

Fascinating remnants of 20th-century history can be found in every crevice of the space at Theatre 80. During prohibition, 80 St. Mark's Place was known as "Schieb's Place" and was the favored speakeasy of the New York City Council. The interior of the bar at Theatre 80, now called the William Barnacle Tavern, boasts historic iron fittings that held steel plates over the windows to hide the bar from law enforcement and even remnants of bomb triggers in the basement – the last resort if the club was raided. The building houses the Museum of the American Gangster to further elaborate on this history. From 1959 until 1964, a music club called Jazz Gallery, owned by brothers Joe and Iggy Termini, was located at 80 St. Mark's. The Thelonious Monk Quartet, the John Coltrane Quartet, Lord Buckley, Harry "Sweets" Edison, and Frank Sinatra, among many others, performed at this venue.

In the 1960s, Theatre 80 began to make its mark in the New York City theater world. It was here that Clark Gesner's You're a Good Man, Charlie Brown premiered in 1967 and ran until 1971. When the theatre was converted into a revival movie house with double features of old Hollywood films showing every day, Theatre 80 further solidified its standing in the community as a gathering spot for those interested in all aspects of theater, performance, and film. In 1994, the Pearl Theatre Company took up residence at Theatre 80 and staged numerous performances here until 2009. The mini-Off-Broadway Walk of Fame, consisting of handprints, footprints, and signatures from some celebrated 20th-century actors and actresses such as Gloria Swanson, Joan Crawford, Myrna Loy, Ruby Keeler, Joan Blondell, Kitty Carlisle, Allan Jones, Winnie Shaw, Fifi D'Orsay, Joan Rivers, and many more, is a testament to the cultural value of Theatre 80 in the community.

Today, Theatre 80 presents a range of productions, from traditional forms such as Shakespearean theater and flamenco dance, to cutting-edge works from new authors. Theatre 80's unique history and cultural offerings add tremendous value to the neighborhood, regularly attracting thousands of tourists to the area each year.

Theatre 80's cultural contribution to the neighborhood has helped make the East Village what it is today. Over the past 57 years, your family has turned Theatre 80 into a pillar of the community by providing space for community meetings, local filmmakers, playwrights, 12 Step meetings, and memorials, as well as hosting fundraisers such as those to benefit victims of the 2015 East Village gas explosion. Independent theaters like Theatre 80 are at the heart of what makes New York City a thriving world cultural center and the continued existence is crucial to maintaining outlets for avant-garde creativity.

As always, don't hesitate to let us know how we can help you to continue Theatre 80's proud legacy.

Sincerely,

Andrew Berman
Executive Director

## **Exhibit B**

The full appraisal is too voluminous to attach here and will be made available at the Debtor's expense upon request.





# Ronald M. Gold, ASA, MRICS

*New York State Certified General Real Estate Appraiser, Lic. #:46000000713*
190 Riverside Drive ● New York, New York 10024
Phone: **212-769-8906** ● **Cell: 212-662-3500**
E-mail: rongold70@gmail.com Web site: www.goldappraisal.com

# A P P R A I S A L   O F

# The Fee Simple Interest In

# 78-80 St. Marks Place, "As Is,"
# New York, New York 10003
### *As of August 1, 2021*

*A 5-Story + Cellar "C7" class Mixed-Use Walk-up Building*
*(Ground Floor Street Level Bar and 74-Seat "Cabaret Style" Theatre, with*
*Several Upper 2nd through 5th Floor Residential Apartments and 2 Commercial Spaces)*
*Containing 14,400 square feet of habitable interior usable above grade (NYC Public Records)*

———————————

**Block: 449 / Lot: 28**

———————————

**FOR:**
**78-80 St. Marks Place LLC**
**c/o Lawrence V. Otway, Managing Member**
**78-80 St. Marks Place, New York, New York 10003**
**And Whisper Capital, LLC and Elohim Financial Corporation**

———————————————

**BY:**
**Ronald M. Gold, ASA, MRICS**
**New York State Certified General Real Estate Appraiser**
**RMG FILE#: 02021014**




# Ronald M. Gold, ASA, MRICS

*New York State Certified General Real Estate Appraiser, Lic. #:46000000713*
190 Riverside Drive ● New York, New York 10024
**Phone: 212-769-8906 ● Cell: 212-662-3500**
E-mail: rongold70@gmail.com Web site: www.goldappraisal.com

78-80 St. Marks Place LLC
Lawrence V. Otway, Managing Member          August 5, 2021
78-80 St. Marks Place
New York, New York 10003
and Whisper Capital, LLC
and Elohim Financial Corporation

**Real Estate Appraisal Report**
**78-80 St. Marks Place, "As Is"**
**New York, New York 10003**
**As of: August 1, 2021**

Mr. Otway,

In accordance with your request, I have inspected the subject premises prepared an appraisal report on the above-captioned subject property. The valuation is based on the definition of the Fee Simple Interest ownership interest and on the definition of Market Value as stated on the following pages of this report. The Effective Date of Value is August 1, 2021 and the date of inspection is August 1, 2021. I have considered the forces and factors, which impact Market Value and have reviewed the general market conditions existing as of The Effective Date of Value.

Based on my investigation and analysis of the data available as of August 1, 2021, subject to the limiting conditions included in this report, I have developed the opinion that the market value of the Fee Simple interest in the above-captioned subject property, "As Is," in its current partially renovated/upgraded average to above average overall condition, is:

## FIFTEEN MILLION
## ($ 15,000,000) DOLLARS

Respectfully submitted,

RONALD M. GOLD, ASA, MRICS

## MARKET VALUE DEFINITION

The term "market value" as used here is defined as the price at which a property would most probably sell, if exposed to the market for a reasonable period of time in an "as is" condition, where payment is made in cash or its equivalent.  Implicit in this definition is the consummation of the sale with passing of title from seller to buyer under conditions whereby:

(1)     Both parties are well informed and acting in what they consider their best interests.

(2)     A reasonable amount of time is allowed for exposure in the local market **(90 to 120 days).**

(3)     Financing, if any, is on terms generally available in the community and typical for the property type in its locale.

(4)     Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements     comparable thereto; and

(5)     The price represents the normal Consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Source: Office of the Comptroller of the Currency under 12 CFR, Part 34, Subpart C-Appraisals, 34.42 Definitions [f].)

## INTENDED USE OF REPORT

This appraisal is intended to assist the client in the valuation of the subject property, "As is," as of  August 1, 2021, for mortgage financing purposes.

## INTENDED USERS

The managing members of 78-80 St. Marks Place LLC and its advisors and Whisper Capital, LLC and Elohim Financial Corporation.

## INTEREST VALUED

Current Market Value of the fee simple interest in the subject property, "As is."

## EFFECTIVE DATE OF VALUE

August 1, 2021  (Based on the August 1, 2021 of Inspection)

## DATE OF REPORT

August 5, 2021

## APPRAISAL DEVELOPMENT AND REPORTING PROCESS

In preparing this appraisal, the appraiser:

- Inspected the subject site and the exterior of the improvements as well as the Approximately 60% of the interior of the subject building *(including the public areas, the Basement and Cellar, the Commercial Spaces and upper floor residential spaces)* on August 1, 2021, the date of inspection; NOTE: The appraiser could not obtain access to inspect the subject roofs. The roofs were reportedly replaced in 2018, according to the Client.

- Gathered information on recent latter 2020 and 1st Half 2021 "C7" and "D7" class comparable 5- and 6- and 7-Story Walk-up and Elevator Buildings within a 20-block radius of the subject building in the subject East Village and West Village neighborhoods, within the 16-month period preceding the effective date of this appraisal. Gathered information from the client on the 2019 - 2021 on-going repairs already made to the subject property, and a projected Income and Operating Expenses and Pro Formas on the Restaurant/Tavern, Cabaret Theatre and Museum for 2021-2022 from the Client.

- Confirmed and analyzed the data and applied the Sales Comparison approach. The Income Approach and The Cost Approach were considered but not utilized. The appraiser deemed these approaches to be inappropriate indicators of value for the subject property. A detailed discussion of the three approaches appears elsewhere in this report, under the heading "The Appraisal Process."

To develop the opinion of value, the appraiser performed a complete appraisal process, as defined by the Uniform Standards of Professional Appraisal Practice. This means that no departures from Standard 1 were invoked. This Summary Appraisal Report is a brief recapitulation of the appraiser's data, analyses, and conclusions. Supporting documentation is retained in the appraiser's file.

### _DEFINITION OF OWNERSHIP INTEREST:_   FEE SIMPLE ESTATE

**_"FEE SIMPLE ESTATE"_*****

**Absolute ownership unencumbered by any other interest or estate, subject only to the limitations**

**Imposed by the governmental powers of taxation, eminent domain, police power and escheat.**

*_The Dictionary of Real Estate Appraisal,_  page 78, Fifth Edition, © _2010_, published by the American
Institute of Real Estate Appraisers.

# Subject building LAYOUT
## (COURTESY, Lee & Associates – May, 2021)

|  | 78 St Marks | 80 St Marks |
|---|---|---|
| **Fifth Floor** | **Residential Unit #4**<br>1,075 SF<br>Currently occupied through July 2021 | **Storage Space**<br>Currently Vacant<br>1,075 SF |
| **Fourth Floor** | **Residential Unit #3**<br>1,075 SF<br>Currently occupied through August 2022 | **Residential Unit #2**<br>1,075 SF<br>Currently Vacant |
| **Third Floor** | **Office Space**<br>Currently vacant - office/meeting space<br>1,275 SF | **Duplex**<br>Owner-occupied<br>2,550 SF |
| **Second Floor** | **Museum of the American Gangster**<br>Owner-operated museum<br>1,275 SF | |
| **Ground Floor** | William Barnacle Tavern, Theatre 80 St. Marks, FoxFace Sandwiches<br>4,875 total square feet across the full-lot ground floor<br>The 160-seat theater includes above and below-grade space and slopes down into the basement level | |

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**ADDRESS:**
78-80 St. Marks Place
New York, New York 10003

**BUILDING DESCRIPTION:**
Two 5-Story + Cellar Walk-up
"C7" class Mixed-Use Attached and
Partially Combined Buildings with Ground Floor Level
Bar and Theatre and 2 Additional Commercial Spaces and Several
Upper Floor Residential Apts. on the 2nd through 5th floor.
Erected circa 1830-1850 / Brick Façade
Containing 14,400 sq.ft. Gross Building Area
In overall Average to Above Average condition throughout

**PLOT SIZE:**
50' X 97.5' = 4,875 sq.ft.

**BUILDING SIZE:**
Ground Floor (at Grade): 50' x 97.5' = 4,875 sq.ft.
2nd – 5th Floors: 50' X 50' X 4 = 10,000 sq.ft.
Total of 14,400 sq.ft. (according to NYC Public Records)

**ZONING:**
R7A (Within a C1-5 Commercial Overlay)

**APPRAISAL HISTORY:**
The appraiser developed an OPINION OF MARKET
VALUE OF THE SUBJECT PROPERTY IN A SEPARATE
APPRAISAL REPORT AS OF MARCH 5, 2021

**SUBJECT PURCHASE HISTORY:**
The subject has been reportedly owned by the client
for at least 5 years.

**BLOCK and LOT:**
Block: 449 / Lot: 28

**HIGHEST & BEST USE**
The Present Use . . . a Mixed-Use Walk-up Building
Ground Floor Bar and 74 Seat Cabaret Style Theatre, 2 Commercial
Spaces, 49 Outdoor Sidewalk Seating Restaurant Spaces and several
upper floor residential apartments on the 2nd through 5th floors.

**DATE OF VALUATION:**
August 1, 2021
**VALUE "AS IS" BY THE**
**CAPITALIZATION**
**OF INCOME APPROACH:**
**$ 14,000,000 ($700,765 NOI Capitalized at 5%)**

**VALUE, "AS IS" BY SALES**
**COMPARISON APPROACH:**
**$ 15,840,000 (equivalent to $ 1,100 per sq.ft. of**
**usable building area above grade)**

# RECONCILED
# TOTAL MARKET VALUE
# ESTIMATE, "As Is:"     **$ 15,000,000**

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate the Market Value of the FEE SIMPLE  interest  in 78-80 St.

Marks Place, as of  **August 1, 2021  for mortgage financing purposes**.   The subject property is described

on the tax maps of the City of New York as:

***78-80 St. Marks Place, New York, New York  10003***

## SCOPE OF THIS APPRAISAL

The scope of this appraisal is to inspect the subject building, analyze its condition and size and make-up and gather

1.) client supplied actual 2020 and projected 2021 subject property income and 2021 operating and repair

expenses;  2.) a variety of comparable sales data of  latter 2020 and 1st half 2021  "C7" and "D7"  class walk-up

and elevator Mixed-Use  sales in the subject surrounding  20-block radius of the East Village and adjacent West

Village neighborhoods.

## INTENDED USERS

The client 78-80 St. Marks Place LLC, its advisors and  WHISPER CAPITAL, LLC, and ELOHIM FINANCIAL

CORPORATION.

## FUNCTION OF THIS APPRAISAL

The function of this appraisal is to assist the client in the valuation of the fee simple interest of the subject

property, "As Is,"  as of  August 1, 2021,  for mortgage financing purposes.

## VALUATION DATE

**August 1, 2021**

## INSPECTION DATE

**August 1, 2021**

# GENERAL ASSUMPTIONS

# AND

# LIMITING CONDITIONS

This appraisal is made for the client to which it is addressed and is to be used only for the purpose stated in the appraisal, and no reliance is to be placed on this appraisal for any other purpose.

No responsibility is assumed for matters legal in character.  We render no opinion as to the title but assume that it is marketable.  The property is appraised as though free and clear of all liens and encumbrances.  Management and ownership are presumed to be competent and responsible.

All drawings and diagrams in this report are included to assist the reader in visualizing the property.  These drawings do not represent the product of any professional survey made by this office.  The appraiser is not a professional engineer, and no engineering survey of the property has been made by him nor are we reporting on structural adequacy.

No right to expert testimony, attendance in court, or publication is included with possession of this report.

The distribution of the total valuation in the report between land and improvements applies only under the proposed manner of utilization.  The separate valuations for land and building must not be used in connection with any other appraisal and are invalid if so used.

The appraiser has no present or contemplated future interest in the property.

Rentals and other income have been supplied by others and have not been subject to independent verification, unless otherwise noted.  Expenses are based either on unverified data supplied by others or are the appraiser's own estimate.  Other facts reported in the appraisal are correct to the best of the appraiser's knowledge and belief.

## MANHATTAN ASSESSMENT REPORT

**Property Address**

78 ST MARKS PL
EAST VILLAGE NY 10003

**Alternative Address**

EAST VILLAGE NY 10003

### LEGAL

Section : 2
Block  : 449
Lot    : 28
Volume : 5
Census : 38
APN    : 1004490028

Tax Payers Name : 78-80 ST. MARKS PLACE,
Owner Occupied  : YES
Owner's Name    : 78-80 ST. MARKS PLACE,
Mailing Address : 78 ST MARKS PL
                  NEW YORK, NY 10003

### BUILDING DATA

Classification  : C7
Year Built      : 1920
Number of Bldg  : 1
Building Size   : 50.00x98.00
Num of Stories  : 4.00
Bldg Sq Feet    : 19600
Num of Units    : 9
Gross Bldg SF   : 14400
FAR / MAX FAR   : 2.950 / 3.440

### PROPERTY DATA

Waterfront       : NO
Lot Size/Shape   : 50.00x97.50 / REGULAR
Lot Sq Feet      : 4875
Corner           :
Ext              : E
Tax Class        : 2
Police Precinct  : 9
Fire District    : L011
Basement         : Full Basement that is Above Grade. The basement is 75% or more of the area of the first floor and the basement walls are at least 4 feet high on at least two sides.

Flood Panel : 3604970201F
Flood Zone  : X
Panel Date  : 09/05/07

Building Classification Definition : C7  OVER 6 FAMILIES WITH STORES
Zoning :: Map# :: Definition        : R7A :: 12c ::

### TAX DATA

|                           |   | LAND    | TOTAL     |
|---------------------------|---|---------|-----------|
| Current Assessed Value    | : | 153,772 | 1,188,000 |
| Transitional Assessed Value | : | 152,087 | 1,235,520 |
| Current Exemption         | : | 454,500 | 3,692,250 |
| Current Tax Amount Total  | : | 19,180  | 148,179 ** CURRENT EXEMPTIONS NOT INCLUDED |

*The subject property real estate taxes are average and typical for this type of property in this part of town, considering the subject's location and size.*



## Property Tax Bill
## Quarterly Statement
Activity through June 5, 2021

Owner name: 78-80 ST. MARKS PLACE, LLC
Property address: 78 SAINT MARKS PL.
Borough, block & lot: MANHATTAN (1), 00449, 0028

**Mailing address:**
78-80 ST. MARKS PLACE, LLC
78 SAINT MARKS PL. # 80
NEW YORK NY 10003-8176

| | |
|---|---|
| Outstanding Charges | $0.00 |
| New Charges | $81,843.10 |
| **Amount Due** | **$81,843.10** |

*Please pay by July 1, 2021*

Most Department of Finance services are available online:
· To pay your bill, visit nyc.gov/payonline.
· For general information, visit nyc.gov/finance.
· To submit a question to the Department of Finance, visit nyc.gov/dofaccount.

PTS - LD
1400.01
0 - 0 - 2B
27377

---



**PLEASE INCLUDE THIS COUPON IF YOU PAY BY MAIL OR IN PERSON 1-00449-0028**

Subject

Total amount due by July 1, 2021
If you want to pay everything you owe by July 1, 2021 please pay

$81,843.10
$162,867.77

Amount enclosed:

#80275982106050l#

78-80 ST. MARKS PLACE, LLC
78 SAINT MARKS PL. # 80
NEW YORK NY 10003-8176

**Make checks payable & mail payment to:**
NYC Department of Finance
P.O. Box 680
Newark NJ 07101-0680

# SUBJECT PROPERTY CURRENT FEBRUARY, 2021 NYC REAL ESTATE TAX BILL



**Statement Details**



June 5, 2021
78-80 St. Marks Place, LLC
78 Saint Marks Pl.
1-00449-0028
Page 2

**Department of Finance**

| Billing Summary | Activity Date | Due Date | Amount |
|---|---|---|---|
| Outstanding charges including interest and payments | | | $0.00 |
| Finance-Property Tax | | 07/01/2021 | $81,843.10 |
| **Total amount due** | | | **$81,843.10** |

| Tax Year Charges Remaining | Activity Date | Due Date | Amount |
|---|---|---|---|
| Finance-Property Tax | | 01/01/2022 | $81,843.10 |
| **Total tax year charges remaining** | | | **$81,843.10** |
| **If you want to pay everything you owe by July 1, 2021 please pay** | | | **$162,867.77** |
| If you pay everything you owe by July 1, 2021, you would save: | | | $818.43 |

| Overpayments/Credits | Activity Date | Due Date | Amount |
|---|---|---|---|
| Credit Balance | | 05/03/2021 | $-79,127.17 |
| Credit Applied | 05/05/2021 | | $79,127.17 |
| | | Total credit applied | $79,127.17 |
| **Total overpayments/credits remaining on account** | | | **$0.00** |

## Annual Property Tax Detail

| | Overall | | |
|---|---|---|---|
| Tax class 2B - 7-10 Unit Residentl Rental Bldg | **Tax Rate** | | |
| Current tax rate | 12.2670% | | |
| **Estimated Market Value $7,629,000** | | | |

| | | | Taxes |
|---|---|---|---|
| **Billable Assessed Value** | $1,334,362 | | |
| **Taxable Value** | $1,334,362 x 12.2670% | | |
| **Tax Before Abatements and STAR** | $163,686.20 | | $163,686.20 |
| **Annual property tax** | | | $163,686.20 |

Please note that property tax bills due in July and October of 2021 are calculated using the 2021 tax rates. Property tax bills due in January and April of 2022 will be calculated using the 2022 tax rates.

## <u>SITE ANALYSIS</u>

The Subject site is located on the south side of St. Mark's Place, between  First and  Second Avenues (approximately 50' west of First Avenue),  in the City, County and State of New York.

The subject site has frontage of approximately 50' along  St. Marks Place and a depth of approximately 97.50', containing a  total gross area of approximately 4,875 SQ.FT., according to New York City public records.

The site is regular (rectangle)  in shape, is level  and is at grade**.**   The site is located approximately 50' west of First Avenue.

The site is improved with all available public utilities including city sewers**.**  The legal description of the subject site is: Block:  449,  Lot:  28.

The site is improved with two circa 1830-50  Construction Walk-up  4-Story + Basement and Cellar painted brick façade "C7"   class Mixed-Use combined and attached (attached at the BELOW GRADE Cellar and SIDEWALK LEVEL Basement)  buildings.  **The subject is not located within an Historic District.**

## <u>FLOOD ZONE</u>

The subject property is not located in a Flood Hazard Zone.

**Exhibit C**

# FORBEARANCE AGREEMENT

This Forbearance Agreement (this "**Forbearance Agreement**") is entered into as of January __, 2021, by and among (i) (a) 78-80 St. Marks Place, LLC, a New York limited liability company (the "**Borrower**"), and (b) Lawrence V. Otway, a/k/a Lawrence Lorcan Otway, a/k/a Lorcan Otway, individually, whose principal residence is located at 78-80 St. Marks Place, Apartment No.1 , New York, New York 10003 ("**Guarantor**"; and together with Borrower are collectively referred to herein as the "**Obligors**"), (ii) Eugene Otway, individually, whose principal residence is located at 78-80 St. Marks Place, Apartment No. 1, New York, New York 10003 ("**EO**"), (iii) Scheib's Place, Inc., a New York corporation ("**SPI**"), (iv) Exhibition of the American Gangster, Inc., a New York corporation  ("**AGI**"), (v) Theater 80 LLC, a New York limited liability company ("**Theater 80**"), and (vi) St. Mark's Mixed Use LLC (the "**Lender**"). Each of the Obligors, EO, SPI, AGI, Theater 80 and the Lender are sometimes referred to herein individually as a "**Party**", and the Obligors, EO, SPI, AGI, Theater 80 and the Lender are sometimes collectively referred to herein as the "**Parties**". Each of the Obligors, EO, SPI, AGI, and Theater 80 are sometimes referred to herein individually as an "**Obligor Related Party**", and the Obligors, EO, SPI, AGI, and Theater 80 are sometimes collectively referred to herein as the "**Obligor Related Parties**".

**WHEREAS**, Borrower is a New York limited liability company and is the fee owner of the premises known as 78-80 St. Marks Place, New York, New York 10003 (Block: 449, Lot: 28) (the "**Mortgaged Premises**");

**WHEREAS**, SPI is a New York corporation;

**WHEREAS**, AGI is a New York corporation;

**WHEREAS**, Theater 80 is a New York limited liability company;

**WHEREAS**, on or about November 12, 2019, the Borrower borrowed the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000.00) from 80 St. Marks Place Funding LLC ("**Funding LLC**"), which loan is evidenced by a Promissory Note, dated as of November 12, 2019 (the "**Note**"), which Note was duly executed by Borrower and delivered by Borrower to Funding LLC;

**WHEREAS**, in order to secure its obligations under the Note, the Borrower, as mortgagor, duly executed, acknowledged and delivered to Funding LLC, as mortgagee, a Mortgage and Security Agreement, dated as of November 12, 2019 (the "**Mortgage**"), which Mortgage encumbers the Mortgaged Premises. The Mortgage was duly recorded in the Office of City Register of the City of New York, New York County (the "**Register's Office**") on November 22, 2019 at CRFN 2019000383130. Any applicable recording tax was duly paid at the time the Mortgage was recorded. The Mortgage constitutes a valid first priority mortgage and lien on the Mortgaged Premises;

**WHEREAS**, in order to further secure its obligations under the Note and Mortgage, the Borrower duly executed, acknowledged and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), which ALR was duly recorded with the

Register's Office on December 4, 2019 under CRFN: 2019000395326;

**WHEREAS**, in order to induce Funding LLC to make the Loan to the Borrower, Guarantor duly executed and delivered to Funding LLC a certain Guaranty, dated as of November 12, 2019 (the "**Guaranty**"). Pursuant to the Guaranty, the Guarantor absolutely, unconditionally and irrevocably guaranteed to Funding LLC the payment to the Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents (as defined below) when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents;

**WHEREAS**, the Guarantor is the sole member of the Borrower and the Guarantor owns 100% of the limited liability company membership interests in the Borrower, and in order to further secure, among other things, the Borrower's obligations under the Note and the other Loan Documents, the Guarantor pledged to Funding LLC, among other things, all of his right, title and interest in, to and under his membership interests in the Borrower and the other "Collateral", as that term is defined in that certain Pledge and Security Agreement dated as of November 12, 2019 (the "**Pledge Agreement**")(the "Collateral" as defined in the Pledge Agreement is referred to herein as the "**Pledged Collateral**");

**WHEREAS**, Funding LLC perfected its security interest against the Pledged Collateral by, among other things, taking possession of the certificate of membership interests  (the "**Certificated Interest**") in the Borrower pledged under the Pledge Agreement and also by duly filing a UCC-1 financing statement (the "**UCC-1**"), which adequately described the Pledged Collateral, with the New York State Department of State on December 18, 2019, designated as File No. 201912180587574. The Certificated Interest and the UCC-1 constitute a valid and perfected first priority lien on the Pledged Collateral;

**WHEREAS**, on December 1, 2020, the Note was duly assigned by Funding LLC to the Lender pursuant to, among other things, an Allonge to Promissory Note, dated December 1, 2020 (the "**Allonge**");

**WHEREAS**, in addition, on December 1, 2020, Funding LLC assigned, among other things, the Mortgage to the Lender, as evidenced by an Assignment of Mortgage, dated as of December 1, 2020 (the "**Mortgage Assignment**"). The Mortgage Assignment was duly submitted for recording in the Register's Office;

**WHEREAS**, in addition, on December 1, 2020, Funding LLC assigned, among other things, the ALR to Plaintiff, as evidenced by an Assignment of Leases and Rents, dated as of December 1, 2020 (the "**ALR Assignment**"). The ALR Assignment was duly submitted for recording in the Register's Office;

**WHEREAS**, in addition, Funding LLC assigned, among other things, the UCC-1 to Plaintiff, as evidenced by a UCC Financing Statement Amendment (the "**UCC-3**");

**WHEREAS**, in addition, pursuant to an Omnibus Assignment of Loan Documents dated as of December 1, 2020 (the "**Omnibus Assignment**"), the Note, the Mortgage, the Guaranty, the Pledge Agreement, the ALR, the Certificated Interest, the UCC-1 and all of the other Loan Documents were each duly assigned by Funding LLC to the Lender.  The Note, the Mortgage,

2

the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage Assignment, the ALR Assignment, the Certificated Interest, the UCC-1, the UCC-3, the Omnibus Assignment and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively referred to herein as the "**Loan Documents**";

**WHEREAS**, pursuant to the Allonge, the Mortgage Assignment, the ALR Assignment, the UCC-3 and the Omnibus Assignment, the Lender is the current holder and owner of the Loan and all of the Loan Documents, and the Lender has standing to enforce the Note, the Pledge Agreement, and other Loan Documents;

**WHEREAS**, pursuant to the Note the Borrower is obligated to pay to the holder of the Note, among other things, installments of interest, and the balance of the principal, interest, and all other sums due under the Loan Documents on December 1, 2020 (the "**Maturity Date**");

**WHEREAS**, the Mortgage provides that the Borrower shall pay all of the indebtedness evidenced by the Note at the time and in the manner as provided for in the Note;

**WHEREAS**, the Borrower breached and defaulted on its obligations under the Note, the Mortgage and the other Loan Documents by, among other things, and without limitation, failing and omitting to pay in full all obligations under the Loan Documents on or before the Maturity Date (*i.e.*, December 1, 2020);

**WHEREAS**, the Borrower's failure to pay the entire indebtedness within five (5) days of when it became due, constitutes an "Event of Default" as defined in the Note and the Mortgage;

**WHEREAS**, the Lender duly sent to the Borrower and the Guarantor a letter dated December 7, 2020, which letter duly notified the Borrower and the Guarantor, among other things, (i) that on December 1, 2020, the Loan matured by its terms and the entirety of the indebtedness became immediately due and payable pursuant to the Note and the Mortgage, (ii) that the Borrower failed to pay the entire indebtedness within five (5) days of when it became due, constituting an Event of Default under both the Note and the Mortgage, and (iii) interest on the indebtedness began to accrue at the "Default Rate" as defined in the Note and Mortgage from and after December 2, 2020;

**WHEREAS**, as a result of, among other things, the Borrower's failure to pay all amounts due under the Loan Documents on the Maturity Date, the Loan is now immediately due and payable in full and the Lender is entitled to, among other things, (i) foreclose the Mortgage and the personalty located at the Mortgaged Premises, (ii) foreclose on all collateral granted by the Guarantor to the Lender under the Pledge Agreement, including, without limitation, all of the Guarantor's limited liability company membership interests in the Borrower, and (iii) exercise all of the Lender's rights and remedies under all of the Loan Documents;

**WHEREAS**, without limiting in any manner any other existing defaults, the Obligors are now in default under the Loan Documents based upon the Borrower's failure to pay to the Lender all amounts due under the Loan Documents on the Maturity Date (the "**Stated Default**");

573231-1

**WHEREAS**, any and all notice provisions contained in all of the Loan Documents have been complied with by the Lender and any applicable grace periods, if any, pertaining to Obligors' defaults occurring prior to the date of this Forbearance Agreement have expired or have been forever waived by the Obligors;

**WHEREAS**, as of December 31, 2020, there is due and owing to the Lender under the Note, the Mortgage, the Guaranty, the Pledge Agreement, and the other Loan Documents the following amounts:

| Payoff | |
| --- | ---: |
| Principal Balance | $6,100,000.00 |
| Interest | $122,000.00 |
| Protective Advances | $0.00 |
| Legal Fees (through 12/18/20) | $23,653.65 |
| **Total Due** | **$6,245,653.65** |

Total Due: $6,245,653.65[1] as of December 31, 2020;

**WHEREAS**, the Lender is currently entitled to exercise any and all of its rights and remedies under the Note, the Mortgage, the Guaranty, the Pledge Agreement, and each of the other Loan Documents; and

**WHEREAS**, each of the Obligors has requested that the Lender temporarily forbear from enforcing its rights under the Loan Documents based on the Stated Default, and the Lender is willing to do so, but only on the terms and conditions of this Forbearance Agreement.

**NOW, THEREFORE**, in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1. <u>Recitals Incorporated Herein</u>. The Parties acknowledge, represent and agree that each of the facts set forth in the recitals above are true and correct in all respects and are incorporated herein as if fully set forth in the body of this Forbearance Agreement.

2. <u>Forbearance; Consent to Judgment of Foreclosure; Consent to Sale of the Mortgaged Premises; Consent to Sale of the Pledged Collateral</u>.

(a) In consideration of the Obligor Related Parties' payment and performance of all of their other obligations under this Forbearance Agreement, and subject to (1) the continued validity of the representations and warranties of the Obligor Related Parties set forth in this

---

[1] Legal fees and protective advances are reflected herein only as of December 18, 2020. Additional legal fees and expenses and protective advances have accrued and continue to accrue after December_18, 2020 and such additional amounts are owed under the Loan Documents and shall be added to the Payoff Amount (as defined herein below).

4

Forbearance Agreement, and (2) the termination provisions set forth in Section 7 below, the Lender shall temporarily forbear from further enforcing any of its remedies under the Pledge Agreement during the period from the date hereof to and including April 15, 2021 (the "**Forbearance Date**"); notwithstanding the foregoing however, the foregoing provisions shall not apply to the Lender taking any of the actions described in Sections 2(b) through (p) below or otherwise set forth elsewhere in this Forbearance Agreement.

(b)      The Lender shall file a complaint against the Obligor Related Parties and such other persons and entities as the Lender may in its sole discretion determine seeking to enforce its rights against the Obligor Related Parties and any other persons or entities, including, without limitation, to foreclose on the Mortgaged Premises. The Obligor Related Parties hereby expressly consent to the immediate filing of the complaint in substantially the form attached hereto as Exhibit A (the "**Complaint**") in the Supreme Court of the State of New York for New York County (the "**State Court**") and the Obligor Related Parties consent to the relief set forth in the Complaint.  The action in the State Court based on the Complaint is referred to herein as the "**Foreclosure Action**".

(c)      The Obligor Related Parties shall, simultaneously herewith, execute and deliver to the Lender a Consent Judgment of Foreclosure and Sale (the "**Judgment**"), in the form of Exhibit B hereto, pursuant to which, among other things, (i) the Obligor Related Parties shall admit all allegations in the Complaint, (ii) the Obligor Related Parties consent to all relief requested in the Complaint, and (iii) a judgment shall be granted in favor of the Lender fixing the amount of its judgment as set forth therein and the State Court shall direct the foreclosure sale of the Mortgaged Premises (a "**Foreclosure Sale**").

(d)      The Lender shall immediately take any and all acts and actions to prosecute the Foreclosure Action in any and all respects, including, without limitation, serving a summons and the Complaint on any and all defendants, filing and serving any motions or pleadings of any kind therein and seeking the entry of the Judgment. The Obligor Related Parties shall execute and deliver to counsel for the Lender a stipulation (the "**Stipulation**"), in the form of Exhibit C hereto, among other things, (i) acknowledging service of the summons and Complaint in the Foreclosure Action, a notice of pendency, and a notice of mandatory electronic filing, and (ii) containing the waivers and consents in connection with the Foreclosure Action set for the in this Forbearance Agreement (including, without limitation, those set forth in Section 2, 8, 10 and 15) of this Forbearance Agreement). The Obligor Related Parties shall execute and deliver the Stipulation to counsel for the Lender not later than three (3) days after counsel for the Lender sends a copy of the Stipulation to counsel for the Obligor Related Parties by email and requests that it be executed and delivered. Each of the Obligor Related Parties hereby represents to the Lender that its counsel is Scott Markowitz, Esq. at Tarter Krinsky & Drogin LLP, and his email address is smarkowitz@tarterkrinsky.com.

(e)      The Obligor Related Parties agree that the form of the Judgment may hereafter be modified or amended in the Lender's sole discretion to address any relief or matters of any kind  effecting any persons or entities other than the Obligor Related Parties, including, without limitation, any tenants or persons or entities in possession or located in or on any part of the Mortgaged Premises, and the Obligor Related Parties shall, on the Lender's request to the Obligor Related Parties' counsel, immediately execute and deliver all such documents as the Lender may request in connection therewith.

573231-1

(f)      Without limiting any of the foregoing, the Obligor Related Parties hereby expressly: (i) waive any and all defenses to the Foreclosure Action and the Complaint, with prejudice, including, without limitation, the defenses of improper service, lack of jurisdiction, lacking of standing, payment, waiver, estoppel, laches, unclean hands, unconscionability, the election of remedies defense, or any claim that the Obligors are not in default under the Loan Documents or that the Note fully matured and that all obligations became due and payable on December 1, 2020; (ii) admit all allegations in the Complaint; (iii) acknowledge and re-affirm the Obligors' due execution of each of the Loan Documents; (iv) agree that none of the Obligor Related Parties shall file any answer, counterclaim, motion, order to show cause or notice of appeal, and that none of the Obligor Related Parties shall contest or delay the Foreclosure Action or the Judgment in any way; (v) admit and acknowledge that, as of December 31, 2020 the Payoff Amount of $6,245,653.65 is due and owing to the Lender (and that additional attorneys' fees and expenses and protective advances have accrued after December 18, 2020 and continue to accrue, and such amounts shall be added to the Payoff Amount and the amount of the Judgment) and interest thereon at the rate of 24% per annum continues to accrue and shall be added to the Payoff Amount and the amount of the Judgment; (vi) waive the appointment of a referee in the Foreclosure Action to compute the sums due and owing to the Lender and hereby consent to the immediate entry of the Judgment, which incorporates the amounts due and owing to the Lender and agree that the Mortgaged Premises shall be sold in one parcel; and (vii) irrevocably and unconditionally agree that the Lender may present the Judgment to the Justice assigned in the Foreclosure Action for signature without any further notice to the Obligor Related Parties and that the Judgment may be presented to the Clerk of Court for entry at any time in the Lender's sole discretion. In addition, all of the foregoing waivers and consents shall also be included in the Stipulation.

(g)      The Obligors shall, within five (5) business days after the date of this Forbearance Agreement, execute and deliver a listing agreement with the firm of Lee & Associates Licensing & Administration Co., L. P., 845 Third Avenue, New York New York 10002 (the "**Broker**") in a form approved by the Lender (the "**Broker Listing Agreement**") pursuant to which the Obligors shall retain the Broker to market and sell the Mortgaged Premises (on the time frame set forth below), on an exclusive basis, and pay the Broker a commission of 3.5% upon the sale of the Mortgaged Premises. The Obligors shall be solely responsible for any broker's commissions with respect to the sale of the Mortgaged Premises.

(h)      If the Obligors have not paid the Payoff Amount in full to the Lender by 10:00 a.m. on April 15, 2021, then the Broker shall immediately begin to market, list and advertise the Mortgaged Premises for immediate sale.

(i)      The Obligors shall not enter into any lease, contract or other agreement for the sale, lease or use of the Mortgaged Premises, or any part thereof, without the Lender's express prior written consent, provided that such consent will not be unreasonably withheld if (i) the contract is for the sale of all of the Mortgaged Premises and contains a 10% non-refundable deposit to be held in escrow by Borrower's counsel pending a closing, (ii) the sale price of the Mortgaged Premises is more than 120% of the Payoff Amount on the date the contract is signed, (iii) the closing of the sale must be set for a date that is not later than 30 days after the date the contract is executed, time being of the essence as to the closing date, and (iv) the obligation of the buyer to close is not subject to any

6

contingencies whatsoever, including, without limitation, as to financing, zoning, development or any other matter of any kind.

(j)     If the Obligors have not entered into a contract for the sale of Mortgaged Premises by May 15, 2021 in a form consented to by the Lender, then the asking price of the Mortgaged Premises shall be reduced to $11,000,000.

(k)     If the Obligors have not entered into a contract for the sale of Mortgaged Premises by June 15, 2021 in a form consented to by the Lender, then the asking price of the Mortgaged Premises shall be reduced to $10,000,000.

(l)     If the Obligors have not entered into a contract for the sale of Mortgaged Premises by July 15, 2021 in a form consented to by the Lender, then the asking price of the Mortgaged Premises shall be reduced to $8,500,000 or such lesser amount as the Lender may determine in its sole and absolute discretion.

(m)     If and only if no Termination Event (as defined below) occurs, then the Lender will forbear, until and including August 15, 2021, from scheduling either (i) a foreclosure sale of the Mortgaged Premises or (ii) a foreclosure sale of the Pledged Collateral. On and after August 16, 2021 (or on any earlier date on which a Termination Event hereunder has occurred) the Lender may enforce all of its rights under the Loan Documents, including without limitation, taking any and all steps whatsoever to enforce the Judgment and schedule, advertise, and conclude a foreclosure sale of the Mortgaged Premises and/or a foreclosure sale of the Pledged Collateral, and may thereafter continue to enforce any and all of its rights under the Loan Documents, the Judgment, applicable law, equity and otherwise, including, without limitation, its rights to any deficiency judgment. If and only if the Payoff Amount is paid in full by the Obligors to the Lender on or before August 15, 2021, the Lender agrees that the Judgment shall be vacated (to the extent it has been signed and entered by the Court) and the Lender shall not enforce such Judgment.

(n)     The Stipulation shall also contain a consent by the Obligor Related Parties to the immediate appointment of a receiver for the Mortgaged Premises and that the such receiver may be any person selected by the Lender.

(o)     The Obligor Related Parties and their counsel shall use best efforts to timely and fully cooperate with the Lender in connection with all matters related to the sale of the Mortgaged Premises and/or the Pledged Collateral, including, without limitation, (i) providing information about the Mortgaged Premises, (ii) providing access, upon 24 hours prior notice, from time to time, to the Mortgaged Premises to the Broker, any other brokers, the Lender, any prospective purchaser of the Mortgaged Premises and all agents and representatives of all of the foregoing, and (iii) executing all documents and performing all acts requested by the Lender in connection with or related to the sale (including, without limitation, a Broker Listing Agreement, advertisement, a deed, a title affidavit, and transfer tax forms). The Obligor Related Parties hereby each grant the Lender an irrevocable power of attorney, coupled with an interest, to take any and all acts  on behalf of each Obligor Related Party in connection with the sale of the Mortgaged Premises and/or the Pledged Collateral, including, without limitation, to execute and deliver any and all documents in connection with the sale of the Mortgaged Premises and/or the Pledged Collateral (including, without limitation, an advertisement of sale, a deed, a title

7

affidavit and transfer tax forms). Notwithstanding, the foregoing nothing herein shall require the Lender to take any act and the Lender shall have no obligation to do so. In addition, the Lender shall be fully exonerated and shall have no liability to any of the Obligor Related Parties or any other person or entity for any acts taken or not taken by the Lender in connection with the sale of the Mortgaged Premises and/or the Pledged Collateral.

3. <u>Interest Rate; Financial Statements</u>. (a) <u>Interest Rate; Payoff Amount; Financial Statements</u>.

(a) Interest shall continue to accrue at the default rate of 24% per annum provided in the Note from December 2, 2020 until the date that the Obligors have indefeasibly paid and satisfied all of their obligations (including, without limitation, principal, interest, default rate interest, late fees, service fees, legal fees and expenses, protective advances, and all other fees and charges) under each of the Loan Documents and this Forbearance Agreement (collectively, the "**Payoff Amount**").

(b) The Obligors shall promptly deliver to the Lender any and all financial information that the Lender may reasonably request, including, without limitation, (i) a current rent roll for Mortgaged Premises; (ii) the operating agreement and other organizational documents of the Borrower; (iii) copies of all leases for the Mortgaged Premises; and (iv) proof of insurance of the Mortgaged Premises and Obligors.

4. <u>Payments to the Lender By Wire Transfer</u>. All payments to the Lender shall be made by wire transfer pursuant to such wire transfer instructions as the Lender shall provide to the Obligors' counsel upon request therefore.

5. <u>No Reinstatement of any Loan</u>. The Lender's acceptance of any payment (other than total indefeasible payment in cash of the Payoff Amount) made by any of the Obligor Related Parties on or after the date hereof, nor the Lender's application of any of such payments to amounts owing under the Loan Documents, shall constitute or be construed as: (a) a waiver by the Lender of (i) the Stated Default or any other breach or default by any of the Obligor Related Parties under any or all of the Loan Documents or this Forbearance Agreement, (ii) any of the Lender's rights or remedies in connection with the Loan, any of the Loan Documents or this Forbearance Agreement, or (iii) any of the provisions of the Loan Documents or this Forbearance Agreement; or (b) a cure of the Stated Default or any other breach or default by any of the Obligor Related Parties under the Loan Documents or this Forbearance Agreement.

6. <u>Application of Payments</u>. Any payments made by any of the Obligor Related Parties to the Lender on or after the date hereof may be accepted by the Lender and applied against the obligations owed under the Loan Documents in such manner as the Lender may hereafter determine from time to time, all in the Lender's sole and absolute discretion.

7. <u>Termination</u>. The agreement by the Lender to forbear under the terms of this Forbearance Agreement shall automatically terminate, without any notice, any further act or otherwise, upon the earliest to occur of any of the following events:

7.1 The Forbearance Date; or

8

7.2     A Termination Event (as such term is defined in Section 9 below); or

7.3     The Lender hereafter becomes aware of any fact or circumstance that the Lender believes in good faith is reasonably likely to impair any of the Lender's collateral under the Loan Documents, including, without limitation, its first priority liens on all of the Mortgaged Premises (other than the failure to pay real estate taxes on the Mortgaged Pemises), and all collateral under the Pledge Agreement.

8.     <u>Representations and Warranties</u>. In order to induce the Lender to enter into this Forbearance Agreement, each of the Obligor Related Parties hereby represents, warrants and covenants to the Lender as follows, all of which representations, warranties and covenants shall survive the execution of this Forbearance Agreement:

8.1     <u>Binding Obligations</u>. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, and all of the other Loan Documents and this Forbearance Agreement, have been duly executed and delivered by the Obligor Related Parties (as applicable) and constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms.

8.2     <u>No Defenses or Claims</u>.     (a)     The Obligor Related Parties expressly represent, warrant and acknowledge that: (i) the Lender (or its predecessors as applicable) has provided any notice of default required under the Loan Documents and would be fully entitled to foreclose on any and/or all of its collateral and otherwise exercise all of its rights and remedies on account of the Stated Default, but for the effect of this Forbearance Agreement; (ii) all amounts owed to the Lender under the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, and the other Loan Documents are now due and payable; (iii) the Lender has elected to grant the forbearance hereunder in its sole discretion, and that absent such election there exists no impediment whatsoever to the commencement of the exercise of any and/or all remedies under the Loan Documents; (iv) there are no defenses, offsets or counterclaims of any nature whatsoever to any of the Loan Documents or to the Lender's ownership thereof or the Lender's status as the due holder of the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, and the other Loan Documents or the Lender's standing to enforce all of the foregoing; (v) the Loan Documents are hereby reaffirmed by the Obligors in their entirety; (vi) the Loan Documents are in full force and effect and the Lender shall not be deemed to waived or modified any of its rights thereunder, at law or in equity by virtue of this Forbearance Agreement, except to the extent specifically provided in Section 2 above; and (vii) none of the Obligor Related Parties is the subject of a bankruptcy proceeding as of the date of this Forbearance Agreement.

(b)     None of the Obligor Related Parties has any defense, affirmative defense, setoff, claim, counterclaim, action, or cause of action of any kind or nature whatsoever against the Lender or any of its past, present, or future directors, officers, employees, agents, attorneys, legal representatives, predecessors, affiliates, successors, or assigns, directly or indirectly, arising out of; based upon, or in any manner connected with any act, transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of this Forbearance Agreement or which occurred, existed, was taken, permitted, or begun in accordance with, pursuant

9

to, or relating to, or by virtue of the Loan or any of the terms of any of the Loan Documents, or which directly or indirectly relates to or arises out of, or in any manner is connected with, the Loan or any or all of the Loan Documents (including, without limitation, the enforcement by the Lender or its predecessor of any of its rights and remedies under any or all of the Loan Documents); and if any such defense, affirmative defense, setoff, claim, counterclaim, action or cause of action exists without the knowledge of any of the Obligor Related Parties, the same is hereby unconditionally forever waived with prejudice as against the Lender, or any of its past, present or future directors, officers, employees, agents, attorneys, legal representatives, predecessors, affiliates, successors, or assigns.

8.3 <u>Maturity of the Note</u>. Pursuant to the express terms of the Note the entire principal balance together with all other amounts payable under the Note, the Mortgage, the Guaranty, the Pledge Agreement and the other Loan Documents were immediately due and payable on December 1, 2020, and the Obligors have failed to pay such obligations as of the date hereof.

8.4 <u>Representations in Loan Documents</u>. All of the representations and warranties made by each of the Obligors in each of the Loan Documents are true and correct in all material respects as if made on the date hereof, except for those made with respect to financial statements bearing a particular date, which representations and warranties are hereby restated to be effective as of the date of the last such financial statements provided to the Lender by the Obligors in question.

8.5 <u>Insurance Policies</u>. Insurance policies complying with the terms of the Loan Documents are in full force and effect.

8.6 <u>Leases</u>. (a) There are no leases or licenses to use any part of the Mortgaged Premises other than the following leases (the "**Stated Leases**"):

(i) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and SPI, as tenant (the "**2019 Scheib's Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

(ii) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and AGI, as tenant (the "**2019 Museum Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

(iii) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and the Guarantor, as tenant (the "**2019 Otway Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

(iv) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Theater 80 LLC ("**2019 Theater 80**"), as tenant (the "**Theater Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

(v)     That certain Standard Form of Loft Lease, dated as of September 1, 2019, between the Borrower (as successor-in-interest to Lawrence Otway), as landlord, and Mr. Ori Kushnir ("**Kushnir**") and Ms. Sivan Lahat ("**Lahat**"), jointly as tenants (the "**Kushnir/Lahat Lease**"), for the 3rd floor (aka Unit 3) of a portion of the Mortgaged Premises located at 78 St. Marks Place, New York, New York. The Kushnir/Lahat Lease expires on August 31, 2022 and has not been modified, amended or extended in any way whatsoever;

(vi)     That certain Lease Agreement, dated as of August 1, 2019 between the Borrower (as successor-in-interest to Lawrence Otway), as landlord, and Mr. Aya Ikeda, as tenant ("**Ikeda**"), for the Unit 4 of a portion of the Mortgaged Premises located at 78 St. Marks Place, New York, New York (the "**Ikeda Lease**"). The Ikeda Lease expires on July 31, 2021 and has not been modified, amended or extended in any way whatsoever;

(vii)     That certain oral sublease (the "**Oral Sublease**") between Theater 80, as sub-landlord, and SPI, as sub-tenant, for a portion of the ground floor of the Mortgaged Premises for the operation of a tavern/bar;

(viii)     That certain oral agreement (the "**Oral Sub-Sublease**") between SPI, as sub-sub-landlord, and Kushnir and Lahat d/b/a Foxface Sandwich Shop ("**Foxface**") for a portion of the ground floor of the Mortgaged Premises consisting of 200 square feet with a concession window opening to St. Marks Place. Foxface is an unincorporated business, is not a legal entity, and is a business owned and operated solely by Kushnir and Lahat under the trade name Foxface Sandwich Shop;

(ix)     That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and SPI, as tenant, for 4,875 square feet of the ground floor/basement of 80 St. Marks Place, New York, New York (the "**2020 Scheib's Lease**");

(x)     That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and AGI, as tenant, for 750 square feet of the Gallery Museum at 80 St. Marks Place, New York, New York (the "**2020 Museum Lease**");

(xi)     That certain Lease Agreement dated as of November 12, 2020 between the Borrower, as landlord, and the Guarantor and Mrs. Eugene Otway, as tenants, for the portion of the Mortgaged Premises known quadplex, a/k/a Unit No.1 (the "**2020 Otway Lease**"); and

(xii)     That certain Commercial Sublease Agreement dated as of November 12, 2020 between Scheibs Place LLC, as sublessor, and Theater 80, as subtenant, for the auditorium, cellar and backstage at 80 St Marks Place, New York, New York (the "**2020 Theater Sublease**"). Scheibs Place LLC is not a legal entity. The reference to "Scheibs Place LLC" in the 2020 Theater Sublease was a typographical error and the correct name of the sublessor under the 2020 Theater Sublease is "Scheib's Place, Inc."; and

573231-1

(xiii) That certain Sub-Commercial Sublease Agreement dated as of November 12, 2020 between Theater 80, as sublessor, and Meeting Space, as subtenant, for the 2nd floor of the Mortgaged Premises (the "**2020 Meeting Space Sub-Sublease**"). Meeting Space is an unincorporated business, is not a legal entity, and is a business owned and operated solely by the Guarantor under the trade name Meeting Space.

(b)     The Guarantor is (i) the sole shareholder and president of both SPI and AGI; and (ii) the sole member and sole manager of Theater 80. The Guarantor solely owns and controls SPI, AGI, and Theater 80, and each of such entities is an affiliate of the Guarantor.

(c)     The 2019 Scheib's Lease, the 2019 Museum Lease, the 2019 Otway Lease, and the 2019 Theater Lease each expired and terminated by its terms on November 12, 2020 and has not been modified, amended or extended in any way whatsoever, and is no longer in effect.

(d)     The 2020 Museum Lease, the 2020 Otway Lease, the 2020 Theater Sublease and 2020 Meeting Space Sub-Sublease, (i) were each entered into in violation of the Borrower's obligations under the Loan Documents and without the consent of the Lender (or its predecessor-in-interest); and (ii) are each hereby forever terminated and without effect as of the date hereof.

(e)     The 2020 Scheib's Lease (i) was entered into in violation of the Borrower's obligations under the Loan Documents and without the consent of the Lender (or its predecessor-in-interest); and (ii) is hereby automatically forever terminated and without effect as of June 1, 2021.  For the avoidance of doubt, no notice or act shall be required to effectuate the termination of the 2020 Scheib's Lease as of June 1, 2021 and SPI shall vacate and surrender the premises under such lease by June 1, 2021.

(d)     AGI, Guarantor, Theater 80, Foxface and Meeting Space have no legal right to use any part of the Mortgaged Premises as of the date hereof. SPI has no legal right to use any part of the Mortgaged Premises as of June 1, 2021.

(e)     The Oral Sublease and the Oral Sub-Sublease are void and of no effect whatsoever, as among other things, they were entered into without the Lender's (or its predecessor-in-interest's) consent and they are oral only and in violation of the statute of frauds.

(f)     In all events, the Oral Sublease is hereby forever terminated and of no effect whatsoever. As a result of the termination of the Oral Sublease, the Oral Sub-Sublease is terminated as a matter of law due to the termination of the Oral Sublease (i.e. its master lease).

(g)     In all events, the Oral Sub-Sublease is hereby forever terminated and of no effect whatsoever.

8.7     <u>Compliance with Laws</u>. The Obligor Related Parties are in compliance with all material laws, ordinances, rules and regulations of all governmental entities (and all agencies,

bodies and subdivisions thereof) affecting the ownership, use, or operation of the Mortgaged Premises, and none of the Obligor Related Parties has received any notice of noncompliance from any such governmental entity with respect to the Mortgaged Premises or that appropriate corrective action is being taken to promptly cure any non-compliance issues(s).

8.8 <u>No Breach of Other Agreements</u>. Neither the execution or delivery of this Forbearance Agreement, nor the consummation of this transactions contemplated by this Forbearance Agreement, nor the compliance with the terms and provisions hereof: (i) will constitute or result in a breach of any of any the Obligor Related Party's respective articles of incorporation or operating agreement, or will constitute or result in a violation of any law, order, writ, injunction, or decree of any court or governmental department, commission, board, bureau, agency, or instrumentality applicable to any of the Obligor Related Parties; (ii) will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions, or provisions thereof; or (iii) will constitute a default under any indenture, mortgage, instrument, documents, agreement, or contract of any kind to which any of the Obligor Related Parties may be bound or subject.

8.9 <u>The Obligor Related Parties Benefitted</u>. The Obligor Related Parties have each derived direct and substantial benefits from this Forbearance Agreement and the transactions contemplated by this Forbearance Agreement.

8.10 <u>Other Documents</u>. (a) All documents, reports, certificates, financial statements, and other statements of any kind furnished to the Lender by or on behalf of each of the Obligor Related Parties in connection with the transactions contemplated by this Forbearance Agreement: (i) are true, correct, and complete in all material respects; (ii) do not contain any untrue statement of material fact; and (iii) do not omit any fact necessary to make the information contained therein not misleading.

(b) The continued validity in all respects of all representations and warranties made by the Obligor Related Parties in the Loan Documents, this Forbearance Agreement and any other documents delivered by the Obligor Related Parties in connection with this Forbearance Agreement constitutes a condition precedent to the Lender's agreements under this Forbearance Agreement.

8.11 <u>Forbearance Agreement Is Duly Executed and Enforceable</u>. Each of the signatories, on behalf of the Obligor Related Parties, to this Forbearance Agreement has full and complete authorization and power to execute and deliver this Forbearance Agreement in the capacity herein stated. This Forbearance Agreement is a valid, binding and enforceable obligation of each of the Obligor Related Parties and does not violate any law, rule or regulation, or any contract or agreement to which any of the Obligor Related Parties is a party. None of the Obligor Related Parties has conveyed, transferred, assigned, pledged or otherwise encumbered any claim or causes of action covered by the releases set forth in this Forbearance Agreement.

8.12 <u>Benefitted From This Stipulation</u>. The Borrower, the Guarantor and the other Obligor Related Parties have each derived direct and substantial benefits from this Forbearance Agreement.

573231-1

INDEX NO. 656446/2021
RECEIVED NYSCEF: 11/11/2021

9.      <u>Termination Events.</u> The occurrence of any one or more of the following shall constitute a "**Termination Event**" under this Forbearance Agreement:

9.1      <u>Failure to Perform Obligations.</u> The failure of the Obligor Related Parties to observe or perform any of its respective obligations under this Forbearance Agreement when due; or

9.2      <u>Other Loan Defaults.</u> The occurrence of any of the following: (i) any "Event of Default" (as defined in the Note) under the Note (other than the timely payment of real estate taxes on the Mortgaged Premises); (ii) any "Event of Default" (as defined in the Mortgage) under the Mortgage(other than the timely payment of real estate taxes on the Mortgaged Premises); or (iii) any default or event of default under any of the other Loan Documents (other than the Stated Default), and the applicable Obligors' time, if any, to cure the same has expired under the applicable Loan Document(s); or

9.3      <u>Misrepresentation.</u> If any representation or warranty made herein, or in any report, certificate, financial statement or other instrument or document furnished in connection with this Forbearance Agreement or contemplated hereby, shall prove to have been materially false or misleading on the date as of which it was made; or

9.4      <u>Judgment.</u> Entry of a judgment or filing of a lien after the date hereof against any of the Obligor Related Parties, the Mortgaged Premises, or any other property of any of the Obligor Related Parties;

9.5      <u>Failure to Maintain Insurance</u>. If at any time (i) the Borrower fails to maintain insurance on the Mortgaged Premises in accordance with the Mortgage or (ii) such insurance fails to include the Lender as an additional insured or fails to provide that the Lender is the sole loss payee. The Borrower shall provide a copy of its insurance policy and proof of insurance within 48 hours of any request by the Lender.

9.6      <u>Bankruptcy.</u> If any of the Obligor Related Parties shall: (i) make a general assignment for the benefit of creditors; (ii) file a voluntary petition or a petition or answer seeking reorganization or an arrangement with creditors or take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation statute or law, or make or file an answer admitting material allegations of a petition filed against it in any proceeding under any such law; (iii) have any bankruptcy proceedings commenced against it by any person or entity; or (iv) have entered against it an order, judgment or decree of any court of competent jurisdiction approving a petition seeking reorganization of assets or appointing a receiver, trustee, or liquidator for any assets.

10.      <u>Covenants Regarding the Mortgaged Premises</u>.

(a)      The Obligor Related Parties shall not in any way whatsoever modify, amend, extend or renew any of the Stated Leases without the Lender's express prior written consent, and any modification, amendment, extension or renewal of any of the Stated Leases without the Lender's express prior written consent shall be void *ab initio* and of no effect

whatsoever. Neither of the Obligor Related Parties shall enter into any agreement of any kind or nature concerning the lease, license, use or sale of the Mortgaged Premises, or any part thereof, without the Lender's express prior written consent, and any such agreement entered into by any Obligor Related Party without the Lender's express prior written consent shall be void *ab initio* and of no effect whatsoever.

(b)      The Borrower, SPI, AGI, the Guarantor, EO, Theater 80 and Meeting Space, and all relatives of the Guarantor and all persons and entities directly or indirectly controlled by either of the Obligors shall completely vacate, and shall cause Foxface, Kushnir, Lahat, and Ikeda to completely vacate, the Mortgaged Premises (other than Kushnir and Lahat with respect to the portion of the Mortgaged Premises demised under the Kushnir/Lahat Lease) no later than July 31, 2021, time being of the essence. In the event that any of the Borrower, SPI, AGI, the Guarantor, EO, Theater 80, Foxface, Kushnir, Lahat, or Ikeda fails to completely vacate the Mortgaged Premises by July 31, 2021 (other than Kushnir and Lahat with respect to the portion of the Mortgaged Premises demised under the Kushnir/Lahat Lease), time being of the essence, then the Obligor Related Parties shall be jointly and severally liable to the Lender in the sum of $200,000 as liquidated damages for the failure of the Obligor Related Parties to timely cause each of the Borrower, SPI, AGI, the Guarantor, EO, Theater 80, Foxface, Kushnir, Lahat, and Ikeda to timely vacate the Mortgaged Premises as required by this Section 10 (b), time being of the essence.  Notwithstanding the foregoing, SPI, AGI, the Guarantor, EO, Theater 80, Meeting Space, Kushnir, and Lahat, shall not be obligated to vacate the Mortgaged Premises by July 31, 2021 if and only if each of the following conditions precedent are satisfied not later than July 15, 2021, time being of the essence: (i) the Obligors and a buyer acceptable to the Lender have entered into a fully executed and delivered contract to sell the Mortgaged Premises for an amount greater than $8,500,000 (an "**Executed Sale Agreement**"), (ii) the Executed Sale Agreement has been approved in writing by the Lender, (iii) the Executed Sale Agreement provides that the closing of the sale of the Mortgaged Premises shall occur not later than August 15, 2021, time being of the essence, and (iv) the buyer under the Executed Sale Agreement has expressly agreed, in a writing acceptable to the Lender, that (x) such person or entity may remain in possession of the Mortgaged Premises, (y) that the failure of such person or entity to vacate the Mortgaged Premises shall not in any way be used by the buyer to refuse to close, or to delay or condition the closing of, the sale of the Mortgaged Premises pursuant to the Executed Sale Agreement, and (z) the buyer forever waives any right to refuse to close, or to delay or condition the closing of, the sale of the Mortgaged Premises pursuant to the Executed Sale Agreement based on the occupancy of any part of the Mortgaged Premises by SPI, AGI, the Guarantor, EO, Theater 80, Meeting Space, Kushnir, and/or Lahat, or any person or entity that is affiliated with, a relative of, or under the control of any of them.

11.      <u>Remedies</u>. Without limiting the rights and remedies of the Lender under any of the other Loan Documents, under this Forbearance Agreement, or under applicable law or in equity, immediately upon the occurrence of any Termination Event hereunder (without any notice or any opportunity to cure), the obligations and agreements of the Lender under this Forbearance Agreement shall immediately terminate, and the Lender shall have the right to immediately exercise any and all rights and remedies available to it hereunder, under the Judgment, under any and all of the other Loan Documents and under applicable law, without regard to any notice or cure period contained therein or otherwise available. All rights and remedies available to the Lender under this Forbearance Agreement, the Judgment, any of the Loan Documents and applicable law may be

573231-1

asserted concurrently, cumulatively, or successively, from time to time, as long as any indebtedness or obligations under the Loan Documents shall remain unpaid or outstanding. By entering into this Forbearance Agreement, or accepting any payments hereunder, the Lender shall in no way be considered to have waived or be estopped from exercising any or all of its rights and remedies under any of the Loan Documents.  Nothing contained herein shall be considered a forgiveness of any obligation under the Loan Documents (except the full, timely payment of the Payoff Amount) and the accommodations made by the Lender herein do not constitute a "course of dealing" or a "course of conduct" in contravention of the terms of the Loan Documents.

12.     <u>Amendments</u>. This Forbearance Agreement may be amended only by a written amendment, fully executed and delivered by each of the Parties.

13.     <u>Loan Documents Still in Force</u>. Notwithstanding anything to the contrary in this Forbearance Agreement, the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement and all of the other Loan Documents are in full force and effect in accordance with their respective terms, remain valid and binding obligations of the Obligors and have not been modified or amended, and are hereby reaffirmed and ratified by the Obligors in all respects. The liens, security interests and pledges created by the Mortgage and Pledge Agreement, and the other Loan Documents are and continue to be valid, effective, properly perfected, enforceable and are hereby ratified and confirmed in all respects.

14.     <u>No Waiver of Rights Under Loan Documents</u>. Neither the failure nor the delay by the Lender to exercise its remedies, nor the acceptance by the Lender of partial payments or any other partial performance (whether any of the foregoing is before or after the date of this Forbearance Agreement), nor any provision of this Forbearance Agreement, shall (a) amend, modify, supplement, extend, delay, renew, terminate, waive, release or otherwise limit or prejudice the Lender's rights and remedies under the Loan Documents or any of the Obligors' obligations under the Loan Documents (including, without limitation, the Lender's right to receive full payment of principal and interest as well as all late charges, default rate interest, delinquent interest, attorneys' fees and expenses, the Lender's protective advances and other charges to the extent provided in the Loan Documents), nor (b) affect the priority of the Lender's security interests in and liens on the property of any of the Obligors (including, without limitations, the Lender's first priority mortgage lien on the Mortgaged Premises pursuant to the Mortgage and the other Loan Documents and the Lender's first priority security interest and lien on all of the equity interests in the Borrower pursuant to the Pledge Agreement and the other Loan Documents). Nothing contained in this Forbearance Agreement shall operate to prohibit, restrict or otherwise inhibit the Lender from exercising any right or remedy the Lender may have under the Loan Documents (except to the extent that the Lender agrees to forbear as specifically provided in Section 2 above) or constitute a cure of the Stated Default or any other existing default or serve to extend any applicable grace or cure period and, without limitation, shall not extend any applicable reinstatement or redemption period.

15.     <u>Release of Claims and Waivers</u>.

15.1     <u>Release of Claims</u>. Each of the Obligor Related Parties, for itself and on behalf of its agents, employees, representatives, affiliates, predecessors-in-interest, successors, and assigns (such persons and entities other than the Obligor Related Parties being collectively referred to herein as the "**Other Releasors**"), does hereby release, discharge and acquit the Lender, and the

573231-1

Lender's past, present and future officers, directors, shareholders, agents, employees, professionals, predecessors, successors, assigns and affiliates, and their respective successors, heirs and assigns (collectively, the "**Released Parties**"), of and from any and all rights, claims, causes of action, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, causes of action, promises, damages, costs, losses and expenses of every kind, nature, description or character whatsoever, and irrespective of how, why, or by reason of any facts, which could or may be claimed to exist, whether known or unknown, matured or contingent, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, fraud, breach of any duty, breach of any federal, state or local laws of any kind or nature whatsoever, or any other legal or equitable theory whatsoever, each as though fully set forth herein at length, from the beginning of the world to the date of execution of this Forbearance Agreement by the Obligor Related Parties (collectively, the "**Claims**"), which in any way arise out of, are connected with or relate to any or all of the following: (a) the Loan or the administration of any or all of the Loan or any or all of the Loan Documents, as well as any action or inaction of the Released Parties or any of them with respect to the Loan or the administration thereof or any or all of the Loan Documents or the enforcement thereof; (b) any or all of the transactions which are the subject of or contemplated by any or all of the Loan Documents; (c) the Mortgaged Premises and/or any other collateral granted under any of the Loan Documents; or (d) any fact, matter or transaction existing or occurring as of or prior to the execution of this Forbearance Agreement by the Parties, which in any way, directly or indirectly, relates to the Loan, any of the Loan Documents, or the Mortgaged Premises.

      15.2  <u>Waiver</u>.  Each of the Obligor Related Parties hereby: (i) waives any and all defenses to the Lender's exercise of any or all of its rights under the Loan Documents, including, without limitation, the defenses of payment, waiver, estoppel, laches, unclean hands, unconscionability, the election of remedies defense, or any claim that the Obligors are not in default under the Loan Documents, or any claim that any notice was not given by the Lender, or that the Note fully matured; (ii) acknowledges and re-affirms its due execution and delivery of the Loan Documents (as applicable); (iii) agrees that it shall not file an answer, counterclaim, motion, order to show cause or appeal as to any judicial or non-judicial actions that may be taken by the Lender after the earlier of the Forbearance Date or the date that any Termination Event occurs; (iv) admits and acknowledges that, the Note matured by its terms on the Maturity Date (i.e. December 1, 2020)  2020 and that as of December 31, 2020 the Payoff Amount is due and owing to the Lender; (v) expressly waives the appointment of a referee in any action to foreclose the Mortgage to compute the sums due and owing to the Lender; (vi) waives any claim or defense regarding the Loan, the Loan Documents or this Forbearance Agreement, including, without limitation, as to the Lender's standing or that the Loan is usurious or requires the Obligors to pay "hidden" or "disguised" interest, fees or charges; (vii) waives any claim or defense that the Lender is prohibited from commencing a proceeding to recover under the Loan Documents by reason of New York State's issuance of any Executive Order, including, without limitation, Executive Order 202.28, 202.48, 202.75, 201.81 and any subsequent modifications and/or extension of said Executive Orders, and/or New York's Chief Administrative Judge's issuance of Administrative Order of the Chief Administrative Judge of the Courts; and (viii) agrees that in the event that any conference is scheduled in the Foreclosure Action it shall agree that the Foreclosure Action may immediately proceed and shall not request an adjournment of the Foreclosure Action for any reason.

573231-1

15.3    <u>Indemnity</u>.  Each of the Obligor Related Parties hereby agrees to defend, indemnify, and hold the Lender and each of the other Released Parties harmless from and against any losses, damages, costs (including, without limitation, attorneys' fees, court costs, and costs of appeal), expenses, judgments, liens, decrees, fines, penalties, liabilities, claims, actions, suits, and causes of action (collectively, the "**Indemnified Claims**") arising, directly or indirectly, from (to the extent not inconsistent with the terms of this Forbearance Agreement): (a) any material breach by any of the Obligor Related Parties of any warranty or representation contained in this Forbearance Agreement or in the documents executed and delivered by any of the Obligor Related Parties pursuant to this Forbearance Agreement (collectively referred to as the "**Obligors Documents**"); (b) and after any material breach, default, or violation by any of the Obligor Related Parties of any covenant, agreement, or provision of any of the Obligors Documents or the Loan Documents; (c) any claims by or liabilities to third parties pertaining to injury to persons or damage to the Mortgaged Premises; and (d) any claims and/ or defenses of any past, present, or future tenants at the Mortgaged Premises, including, without limitation, SPI, AGI, the Guarantor, EO, Theater 80, Foxface, Kushnir, Lahat and Ikeda.

15.4    <u>Waivers of Unknown Claims</u>.  As to all matters being released by the Obligor Related Parties pursuant to the provisions hereof, each of the Obligor Related Parties for itself and on behalf of the Other Releasors, expressly acknowledges that the release of Claims set forth in Section 15.1 hereof applies to all Claims whether or not known to, or suspected by the Obligor Related Parties to exist. Each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, acknowledges and agrees that the facts with respect to which the release of Claims contained in Section 15.1 is executed may hereafter be found to be different from the facts now believed by the Obligor Related Parties to be true, and each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, expressly accepts and assumes the risk of all such possible differences, and agrees that the release of Claims contained in this Section shall be and remain effective notwithstanding any such difference in facts.

15.5    <u>No Admission of Liability</u>.  Nothing contained in this Forbearance Agreement, including, without limitation, the terms of this Section 15, constitutes or shall be construed as an admission by the Lender of any liability whatsoever.

15.6    <u>No Assignment</u>.  Each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, warrants and represents to the Lender that none of the Obligor Related Parties and none of the Other Releasors have sold, assigned, transferred, conveyed or otherwise disposed of any Claims or Indemnified Claims which are the subject of this Section 15.

16.    <u>No Waiver by the Lender</u>.  The agreement by the Lender to forbear from exercising its rights and remedies under the Loan Documents shall not constitute a waiver of, consent to, or condoning of the Stated Default or any other default by any of the Obligor Related Parties. The Obligor Related Parties agree that Lender may immediately exercise all rights and remedies available to the Lender under the Loan Documents by reason of the Stated Default or any other default immediately upon the earlier of (i) the Forbearance Date, (ii) the occurrence of any Termination Event; or (iii) the expiration or termination of this Forbearance Agreement for any

reason, without the Lender being required to provide any additional notice of default or of acceleration and without any grace or cure periods therefor.

17.     Bankruptcy.

17.1     Statement of Intent. Each of the Obligor Related Parties warrants and represents to the Lender that it has no present intent (i) to file any voluntary petition in bankruptcy under any chapter of the United States Bankruptcy Code (the "**Bankruptcy Code**"), or directly or indirectly to cause any Obligor Related Party, or any other person or entity that may hereafter own any interest in, or claim any beneficial interest in, the Mortgaged Premises, to file any voluntary petition in bankruptcy under any chapter of the Bankruptcy Code or to have any involuntary petition in bankruptcy filed against it under any chapter of the Bankruptcy Code, or (ii) in any manner, directly or indirectly, to cause the any of the Obligor Related Parties, or any other person or entity that may hereafter own any interest in, or claim any beneficial interest in, the Mortgaged Premises, to seek relief, protection, reorganization, liquidation, dissolution, or similar relief for debtors under any federal, state, or local law, or in equity, or (iii) in any manner, directly or indirectly, to cause the Mortgaged Premises to be the subject of any bankruptcy or insolvency proceedings or the property of any bankruptcy or insolvency estate.

17.2     Further Agreement. As additional consideration for the Lender's execution of this Forbearance Agreement, the Obligor Related Parties agree that in the event of a bankruptcy filing by or against any of the Obligor Related Parties, no Obligor Related Party shall  reject this Forbearance Agreement, nor shall any of the Obligor Related Parties contest any claim or assertion by the Lender that this Forbearance Agreement is binding on the Parties, and that valuable consideration has been received by the Obligor Related Parties for this Forbearance Agreement.

18.     Miscellaneous.

18.1     Costs and Expenses. Nothing in this Forbearance Agreement shall (i) diminish or otherwise limit any obligation that any of the Obligors has under the Loan Documents with respect to payment of the costs and expenses (including, without limitation, attorneys' fees and expenses) of the Lender, or (ii) prevent the Lender from requiring each of the Obligors to pay all such costs and expenses in accordance with the terms of the Loan Documents.

18.2     Further Instruments. The Obligor Related Parties shall, whenever and as often as they shall be requested to do so by the Lender, cause to be executed, acknowledged and/or delivered to the Lender any and all such further instruments and documents as may be necessary or desirable, in the sole discretion of the Lender, in order to carry out the intent and purpose of this Forbearance Agreement. Without limiting of the foregoing, each of the Obligor Related Parties hereby irrevocably appoints Lender as its and his attorney-in-fact, coupled with an interest, to execute any such documents as provided above and to fill in any blank in the Judgment, or any modification thereof, in accordance with the terms of this Forbearance Agreement.

18.3     Written Waiver Only. No waiver by the Lender of any of its rights or remedies in connection with the Loan or any Loan Documents shall be effective unless such

573231-1

waiver is in writing and signed and delivered by the Lender. Without limiting the generality of the preceding sentence, nothing contained in this Forbearance Agreement nor any delay or omission by the Lender in exercising or enforcing any of its rights and remedies in connection with the Loan Documents constitutes or shall be construed as a waiver by the Lender of: (i) the Stated Default or any other breach or default by any of the Obligors under any of the Loan Documents; or (ii) any of the Lender's rights or remedies in connection with the Loan or any of the provisions of any of the Loan Documents.

18.4    <u>Governing Law</u>. This Forbearance Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the law on conflicts of law.

18.5    <u>Third Party Beneficiaries</u>. Nothing in this Forbearance Agreement is intended to or shall confer any rights or remedies upon any person, other than the Parties hereto and the Released Parties and, subject to any restrictions on assignment contained in this Forbearance Agreement and the other Loan Documents, their respective successors and assigns.

18.6    <u>No Offsets</u>. No indebtedness evidenced by the Note or any other Loan Documents shall be offset by all or part of any claim, cause of action, or cross-claim of any kind, whether liquidated or unliquidated, which any of the Obligor Related Parties now has or may hereafter acquire or allege to have acquired against the Lender.

18.7    <u>Relationship of Parties</u>. Nothing contained in this Forbearance Agreement or the other Loan Documents constitutes or shall be construed as the formation of a partnership, joint venture, tenancy-in-common, or any other form of co-ownership, or the creation of any confidential or fiduciary relationship of any kind between the Lender, on the one hand, and the Obligor Related Parties and/or any other person or entity on the other hand. The Obligor Related Parties acknowledge and agree that the Lender has at all times acted and shall at all times continue to be acting only as a lender to the Obligors within the normal and usual scope of activities of a lender.

18.8    <u>Attorneys' Fees</u>. Upon demand therefor by the Lender, the Obligors shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, now or hereafter incurred by the Lender (i) in negotiating and preparing this Forbearance Agreement; and (ii) in administering, enforcing or effectuating any of the terms of this Forbearance Agreement and the other Loan Documents, whether or not any legal proceedings are instituted by the Lender. Without limiting the generality of the immediately preceding sentence, such costs and expenses shall include all attorneys' fees and costs now or hereafter incurred by the Lender in connection with any federal or state bankruptcy, insolvency, reorganization, foreclosure, or other similar proceeding or action by or against any of the Obligor Related Parties which in any way relates to or affects the Lender's exercise of its rights and remedies under any or all of the Loan Documents. The amount of any attorneys' fees, costs and expenses of the Lender that are not paid by the Obligors shall be added to the Payoff Amount, shall constitute secured obligations of the Obligors under the Loan Documents and shall bear interest at the default rate under the Loan Documents.

573231-1

18.9    Descriptive Headings; Interpretation. The headings to sections of this Forbearance Agreement are for convenient reference only, do not in any way limit or amplify the terms of this Forbearance Agreement, and shall not be used in interpreting this Forbearance Agreement. For purposes of this Forbearance Agreement: (i) the term "including" shall be deemed to mean "including, without limitation,"; (ii) the term "Loan Documents" shall be deemed to include, without limitation, this Forbearance Agreement; (iii) the term "person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability Borrower, unincorporated organization or association, or trustee; and (iv) whenever the context of this Forbearance Agreement reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Forbearance Agreement has been prepared and drafted through a joint effort of the Parties and, therefore, shall not be construed against any of the Parties as the person who prepared or drafted this Forbearance Agreement.

18.10    Entire Agreement. This Forbearance Agreement and the other Loan Documents contain the entire agreement and understanding between the Parties concerning the matters covered by this Forbearance Agreement and the other Loan Documents, and supersede all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether written or oral, made by the Lender or any of the Obligor Related Parties concerning the matters covered by this Forbearance Agreement and the other Loan Documents.

18.11    Payoff Amount.  Each of the Obligor Related Parties hereby acknowledges and agrees that the Payoff Amount as of December 31, 2020 is $6,245,653.65 (exclusive of attorneys' fees and expenses and protective advances incurred after December 18, 2020, which amounts have accrued and continue to accrue and shall be added to the Payoff Amount), that interest is continuing to accrue thereon at the default rate of 24% per annum from and after December 2, 2020, and that the Obligors are jointly and severally liable for the Payoff Amount.

**18.12    TIME OF THE ESSENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY, TIME IS OF THE ESSENCE WITH RESPECT TO EACH OF THE OBLIGOR RELATED PARTIES' OBLIGATIONS HEREUNDER.**

18.13    Severability. If any term or provision of this Forbearance Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Forbearance Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Forbearance Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

18.14    Notices. All notices and other communications provided for in this Forbearance Agreement shall be in writing and shall be given by Federal Express or hand delivery:

573231-1

If to the Lender, at:

St. Mark's Mixed Use LLC
100 Park Avenue, Suite 2305
New York, New York 10012
Attn: Jason S. Leibowitz, Esq.

with a copy to:

Katsky Korins LLP
605 Third Avenue, 17th Floor
New York, New York 10158
Attn.: Steven H. Newman, Esq.
Email: snewman@katskykorins.com

If to the Borrower, at:

78-80 St. Marks Place, LLC
78-80 St. Marks Place
New York, New York 10003
Attn: Lawrence v. Otway

With a copy to:

Scott Markowitz, Esq.
Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Email: smarkowitz@tarterkrinsky.com

If to the Guarantor, at:

Mr. Lawrence v. Otway
78-80 St. Marks Place, Apt. No. 1
New York, New York 10003

With a copy to:

Scott Markowitz, Esq.
Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Email: smarkowitz@tarterkrinsky.com

<u>If to EO, SPI, AGI or Theater 80, to such person or entity at</u>:

78-80 St. Marks Place
New York, New York 10003
Attn: Lawrence v. Otway

With a copy to:

Scott Markowitz, Esq.
Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Email: smarkowitz@tarterkrinsky.com


Notices shall be deemed given (i) if sent by hand, the date sent; and (ii) if sent by Federal Express, one (1) business day after delivery to an authorized agent or authorized depository box of Federal Express.

18.15   <u>Counterparts, Etc</u>. This Forbearance Agreement may be executed in any number of counterparts so long as each signatory hereto executes at least one such counterpart. Each such counterpart shall constitute one original, but all such counterparts taken together shall constitute one and the same instrument.  This Forbearance Agreement may be executed by electronic signatures, including without limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

18.16   <u>Service of Process</u>. The Obligor Related Parties hereby irrevocably agrees that service of process of any action or proceeding by the Lender against the Guarantor and/or any other Obligor Related Parties may be served upon the Guarantor or such Obligor Related Party by first class mail addressed to "Mr. Lawrence V. Otway, 78-80 St. Marks Place, Apt. No. 1, New York, New York 10003" and the Obligor Related Parties hereby irrevocably waive any objection or defense whatsoever that any service of process so effectuated is invalid or improper in any manner. The foregoing is without prejudice to the Lender's rights to effectuate service of process by any other means allowed by applicable law.

18.17   **WAIVER OF JURY TRIAL. THE OBLIGOR RELATED PARTIES AND THE LENDER IRREVOCABLY WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR IN ANY WAY RELATING TO THE LOAN, THE NOTE, THE MORTGAGE, THE GUARANTY, THE PLEDGE AGREEMENT, THIS FORBEARANCE AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, THE MORTGAGED PREMISES, ANY OR ALL OF THE REAL AND PERSONAL PROPERTY COLLATERAL SECURING THE LOAN OR ANY OF THE TRANSACTIONS WHICH ARE CONTEMPLATED BY THE LOAN DOCUMENTS. THE JURY TRIAL WAIVER CONTAINED IN THIS SECTION IS INTENDED TO APPLY, TO THE FULLEST EXTENT PERMITTED BY LAW, TO ANY AND ALL**

573231-1

DISPUTES AND CONTROVERSIES THAT ARISE OUT OF OR IN ANY WAY RELATE TO ANY OR ALL OF THE MATTERS DESCRIBED IN THE PRECEDING SENTENCE, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS OF ANY KIND WHATSOVER. THE WAIVER CONTAINED IN THIS SECTION SHALL APPLY TO ALL SUBSEQUENT EXTENSIONS, RENEWALS, MODIFICATIONS AND REPLACEMENTS OF ANY OR ALL OF THE LOAN DOCUMENTS. THIS FORBEARANCE AGREEMENT MAY BE FILED WITH ANY COURT OF COMPETENT JURISDICTION AS EACH PARTY'S WRITTEN CONSENT TO WAIVER OF A JURY TRIAL.

18.18  Conflicts With Loan Documents. Notwithstanding anything in this Forbearance Agreement to the contrary, in the event of an actual conflict or inconsistency between this Forbearance Agreement and any of the Loan Documents (which is not resolved by the terms of this Forbearance Agreement itself), the provisions which shall enlarge the rights of the Lender shall govern to the extent of such conflict.

18.19  **REVIEW WITH COUNSEL.** THE OBLIGOR RELATED PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT: (A) THE OBLIGOR RELATED PARTIES HAVE CAREFULLY READ AND UNDERSTAND ALL OF THE TERMS OF THIS FORBEARANCE AGREEMENT; (B) THE OBLIGOR RELATED PARTIES HAVE EXECUTED THIS FORBEARANCE AGREEMENT FREELY AND VOLUNTARILY AND WITHOUT ANY DURESS, AFTER HAVING CONSULTED WITH THE OBLIGOR RELATED PARTIES' INDEPENDENT LEGAL COUNSEL AND AFTER HAVING ALL OF THE TERMS OF THIS FORBEARANCE AGREEMENT EXPLAINED TO EACH OF THEM BY THEIR INDEPENDENT LEGAL COUNSEL; (C) THE WAIVERS AND RELEASES CONTAINED IN THIS FORBEARANCE AGREEMENT ARE REASONABLE, NOT CONTRARY TO PUBLIC POLICY OR LAW, AND HAVE BEEN INTENTIONALLY, INTELLIGENTLY, KNOWINGLY AND VOLUNTARILY AGREED TO BY EACH OF THE OBLIGOR RELATED PARTIES; (D) THE WAIVERS AND RELEASES CONTAINED IN THIS FORBEARANCE AGREEMENT HAVE BEEN AGREED TO BY THE OBLIGOR RELATED PARTIES WITH FULL KNOWLEDGE OF THEIR SIGNIFICANCE AND CONSEQUENCES, INCLUDING FULL KNOWLEDGE OF THE SPECIFIC NATURE OF ANY RIGHTS OR DEFENSES WHICH THE OBLIGOR RELATED PARTIES HAVE AGREED TO WAIVE OR RELEASE PURSUANT TO THIS FORBEARANCE AGREEMENT; (E) THE OBLIGOR RELATED PARTIES HAVE HAD A FULL AND ADEQUATE OPPORTUNITY TO NEGOTIATE THE TERMS CONTAINED IN THIS FORBEARANCE AGREEMENT; (F) THE OBLIGOR RELATED PARTIES ARE EXPERIENCED IN AND FAMILIAR WITH LOAN TRANSACTIONS OF THE TYPE EVIDENCED BY THIS FORBEARANCE AGREEMENT; (G) THE OBLIGOR RELATED PARTIES EXECUTION AND DELIVERY OF THIS FORBEARANCE AGREEMENT IS NOT BASED UPON RELIANCE UPON ANY REPRESENTATION, UNDERSTANDING OR AGREEMENT NOT EXPRESSLYSET FORTH IN THIS FORBEARANCE AGREEMENT AND NEITHER THE LENDER NOR ANY AFFILIATE THEREOF

573231-1

**HAS MADE ANY REPRSENTATION WHATSOVER TO ANY THE OBLIGOR RELATED PARTIES NOT EXPRESSLY SET FORTH HEREIN; (H) THE WAIVERS AND RELEASES CONTAINED IN THIS FORBEARANCE AGREEMENT ARE MATERIAL INDUCEMENTS TO THE LENDER'S EXECUTION OF THIS FORBEARANCE AGREEMENT, AND THE LENDER HAS RELIED ON SUCH WAIVERS AND RELEASES IN ENTERING INTO THIS FORBEARANCE AGREEMENT AND WILL CONTINUE TO RELY ON SUCH WAIVERS AND RELEASES IN ANY RELATED FUTURE DEALINGS WITH THE OBLIGOR RELATED PARTIES.**

18.20   Conditions Precedent. This Forbearance Agreement shall not be effective and binding on the Parties unless and until it is executed and delivered by each of the Obligor Related Parties and by the Lender.

18.21   Agreement May Be Used Against Obligor Related Parties. This Forbearance Agreement may be used as evidence against any or all of the Obligor Related Parties in any litigation now or hereafter existing, including, without limitation, in the Foreclosure Action.

[SIGNATURES APPEAR ON NEXT PAGE]

573231-1

Executed as of the date set forth above:

**78-80 ST. MARKS PLACE, LLC**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: Manager and Sole Member


_____
**LAWRENCE V. OTWAY**, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway,
Individually


_____
**EUGENE OTWAY**,
Individually


**SCHIEB'S PLACE, INC.**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: President and sole shareholder

**EXHIBITION OF THE AMERICAN GANGSTER, INC.**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: President and sole shareholder


**THEATER 80 LLC**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: Manager and Sole Member


**ST. MARK'S MIXED USE LLC**

By: _____
      Name:
      Title:

573231-1

State of New York )
)ss.:
County of New York )

On the _____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as Manager and sole member of 78-80 St. Marks Place, LLC, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

State of New York )
)ss.:
County of New York )

On the _____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his individual capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

State of New York )
)ss.:
County of New York )

On the _____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Eugene Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her individual capacity,  and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

573231-1

State of New York )
)ss.:
County of New York )

On the ____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as president of Scheib's Place, Inc., and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

State of New York )
)ss.:
County of New York )

On the ____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as president of Exhibition of the American Gangster, Inc., and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

State of New York )
)ss.:
County of New York )

On the ____ day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as Manager and sole member of Theater 80 LLC, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

28

NYSCEF DOC. NO. 3

**EXHIBIT A**

Form of Foreclosure Complaint

## **EXHIBIT B**

Form of Consent Judgment of Foreclosure and Sale

573231-1

## EXHIBIT C

Form of Stipulation

# *TABLE OF CONTENTS*

Letter of Transmittal
Market Value Defined
Intended Use and Intended Users of this Report
Ownership Interest Defined
Summary of Important Facts and Conclusions

**PAGE #**

Photographs of the Subject . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1
Purpose, Scope and Function of the Appraisal . . . . . . . . . . . . . . . . . . . .     73
General Assumptions and Limiting Conditions . . . . . . . . . . . . . . . . . . . .     74
Assessed Value & Real Estate Taxes . . . . . . . . . . . . . . . . . . . . . . . . .     75
Site Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     78
Zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     82
Neighborhood Analysis . . . . . . . . . . . . . . . . . . . . . . . .     88
Subject Area Trend . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     109
Maps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     110
Subject OUTDOOR SEATING NYC DOT certification . . . . . . . . .     115
Architectural Plans (2020 and 2011) . . . . . . . . . . . . . . . . . . . . . . . . .     116
Description of the Improvements (The Subject Building) . . . . . . . . . . . .     122
Definition of Highest & Best Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     129
The Appraisal Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     131
The Cost Approach Considered . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     131
The Capitalization of Income Approach . . . . . . . . . . . . . . . . . . . . . . . .     133
Naming or "Branding" Rights Proposal for Subject (August, 2020) . . .     134
Client Supplied 2021 Business Plan . . . . . . . . . . . . . . . . . . . . . . . . . . .     164
Client Supplied 2021-2022 Pro Formas . . . . . . . . . . . . . . . . . . . . . . . .     167
Key Numbers in the Capitalization of Income Appoach . . . . . . . . .     176
Market Data (Sales Comparison) Approach. . . . . . . . . . . . . . . . . . . . .     177
Comparative Building Sales Map . . . . . . . . . . . . . . . . . . . . . . . . . . .     183
Market Data Valuation Analysis . . . . . . . . . . . . . . . . . . . . . . . . .     198
Conclusions of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     200
Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     206

# ADDENDUM:

- **Qualifications of RONALD M. GOLD, ASA**
  **NY State Certified General Real Estate Appraiser**
  **License No.: 46000000713**

- **July and August, 2021 local newspaper articles and reports with CLIENT RESPONSE TO THE MARCH 8, 2021 NY POST ARTICLE ON THE ST. MARKS PLACE neighborhood .**

- **2020 and 2014 NY TIMES and CURBED NY articles on the subject East Village neighborhood.**

- **General and Limiting Condition**

**Exhibit D**

-------------------------------------------------------------------X

78-80 ST. MARKS PLACE, LLC, LAWRENCE
OTWAY a/k/a LORCAN OTWAY, EUGENIE OTWAY,
SCHEIB'S PLACE, INC, EXHIBITION OF THE
AMERICAN GANGSTER, INC., and THEATRE 80
LLC,

                              Plaintiffs,

             v.

ST. MARK'S MIXED USE LLC,

                            Defendant.

-------------------------------------------------------------------X

Index No. 656446/2021

[PROPOSED] SO-ORDERED
STIPULATION OF
SETTLEMENT AND
DISMISSAL OF ACTION

      This Stipulation of Settlement and Dismissal of Action (this "**Stipulation**") is entered into as of November 29, 2021, by and among (i) (a) 78-80 St. Marks Place, LLC, a New York limited liability company (the "**Borrower**"), and (b) Lawrence V. Otway, a/k/a Lawrence Lorcan Otway, a/k/a Lorcan Otway, individually, whose principal residence is located at 78-80 St. Marks Place, Apartment No. 1, New York, New York 10003 ("**Guarantor**"; and together with Borrower are collectively referred to herein as the "**Obligors**"), (ii) Eugenie Otway, individually, whose principal residence is located at 78-80 St. Marks Place, Apartment No. 1, New York, New York 10003 ("**EO**"), (iii) Scheib's Place, Inc., a New York corporation ("**SPI**"), (iv) Exhibition of the American Gangster, Inc., a New York corporation ("**AGI**"), (v) Theatre 80 LLC, a New York limited liability company ("**Theatre 80**"), and (vi) St. Mark's Mixed Use LLC (the "**Lender**"). Each of the Obligors, EO, SPI, AGI, Theatre 80 and the Lender are sometimes referred to herein individually as a "**Party**", and the Obligors, EO, SPI, AGI, Theatre 80 and the Lender are sometimes collectively referred to herein as the "**Parties**". Each of the Obligors, EO, SPI, AGI, and Theatre 80 are sometimes referred to herein individually as an "**Obligor Related Party**", and the Obligors, EO, SPI, AGI, and Theatre 80 are sometimes collectively referred to herein as the "**Obligor Related Parties**".

      **WHEREAS**, Borrower is a New York limited liability company and is the fee owner of the premises known as 78-80 St. Marks Place, New York, New York 10003 (Block: 449, Lot: 28) (the "**Mortgaged Premises**");

      **WHEREAS**, SPI is a New York corporation;

      **WHEREAS**, AGI is a New York corporation;

      **WHEREAS**, Theatre 80 is a New York limited liability company;

      **WHEREAS**, on or about November 12, 2019, the Borrower borrowed the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000.00) from 80 St. Marks Place

Funding LLC ("**Funding LLC**"), which loan is evidenced by a Promissory Note, dated as of November 12, 2019 (the "**Note**"), which Note was duly executed by Borrower and delivered by Borrower to Funding LLC;

**WHEREAS**, in order to secure its obligations under the Note, the Borrower, as mortgagor, duly executed, acknowledged and delivered to Funding LLC, as mortgagee, a Mortgage and Security Agreement, dated as of November 12, 2019 (the "**Mortgage**"), which Mortgage encumbers the Mortgaged Premises. The Mortgage was duly recorded in the Office of City Register of the City of New York, New York County (the "**Register's Office**") on November 22, 2019 at CRFN 2019000383130. Any applicable recording tax was duly paid at the time the Mortgage was recorded. The Mortgage constitutes a valid first priority mortgage and lien on the Mortgaged Premises;

**WHEREAS**, in order to further secure its obligations under the Note and Mortgage, the Borrower duly executed, acknowledged and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), which ALR was duly recorded with the Register's Office on December 4, 2019 at CRFN: 2019000395326;

**WHEREAS**, in order to induce Funding LLC to make the Loan to the Borrower, Guarantor duly executed and delivered to Funding LLC a certain Guaranty, dated as of November 12, 2019 (the "**Guaranty**"). Pursuant to the Guaranty, the Guarantor absolutely, unconditionally and irrevocably guaranteed to Funding LLC the payment to the Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents (as defined below) when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents;

**WHEREAS**, the Guarantor is the sole member of the Borrower and the Guarantor owns 100% of the limited liability company membership interests in the Borrower, and in order to further secure, among other things, the Borrower's obligations under the Note and the other Loan Documents, the Guarantor pledged to Funding LLC, among other things, all of his right, title and interest in, to and under his 100% of the membership interests in the Borrower and the other "Collateral", as that term is defined in that certain Pledge and Security Agreement dated as of November 12, 2019 (the "**Pledge Agreement**")(the "Collateral" as defined in the Pledge Agreement is referred to herein as the "**Pledged Collateral**");

**WHEREAS**, Funding LLC perfected its security interest against the Pledged Collateral by, among other things, taking possession of the certificate of membership interests (the "**Certificated Interest**") in the Borrower pledged under the Pledge Agreement and also by duly filing a UCC-1 financing statement (the "**UCC-1**"), which adequately described the Pledged Collateral, with the New York State Department of State ("**NYSOS**") on December 18, 2019, designated as File No. 201912180587574. The Certificated Interest and the UCC-1 constitute a valid and perfected first priority lien on the Pledged Collateral;

**WHEREAS**, on December 1, 2020, the Note was duly assigned by Funding LLC to the Lender pursuant to, among other things, an Allonge to Promissory Note, dated December 1, 2020 (the "**Allonge**");

2

**WHEREAS**, in addition, on December 1, 2020, Funding LLC assigned, among other things, the Mortgage to the Lender, as evidenced by an Assignment of Mortgage, dated as of December 1, 2020 (the "**Mortgage Assignment**"). The Mortgage Assignment was duly recorded in the Register's Office on January 14, 2021 at CRFN 2021000015556;

**WHEREAS**, in addition, on December 1, 2020, Funding LLC assigned, among other things, the ALR to Plaintiff, as evidenced by an Assignment of Assignment of Leases and Rents, dated as of December 1, 2020 (the "**ALR Assignment**"). The ALR Assignment was duly duly recorded in the Register's Office on January 14, 2021 at CRFN 2021000015557;

**WHEREAS**, in addition, Funding LLC assigned, among other things, the UCC-1 to Plaintiff, as evidenced by a UCC Financing Statement Amendment (the "**UCC-3**"). The UCC-3 was duly filed with the NYSOS on June 8, 2021;

**WHEREAS**, in addition, pursuant to an Omnibus Assignment of Loan Documents dated as of December 1, 2020 (the "**Omnibus Assignment**"), the Note, the Mortgage, the Guaranty, the Pledge Agreement, the ALR, the Certificated Interest, the UCC-1 and all of the other Loan Documents were each duly assigned by Funding LLC to the Lender. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage Assignment, the ALR Assignment, the Certificated Interest, the UCC-1, the UCC-3, the Omnibus Assignment and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively referred to herein as the "**Loan Documents**";

**WHEREAS**, pursuant to the Allonge, the Mortgage Assignment, the ALR Assignment, the UCC-3 and the Omnibus Assignment, the Lender is the current holder and owner of the Loan and all of the Loan Documents, and the Lender has standing to enforce the Note, the Pledge Agreement, and other Loan Documents;

**WHEREAS**, pursuant to the Note the Borrower is obligated to pay to the holder of the Note, among other things, installments of interest, and the balance of the principal, interest, and all other sums due under the Loan Documents on December 1, 2020 (the "**Maturity Date**");

**WHEREAS**, the Mortgage provides that the Borrower shall pay all of the indebtedness evidenced by the Note at the time and in the manner as provided for in the Note;

**WHEREAS**, the Borrower breached and defaulted on its obligations under the Note, the Mortgage and the other Loan Documents by, among other things, and without limitation, failing and omitting to pay in full all obligations under the Loan Documents on or before the Maturity Date (*i.e.*, December 1, 2020);

**WHEREAS**, the Borrower's failure to pay the entire indebtedness within five (5) days of when it became due, constitutes an "Event of Default" as defined in the Note and the Mortgage;

**WHEREAS**, the Lender duly sent to the Borrower and the Guarantor a letter dated December 7, 2020, which letter duly notified the Borrower and the Guarantor, among other things, (i) that on December 1, 2020, the Loan matured by its terms and the entirety of the indebtedness became immediately due and payable pursuant to the Note and the Mortgage, (ii)

3

that the Borrower failed to pay the entire indebtedness within five (5) days of when it became due, constituting an Event of Default under both the Note and the Mortgage, and (iii) interest on the indebtedness began to accrue at the "Default Rate" as defined in the Note and Mortgage from and after December 2, 2020;

**WHEREAS**, as a result of, among other things, the Borrower's failure to pay all amounts due under the Loan Documents on the Maturity Date, the Loan is now immediately due and payable in full and the Lender is entitled to, among other things, (i) foreclose the Mortgage and the personalty located at the Mortgaged Premises, (ii) foreclose on all collateral granted by the Guarantor to the Lender under the Pledge Agreement, including, without limitation, all of the Guarantor's limited liability company membership interests in the Borrower, and (iii) exercise all of the Lender's rights and remedies under all of the Loan Documents;

**WHEREAS**, without limiting in any manner any other existing defaults, the Obligors are now in default under the Loan Documents based upon the Borrower's failure to pay to the Lender all amounts due under the Loan Documents on the Maturity Date (the "**Maturity Default Default**") and the Obligors failure to pay the property taxes due on July 1, 2021 with respect to the Mortgaged Premises (the "**Tax Default**");

**WHEREAS**, on or about January 14, 2021, the Parties entered into that certain Forbearance Agreement dated as of January 14, 2021 (the "**Existing Forbearance Agreement**") pursuant to the terms contained therein;

**WHEREAS**, without limiting in any manner any other existing defaults, the Obligors are now in default under the Existing Forbearance Agreement based upon the Borrower's failure to, among other things (i) to pay Lender the Payoff Amount by 10:00 a.m. on April 15, 2020 and (ii) they failed to cause Lee & Associates Licensing & Administration Co., L.P. (the "**Broker**") to (a) reduce the asking price for the sale of the Mortgaged Premises to $11,000,000 by May 15, 2021; and (b) reduce the asking price of the Mortgaged Premises to $10,000,000 by June 15, 2021 (the "**Existing Forbearance Agreement Defaults**"; and together with Maturity Default and the Tx Default, collectively the "**Stated Defaults**"). Each of the forgoing failures described in clauses (i) and (ii) in the immediately preceding sentence constitutes a separate and independent breach of the Existing Forbearance Agreement and a Termination Event (as defined in the Existing Forbearance Agreement) thereunder. As a result of each of such Termination Events, the agreement of Lender to forbear under the Existing Forbearance Agreement automatically terminated, and Lender was automatically entitled to schedule enforce al of its remedies, including conducting a foreclosure sale of all of its collateral;

**WHEREAS**, by a Notice of Disposition of Collateral dated September 3, 2021, Lender properly and timely noticed the November 18, 2021 sale ("**11/18/21 Scheduled UCC Sale**") at public auction of all of Guarantor's right, title and interest in and to the Pledged Collateral pursuant to the New York UCC;

**WHEREAS**, on November 11, 2021, the Obligor Related Parties brought the above-captioned action in the Supreme Court Supreme Court of the State of New York for New York County (this "**Court**") styled *78-80 St. Marks Place, LLC et al. v. St. Mark's Mixed Use LLC* (Index No. 656446/2021) (this "**Obligor Action**") by summons and complaint and

4

596657-1

contemporaneously filed a motion by Order to Show Cause seeking to preliminarily enjoin the 11/18/21 Scheduled UCC Sale (NYSCEF Dkt. No. 6 through 18) [Motion Seq. No. 1] (the "**Stay Motion**");

**WHEREAS**, by Order to Show Cause dated November 17, 2021 and entered in this Obligor Action on November 19, 2021, the Hon. Barry R. Ostrager, J.S.C. ordered that "pending the hearing of the [Stay Motion] brought on by this Order to Show Cause, Defendant shall not go forward with the UCC sale anticipated to take place on November 18, 2021" and scheduled the Stay Motion for a hearing on December 3, 2021 (NYSCEF Dkt. No. 25) (the "**11/17/21 OSC**");

**WHEREAS**, any and all notice provisions contained in all of the Loan Documents and the Existing Forbearance Agreement have been complied with by the Lender and any applicable grace periods, if any, pertaining to Obligor Related Parties' defaults occurring prior to the date of this Stipulation have expired or have been forever waived by the Obligors;

**WHEREAS**, the sale of the Pledged Collateral pursuant to the New York UCC has been duly adjourned from November 18, 2021 to December 7, 2021 at 2:00 p.m.;

**WHEREAS**, as of November 30, 2021 there is due and owing to the Lender under the Note, the Mortgage, the Guaranty, the Pledge Agreement, and the other Loan Documents and the Existing Forbearance Agreement, the following amounts:

| Payoff | |
|---|---|
| Principal Balance | $6,100,000.00 |
| Interest | $1,484,333.33 |
| Protective Advances (through 11/21/21) | $202,121.59 |
| Legal Fees (through 11/21/21) | $194,400.73 |
| **Total Due** | **$7,980,855.65** |

Total Due: $7,980,855.65[1] as of November 30, 2021;

**WHEREAS**, the Lender is currently entitled to exercise any and all of its rights and remedies under the Note, the Mortgage, the Guaranty, the Pledge Agreement, and each of the other Loan Documents and the Existing Forbearance Agreement;

WHEREAS, the Parties have reached a settlement with respect to this matter; and

---

[1] Legal fees and protective advances are reflected herein only as of November 21, 2021. Additional legal fees and expenses and protective advances have accrued and continue to accrue after November 21, 2021 and such additional amounts are owed under the Loan Documents and shall be added to the Payoff Amount (as defined herein below).

5

596657-1

WHEREAS, in connection with the aforesaid settlement, among other things, (i) Borrower has agreed, among other things, to (a) dismiss this Obligor Action, with prejudice, and (b) withdraw its Stay Motion, with prejudice, and (ii) Lender has agreed to adjourn its sale of the Pledged Collateral, all on the terms set forth hereinbelow;

**NOW, THEREFORE**, in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.  Recitals Incorporated Herein. The Parties acknowledge, represent and agree that each of the facts set forth in the recitals above are true and correct in all respects and are incorporated herein as if fully set forth in the body of this Stipulation.

2.  Dismissal of this Obligor Action and Stay Motion; Forbearance; Consent to Sale of the Pledged Collateral.

    (a)    The Stay Motion is hereby withdrawn, with prejudice.

    (b)    The 11/17/21 OSC is hereby vacated.

    (c)    This action (ie. this Obligor Action) be and hereby is dismissed, with prejudice.

    (d)    Subject to (1) the continued validity of the representations and warranties of the Obligor Related Parties set forth in this Stipulation (2) the termination provisions set forth in Section 7 below, the Lender shall temporarily forbear from further enforcing any of its remedies under the Pledge Agreement during the period from the date hereof to and including December 30, 2021 (the "**Forbearance Date**"); notwithstanding the foregoing however, the foregoing provisions shall not apply to the Lender taking any of the actions described in Sections 2(e) through (g) below or otherwise set forth elsewhere in this Stipulation.

    (e)    The Obligors shall not enter into any lease, contract or other agreement for the sale, lease or use of the Mortgaged Premises, or any part thereof, unless (i) the contract is for the sale of all of the Mortgaged Premises and contains a 10% non-refundable deposit to be held in escrow by Borrower's counsel pending a closing, (ii) the sale price of the Mortgaged Premises is equal to or more than the 100% of the Payoff Amount, (iii) the closing of the sale must be set for a date that is not later than December 30, 2021, time being of the essence as to the closing date, and (iv) the obligation of the buyer to close is not subject to any contingencies whatsoever, including, without limitation, as to financing, zoning, development or any other matter of any kind.

    (f)    If no Termination Event (as defined below) occurs, then the Lender will forbear, until and including 10:00 a.m. on December 30, 2021, from holding a foreclosure sale of the Pledged Collateral pursuant to the New York UCC. On and after 10:00 a.m. December 30, 2021 (or on any earlier date on which a Termination Event hereunder has occurred) the Lender may enforce all of its rights under the Loan Documents, including without limitation, taking any and all steps whatsoever to conduct a foreclosure sale of the Pledged Collateral, and may thereafter continue to enforce any and all of its rights under the Loan Documents, applicable law, equity and otherwise,

6

including, without limitation, its rights to any deficiency judgment. An announcement of the adjournment of the sale of the Pledged Collateral from December 7, 2021 to a date and time on and after 10:00 a.m. on December 30, 2021, on the record of the auction sale (currently scheduled to be held on December 7, 2021) shall be sufficient notice of the adjournment of the sale of the Pledged Collateral. The Obligor Related Parties hereby irrevocably (i) agree that the auction sale of the Pledged Collateral pursuant to the New York UCC to be conducted on or after 10:00 a.m. on December 30, 2021 based on the publication and marketing of the sale that has been done to date is commercially reasonable in all respects, (ii) waive any further notice of the adjournment of the sale of the Pledged Collateral and requirement, if any, to give further notice or advertisement of the sale of the Pledged Collateral, all of which is hereby dispensed with, and (iii) agree that they shall not in any way file, or collude with any person or entity to file, any motion or proceeding to stay or vacate the sale of the Pledged Collateral. For the avoidance of doubt, nothing herein shall restrict Lender from taking any acts to adjourn the sale or market the Pledged Collateral, it being the intent that only the occurrence of the sale itself shall not occur prior to December 30, 2021 at 10:00 a.m.

(g)    The Obligor Related Parties and their counsel shall use best efforts to timely and fully cooperate with the Lender in connection with all matters related to the sale of the Pledged Collateral, including, without limitation, (i) providing information about the Mortgaged Premises, (ii) providing access, on 48 hours notice, at all times and from time to time, to the Mortgaged Premises to any brokers, the Lender, any prospective purchaser of the Pledged Collateral and all agents and representatives of all of the foregoing.

3.    <u>Interest Rate; Financial Statements</u>. (a) <u>Interest Rate; Payoff Amount; Financial Statements</u>.

(a)    Interest shall continue to accrue at the default rate of 24% per annum provided in the Note from December 2, 2020 until the date that the Obligors have indefeasibly paid and satisfied all of their obligations (including, without limitation, principal, interest, default rate interest, late fees, service fees, legal fees and expenses, protective advances, and all other fees and charges) under each of the Loan Documents and this Stipulation (collectively, the "**Payoff Amount**").

(b)    The Obligors shall promptly deliver to the Lender any and all financial information that the Lender may reasonably request, including, without limitation, (i) a current rent roll for Mortgaged Premises; (ii) the operating agreement and other organizational documents of the Borrower; (iii) copies of all leases for the Mortgaged Premises; and (iv) proof of insurance of the Mortgaged Premises and Obligors.

4.    <u>Payments to the Lender By Wire Transfer</u>.  All payments to the Lender shall be made by wire transfer pursuant to such wire transfer instructions as the Lender shall provide to the Obligors' counsel upon request therefore.

5.    <u>No Reinstatement of any Loan</u>. The Lender's acceptance of any payment (other than total indefeasible payment in cash of the Payoff Amount) made by any of the Obligor Related Parties on or after the date hereof, nor the Lender's application of any of such payments to amounts owing under the Loan Documents, shall constitute or be construed as: (a) a waiver by the Lender of (i) the Stated Defaults or any other breach or default by any of the Obligor Related Parties under any or all

7

596657-1

of the Loan Documents or this Stipulation, (ii) any of the Lender's rights or remedies in connection with the Loan, any of the Loan Documents, the Existing Forbearance Agreement, or this Stipulation, or (iii) any of the provisions of the Loan Documents, the Existing Forbearance Agreement, or this Stipulation; or (b) a cure of any of the Stated Defaults or any other breach or default by any of the Obligor Related Parties under the Loan Documents, the Existing Forbearance Agreement, or this Stipulation.

6.      Application of Payments. Any payments made by any of the Obligor Related Parties to the Lender on or after the date hereof may be accepted by the Lender and applied against the obligations owed under the Loan Documents in such manner as the Lender may hereafter determine from time to time, all in the Lender's sole and absolute discretion.

7.      Termination. The agreement by the Lender to forbear under the terms of this Stipulation shall automatically terminate, without any notice, any further act or otherwise, upon the earliest to occur of any of the following events:

7.1    The Forbearance Date; or

7.2    A Termination Event (as such term is defined in Section 9 below); or

7.3    The Lender hereafter becomes aware of any fact or circumstance that the Lender believes in good faith is reasonably likely to impair any of the Lender's collateral under the Loan Documents, including, without limitation, its first priority liens on all of the Mortgaged Premises (other than the failure to pay real estate taxes on the Mortgaged Premises), and all collateral under the Pledge Agreement.

8.      Representations and Warranties. In order to induce the Lender to enter into this Stipulation, each of the Obligor Related Parties hereby represents, warrants and covenants to the Lender as follows, all of which representations, warranties and covenants shall survive the execution of this Stipulation:

8.1    Binding Obligations. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, all of the other Loan Documents, the Existing Forbearance Agreement and this Stipulation, have been duly executed and delivered by the Obligor Related Parties (as applicable) and constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms.

8.2    No Defenses or Claims.   (a)    The Obligor Related Parties expressly represent, warrant and acknowledge that: (i) the Lender (or its predecessors as applicable) has provided any notice of default required under the Loan Documents and/or the Existing Forbearance Agreement, and is now fully entitled to foreclose on any and/or all of its collateral and otherwise exercise all of its rights and remedies on account of the Stated Defaults, but for the effect of this Stipulation; (ii) all amounts owed to the Lender under the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the other Loan Documents, and the Existing Forbearance Agreement are now due and payable; (iii) the Lender has elected to grant the forbearance hereunder in its sole discretion, and that absent such election there exists no impediment whatsoever to the commencement of the exercise of any and/or all remedies under

8

the Loan Documents or the Existing Forbearance Agreement; (iv) there are no defenses, offsets or counterclaims of any nature whatsoever to any of the Loan Documents, the Existing Forbearance Agreement, or to the Lender's ownership thereof or the Lender's status as the due holder of the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, and the other Loan Documents or the Lender's standing to enforce all of the foregoing; (v) the Loan Documents and the Existing Forbearance Agreement are hereby reaffirmed by the Obligors in their entirety; (vi) the Loan Documents and the Existing Forbearance Agreement are in full force and effect and the Lender shall not be deemed to waived or modified any of its rights thereunder, at law or in equity by virtue of this Stipulation, except to the extent specifically provided in Section 2 above; and (vii) none of the Obligor Related Parties is the subject of a bankruptcy proceeding as of the date of this Stipulation.

(b) None of the Obligor Related Parties has any defense, affirmative defense, setoff, claim, counterclaim, action, or cause of action of any kind or nature whatsoever against the Lender or any of its past, present, or future directors, officers, employees, agents, attorneys, legal representatives, predecessors, affiliates, successors, or assigns, directly or indirectly, arising out of, based upon, or in any manner connected with any act, transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution of this Stipulation or which occurred, existed, was taken, permitted, or begun in accordance with, pursuant to, or relating to, or by virtue of the Loan or any of the terms of any of the Loan Documents, or which directly or indirectly relates to or arises out of, or in any manner is connected with, the Loan or any or all of the Loan Documents (including, without limitation, the enforcement by the Lender or its predecessor of any of its rights and remedies under any or all of the Loan Documents or the Existing Forbearance Agreement); and if any such defense, affirmative defense, setoff, claim, counterclaim, action or cause of action exists without the knowledge of any of the Obligor Related Parties, the same is hereby unconditionally forever waived with prejudice as against the Lender, or any of its past, present or future directors, officers, employees, agents, attorneys, legal representatives, predecessors, affiliates, successors, or assigns.

8.3  Maturity of the Note and Stated Defaults.  Pursuant to the express terms of the Note the entire principal balance together with all other amounts payable under the Note, the Mortgage, the Guaranty, the Pledge Agreement and the other Loan Documents were immediately due and payable on December 1, 2020, and the Obligors have failed to pay such obligations as of the date hereof. Obligors are in default under the Loan Documents and the Existing Forbearance Agreement on account of the Stated Defaults.

8.4  Representations in Loan Documents.  All of the representations and warranties made by each of the Obligors in each of the Loan Documents are true and correct in all material respects as if made on the date hereof, except for those made with respect to financial statements bearing a particular date, which representations and warranties are hereby restated to be effective as of the date of the last such financial statements provided to the Lender by the Obligors in question.

8.5  Insurance Policies. Insurance policies complying with the terms of the Loan Documents are in full force and effect.

9

    8.6  <u>Leases</u>. (a) There are no leases or licenses to use any part of the Mortgaged Premises other than the following leases (the "**Stated Leases**"):

    (i)    That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and SPI, as tenant (the "**2019 Scheib's Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

    (ii)    That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and AGI, as tenant (the "**2019 Museum Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

    (iii)    That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and the Guarantor, as tenant (the "**2019 Otway Lease**"), which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

    (iv)    That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Theatre 80 LLC ("**2019 Theatre 80 Lease**"), as tenant, which lease expired and terminated by its terms on November 12, 2020 and is no longer in effect;

    (v)    That certain Standard Form of Loft Lease, dated as of September 1, 2019, between the Borrower (as successor-in-interest to Lawrence Otway), as landlord, and Mr. Ori Kushnir ("**Kushnir**") and Ms. Sivan Lahat ("**Lahat**"), jointly as tenants (the "**Kushnir/Lahat Lease**"), for the 3rd floor (aka Unit 3) of a portion of the Mortgaged Premises located at 78 St. Marks Place, New York, New York. The Kushnir/Lahat Lease expires on August 31, 2022 and has not been modified, amended or extended in any way whatsoever;

    (vi)    That certain Lease Agreement, dated as of August 1, 2019 between the Borrower (as successor-in-interest to Lawrence Otway), as landlord, and Mr. Aya Ikeda, as tenant ("**Ikeda**"), for the Unit 4 of a portion of the Mortgaged Premises located at 78 St. Marks Place, New York, New York (the "**Ikeda Lease**"). The Ikeda Lease expired on July 31, 2021 and has not been modified, amended or extended in any way whatsoever;

    (vii)    That certain oral sublease (the "**Oral Sublease**") between Theatre 80, as sub-landlord, and SPI, as sub-tenant, for a portion of the ground floor of the Mortgaged Premises for the operation of a tavern/bar;

    (viii)    That certain oral agreement (the "**Oral Sub-Sublease**") between SPI, as sub-sub-landlord, and Kushnir and Lahat d/b/a Foxface Sandwich Shop ("**Foxface**") for a portion of the ground floor of the Mortgaged Premises consisting of 200 square feet with a concession window opening to St. Marks Place. Foxface is an unincorporated business, is not a legal entity, and is a business owned and operated solely by Kushnir and Lahat under the trade name Foxface Sandwich Shop;

10

(ix)     That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and SPI, as tenant, for 4,875 square feet of the ground floor of 80 St. Marks Place, New York, New York (the "**2020 Scheib's Lease**");

(x)     That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and AGI, as tenant, for 750 square feet of the Gallery Museum at 80 St. Marks Place, New York, New York (the "**2020 Museum Lease**");

(xi)     That certain Lease Agreement dated as of November 12, 2020 between the Borrower, as landlord, and the Guarantor and Mrs. Eugenie Otway, as tenants, for the portion of the Mortgaged Premises known quadplex, a/k/a Unit 1 (the "**2020 Otway Lease**");

(xii)     That certain Commercial Sublease Agreement dated as of November 12, 2020 between Scheibs Place LLC, as sublessor, and Theatre 80, as subtenant, for the auditorium, cellar and backstage at 80 St Marks Place, New York, New York (the "**2020 Theatre Sublease**"). Scheibs Place LLC is not a legal entity. The reference to "Scheibs Place LLC" in the 2020 Theatre Sublease was a typographical error and the correct name of the sublessor under the 2020 Theatre Sublease is "Scheib's Place, Inc."; and

(xiii) That certain Sub-Commercial Sublease Agreement dated as of November 12, 2020 between Theatre 80, as sublessor, and Meeting Space, as subtenant, for the 2nd floor of the Mortgaged Premises (the "**2020 Meeting Space Sub-Sublease**"). Meeting Space is an unincorporated business, is not a legal entity, and is a business owned and operated solely by the Guarantor under the trade name Meeting Space.

(b)     The Guarantor is (i) the sole shareholder and president of both SPI and AGI; and (ii) the sole member and sole manager of Theatre 80. The Guarantor solely owns and controls SPI, AGI, and Theatre 80, and each of such entities is an affiliate of the Guarantor.

(c)     The 2019 Scheib's Lease, the 2019 Museum Lease, the 2019 Otway Lease, and the 2019 Theatre 80 Lease each expired and terminated by its terms on November 12, 2020 and has not been modified, amended or extended in any way whatsoever, and is no longer in effect.

(d)     The 2020 Museum Lease, the 2020 Otway Lease, the 2020 Theatre Sublease and 2020 Meeting Space Sub-Sublease, (i) were each entered into in violation of the Borrower's obligations under the Loan Documents and without the consent of the Lender (or its predecessor-in-interest); and (ii) are each hereby forever terminated and without effect as of the date hereof.

(e)     The 2020 Scheib's Lease (i) was entered into in violation of the Borrower's obligations under the Loan Documents and without the consent of the Lender (or its predecessor-in-interest); and (ii) is hereby automatically forever terminated and without effect as of June 1, 2021. For the avoidance of doubt, no notice or act shall be required to effectuate the

11

termination of the 2020 Scheib's Lease as of June 1, 2021 and SPI shall vacate and surrender the premises under such lease by December 30, 2021.

(d)     AGI, Guarantor, Theatre 80, Foxface and Meeting Space have no legal right to use any part of the Mortgaged Premises as of the date hereof. SPI has no legal right to use any part of the Mortgaged Premises as of June 1, 2021.

(e)     The Oral Sublease and the Oral Sub-Sublease are void and of no effect whatsoever, as among other things, they were entered into without the Lender's (or its predecessor-in-interest's) consent and they are oral only and in violation of the statute of frauds.

(f)     In all events, the Oral Sublease is hereby forever terminated and of no effect whatsoever. As a result of the termination of the Oral Sublease, the Oral Sub-Sublease is terminated as a matter of law due to the termination of the Oral Sublease (i.e. its master lease).

(g)     In all events, the Oral Sub-Sublease is hereby forever terminated and of no effect whatsoever.

8.7     Compliance with Laws. The Obligor Related Parties are, to the best of their knowledge, in compliance with all material laws, ordinances, rules and regulations of all governmental entities (and all agencies, bodies and subdivisions thereof) affecting the ownership, use, or operation of the Mortgaged Premises, and none of the Obligor Related Parties has received any notice of noncompliance from any such governmental entity with respect to the Mortgaged Premises or that appropriate corrective action is being taken to promptly cure any non-compliance issues(s).

8.8     No Breach of Other Agreements. To the best of the knowledge of the Obligor Related Parties, neither the execution or delivery of this Stipulation, nor the consummation of this transactions contemplated by this Stipulation, nor the compliance with the terms and provisions hereof: (i) will constitute or result in a breach of any of any the Obligor Related Party's respective articles of incorporation or operating agreement, or will constitute or result in a violation of any law, order, writ, injunction, or decree of any court or governmental department, commission, board, bureau, agency, or instrumentality applicable to any of the Obligor Related Parties; (ii) will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions, or provisions thereof; or (iii) will constitute a default under any indenture, mortgage, instrument, documents, agreement, or contract of any kind to which any of the Obligor Related Parties may be bound or subject.

8.9     The Obligor Related Parties Benefitted. The Obligor Related Parties have each derived direct and substantial benefits from this Stipulation and the transactions contemplated by this Stipulation.

8.10     Other Documents. (a) All documents, reports, certificates, financial statements, and other statements of any kind furnished to the Lender by or on behalf of each of the Obligor Related Parties in connection with the transactions contemplated by this Stipulation: (i) are true, correct, and complete in all material respects; (ii) do not contain any untrue statement

12

596657-1

of material fact; and (iii) do not omit any fact necessary to make the information contained therein not misleading.

(b) The continued validity in all respects of all representations and warranties made by the Obligor Related Parties in the Loan Documents, this Stipulation and any other documents delivered by the Obligor Related Parties in connection with this Stipulation constitutes a condition precedent to the Lender's agreements under this Stipulation.

8.11 <u>Stipulation Is Duly Executed and Enforceable</u>. Each of the signatories, on behalf of the Obligor Related Parties, to this Stipulation has full and complete authorization and power to execute and deliver this Stipulation in the capacity herein stated. This Stipulation is a valid, binding and enforceable obligation of each of the Obligor Related Parties and does not violate any law, rule or regulation, or any contract or agreement to which any of the Obligor Related Parties is a party. None of the Obligor Related Parties has conveyed, transferred, assigned, pledged or otherwise encumbered any claim or causes of action covered by the releases set forth in this Stipulation.

8.12 <u>Benefitted From This Stipulation</u>. The Borrower, the Guarantor and the other Obligor Related Parties have each derived direct and substantial benefits from this Stipulation.

9. <u>Termination Events.</u> The occurrence of any one or more of the following shall constitute a "**Termination Event**" under this Stipulation:

9.1 <u>Failure to Perform Obligations.</u> The failure of the Obligor Related Parties to observe or perform any of its respective obligations under this Stipulation when due; or

9.2 <u>Other Loan Defaults.</u> The occurrence of any of the following: (i) any "Event of Default" (as defined in the Note) under the Note (other than the timely payment of real estate taxes on the Mortgaged Premises); (ii) any "Event of Default" (as defined in the Mortgage) under the Mortgage (other than the timely payment of real estate taxes on the Mortgaged Premises); or (iii) any default or event of default under any of the other Loan Documents (other than the Stated Defaults), and the applicable Obligors' time, if any, to cure the same has expired under the applicable Loan Document(s); or

9.3 <u>Misrepresentation.</u> If any representation or warranty made herein, or in any report, certificate, financial statement or other instrument or document furnished in connection with this Stipulation or contemplated hereby, shall prove to have been knowingly and materially false or misleading on the date as of which it was made; or

9.4 <u>Judgment.</u> Entry of a judgment or filing of a lien after the date hereof against any of the Obligor Related Parties, the Mortgaged Premises, or any other property of any of the Obligor Related Parties;

9.5 <u>Failure to Maintain Insurance.</u> If at any time (i) the Borrower fails to maintain insurance on the Mortgaged Premises in accordance with the Mortgage or (ii) such

13

596657-1

insurance fails to include the Lender as an additional insured or fails to provide that the Lender is the sole loss payee. The Borrower shall provide a copy of its insurance policy and proof of insurance within 48 hours of any request by the Lender.

    9.6    Bankruptcy. If any of the Obligor Related Parties shall: (i) make a general assignment for the benefit of creditors; (ii) file a voluntary petition or a petition or answer seeking reorganization or an arrangement with creditors or take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation statute or law, or make or file an answer admitting material allegations of a petition filed against it in any proceeding under any such law; (iii) have any bankruptcy proceedings commenced against it by any person or entity; or (iv) have entered against it an order, judgment or decree of any court of competent jurisdiction approving a petition seeking reorganization of assets or appointing a receiver, trustee, or liquidator for any assets.

    10.    Covenants Regarding the Mortgaged Premises.

    (a)    The Obligor Related Parties shall not in any way whatsoever modify, amend, extend or renew any of the Stated Leases without the Lender's express prior written consent, and any modification, amendment, extension or renewal of any of the Stated Leases without the Lender's express prior written consent shall be void *ab initio* and of no effect whatsoever. Neither of the Obligor Related Parties shall enter into any agreement of any kind or nature concerning the lease, license, use or sale of the Mortgaged Premises, or any part thereof, without the Lender's express prior written consent, and any such agreement entered into by any Obligor Related Party without the Lender's express prior written consent shall be void *ab initio* and of no effect whatsoever.

    (b)    The Borrower, SPI, AGI, the Guarantor, EO, Theatre 80 and Meeting Space, and all relatives of the Guarantor and all persons and entities directly or indirectly controlled by either of the Obligors shall completely vacate, and shall cause Foxface, Kushnir, Lahat, and Ikeda to completely vacate, the Mortgaged Premises (other than Kushnir and Lahat with respect to the portion of the Mortgaged Premises demised under the Kushnir/Lahat Lease) no later than December 30, 2021, time being of the essence. In the event that any of the Borrower, SPI, AGI, the Guarantor, EO, Theatre 80, Foxface, Kushnir, Lahat, or Ikeda fails to completely vacate the Mortgaged Premises by December 30, 2021 (other than Kushnir and Lahat with respect to the portion of the Mortgaged Premises demised under the Kushnir/Lahat Lease), time being of the essence, then the Obligor Related Parties shall be jointly and severally liable to the Lender in the sum of $200,000 as liquidated damages for the failure of the Obligor Related Parties to timely cause each of the Borrower, SPI, AGI, the Guarantor, EO, Theatre 80, Foxface, Kushnir, Lahat, and Ikeda to timely vacate the Mortgaged Premises as required by this Section 10 (b), time being of the essence.

    11.    Remedies. Without limiting the rights and remedies of the Lender under any of the other Loan Documents, under this Stipulation, or under applicable law or in equity, immediately upon the occurrence of any Termination Event hereunder (without any notice or any opportunity to cure), the obligations and agreements of the Lender under this Stipulation shall immediately

14

596657-1

terminate, and the Lender shall have the right to immediately exercise any and all rights and remedies available to it hereunder, under any and all of the other Loan Documents, the Existing Forbearance Agreement, and under applicable law, without regard to any notice or cure period contained therein or otherwise available. All rights and remedies available to the Lender under this Stipulation, any of the Loan Documents, the Existing Forbearance Agreement and applicable law may be asserted concurrently, cumulatively, or successively, from time to time, as long as any indebtedness or obligations under the Loan Documents shall remain unpaid or outstanding. By entering into this Stipulation, or accepting any payments hereunder, the Lender shall in no way be considered to have waived or be estopped from exercising any or all of its rights and remedies under any of the Loan Documents and/or the Existing Forbearance Agreement. Nothing contained herein shall be considered a forgiveness of any obligation under the Loan Documents (except the full, timely payment of the Payoff Amount) and the accommodations made by the Lender herein do not constitute a "course of dealing" or a "course of conduct" in contravention of the terms of the Loan Documents.

12.     <u>Amendments</u>. This Stipulation may be amended only by a written amendment, fully executed and delivered by each of the Parties.

13.     <u>Loan Documents Still in Force</u>. Notwithstanding anything to the contrary in this Stipulation, the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, and all of the other Loan Documents and Existing Forbearance Agreement are in full force and effect in accordance with their respective terms, remain valid and binding obligations of the Obligors and have not been modified or amended, and are hereby reaffirmed and ratified by the Obligors in all respects. The liens, security interests and pledges created by the Mortgage and Pledge Agreement, and the other Loan Documents are and continue to be valid, effective, properly perfected, enforceable and are hereby ratified and confirmed in all respects.

14.     <u>No Waiver of Rights Under Loan Documents</u>. Neither the failure nor the delay by the Lender to exercise its remedies, nor the acceptance by the Lender of partial payments or any other partial performance (whether any of the foregoing is before or after the date of this Stipulation), nor any provision of this Stipulation, shall (a) amend, modify, supplement, extend, delay, renew, terminate, waive, release or otherwise limit or prejudice the Lender's rights and remedies under the Loan Documents and Existing Forbearance Agreement or any of the Obligors' obligations under the Loan Documents (including, without limitation, the Lender's right to receive full payment of principal and interest as well as all late charges, default rate interest, delinquent interest, attorneys' fees and expenses, the Lender's protective advances and other charges to the extent provided in the Loan Documents), nor (b) affect the priority of the Lender's security interests in and liens on the property of any of the Obligors (including, without limitations, the Lender's first priority mortgage lien on the Mortgaged Premises pursuant to the Mortgage and the other Loan Documents and the Lender's first priority security interest and lien on all of the equity interests in the Borrower pursuant to the Pledge Agreement and the other Loan Documents). Nothing contained in this Stipulation shall operate to prohibit, restrict or otherwise inhibit the Lender from exercising any right or remedy the Lender may have under the Loan Documents and Existing Forbearance Agreement (except to the extent that the Lender agrees to forbear as specifically provided in Section 2 above) or constitute a cure of the Stated Defaults or any other existing default or serve to extend any applicable grace or cure period and, without limitation, shall not extend any applicable reinstatement or redemption period.

15

596657-1

15.    Release of Claims and Waivers.

15.1    Release of Claims. Each of the Obligor Related Parties, for itself and on behalf of its agents, employees, representatives, affiliates, predecessors-in-interest, successors, and assigns (such persons and entities other than the Obligor Related Parties being collectively referred to herein as the "**Other Releasors**"), does hereby release, discharge and acquit the Lender, and the Lender's past, present and future officers, directors, shareholders, agents, employees, professionals, predecessors, successors, assigns and affiliates, and their respective successors, heirs and assigns (collectively, the "**Released Parties**"), of and from any and all rights, claims, causes of action, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, causes of action, promises, damages, costs, losses and expenses of every kind, nature, description or character whatsoever, and irrespective of how, why, or by reason of any facts, which could or may be claimed to exist, whether known or unknown, matured or contingent, suspected or unsuspected, liquidated or unliquidated, claimed or unclaimed, whether based on contract, tort, fraud, breach of any duty, breach of any federal, state or local laws of any kind or nature whatsoever, or any other legal or equitable theory whatsoever, each as though fully set forth herein at length, from the beginning of the world to the date of execution of this Stipulation by the Obligor Related Parties (collectively, the "**Claims**"), which in any way arise out of, are connected with or relate to any or all of the following: (a) the Loan or the administration of any or all of the Loan or any or all of the Loan Documents, as well as any action or inaction of the Released Parties or any of them with respect to the Loan or the administration thereof or any or all of the Loan Documents or the enforcement thereof; (b) any or all of the transactions which are the subject of or contemplated by any or all of the Loan Documents and/or the Existing Forbearance Agreement; (c) the Mortgaged Premises and/or any other collateral granted under any of the Loan Documents; (d) any fact, matter or transaction existing or occurring as of or prior to the execution of this Stipulation by the Parties, which in any way, directly or indirectly, relates to the Loan, any of the Loan Documents, the Existing Forbearance Agreement, or the Mortgaged Premises; or (e) any and all claims that could or have been set forth in this Obligor Action.

15.2    Waiver. Each of the Obligor Related Parties hereby: (i) waives any and all defenses to the Lender's exercise of any or all of its rights under the Loan Documents, including, without limitation, the defenses of payment, waiver, estoppel, laches, unclean hands, unconscionability, the election of remedies defense, or any claim that the Obligors are not in default under the Loan Documents, or any claim that any notice was not given by the Lender, or that the Note fully matured; (ii) acknowledges and re-affirms its due execution and delivery of the Loan Documents (as applicable) and the Existing Forbearance Agreement; (iii) agrees that it shall not file an answer, counterclaim, motion, order to show cause or appeal as to any judicial or non-judicial actions that may be taken by the Lender after the earlier of the Forbearance Date or the date that any Termination Event occurs; (iv) admits and acknowledges that, the Note matured by its terms on the Maturity Date (i.e. December 1, 2020) and that the Payoff Amount is due and owing to the Lender; (v) expressly waives the appointment of a referee in any action to foreclose the Mortgage to compute the sums due and owing to the Lender; (vi) waives any claim or defense regarding the Loan, the Loan Documents or this Stipulation, including, without limitation, as to the Lender's standing or that the Loan is usurious or requires the Obligors to pay "hidden" or "disguised" interest, fees or charges; (vii) waives any claim or defense that the Lender is prohibited from commencing a proceeding to recover under the Loan Documents by reason of

16

any statute, law or executive order, or otherwise, including without limitation (a) New York State's issuance of any Executive Order, including, without limitation, Executive Order 202.28, 202.48, 202.75, 201.81, or (b) any statute in New York State, including without limitation, NY LEGIS 417 (2021), 2021 Sess. Law News of N.Y. Ch. 417 (S. 50001) (McKINNEY'S), and any subsequent modifications and/or extension of said executive orders or laws, and/or (c) New York's Chief Administrative Judge's issuance of Administrative Order of the Chief Administrative Judge of the Courts; and (viii) agrees that in the event that any conference is scheduled in any action to foreclose the Mortgaged Premises it shall agree that the action may immediately proceed and shall not request an adjournment or stay of any foreclosure action for any reason.

15.3    Indemnity.  Each of the Obligor Related Parties hereby agrees to defend, indemnify, and hold the Lender and each of the other Released Parties harmless from and against any losses, damages, costs (including, without limitation, attorneys' fees, court costs, and costs of appeal), expenses, judgments, liens, decrees, fines, penalties, liabilities, claims, actions, suits, and causes of action (collectively, the **"Indemnified Claims"**) arising, directly or indirectly, from (to the extent not inconsistent with the terms of this Stipulation): (a) any material breach by any of the Obligor Related Parties of any warranty or representation contained in this Stipulation or in the documents executed and delivered by any of the Obligor Related Parties pursuant to this Stipulation (collectively referred to as the **"Obligors Documents"**); (b) and after any material breach, default, or violation by any of the Obligor Related Parties of any covenant, agreement, or provision of any of the Obligors Documents or the Loan Documents; (c) any claims by or liabilities to third parties pertaining to injury to persons or damage to the Mortgaged Premises; and (d) any claims and/ or defenses of any past, present, or future tenants at the Mortgaged Premises, including, without limitation, SPI, AGI, the Guarantor, EO, Theatre 80, Foxface, Kushnir, Lahat and Ikeda.

15.4    Waivers of Unknown Claims.  As to all matters being released by the Obligor Related Parties pursuant to the provisions hereof, each of the Obligor Related Parties for itself and on behalf of the Other Releasors, expressly acknowledges that the release of Claims set forth in Section 15.1 hereof applies to all Claims whether or not known to, or suspected by the Obligor Related Parties to exist. Each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, acknowledges and agrees that the facts with respect to which the release of Claims contained in Section 15.1 is executed may hereafter be found to be different from the facts now believed by the Obligor Related Parties to be true, and each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, expressly accepts and assumes the risk of all such possible differences, and agrees that the release of Claims contained in this Section shall be and remain effective notwithstanding any such difference in facts.

15.5    No Admission of Liability.  Nothing contained in this Stipulation, including, without limitation, the terms of this Section 15, constitutes or shall be construed as an admission by the Lender of any liability whatsoever.

15.6    No Assignment.  Each of the Obligor Related Parties, for itself and on behalf of all Other Releasors, warrants and represents to the Lender that none of the Obligor Related Parties and none of the Other Releasors have sold, assigned, transferred, conveyed or

17

otherwise disposed of any Claims or Indemnified Claims which are the subject of this Section 15.

16.     No Waiver by the Lender. The agreement by the Lender to forbear from exercising its rights and remedies under the Loan Documents shall not constitute a waiver of, consent to, or condoning of the Stated Defaults or any other default by any of the Obligor Related Parties. The Obligor Related Parties agree that Lender may immediately exercise all rights and remedies available to the Lender under the Loan Documents by reason of the Stated Defaults or any other default immediately upon the earlier of (i) the Forbearance Date, or (ii) the occurrence of any Termination Event for any reason, without the Lender being required to provide any additional notice of default or of acceleration and without any grace or cure periods therefor.

17.     Bankruptcy.

17.1     Statement of Intent. Each of the Obligor Related Parties warrants and represents to the Lender that it has no present intent (i) to file any voluntary petition in bankruptcy under any chapter of the United States Bankruptcy Code (the "**Bankruptcy Code**"), or directly or indirectly to cause any Obligor Related Party, or any other person or entity that may hereafter own any interest in, or claim any beneficial interest in, the Mortgaged Premises, to file any voluntary petition in bankruptcy under any chapter of the Bankruptcy Code or to have any involuntary petition in bankruptcy filed against it under any chapter of the Bankruptcy Code, or (ii) in any manner, directly or indirectly, to cause the any of the Obligor Related Parties, or any other person or entity that may hereafter own any interest in, or claim any beneficial interest in, the Mortgaged Premises, to seek relief, protection, reorganization, liquidation, dissolution, or similar relief for debtors under any federal, state, or local law, or in equity, or (iii) in any manner, directly or indirectly, to cause the Mortgaged Premises to be the subject of any bankruptcy or insolvency proceedings or the property of any bankruptcy or insolvency estate.

18.     Miscellaneous.

18.1     Costs and Expenses. Nothing in this Stipulation shall (i) diminish or otherwise limit any obligation that any of the Obligors has under the Loan Documents with respect to payment of the costs and expenses (including, without limitation, attorneys' fees and expenses) of the Lender, or (ii) prevent the Lender from requiring each of the Obligors to pay all such costs and expenses in accordance with the terms of the Loan Documents and the Existing Forbearance Agreement.

18.2     Further Instruments. The Obligor Related Parties shall, whenever and as often as they shall be requested to do so by the Lender, cause to be executed, acknowledged and/or delivered to the Lender any and all such further instruments and documents as may be necessary or desirable, in the sole discretion of the Lender, in order to carry out the intent and purpose of this Stipulation. Without limiting of the foregoing, each of the Obligor Related Parties hereby irrevocably appoints Lender as its and his attorney-in-fact, coupled with an interest, to execute any such documents as provided above.

18

596657-1

18.3    Written Waiver Only. No waiver by the Lender of any of its rights or remedies in connection with the Loan or any Loan Documents shall be effective unless such waiver is in writing and signed and delivered by the Lender. Without limiting the generality of the preceding sentence, nothing contained in this Stipulation nor any delay or omission by the Lender in exercising or enforcing any of its rights and remedies in connection with the Loan Documents constitutes or shall be construed as a waiver by the Lender of: (i) the Stated Defaults or any other breach or default by any of the Obligors under any of the Loan Documents; or (ii) any of the Lender's rights or remedies in connection with the Loan or any of the provisions of any of the Loan Documents or the Existing Forbearance Agreement.

18.4    Governing Law. This Stipulation shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the law on conflicts of law.

18.5    Third Party Beneficiaries. Nothing in this Stipulation is intended to or shall confer any rights or remedies upon any person, other than the Parties hereto and the Released Parties and, subject to any restrictions on assignment contained in this Stipulation and the other Loan Documents, their respective successors and assigns.

18.6    No Offsets. No indebtedness evidenced by the Note or any other Loan Documents shall be offset by all or part of any claim, cause of action, or cross-claim of any kind, whether liquidated or unliquidated, which any of the Obligor Related Parties now has or may hereafter acquire or allege to have acquired against the Lender.

18.7    Relationship of Parties. Nothing contained in this Stipulation or the other Loan Documents constitutes or shall be construed as the formation of a partnership, joint venture, tenancy-in-common, or any other form of co-ownership, or the creation of any confidential or fiduciary relationship of any kind between the Lender, on the one hand, and the Obligor Related Parties and/or any other person or entity on the other hand. The Obligor Related Parties acknowledge and agree that the Lender has at all times acted and shall at all times continue to be acting only as a lender to the Obligors within the normal and usual scope of activities of a lender.

18.8    Attorneys' Fees. Upon demand therefor by the Lender, the Obligors shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, now or hereafter incurred by the Lender (i) in negotiating and preparing this Stipulation; and (ii) in administering, enforcing or effectuating any of the terms of this Stipulation and the other Loan Documents and the Existing Forbearance Agreement, whether or not any legal proceedings are instituted by the Lender. Without limiting the generality of the immediately preceding sentence, such costs and expenses shall include all attorneys' fees and costs now or hereafter incurred by the Lender in connection with any federal or state bankruptcy, insolvency, reorganization, foreclosure, or other similar proceeding or action by or against any of the Obligor Related Parties which in any way relates to or affects the Lender's exercise of its rights and remedies under any or all of the Loan Documents or the Existing Forbearance Agreement. The amount of any attorneys' fees, costs and expenses of the Lender that are not paid by the Obligors shall be added to the Payoff Amount, shall

19

constitute secured obligations of the Obligors under the Loan Documents and shall bear interest at the default rate under the Loan Documents.

18.9 Descriptive Headings; Interpretation. The headings to sections of this Stipulation are for convenient reference only, do not in any way limit or amplify the terms of this Stipulation, and shall not be used in interpreting this Stipulation. For purposes of this Stipulation: (i) the term "including" shall be deemed to mean "including, without limitation,"; (ii) the term "Loan Documents" shall be deemed to include, without limitation, the Existing Forbearance Agreement and this Stipulation; (iii) the term "person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability Borrower, unincorporated organization or association, or trustee; and (iv) whenever the context of this Stipulation reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Stipulation has been prepared and drafted through a joint effort of the Parties and, therefore, shall not be construed against any of the Parties as the person who prepared or drafted this Stipulation.

18.10 Entire Agreement. This Stipulation and the other Loan Documents contain the entire agreement and understanding between the Parties concerning the matters covered by this Stipulation and the other Loan Documents, and supersede all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether written or oral, made by the Lender or any of the Obligor Related Parties concerning the matters covered by this Stipulation and the other Loan Documents.

18.11 Payoff Amount. Each of the Obligor Related Parties hereby acknowledges and agrees that the Payoff Amount as of November 30, 2021 is $7,980,855.65 (exclusive of attorneys' fees and expenses and protective advances incurred after November 21, 2021, which amounts have accrued and continue to accrue and shall be added to the Payoff Amount), that interest is continuing to accrue thereon at the default rate of 24% per annum from and after December 2, 2021, and that the Obligors are jointly and severally liable for the Payoff Amount.

**18.12 TIME OF THE ESSENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY, TIME IS OF THE ESSENCE WITH RESPECT TO EACH OF THE OBLIGOR RELATED PARTIES' OBLIGATIONS HEREUNDER.**

18.13 Severability. If any term or provision of this Stipulation or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Stipulation, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Stipulation shall be valid and shall be enforced to the fullest extent permitted by law.

18.14 Notices. All notices and other communications provided for in this Stipulation shall be in writing and shall be given by Federal Express or hand delivery:

20

596657-1

If to the Lender, at:

St. Mark's Mixed Use LLC
100 Park Avenue, Suite 2305
New York, New York 10012
Attn: Jason Leibowitz

with a copy to:

Katsky Korins LLP
605 Third Avenue, 17th Floor
New York, New York 10158
Attn.: Steven H. Newman, Esq.

If to the Borrower, at:

78-80 St. Marks Place, LLC
78-80 St. Marks Place
New York, New York 10003
Attn: Lawrence v. Otway

With a copy to:

The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York 10017
Attn: Richard Roth, Esq.

If to the Guarantor, at:

Mr. Lawrence v. Otway
78-80 St. Marks Place, Apt. 1
New York, New York 10003

With a copy to:

The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York 10017

If to EO, SPI, AGI or Theatre 80, to such person or entity at:

78-80 St. Marks Place
New York, New York 10003

21

Attn: Lawrence v. Otway

With a copy to:

The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York 10017

Notices shall be deemed given (i) if sent by hand, the date sent; and (ii) if sent by Federal Express, one (1) business day after delivery to an authorized agent or authorized depository box of Federal Express.

18.15 <u>Counterparts, Etc</u>. This Stipulation may be executed in any number of counterparts so long as each signatory hereto executes at least one such counterpart. Each such counterpart shall constitute one original, but all such counterparts taken together shall constitute one and the same instrument. This Stipulation may be executed by electronic signatures, including without limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

18.16 <u>Service of Process</u>. The Obligor Related Parties hereby irrevocably agrees that service of process of any action or proceeding by the Lender against the Guarantor and/or any other Obligor Related Parties may be served upon the Guarantor or such Obligor Related Party by first class mail addressed to "Mr. Lawrence V. Otway, 78-80 St. Marks Place, Apt. 1, New York, New York 10003" and the Obligor Related Parties hereby irrevocably waive any objection or defense whatsoever that any service of process so effectuated is invalid or improper in any manner. The foregoing is without prejudice to the Lender's rights to effectuate service of process by any other means allowed by applicable law.

18.17 **WAIVER OF JURY TRIAL. THE OBLIGOR RELATED PARTIES AND THE LENDER IRREVOCABLY WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR IN ANY WAY RELATING TO THE LOAN, THE NOTE, THE MORTGAGE, THE GUARANTY, THE PLEDGE AGREEMENT, THIS STIPULATION, ANY OF THE OTHER LOAN DOCUMENTS, THE MORTGAGED PREMISES, ANY OR ALL OF THE REAL AND PERSONAL PROPERTY COLLATERAL SECURING THE LOAN OR ANY OF THE TRANSACTIONS WHICH ARE CONTEMPLATED BY THE LOAN DOCUMENTS. THE JURY TRIAL WAIVER CONTAINED IN THIS SECTION IS INTENDED TO APPLY, TO THE FULLEST EXTENT PERMITTED BY LAW, TO ANY AND ALL DISPUTES AND CONTROVERSIES THAT ARISE OUT OF OR IN ANY WAY RELATE TO ANY OR ALL OF THE MATTERS DESCRIBED IN THE PRECEDING SENTENCE, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS OF ANY KIND WHATSOVER. THE WAIVER CONTAINED IN THIS SECTION SHALL APPLY TO ALL SUBSEQUENT EXTENSIONS, RENEWALS, MODIFICATIONS AND REPLACEMENTS OF ANY OR ALL OF THE LOAN DOCUMENTS. THIS**

22

596657-1

STIPULATION MAY BE FILED WITH ANY COURT OF COMPETENT JURISDICTION AS EACH PARTY'S WRITTEN CONSENT TO WAIVER OF A JURY TRIAL.

18.18 <u>Conflicts With Loan Documents</u>. Notwithstanding anything in this Stipulation to the contrary, in the event of an actual conflict or inconsistency between this Stipulation and any of the Loan Documents (which is not resolved by the terms of this Stipulation itself), the provisions which shall enlarge the rights of the Lender shall govern to the extent of such conflict.

18.19 <u>**REVIEW WITH COUNSEL.**</u> **THE OBLIGOR RELATED PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT: (A) THE OBLIGOR RELATED PARTIES HAVE CAREFULLY READ AND UNDERSTAND ALL OF THE TERMS OF THIS STIPULATION; (B) THE OBLIGOR RELATED PARTIES HAVE EXECUTED THIS STIPULATION FREELY AND VOLUNTARILY AND WITHOUT ANY DURESS, AFTER HAVING CONSULTED WITH THE OBLIGOR RELATED PARTIES' INDEPENDENT LEGAL COUNSEL AND AFTER HAVING ALL OF THE TERMS OF THIS STIPULATION EXPLAINED TO EACH OF THEM BY THEIR INDEPENDENT LEGAL COUNSEL; (C) THE WAIVERS AND RELEASES CONTAINED IN THIS STIPULATION ARE REASONABLE, NOT CONTRARY TO PUBLIC POLICY OR LAW, AND HAVE BEEN INTENTIONALLY, INTELLIGENTLY, KNOWINGLY AND VOLUNTARILY AGREED TO BY EACH OF THE OBLIGOR RELATED PARTIES; (D) THE WAIVERS AND RELEASES CONTAINED IN THIS STIPULATION HAVE BEEN AGREED TO BY THE OBLIGOR RELATED PARTIES WITH FULL KNOWLEDGE OF THEIR SIGNIFICANCE AND CONSEQUENCES, INCLUDING FULL KNOWLEDGE OF THE SPECIFIC NATURE OF ANY RIGHTS OR DEFENSES WHICH THE OBLIGOR RELATED PARTIES HAVE AGREED TO WAIVE OR RELEASE PURSUANT TO THIS STIPULATION; (E) THE OBLIGOR RELATED PARTIES HAVE HAD A FULL AND ADEQUATE OPPORTUNITY TO NEGOTIATE THE TERMS CONTAINED IN THIS STIPULATION; (F) THE OBLIGOR RELATED PARTIES ARE EXPERIENCED IN AND FAMILIAR WITH LOAN TRANSACTIONS OF THE TYPE EVIDENCED BY THIS STIPULATION; (G) THE OBLIGOR RELATED PARTIES EXECUTION AND DELIVERY OF THIS STIPULATION IS NOT BASED UPON RELIANCE UPON ANY REPRESENTATION, UNDERSTANDING OR AGREEMENT NOT EXPRESSLYSET FORTH IN THIS STIPULATION AND NEITHER THE LENDER NOR ANY AFFILIATE THEREOF HAS MADE ANY REPRSENTATION WHATSOVER TO ANY THE OBLIGOR RELATED PARTIES NOT EXPRESSLY SET FORTH HEREIN; (H) THE WAIVERS AND RELEASES CONTAINED IN THIS STIPULATION ARE MATERIAL INDUCEMENTS TO THE LENDER'S EXECUTION OF THIS STIPULATION, AND THE LENDER HAS RELIED ON SUCH WAIVERS AND RELEASES IN ENTERING INTO THIS STIPULATION AND WILL CONTINUE TO RELY ON SUCH WAIVERS AND RELEASES IN ANY RELATED FUTURE DEALINGS WITH THE OBLIGOR RELATED PARTIES.**

23

596657-1

18.20  Conditions Precedent. This Stipulation shall not be effective and binding on the Parties unless and until it is executed and delivered by each of the Obligor Related Parties and by the Lender.

18.21  Agreement May Be Used Against Obligor Related Parties. This Stipulation may be used as evidence against any or all of the Obligor Related Parties in any litigation now or hereafter existing.

18.21  Release Upon Payment in Full of the Payoff Amount. If the Payoff Amount has been irrevocably paid (and without protest) in full to Lender, Lender will issue a general release of all its claims against the Obligor Related Parties under the Loan Documents.

24

596657-1

Executed as of the date set forth above:

**78-80 ST. MARKS PLACE, LLC**

By: _____
   Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
   Title: Manager and Sole Member

_____
LAWRENCE V. OTWAY, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway,
Individually

_____
EUGENIE OTWAY,
Individually

**SCHIEB'S PLACE, INC.**

By: _____
   Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
   Title: President and sole shareholder

**EXHIBITION OF THE AMERICAN GANGSTER, INC.**

By: _____
   Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
   Title: President and sole shareholder

**THEATRE 80 LLC**

By: _____
   Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
   Title: Manager and Sole Member

**ST. MARK'S MIXED USE LLC**

By: _____
   Name:
   Title:

596657-1

Executed as of the date set forth above:

**78-80 ST. MARKS PLACE, LLC**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: Manager and Sole Member

_____
**LAWRENCE V. OTWAY**, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway,
Individually

_____
**EUGENIE OTWAY**,
Individually

**SCHIEB'S PLACE, INC.**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: President and sole shareholder

**EXHIBITION OF THE AMERICAN GANGSTER, INC.**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: President and sole shareholder

**THEATRE 80 LLC**

By: _____
      Name: Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway
      Title: Manager and Sole Member

**ST. MARK'S MIXED USE LLC**

By: _____
      Name: Thomas Hooker
      Title: Manager

596657-1

State of New York      )
                       )ss.:
County of New York     )

On the 23rd day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as Manager and sole member of 78-80 St. Marks Place, LLC, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

RICHARD ROTH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RO5075155
Qualified in Westchester County
Commission Expires March 31, 2023

State of New York      )
                       )ss.:
County of New York     )

On the 23rd day of _____ in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his individual capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

RICHARD ROTH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RO5075155
Qualified in Westchester County
Commission Expires March 31, 2023

State of New York      )
                       )ss.:
County of New York     )

On the 23rd day of _____ in the year 2021, before me, the a notary public in and for said state, personally appeared Eugenie Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her individual capacity,  and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

RICHARD ROTH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RO5075155
Qualified in Westchester County
Commission Expires March 31, 2023

26

State of New York    )
                     )ss.:
County of New York   )

On the 23ʳᵈ day of November in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as president of Scheib's Place, Inc., and that by his signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

> RICHARD ROTH
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 02RO5075155
> Qualified in Westchester County
> Commission Expires March 31, 2023

State of New York    )
                     )ss.:
County of New York   )

On the 23ʳᵈ day of November in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as president of Exhibition of the American Gangster, Inc., and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

> RICHARD ROTH
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 02RO5075155
> Qualified in Westchester County
> Commission Expires March 31, 2023

State of New York    )
                     )ss.:
County of New York   )

On the 23ʳᵈ day of November in the year 2021, before me, the undersigned, a notary public in and for said state, personally appeared Lawrence V. Otway, a/k/a Lawrence Lorcan Otway a/k/a Lorcan Otway, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, as Manager and sole member of Theatre 80 LLC, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

27

RICHARD ROTH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02RO5075155
Qualified in Westchester County
Commission Expires March 31, 2025

NOTARY PUBLIC
THE ROTH LAW FIRM

KATSKY KORINS LLP,

By: _____
    Steven H. Newman, Esq.
605 Third Avenue
New York, New York 10158
Attorneys for the Defendant

By: _____
Richard Roth, Esq.
295 Madison Avenue
New York, New York 10017
Attorneys for Plaintiffs

                          November
"**SO-ORDERED**" this 29th day of _____, 2021

HON. _____
                 BARRY R. OSTRAGER, J.S.C.

28

596657-1

KATSKY KORINS LLP,

By: _____
    Steven H. Newman, Esq.
605 Third Avenue
New York, New York 10158
Attorneys for the Defendant

NOTARY PUBLIC
THE ROTH LAW FIRM

By: _____
Richard Roth, Esq.
295 Madison Avenue
New York, New York 10017
Attorneys for Plaintiffs


**"SO-ORDERED"** this 29th day of November ____, 2021

HON. _____
     BARRY R. OSTRAGER, J.S.C.

596657-1

**Exhibit E**

MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, New York 10016
Telephone: (212) 696-4848
Facsimile: (212) 696-1231
Andrew R. Gottesman, Esq.

*Proposed Attorneys for the Debtors*

**UNITED STATES BANKRUPTCY COURT**     Chapter 11
**SOUTHERN DISTRICT OF NEW YORK**

In re:

                                        Case No.

78-80 St Mark's Place, LLC,

                       Debtors.

### LIST OF CREDITORS HOLDING THE 20 LARGEST
### UNSECURED CLAIMS AGAINST THE DEBTOR

Set forth below is the list of creditors that hold, based upon information presently available and belief, the twenty largest unsecured claims (the "Top 20 List") against 78-80 St Mark's Place, LLC ("SMP") as debtor and debtor in possession in the above-captioned case (the "Debtor"). This list has been prepared based upon the books and records of the Debtor. The Top 20 List was prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure for filing in the Debtor's chapter 11 case. The Top 20 List does not include: (1) persons who come  within the definition of an "insider" as set forth in 11 U.S.C. § 101(31); or (2) secured creditors,  including those creditors with a right to setoff under applicable law, unless the value of the collateral (or amount entitled to be offset) is such that the unsecured deficiency places the creditor among the holders of the twenty (20) largest unsecured claims. The information presented in the Top 20 List shall not constitute an admission by, nor is it binding on, the Debtor. The information presented herein, including, without limitation: (a) the failure of the Debtor to list any claim as contingent, unliquidated, disputed or subject to a setoff; or (b) the listing of any claim as unsecured, does not constitute an admission by the Debtor that any secured lenders listed here or elsewhere hold any deficiency claims, nor does it constitute a waiver of the Debtor's rights to contest the validity, priority, nature, characterization, and/or amount of any claim.

[List appears on following page]

| | |
|---|---|
| Debtor name | **78-80 St. Marks Place, LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Abstracts Incorporated 100 Garden City Plaza Suite 201 Garden City, NY 11530 | | title services | | | | $0.00 |
| ConEdison PO Box 1702 New York, NY 10116-1702 | | electricity | | | | $6,730.00 |
| Dollman & Weiss 383 Ogden Ave Teaneck, NJ 07666 | | accounting services | | | | $9,725.00 |
| NYC WATER BOARD PO BOX 11863 NEW YORK, NY 07101 | | utilities | | | | $7,652.25 |
| Roth Law Firm 295 Madison Ave 22nd Floor New York, NY 10017 | | legal services | | | | $40,000.00 |
| Schlam Stone and Dolan 26 Broadway New York, NY 10004 | | legal services | | | | $59,371.00 |
| Tarter Krinsky & Drogin LLP attn: Scott Markowitz, Esq. 1350 Broadway NEW YORK, NY 10038 | | legal services | | | | $24,380.00 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Waxman & Waxman PC**<br>**217 Broadway**<br>**Suite 712**<br>**New York, NY 10007** | | **legal services relkated to tax cert** | | | | **$0.00** |

## Exhibit F

# 78-80 ST MARKS LLC 30 day Expected Income and Expenses LBR 1007-2(b)(3)

## INCOME

| | | | | | |
|---|---|---|---|---|---|
| Loft 1 - 750 sq.ft (rental) | 0.00 | 3,000.00 | 0.00 | 0.00 | **3,000.00** |
| Loft 2 - 750 sq.ft (rental) | 0.00 | 2,950.00 | 0.00 | 0.00 | **2,950.00** |
| | | | | | **0.00** |
| Scheib's Place  (rental) | 0.00 | 0.00 | 14,000.00 | 0.00 | **14,000.00** |
| Museum 750 sq. ft. (rental) | 0.00 | 0.00 | 0.00 | 0.00 | **0.00** |
| **Income totals** | **0.00** | **5,950.00** | **14,000.00** | **0.00** | **19,950.00** |

## EXPENSES

| | | | | | |
|---|---|---|---|---|---|
| Adv and promotion | 0.00 | 0.00 | 100.00 | 0.00 | **100.00** |
| Electricity/gas | 0.00 | 0.00 | 1,728.00 | 0.00 | **1,728.00** |
| Office mgt. and supplies | 0.00 | 0.00 | 20.00 | 0.00 | **20.00** |
| Bank fees | 10.00 | 0.00 | 0.00 | 0.00 | **10.00** |
| Equipment/Supplies | 50.00 | 50.00 | 50.00 | 50.00 | **200.00** |
| Property Management Staff | 1,460.00 | 850.00 | 850.00 | 850.00 | **4,010.00** |
| Property Tax | 70,167.26 | 0.00 | 0.00 | 0.00 | **70,167.26** |
| Property Insurance | 0.00 | 0.00 | 3,826.00 | 0.00 | **3,826.00** |
| Water/sewer 12000 | | | 2,800.00 | | **2,800.00** |
| IT/Security | 0.00 | 0.00 | 0.00 | 400.00 | **400.00** |
| Repairs and Maintenance 100. | 100.00 | 100.00 | 100.00 | 100.00 | **400.00** |
| Exterminating | 0.00 | 350.00 | 0.00 | 0.00 | **350.00** |
| **Expenses totals** | **71,787.26** | **1,350.00** | **9,474.00** | **1,400.00** | **84,011.26** |