MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, New York 10016
Telephone: (212) 696-4848
Facsimile: (212) 696-1231
Andrew R. Gottesman, Esq.

*Hearing Date*:
**February 3, 2022 at 10:00 a.m. (Eastern Time)**

*Objection Deadline:*
**January 27, 2022 at 4:00 p.m. (Eastern Time)**

*Proposed Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

Chapter 11

In re:

78-80 St Mark's Place, LLC,

Case No. 21-12139 (mg)

Debtor.

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTOR TO OBTAIN SUPERPRIORITY POST-PETITION FINANCING, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, AND (D) GRANTING RELATED RELIEF**

78-80 St Mark's Place, LLC ("80 SMP" or the "Debtor"), submits this motion (the "Motion") pursuant to 11 U.S.C. §§ 105 and 361, 362(d), 364(b), 364(c)(1), 364(d)(1), 364(e), 503, 506, 507, and 552, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2, and 9014-2 of the Local Bankruptcy Rules for the Southern District of New York the ("Local Rules") for entry of an order, substantially in the form annexed hereto, (a) Authorizing the Debtor to Obtain Superpriority Post-petition Financing, (b) Granting Liens and Superpriority Claims, (c) Granting Adequate Protection to Prepetition Secured Party, (d) Modifying the Automatic Stay, and (e) Granting Related Relief.

In support of the Motion, the Debtor relies on the Declaration of Lawrence V. Otway, pursuant to Local Bankruptcy Rule 1007-1 filed on December 29, 2021 [ECF 2] (the "1007 Affidavit"); the Declaration of Lawrence v. Otway in support of the Motion annexed hereto as

Exhibit A; the Declaration of Ronald M. Gold in Support of the Debtor's Financing annexed hereto as Exhibit B and respectfully represents as follows:[1]

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 361, 362(d), 364(b), 364(c)(1), 364(d)(1), 503, 506, 507, and 552, Rules 2002, 4001, 6003, 6004 and 9014 of the Bankruptcy Rules and Rules 2002-1, 4001-2, and 9014-2 of the Local Rules.

## BACKGROUND

3.      On December 29, 2021(the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      The Debtor continues to operate its business and manage its property as a debtor and debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee or examiner has been appointed in this case. No official committee of unsecured creditors has been appointed.

5.      The Debtor is the fee owner of real property located at 78-80 St Mark's Place (the "Property"). The Property is a mixed-use property which houses three (3) residential units, meeting and storage space and four (4) operating businesses. The Debtor itself does not operate any business other than ownership and maintenance of the Property. However, the Property is an integral part of a larger consolidated enterprise which includes the Theatre 80 LLC ("Theatre 80"), the William Barnacle Tavern (a/k/a Scheib's Place, Inc., the "Tavern") and Exhibition of the American Gangster, Inc. (the "Museum," and collectively with Theatre 80 and the Tavern, the "Businesses") which all

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the 1007 Affidavit.

rely on each other for income and support. The Debtor's largest tenant is the Tavern, which subleases space to Theatre 80.

6.      Lawrence V. Otway (aka Lorcan Otway, "Otway") wholly owns the Debtor. Otway is also a debtor in a case pending before this Court under case number 21-12140 (mg) and is represented by M&G.

7.      This case and that of Otway's is intended to provide both Debtors with the breathing spell afforded by the automatic stay under section 362 of the Bankruptcy Code, which will allow the Debtor to obtain financing to repay the 2019 Loan and to protect and preserve the financial and historical value of the Property. This case is essential to protecting the Debtor's assets. Without protection available under the Bankruptcy Code, the Debtor would undoubtedly face irreparable harm to the value of the Property to the detriment of all stakeholders.

8.      Additional facts regarding the Debtor's business, the events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the 1007 Declaration.

## RELIEF REQUESTED

9.      By this Motion, the Debtor requests entry of an order, substantially in the form attached hereto (the "DIP Order") granting, among other things, the following relief:

- authorizing the Debtor to (i) obtain and use post-petition senior secured debtor in–possession financing in an aggregate principal amount of up to $650,000 (the "DIP Facility"), subject to disbursement in accordance with the Approved Budget (defined below), pursuant to the terms and conditions of the DIP Order and that certain Debtor In Possession Loan Agreement (substantially in the form attached to the DIP Order and as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Agreement"), by and among the Debtor, as borrower, and JEC Capital Partners SPV, LLC as lender (in such capacity, the "DIP Lender") and (ii) incur the Obligations (as defined in the DIP Agreement, the "DIP Obligations") under the DIP Loan

Documents;[2]

- authorizing the Debtor to execute and enter into the DIP Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents and consummation of the DIP Facility;

- authorizing the Debtor to grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all DIP Obligations, subject to the Carve Out (defined below);

- authorizing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such become due and payable;

- modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Order; and

- waiver of any applicable stay with respect to the effectiveness and enforceability of the DIP Order or the Final DIP Order (including a waiver pursuant to BankruptcyRule 6004(h)).

## **THE INDEBTEDNESS**

24.    The Debtor has one secured creditor which is an assignee of the 2019 Loan made by 80 St. Marks Funding, LLC (the "Original Creditor") to the Debtor on or about November 12, 2019, in the principal amount of six million one hundred thousand dollars ($6,100,000). The 2019 Loan was evidenced by a Promissory Note given by the Debtor in favor of the Original Creditor (the "2019 Note"). The Note is secured by a Mortgage and Security Agreement (the "2019 Mortgage") of even date with the Note executed by the Debtor, as Mortgagor, to the Original Creditor, as Mortgagee, encumbering (among other things) the Property; and an Assignment of Leases and Rents (the "2019 ALR") of even date therewith.

25.    On or about the same date as the execution of the 2019 Note, Otway, the Debtor's sole member, personally guaranteed the obligations under the 2019 Loan (the "2019 Guarantee") and

---

[2] The term "DIP Loan Documents" means the DIP Agreement and any and all other agreements, instruments and documents now or hereafter executed by Debtor in favor of DIP Lender with respect to any of the transactions contemplated by the DIP Agreement.

executed a Pledge and Security Agreement (the "2019 Pledge Agreement") in favor of the Original

Creditor. Pursuant to the Pledge Agreement, he pledged all rights, title and interests in, to and under

100% of the limited-liability company membership interests in the Debtor to the Original Creditor.

The Loan, Note, the Guarantee, the Pledge Agreement, and all other documents evidencing the Loan

are collectively referred to herein as the "2019 Loan Agreements."

26.     The Original Creditor perfected its security interest in the Collateral (as defined in the

2019 Loan Agreements, the "Prepetition Collateral") by taking possession of certificate of

membership interests (the "Certificated Interest") in the Debtor and filing UCC-1 financing

statements describing the Collateral, with the New York State Department of State on December 4,

2019, and December 18, 2019.

27.     On or around the maturity date of the 2019 Loan (December 1, 2020) the Original

Creditor assigned the 2019 Loan Agreements, and the obligations thereunder, to SM Mixed Use, LLC

("SM Mixed Use"), owned by The Secured Creditor Real Estate Partners (together with SM Mixed

Use "The Secured Creditor" or the "Secured Creditor").

28.     Less than one week after purchasing the Loan, The Secured Creditor sent a letter,

dated December 7, 2020, to the Debtor and Otway (as Guarantor) notifying us, among other things,

(i) that on December 1, 2020, the Loan matured by its terms and the entirety of the indebtedness

became immediately due and payable pursuant to the Note and the Mortgage, (ii) that the Debtor

failed to pay the entire indebtedness within five (5) days of when it became due, constituting an Event

of Default under both the Note and the Mortgage, and (iii) interest on the indebtedness began to

accrue at the "Default Rate" as defined in the Note and Mortgage from and after December 2, 2020.[3]

29.     In January 2021, Plaintiffs and Defendant entered into a Forbearance Agreement (the

"Forbearance Agreement") wherein the Debtor acknowledged the Obligations and The Secured

---

[3] The Default rate under the Note is 24% per annum.

Creditor, and St. Marks Mixed Use LLC, for consideration including a release, agreed to extend certain Obligations under the Loan Agreements.[4]

30.     Under the Forbearance Agreement, the Debtor was required, among other things, to pay the principal and accrued interest on the Loan in less than four (4) months, with the majority of New York State and New York City COVID restrictions still in effect. Failing such repayment, the Debtor was required to list the Property for sale at $11,000,000 with the price decreasing each month through July 15, 2021, to a final listing price of $8,500,000. If the Property were not sold (under a contract acceptable to the Secured Creditor) by August 15, 2021, The Secured Creditor would have the right to foreclose without opposition. At the time of the execution of the Forbearance Agreement, a government mandated moratorium existed on commercial foreclosures related to the COVID-19 pandemic. This protection remained in place on August 15, 2021 and was mostly in place through at least January 15, 2022.[5] The Debtor and I reserve all rights regarding the Forbearance Agreement, the assignment of the 2019 Loan and all transactions associated therewith.

31.     The Property was not sold by August 15, 2021. On September 3, 2021, The Secured Creditor forwarded a Notice of Disposition of Collateral under sections 9-611 and 9-612 of the New York State Uniform Commercial Code (the "Notice of Disposition") that set forth The Secured Creditor's intention to conduct a public auction of all of right, title and interest in Otway's membership interests in the Debtor on November 18, 2021, at 1:00 p.m. eastern time (the "UCC Sale").

32.     On November 11, 2021, the Debtor, along with the Debtor's sole member and other related plaintiffs brought an action in New York State Supreme Court seeking a preliminary injunction to stop any foreclosure or sale under the UCC (the "NYS Case"). That action was pending in New York County under index number 65446/2021. On November 17, 2021, the Honorable Justice

---

[4] A copy of the Forbearance Agreement is annexed hereto as Exhibit C.
[5] *See* Chapter 417 of the Laws of 2021, effective September 2, 2021; Administrative Order AO/262/21

Ostrager, entered an Order to Show Cause on the docket of the NYS Case, staying the UCC Sale and scheduling an evidentiary hearing on the request for a preliminary injunction for December 3, 2021. [NYS ECF Case Docket. No 25]. That case was voluntarily dismissed upon entry of a second Forbearance Agreement in the form of a stipulation (the "Second Forbearance Agreement") by which The Secured Creditor agreed to forbear from exercising remedies through December 30, 2021.[6]

33.    Pursuant to the terms of the 2019 ALR, the Debtor's outstanding payment obligations under the 2019 Note are secured by first priority security interests in all rents, additional rents, increases in rents, security deposits, advance rents, income, proceeds, earnings, revenues, issues, profits, royalties, revenues, rights, deposits and benefits or other payments now due, or to become due, under or by virtue of any lease, whether written or verbal, or any letting of, or of any agreement for the use or occupancy of, the Premises or any part thereof. Accordingly, it is the Debtor's position that the Debtor's cash, whether now existing or hereafter acquired, constitutes "cash collateral" of the Secured Creditor, within the meaning of Code sections 363(a) and 552(b) ("Cash Collateral").

10.    As of the Petition Date, SM Mixed Use was owed approximately $7,980,000.00 plus accruing interest, fees and expenses provided for in the Notes (the "Claim").

11.    The Secured Creditor is the only known party to assert a security interest in the Collateral.

### STATEMENT PURSUANT TO
### BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

12.    In accordance with Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, below is a summary of the terms of the proposed DIP Facility, as specified in the DIP Loan Documents and DIP Order:

---

[6] A copy of the Second Forbearance Agreement is annexed hereto as Exhibit D.

| Material Terms (Applicable Rule) | DIP Facility Provision; Location |
|---|---|
| **Borrowers**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Debtor, 78-80 St. Mark's Place, LLC<br><br><br>*See* DIP Agmt. at preamble. |
| **DIP Lender**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | JEC Capital Partners SPV, LLC<br><br>*See* DIP Agmt. at preamble. |
| **Amount and Facility**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(1) | Nonamortized credit line facility in the amount of $650,000, to be advanced immediately following the entry of the DIP Order, subject to disbursement in accordance with the Approved Budget.<br><br>*See* DIP Agmt. at Recitals, § 2(a) and definition for "Commitment". |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(3) | 15.0% per annum.<br><br><br>*See* DIP Agmt. § 3(a). |
| **Default Interest**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(3) | 24.0% per annum.<br><br><br>DIP Agmt. definition for "Default Rate." |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(3), (16). | A "Commitment Fee" equal to $19,500. The Debtor shall be obligated for the Commitment Fee, which shall be fully earned and payable to the DIP Lender on the Closing Date (as defined in Definitions section of the DIP Agreement) by the DIP Lender adding the amount of the Commitment Fee to the outstanding principal balance of the Loans (as defined in § 2(a) of the DIP Agreement).<br><br>An "Exit Fee" equal to $19,500 which shall be fully earned immediately before the Maturity Date (as defined in the DIP Agreement) and added to the principal balance at such time.<br><br>Customary reimbursement of DIP Lender's reasonable legal, accounting, appraisal and other fees and expenses incurred by DIP Lender.<br><br>See Order ¶¶ 7, 25; DIP Agmt. §§ 3(c), 12. |
| **Borrowing Conditions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | Customary borrowing conditions, including:<br><br>(a)    execution of the DIP Agreement;<br><br>(b)    entry of the DIP Order that, among other things, provides that the Liens and security interests in favor of the DIP Lender granted pursuant to the DIP Agreement shall be valid |

|  |  |  |
|---|---|---|
|  |  | and perfected first priority Liens prior to all other Liens in or on the DIP Collateral, subject to the Carve Out; |
|  | (c) | receipt of a Borrowing Request by the DIP Lender not less than two (2) business days prior to the date of each requested borrowing of a Loan; *provided, however*, (i) no Loan shall be in an amount less than $50,000, (ii) Debtor shall not be permitted to deliver a Borrowing Request more frequently than once per calendar week and (iii) Debtor shall not be permitted to request Loans (and DIP Lender shall not be required to fund Loans) in excess of Debtor's cash needs for the four (4) calendar weeks immediately following the date of the Borrowing Request (as set forth in an Approved Budget, subject to any Permitted Variance).; |
|  | (d) | absence of any Default or Event of Default; |
|  | (e) | the absence of a Material Adverse Change (as defined in the DIP Agreement); |
|  | (e) | compliance with the Approved Budget; and |
|  | (f) | such other approvals or documents as the DIP Lender may reasonably request. |
|  |  | See Order ¶ 4; DIP Agmt. §§ 4,5. |
| **Prepayment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(13) | | The Debtor shall have the right to make prepayments of principal at any time or from time to time, *provided* that: (i) Debtor shall give DIP Lender irrevocable notice of each prepayment by 12:00 p.m. Eastern on the date of prepayment of a Loan; (ii) all prepayments shall be in a minimum amount of $100,000; and (iii) in the event Debtor should repay the DIP Facility prior to the Maturity Date, DIP Lender will be due all interest and fees based on amounts actually drawn on the DIP Facility as if it had been repaid on the Maturity Date.<br><br>See DIP Agmt. §§ 2.9, 2.10. |
| **Term**<br><br>Fed. R. Bankr.<br>P. 4001(b)(1)(B)(iii)<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | | The earliest of (a) one (1) year from the entry of the DIP Order, (b) substantial consummation (as defined in Bankruptcy Code § 1101) of a chapter 11 plan that is confirmed in respect of Debtor in the Chapter 11 Case, (c) the closing of a sale of all or substantially all of Debtor's assets, pursuant to Bankruptcy Code section 363 and (d) the date of the acceleration of the Loans or termination of the Commitment pursuant following and Event of Default.<br><br>Debtor may extend the Maturity Date for a period of one (1) year, absent the existence of an Event of Default on at least thirty (30) days' notice before the Maturity Date. Upon the exercise of this extension option, Debtor agrees to pay to DIP Lender an extension fee equal to six percent (6%) of the Commitment, which shall be |

| | fully earned on the exercise date, and which shall be capitalized and added to the principal balance on such date.<br><br>See Order ¶ 6; DIP Agmt. § 2(e), Definitions. |
|---|---|
| **Security and Priority**<br><br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)(i), (vii)<br>Local Rule 4001-2(a)(4) | The liens and security interests in favor of the DIP Lender shall have first priority, senior to the Liens of the Secured Creditor, pursuant to Bankruptcy Code section 364(d), with respect to the (a) the Property and (b) all of Debtor's right, title and interest in and to any and all leases and rents in respect of the Property, that are pledged to DIP Lender pursuant to § 11(d) of the DIP Agreement which liens shall be subject only to the Carve Out.<br><br>The DIP Obligations shall constitute allowed administrative expenses in the chapter 11 case and have priority over all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b), pursuant to Bankruptcy Code section 364(c)(1), subject only to the Carve Out.<br><br>See Order ¶¶ 8, 13; DIP Agmt. §§ 9(e),10(a), 11, Definitions |
| **Use of DIP**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(ii)<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | The DIP Facility Amount advanced by DIP Lender to the Debtor and shall be used in the amounts and for the purposes identified in the Approved Budget.<br><br>See Order ¶ I, 3, 12; DIP Agmt. §§ 5(f),5(i),7(e),7(i), 8 |
| **Approved Budget**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | A copy of the Approved Budget is annexed to the DIP Order as Exhibit B. Each request for a Borrowing under the DIP Agreement shall be made strictly in compliance with and solely to pay amounts contemplated by the Approved Budget subject to Permitted Variances), *provided* that payments on account of professional fees, including funding of the Carve Out, shall not be subject to the Budget.<br><br>See Order ¶¶ J, 3; DIP Agt. §§ 2(b), 5(f), 7(f). |
| **Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(2) | Customary and appropriate affirmative and negative covenants for financing of this type, including, without limitation, relating to (a) financial reporting and notices of material events and regular updates to the Approved Budget; (b) information regarding collateral;(c) continuation of the Debtor's legal existence and conduct of business; (d) keeping of books and records and granting of inspection rights; (e) maintenance of the Premises; (f) maintenance of insurance, (g) compliance with applicable laws, (h) limitations on activities, (i) use of proceeds, (j) liens, (k) asset disposition, and (l) certain other bankruptcy matters.<br><br>*See* DIP Agmt. at §§ 8,10. |

| | |
|---|---|
| **Limitations on use of DIP Facility; Cash Collateral**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(9) | No DIP Collateral or Loan proceeds may be used directly or indirectly by Debtor, any committee, any trustee or other estate representative appointed in the Chapter 11 Case or any other person or entity:<br><br>   (i)    to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of DIP Lender or the Superpriority DIP Claims (except to the extent expressly set forth in this Agreement); or<br><br>   (ii)   to prepare, assert, join, commence, support or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter seeking an order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Lender, its controlling persons, affiliates or successors and assigns, and each of their respective officers, directors, employees, agents, attorneys or advisors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including without limitation (a) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (b) any so-called "lender liability" claims or causes of action, (c) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim or offset to, the Obligations, the Superpriority DIP Claims, the DIP Loan Documents or any Liens in favor of DIP Lender, (d) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or any Liens in favor of DIP Lender, (e) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted DIP Lender in the DIP Financing Order or any of the DIP Loan Documents or (f) objecting to, contesting or interfering with, in any way, DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred.<br><br>Order ¶ 15, DIP Agmt. § 8(h) |
| **Entities with Interests in Cash Collateral**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(i) | The Secured Creditor<br><br>Order ¶¶ D, E |
| **Adequate Protection**<br>Fed. R. Bankr. P 4001(b)(1)(B)(iv) | Equity Cushion<br><br>Order ¶¶ M,N |
| **Carve Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(5) | The DIP Liens, the DIP Superiority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Superpriority Adequate Protection Claim shall be junior and subject to the |

|  | payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve Out") an amount equal to the sum of the following:<br><br>(a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717;<br><br>(b) fees and disbursements incurred by a chapter 7 trustee (if any) under Bankruptcy Code section 726(b) in an amount not to exceed $10,000;<br><br>(c) accrued but unpaid fees and expenses of professionals retained by Debtor, incurred prior to an Event of Default; and<br><br>(d) after the occurrence and during the continuation of an Event of Default, allowed and unpaid professional fees and expenses incurred by (i) Borrower, in an amount not to exceed $200,000, and (ii) any official committee appointed pursuant to Bankruptcy Code section 1102, in an amount not to exceed $50,000; *provided, however*, that any amount hereby allocated to an official committee may be reallocated to Debtor in the event no official committee is appointed; *provided further*, that so long as no Event of Default shall have occurred and be continuing, the Carveout shall not be reduced by the payment of fees and expenses allowed by the Bankruptcy Court under Bankruptcy Code sections 330 and 331 (including for the avoidance of doubt, fees and expenses incurred prior to an Event of Default that were allowable when incurred and allowed by the Bankruptcy Court after the occurrence and continuance of such Event of Default); *provided further*, that any payments of allowed professional fees incurred after an Event of Default shall reduce the amount of the Carveout by the amount of any such payment.<br><br>Order ¶ 9; DIP Agmt. Definitions |
|---|---|
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(10) | Events of Default under the DIP Agreement include:<br><br>(a) Debtor shall fail to pay (i) the principal amount of the Loans as and when due and payable, or (ii) interest on the Loans, or any other amount payable under this Agreement, as and when due and payable.<br><br>(b) Any representation or warranty made or deemed made by Debtor in this Agreement, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any material respect on or after the date hereof. |

(c) Debtor shall fail to perform or observe any material term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed and fails to cure said Event of Default within five (5) days following receipt of written notice from DIP Lender of a monetary Event of Default and fifteen (15) days following receipt of written notice from DIP Lender of a non-monetary Event of Default.

(d) Debtor is involved in any proceeding which would reasonably be expected to result in a forfeiture of all or a substantial part of its assets, or a material judgment is entered against Debtor and such judgment is not stayed from enforcement.

(e) Any Lien or security interest purported to be created by any DIP Loan Document or the DIP Financing Order shall cease to be, or shall be asserted by Debtor not to be, a valid, perfected, first priority (except as otherwise expressly provided in the DIP Financing Order, or any other DIP Loan Document) security interest in the assets or properties covered thereby.

(f) Any of the following shall occur in the Chapter 11 Case:

   (i)    filing of a chapter 11 plan in respect of Debtor that does not indefeasibly repay the DIP Obligations in full, in cash, unless otherwise consented to in writing by DIP Lender;

   (ii)   filing of a motion or application by Debtor seeking to vacate or modify the DIP Financing Order without the prior written consent of DIP Lender;

   (iii)  entry of an order without the prior written consent of DIP Lender amending, supplementing or otherwise modifying the DIP Order;

   (iv)   reversal, vacatur or stay of the effectiveness of the DIP Order;

   (v)    any violation of the terms of the DIP Order;

   (vi)   conversion or dismissal of the Chapter 11 Case, pursuant to Bankruptcy Code section 1112;

   (vii)  appointment of a trustee, pursuant to Bankruptcy Code section 1104;

   (viii) Debtor seeks to sell any of its assets outside of the ordinary course of business, without advance consent of DIP Lender, other than a sale pursuant to a chapter 11 plan that proposes to indefeasibly repay the

| | |
|---|---|
| | Obligations in full in cash; |
| | (ix) appointment of a responsible officer, or examiner, pursuant to Bankruptcy Code section 1104, with enlarged powers relating to the operation of the business of Debtor, without the prior written consent of DIP Lender; |
| | (x) granting of relief from the automatic stay in the Chapter 11 Case to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of Debtor exceeding $500,000 in value; |
| | (xi) Debtor's filing (or supporting another party in the filing of) a motion for an order granting any superpriority claim or Lien which is senior to or *pari passu* with the Superpriority DIP Claims, except as contemplated herein and other than the DIP Lender Carveout; |
| | (xii) payment or granting of adequate protection with respect to prepetition debt, other than as expressly provided herein, in the DIP Financing Order, approved in writing by the DIP Lender or as otherwise ordered by the Bankruptcy Court; |
| | (xiii) Borrower's failure to file a plan and disclosure statement, or relevant extension motion resulting in the termination of Debtor's exclusive period for filing or soliciting a chapter 11 plan, under Bankruptcy Code section 1121, within one (1) year after the Petition Date; or |
| | (xiv) cessation of the Liens of DIP Lender to be valid, perfected and enforceable in all respects. |
| | (xv) Borrower shall use Loan proceeds for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any prepetition debt except as approved by the Bankruptcy Court or DIP Lender. |
| | Order ¶ 15; DIP Agmt. § 9 |
| **Section 506(c) Waiver**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a) | Subject to entry of a Final DIP Order, no costs or expenses of administration which have been or may be incurred in the case at any time shall be charged against the DIP Lender, or the interests of the DIP Lender in the DIP Collateral.<br><br>*See* Order ¶ 17; DIP Agmt. § 5.7 |

## THE DEBTOR'S NEED FOR POST-PETITION FINANCING

13.    The Debtor requires access to debtor in possession financing to continue operating as a going concern and fund the prosecution of these cases. The debtor expects a shortfall between the amount expected to be paid in rents and the expenses of the Debtor as it moves through this case. DIP Facility will help fund this shortfall and provide capital sufficient to continue operations while the Debtor operates in chapter 11 and seeks to refinance the 2019 Loan. The Debtor requires access to the DIP Facility to avoid the irreparable harm that will be suffered by the Debtor's estate if it does not have access to the cash necessary to do so. Absent access to the DIP Facility, the Debtor may be forced to convert these cases to cases under chapter 7 of the Bankruptcy Code or dismiss these cases and liquidate out of court. Either alternative means the destruction of the value in the Property and a windfall for the Secured Creditor.

14.    As shown in the Approved Budget, the Debtor intends to use the funds in its bank accounts and the DIP Facility to pay limited staff to maintain the Property, fund ongoing maintenance of the Property, maintain the provision of essential services to the Property, pay accruing real estate taxes, provide access to capital in the event of any emergency and pay the administrative expenses accruing during the conduct of this case. This includes the requirement to pay over $70,000.00 in real estate taxes that became due on January 1, 2022. The DIP Facility will also be used to pay the costs and fees associated with this case and the professional fees required to do so. Without access to the DIP Facility and the Cash Collateral, the Debtor will not be able to utilize the bankruptcy process to protect the Property and would need to liquidate the Property in a "fire sale" to the detriment of all of the Debtor's stakeholders. *See* Otway Declaration at ¶ 11. Segregating the amount of the Secured Creditor's claim is not practical because the Debtor's accounts do not contain amounts in excess of that claim. *See* Otway Declaration ¶ 10.

15.    Given the Debtor's current liquidity position, it would not be possible to finance this case on prepetition Cash Collateral alone, and the Debtor anticipates there will be a monthly shortfall

between its expenses and income during the case. *See* Otway Declaration at ¶ 11. Therefore, the use of Cash Collateral and the DIP Facility is crucial to preserving the Debtor and its bankruptcy estate. *Id.* As detailed in the Otway Declaration, the Debtor and the Debtor's counsel, approached over eleven (11) direct lenders and alternative investment firms seeking either debtor in possession financing or funds to refinance the 2019 Loan. *See* Otway Declaration at ¶ 7. This led to two potential lenders willing to extend the DIP Facility. With the advice of counsel, the Debtor selected the offer from the DIP Lender. See Otway Decl. ¶ 8.

16.     The Debtor's negotiations with the DIP Lender over the terms and conditions of the DIP Agreement only recently concluded. The Debtor's negotiations with the DIP Lender were arm's length and each party was represented by separate counsel. This process resulted in terms and conditions that the Debtor believes are fair and reasonable under the circumstances, particularly considering the business and financing challenges the Debtor have faced over the past two (2) years.

17.     The Debtor believes that the Approved Budget is adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Approved Budget. See Otway Decl. at ¶ 11.

## PROPOSED ADEQUATE PROTECTION

18.     The Secured Creditor is adequately protected by an equity cushion of over $4,800,000 in this case. The United States Supreme Court in *Associates Commercial Corp. v. Rash* held that the appropriate standard courts should use to value collateral is the "replacement-value standard." 520 U.S. 953, 962 (1997). The Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." Id. at 960. In applying a replacement-value standard, the Rash Court left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." *Id*. at 965 n.6.

19.     Property is properly valued at approximately $13,680,00.00 as of December 31, 2021, at an arms-length market sale.[7] *See* Gold Declaration at ¶ 21. Here, the most rational standard to use is replacement value because the Property is not generating revenue from its main commercial tenants making any other valuation speculative.[8] The appraisal annexed to the Gold Declaration (the "Updated Appraisal") is an update of the appraisal done by Mr. Gold valuing the Property at $15,000,000 as of August 1, 2021 (the "August Appraisal"). The Updated Appraisal goes through various methodologies to value and finds that the Sales Comparison approach of analyzing sales of comparable buildings in the latter half of 2021 to be the most reliable and relevant. *See* Gold Declaration at ¶ 19. It therefore uses that methodology used to determine the Property's value. *Id.*

20.     Based on the 2019 Loan Documents, the value of The Secured Creditor's claim, assuming no successful challenges, is approximately $8,284,228.98 as of the date of this Motion.[9] Adequate protection entitles a secured creditor to protection of its interest in property of the estate. Its interest is equal to its petition date principal and interest, not to the value of its collateral or of any equity cushion. *In re: Constr. Supervision Servs., Inc.*, No. 5:15-CV-434-FL, 2016 WL 2764328, at *5 (E.D.N.C. May 9, 2016). Under no circumstance may the "value" of creditor's "interest" to be adequately protected exceed the value of the principal debt and matured interest owed to the creditor as of the petition date. See *Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.)*, 54 F.3d 722, 729–30 (11th Cir. 1995).

21.     Accordingly, the value of the Property is approximately $4,745,771.02 higher than the Preparation Lender's claim plus the principal amount of the DIP Facility, or a 57% "equity cushion." After applying interest on the 2019 Loan accruing at the default rate,[10] interest accruing on the DIP Facility, and the use of the maximum amount of Cash Collateral possible, the value of the Property

---

[7] December 31, 2021 was used in order to obtain a sufficient comparable sales data for the Updated Appraisal.
[8] The August 1, 2021 appraisal valued the property on a capitalization of income approach to value at $14,000,000. *See* August Appraisal, [ECF No. 2] at *Summary Of Important Facts And Conclusions.*
[9] The Debtor reserves all rights with respect to the amount, validity and enforceability of The Secured Creditor's claim.
[10] The Debtor reserves all right with respect to the accrual of interest at the default prepetiton or post-petition.

still supports an equity cushion of 50% in the first month of following approval of the DIP Facility.

This cushion reduces monthly to 20% at the end of the first year of the DIP Facility and does not

decline to 11% until 16 months following approval of the DIP Facility. The Debtor does not believe

additional adequate protection will be necessary throughout the course of this case. The Secured

Creditor will have notice of the Debtor's cash position through the Debtor's reporting requirements

and have ample opportunity to react to potential market factors should the Property drastically

decrease in value.

## **BASIS FOR RELIEF REQUESTED**

### A. **The Court Should Approve the DIP Facility**
### **Under Section 364(c) and (d)(1) of the Bankruptcy Code**

22.     As stated, the Debtor's ability to continue to operate its business and maintain the

Property in this chapter 11 case would be severely jeopardized without access to the DIP Facility and

Cash Collateral. Put simply, the Debtor will be forced to sell the Property and forgo the opportunity

to refinance the 2019 Loan unless the relief requested in this Motion is approved. Approval of the

DIP Facility will allow the Debtor to fund its current and ongoing obligations to the Property's

superintendent, working capital, and operating expenses and prosecute these chapter 11 case. For the

reasons set forth herein, the Debtor submit that entry into the DIP Facility is a sound exercise of its

business judgment and should be approved.

      i.    The Debtor Exercised Sound and Reasonable Business
             Judgment in Deciding to Enter into the DIP Facility

23.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing under certain circumstances discussed in detail below.

24.     Courts grant a debtor considerable deference in acting in accordance with its business

judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit

does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See In re*

*Barbara K. Enters., Inc.*, Case No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers, or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

25.    To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

26.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). Courts may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed post-petition facility. See *In re ION Media Networks, Inc.*, Case No. 09-13125, 2009 (JMP) WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (noting that "[r]elevant features of the financing must be evaluated, including non-economic elements

such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

27.    The Debtor's determination to enter into the DIP Facility is a sound exercise of its business judgment given the circumstances of this case. The DIP Facility will allow the Debtor to protect the value of the Property during the pendency of these cases, while they seek to refinance the 2019 Loan and implement a holistic business plan that will bring the Debtor to profitability. The DIP Facility will allow the Debtor to: (a) fund the income shortfall in the maintenance of the Property and related necessary expenditures, (b) fund certain costs, fees, and expenses related to the chapter 11 case, and  (c)  fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees,costs, and expenses incurred by the DIP Lender.

28.    The Debtor negotiated the DIP Facility and DIP Loan Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtor believes that they have obtained the best financing available under the circumstances.

29.    Accordingly, the Debtor respectfully asserts that Court should authorize the Debtor's entry into the DIP Agreement, as it is a reasonable exercise of the Debtor's business judgment.

       ii.    <u>The Debtor Should Be Authorized to Grant Liens and
Superpriority Claims</u>

30.    The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to sections 364(c)(1) and (d)(1) of the Bankruptcy Code. Specifically, the Debtor proposes to provide to the DIP Lender (a) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition first priority security interests in, and liens on, the DIP Collateral subject only to the Carve Out (the "DIP Liens") and (b) allowed administrative expenses in the chapter 11 case and have priority over all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b), subject only to the Carve Out (the "DIP Claims"). The Debtor satisfies the requirements for

relief under section 364(c) and 364(d) of the Bankruptcy Code, which authorizes a debtor to incur

secured or superpriority debt under certain circumstances.

31.    The statutory requirement for obtaining post-petition credit with priority over all

administrative expenses under section 364(c)(1) of the Bankruptcy Code is a finding that a debtor is

"unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11

U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit

under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing

that unsecured credit cannot be obtained). A debtor need only demonstrate "by a good faith effort that

credit was not available" to the debtor on an unsecured or administrative expense basis. *See In re

Crouse Grp.*, 71 B.R. at 549; *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*,

789 F.2d 1085, 1088 (4th Cir. 1986). The statute imposes no duty to seek credit from every possible

lender before concluding that such credit is unavailable. *Id.*; *See Pearl-Phil GMT (Far East) Ltd. v.

Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized

where debtor could not obtain credit as an administrative expense). When few lenders are likely to

be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary

to require [the debtor] to conduct such an exhaustive search for financing." *In re SkyValley, Inc.*, 100

B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99

B.R. 117, 120 n.4 (N.D. Ga. 1989).

32.    Courts have articulated the following three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code:

      a.  the debtor is unable to obtain unsecured credit under section 364(b) of the
          Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

      b.  the credit transaction is necessary to preserve the assets of the estate; and

      c.  the terms of the transaction are fair, reasonable, and adequate, given the
          circumstances of the debtor-borrower and proposed lenders.

*In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames*, 115 B.R. at 37–40; *In re Crouse Grp.*, 71 B.R. at 549.

33.    As stated, the Debtor has been unable to find a third-party willing to provide the necessary financing junior to, or *pari passu* with, the Secured Creditor. *See* Otway Declaration at ¶ 7. The DIP Facility was negotiated on an arms' length basis and was selected by the Debtor as containing the most advantageous terms as between two proposals. The DIP Facility is therefore the best financing available to the Debtor under the circumstances to provide liquidity during the chapter 11 case. Absent the DIP Facility, which will provide assurances that the Debtor will have liquidity to administer the cases, the value of the Debtor's estate would be significantly impairedto the detriment of all stakeholders. Without post-petition financing, the Debtor lacks sufficient funds to operate its enterprise, continue paying its debts as they come due, and cover the projected costs of the chapter 11 case. *See* Otway Decl. ¶ 11. For all these reasons, and those stated above, the Debtor submits that it has satisfied the standard for obtaining post-petition financing under section 364(c).

34.    Section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien isproposed to be granted." 11 U.S.C. § 364(d)(1). The Secured Creditor was assigned a perfected lien on the Property and obtained an assignment of the leases and rents including all "general intangibles," "accounts," and "proceeds" as those terms are defined under the New York state Uniform Commercial Code. "Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992). As stated, the Debtor and its counsel sought financing from numerous parties prior to the Petition Date. No party would provide financing on any basis over than on a super priority basis under section 364(d)(1).

35.     The Bankruptcy Code does not define "adequate protection." Bankruptcy Code section 361 contains non-exclusive list of examples as to how adequate protection may be provided, including cash payments and replacement liens. *See Resolution Trust Corp. v. Swedeland Dev. Gr., Inc. (In re Swedeland Dev. Gr., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Absent cash payment or replacement liens, the court is authorized to grant such adequate protection that will result in a senior lender realizing the indubitable equivalent of its interest in the collateral. *See* 11 U.S.C. § 361(3).

36.     Congress intended to protect secured creditors through the inclusion of the adequate protection requirement in section 365(d)(1) and thereby ensure that secured creditors are not "deprived of the benefit of their bargain." See H.R. Rep. No. 95-595 (1977). S*ee also In re Swedeland Dev. Gr. Inc.*, 16 F.3d at 564 (stating that the purpose of adequate protection is to "provide the prepetition secured creditors with the same level of protection it would have had if there had been no post-petition. ... financing."). The determination of what constitutes adequate protection is made on a case-by-case basis. *See Swedeland*, 16 F.3d at 563.

37.     The existence of an equity cushion may be sufficient alone to provide a prepetition secured lender with adequate protection for purposes of satisfying section 364(d)(1)(b). *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted); *See also Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("[T]he existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection."); *In re M.D. Moody & Sons, Inc.*, No. 3:09-BK-06247 (JAF), WL 11719122, at *7 (Bankr. M.D. Fla. Mar. 5, 2010); *see In re Megan-Racine Associates, Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996).

38.     It is widely accepted that an equity cushion of approximately 20% constitutes adequate protection where anything below 11% does not. *See In re James River Assocs.*, 148 B.R.

790, 796 (E.D. Va. 1992) ("Case law has almost uniformly held that an equity cushion of 20% or

more constitutes adequate protection …. Case law has almost as uniformly held that an equity cushion

under 11% is insufficient to constitute adequate protection …. Case law is divided on whether a

cushion of 12% to 20% constitutes adequate protection …."); *See also In re O'Farrill*, 569 B.R. 586,

591 (Bankr. S.D.N.Y. 2017) (*citing In re Rorie,* 98 B.R. 215, 221 (Bankr. E.D. Pa. 1989) (finding a

42% equity cushion sufficient to provide adequate protection)); *In re Big Dog II, LLC*, 602 B.R. 64,

70 (Bankr. N.D. Fla. 2019); *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987); *In re Las

Torres Dev., LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) (20% equity cushion is sufficient); *In

re San Clemente Estate*, 5 B.R. 605, 610 (Bankr. S.D. Ca1. 1980) (65% is adequate); *In re Nashua

Trust Co.*, 73 B.R. 423, 433 (Bankr. D. N.J. 1987) (50% is adequate); *In re Ritz Theatres*, 68 B.R.

256, 260 (Bankr. M.D. Fla. 1987) (38% is adequate); *In re Dunes Casino Hotel*, 69 B.R. 784, 795-

96 (Bankr. D.N.J. 1986) (45% is adequate); *In re Helionetics*, 70 B.R. 433, 440 (Bankr. C.D. Cal.

1987) (20.4% is adequate); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (20% is adequate).

39.     As shown above, the Equity Cushion in this case is more than twice what is generally

accepted by courts to constitute adequate protection, with all other factors considered. Interest erosion

in this case does not reach unacceptable levels until the Spring of 2023 even when calculated at the

default rate.

40.     Accordingly, the Debtor respectfully submits that granting the DIP Liens, the DIP

Claims and the Secured Creditor Adequate Protection is appropriate.

### B.  The Debtor Should Be Authorized to Pay the Fees Required Under the DIP Loan Documents

41.     Under the DIP Loan Documents, the Debtor has agreed to pay certain fees to the DIP

Lender. In particular, as noted above, the Debtor has agreed to pay: (i) a Commitment Fee of $19,500

which is approximately three percent (3%) of the Commitment amount which will be fully earned

and payable on the Closing Date; (ii) an Exit Fee equal to $19,500 which is also approximately three

percent (3%) of the Commitment but will be fully earned immediately before the Maturity Date and (iii) customary reimbursement of DIP Lender's reasonable legal, accounting, appraisal and other fees and expenses incurred by DIP Lender.

42.    Courts in this district and others have approved similar aggregate fees in chapter 11 cases. *See, e.g., In re Sungard Availability Serv's Capital, Inc.*, Case No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 1, 2019) (approving upfront and commitment fees of 3% of the committed DIP amount and 2.5% of the average daily unused delayed draw, respectively); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (Bankr. S.D.N.Y. Mar. 28, 2017) (approving 3.5% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10–12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee).

43.    The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good faith negotiation between the Debtor and the DIP Lender, are an integral component of the overall terms of the proposed DIP Facility and were required by the DIP Lender as consideration for the extension of debtor in possession financing. See Otway Decl. at ¶ 11. Accordingly, the Bankruptcy Court should authorize the Debtor to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

**C.    The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e).**

44.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

45.     As explained herein and in the Otway Declaration, the DIP Loan Agreement and DIP

Loan Documents are the result of: (a) the Debtor's reasonable and informed determination that the

DIP Lender provided the best financing alternative available under the circumstances; and (b) arm's–

length, good faith negotiations between the Debtor and the DIP Lender. The Debtor submits that the

terms and conditions of the DIP Loan Documents are fair and reasonable under the circumstances,

and the proceeds of the DIP Facility will be used only for purposes that are permissible under the

Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan

Documents other than as described herein or in the DIP Loan Documents. Accordingly, the Court

should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the

Bankruptcy Code and is entitled to all of the protections afforded by that section.

### C.  The Proposed Carve Out Is Appropriate.

46.     The proposed adequate protection is subject to the Carve Out, which applies to

payments to the Clerk of the Court, the Office of the U.S. Trustee, and professionals retained by the

Debtor and any statutory committees appointed in this chapter 11 case. Without the Carve Out, the

Debtor and other parties in interest may not have the benefit of the advisors of its choice and the

actions taken by any advisors would be limited by the availability of funds. *See In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for

professionals representing parties in interest—where such professionals' fees are payable by the

estate—because "[a]bsent such protection, the collective rights and expectations of all parties in

interest are sorely prejudiced"). The Carve Out also helps to protect against administrative insolvency

in these chapter 11 case by ensuring that assets remain for payment of fees and expenses of necessary

action by professionals. Consequently, the Carve Out should be approved.

### D.  The Automatic Stay Should Be Modified on a Limited Basis.

47.     The Debtor requests that the automatic stay imposed by section 362 be modified to the extent necessary to implement and effectuate the granting of the DIP Leins, the DIP Claims, and the Secured Creditor Adequate Protection, Orders grating stay modifications are commonplace and standard features of debtor in possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this chapter 11 case.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

48.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a). Additionally, the Debtor also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizingthe use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 daysafter entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

49.     As described above, the relief that the Debtor seeks in this Motion is necessary to operate its business without interruption and to preserve value for its estate. Accordingly, the Debtor respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Bankruptcy Rule 4001(a)(3) Should Be Waived

50.     Bankruptcy Rule 4001(a)(3) provides, "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 4001(a)(3). The Debtor requests a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). As explained herein, access to the DIP Facility isessential to prevent irreparable damage to the Debtor's estate. Accordingly, ample cause exists tojustify the waiver of the fourteen-day imposed by Bankruptcy Rule 4001(a)(3), to the extent suchapplies.

## NOTICE

51.     Notice of this Motion will be provided by overnight delivery or electronic mail to: (i) Office of the United States Trustee for the Region 2, Southern District of New York; (ii) the Internal Revenue Service; (iii) New York State Department of Finance; (iv) the Debtor's top 20 unsecured creditors; (v) Katsky Korins LLP 605 Third Avenue New York, New York 10158, Attn: Steven H. Newman, Esq., counsel to the senior secured lender; and (vi) all other parties who have requested notice under Bankruptcy Rule 2002. The Debtor submits that such notice is sufficient under the circumstances.

## NO PREVIOUS REQUEST

52.     The Debtor has not previously applied to this or any other Court for the relief sought herein.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order annexed hereto granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 19, 2022
      New York, New York

                                  MINTZ & GOLD LLP
                                  by: */s/ Andrew R. Gottesman*
                                      Andrew R. Gottesman

                                  600 Third Avenue, 25th Floor
                                  New York, New York 10016
                                  Telephone: (212) 696-4848
                                  Facsimile: (212) 696-1231

                                  *Proposed Attorneys for the Debtor*

**<u>PROPOSED ORDER</u>**

**<u>EXHIBIT A</u>**

**<u>EXHIBIT B</u>**

## EXHIBIT C

## EXHIBIT D