**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**     Chapter 11

In re:

78-80 St Mark's Place, LLC,          Case No. 21-12139 (mg)

       Debtor.

**ORDER (A) AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO OBTAIN SUPERPRIORITY POST-PETITION FINANCING, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) MODIFYING THE AUTOMATIC STAY, AND (E) GRANTING RELATED RELIEF**

Upon consideration of the Motion (the "Motion")[1] dated January 19, 2022, filed by the above-captioned debtor and debtor in possession (the "Debtor") pursuant to 11 U.S.C. §§ 105 and 361, 362(d), 364(b), 364(c)(1), 364(d)(1), 503, 506, 507, and 552, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2, and 9014-2 of the Local Bankruptcy Rules for the Southern District of New York the ("Local Rules") for entry of an order (a) Authorizing the Debtor to Obtain Superpriority Post-petition Financing, (b) Granting Liens and Superpriority Claims, (c) Modifying the Automatic Stay, and (d) Granting Related Relief; the Declaration of Lawrence V. Otway, pursuant to Local Bankruptcy Rule 1007-1 filed on December 29, 2021 [ECF 2] (the "1007 Affidavit"); the Declaration of Lawrence V. Otway in support of the Motion; the Declaration of Ronald M. Gold in Support of the Motion and the record of the hearing thereon held by the Court on [_____] 2022 (the "Hearing"); and the Court having considered the Motion, the exhibits thereto, and the evidence and the arguments of counsel presented at the Hearing; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**THE COURT HEREBY MAKES THE FOLLOWING**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      <u>**Petition Date**</u>. On January 19, 2022 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case (the "Bankruptcy Case") by filing petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court"). Since the Petition Date, the Debtor has remained in possession of its assets and are Debtor in possession pursuant to section 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Bankruptcy Case.

B.      <u>**Jurisdiction and Venue**</u>. This Court has jurisdiction to hear the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b). Venue for the Bankruptcy Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtor and the DIP Lender consent to the entry of this Order to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with the Motion consistent with Article III of the United States Constitution. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 361, 362(d), 364(b), 364(c)(1), 364(d)(1), 503, 506, 507, and 552, Rules 2002, 4001, 6003, 6004 and 9014 of the Bankruptcy Rules and Rules 2002-1, 4001-2, and 9014-2 of the Local Rules.

C.      <u>**Notice**</u>. Notice of the Hearing and the relief requested in the Motion  have been provided by the Debtor as set forth in the Motion to the required parties. The Debtor has made reasonable efforts to afford the best notice possible under the circumstances. Such notice of the Hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), and applicable Local Rules.

**D.**      **<u>Prepetition Collateral</u>**. Pursuant to the 2019 Loan Agreement, and on the terms set forth therein, the Debtor granted to the Original Creditor liens on the Prepetition Collateral (the "Prepetition Liens"). The Original Creditor assigned the 2019 Loan Agreements, and the obligations thereunder, to the Secured Creditor.

**E.**      **<u>Prepetition Liens</u>**. The Prepetition Liens granted to Original Creditor, as assigned to the Secured Creditor, constitute legal, valid, binding, enforceable, and perfected (to the extent properly perfected) security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Original Creditor for fair consideration and reasonably equivalent value.

**F.**      **<u>Post-Petition Financing</u>**. The Debtor has requested from the DIP Lender, and the DIP Lender is willing, subject to entry of and on the terms set forth in this Order and satisfaction of the conditions set forth in the DIP Agreement (as hereinafter defined), to extend the DIP Loan on the terms and conditions set forth in this Order and the DIP Loan Documents (as hereinafter defined), respectively.

**G.**      **<u>Need for Post-Petition Financing and Use of Cash Collateral</u>**. The Debtor has an immediate need to obtain credit as set forth in this Order in order to, among other things, administer and preserve the value of its assets and to avoid harm to its estate. The ability of the Debtor to administer the Bankruptcy Case, preserve and maintain the value of the Property and other assets, and maximize the return for stakeholders requires the availability of the debtor in possession financing transaction (the "DIP Facility") described in the post-petition loan and security agreement between the Debtor and the DIP Lender attached hereto as Exhibit A (the "DIP Agreement"). The DIP Agreement, and any and all other agreements, instruments and documents now or hereafter executed by Debtor in favor of DIP Lender with respect to any of the transactions contemplated by the DIP Agreement shall hereinafter be referred to as the "DIP Loan Documents." In the absence of the immediate availability of such funds in accordance with the terms hereof and

the DIP Loan Documents as set forth in this Order, the Debtor's ability to maintain, preserve and operate its business, pay taxes and other administrative expenses would not be possible, and serious and irreparable harm to the Debtor, the estate, and its stakeholders would occur. Accordingly, the Debtor has an immediate need to obtain post-petition financing and to use Cash Collateral as set forth in this Order to, among other things, preserve and maximize the value of the assets of the Debtor's Estates to maximize recovery to all creditors.

H. **No Credit Available on More Favorable Terms**. The Debtor have been unable to obtain credit on more favorable terms and conditions than those set forth in the DIP Agreement and this Order.

I. **Use of Proceeds of the DIP Facility**. Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Loan Documents) shall be used in each case in a manner consistent with the DIP Loan Documents, this Order, and the Budget (as hereinafter defined). In the event the terms of the DIP Agreement and/or the terms of the DIP Loan Documents are inconsistent with the terms of this Order, the terms of this Order shall control in all respects.

J. **Budget**. The Debtor have prepared and delivered to the DIP Lender and the Secured Creditor a Budget (as defined in DIP Agreement), which reflects the Debtor's anticipated cash receipts and disbursements for each calendar week from the Petition Date through and including March 25, 2022. The Budget is reasonable under the circumstances and is hereby approved (the "Approved Budget").[2] A copy of the Approved Budget is annexed hereto as Exhibit B. The DIP Lender is relying upon Debtor's agreement to comply with the terms set forth in the DIP Loan Documents, the Approved Budget, and this Order in determining to enter into the post-petition

---

[2] For the avoidance of doubt, the Approved Budget may be amended, modified or supplemented from time to time with the DIP Lender's written consent.

financing arrangements provided for herein and the DIP Loan Documents and to consent to the Debtor's use of DIP Collateral (as hereinafter defined).

**K.** **<u>Certain Conditions to DIP Facility</u>**. The DIP Lender's willingness to make the DIP Loan is conditioned upon, among other things: (a) the Debtor's obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer, as applicable, upon the DIP Lender all rights, powers, and remedies thereunder in each case as may be modified by this Order; (b) the DIP Lender being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtor under the DIP Loan Documents, subject to the Carve Out, priming superpriority perfected security interests in and liens upon all property and assets of the Debtor, including, but not limited to, a valid and perfected security interest in and lien upon all of the now existing or hereafter arising or acquired assets, including: (i) assets constituting Prepetition Collateral, (ii) liens on Cash Collateral (as hereinafter defined), and (iii) any assets of the Debtor that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest or lien (collectively hereinafter referred to as the "DIP Collateral");

**L.** **<u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>**. Good cause has been shown for entry of this Order. The relief requested herein is necessary, essential and appropriate to aid the continuation of the Debtor's businesses and the preservation and maintenance of its assets, absent which the Debtor's ability to maximize the value of its Estates for the benefit of creditors will be jeopardized. The terms and conditions of the DIP Facility, as set forth in the DIP Loan Documents, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances; (ii) reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are enforceable pursuant to their terms; (iii) are supported by reasonably equivalent value and consideration, and (iv) and have been

negotiated in good faith and at arm's length, between Debtor and DIP Lender. DIP Lender has indicated its willingness to provide financing to the Debtor pursuant to the DIP Loan Documents. The funds to be extended under the DIP Facility will be extended by DIP Lender in good faith, and for valid business purposes and uses by the Debtor, and, as a consequence, DIP Lender is entitled to the protection and benefits afforded by section 364(e) of the Bankruptcy Code. The DIP Superpriority Claim (as hereinafter defined), and other protections granted pursuant to this Order, the DIP Loan Documents and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order, as provided in section 364(e) of the Bankruptcy Code.

**M.** **Equity Cushion**. The Debtor has shown, through competent evidence, that the value of the Property is not less than $13,800,000.00. As a result, the Debtor has no less than $5,000,00.00 of equity value in the Property (the "Equity Cushion").

**N.** **Adequate Protection.** The Equity Cushion is sufficient to provide adequate protection to the Secured Creditor within the meaning of sections 363(e), and 361 of the Bankruptcy Code.

**O.** **Relief Essential; Best Interests**. The relief requested in the Motion (and as provided in this Order) is necessary, essential, and appropriate for the continued preservation of the Debtor's Assets. It is in the best interest of the estate that the Debtor be allowed to obtain credit pursuant to the DIP Facility and the DIP Loan Documents.

**P.** **Entry of Order**. For the reasons stated above, the Debtor have requested and are entitled to immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE,** upon the Motion and the record before this Court with respect to the Motion, including the record made during the Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    **Motion Granted**. The Motion is granted to the extent and in accordance with the terms and conditions set forth in this Order. Any objections to the Motion with respect to the entry of this Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein (but subject to all reservation of rights included herein), if any, are hereby denied and overruled.

2.    **Approval of Entry into the DIP Loan Documents**. The Debtor is expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Loan Documents in the form annexed to the Motion, and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtor in connection with the DIP Facility described in and provided for by this Order and the DIP Loan Documents. The Debtor is hereby authorized to do and perform all acts, satisfy all obligations, and to pay all principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due (collectively with all other obligations under and as defined in the DIP Loan Documents, the "DIP Obligations"), which amounts shall, subject to the terms hereof, not otherwise be subject to further approval of this Court. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor in accordance with their terms enforceable against the Debtor and the estate.

3.    **Use of the DIP Facility Amount**. The DIP Facility advanced by DIP Lender to the Debtor shall be used by the Debtor in the amounts and for the purposes identified in the Approved Budget to (i) pay related DIP-related transaction costs, fees and expenses of the DIP Facility in accordance with the DIP Loan Documents; and (ii) pay expenses to preserve, maintain and operate the businesses. All advances by DIP Lender to the Debtor shall be subject to the Approved Budget.

4.    **Conditions Precedent**. The DIP Lender shall have no obligation to make any loan

or any other financial accommodations under the DIP Loan Documents unless the conditions precedent to make such loans or financial accommodations under the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents. For the avoidance of doubt, no loans or other extensions of credit will be available to the Debtor unless (i) DIP Lender and the Debtor execute and deliver the DIP Loan Documents, or (ii) in excess of the DIP Facility Amount, in accordance with the DIP Loan Documents.

5.      **DIP Superpriority Claim.** Provided that DIP Lender advances the DIP Facility Amount, effective immediately upon entry of this Order, and subject to the terms of the DIP Loan Documents, DIP Lender is hereby granted a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses in the Bankruptcy Case, including, without limitation, any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 and 1114 of the Bankruptcy Code (the "DIP Superpriority Claim"), *provided, however*, that the DIP Superpriority Claim shall be subject and subordinate to the Carve Out.

6.      **Maturity**. The DIP Facility will mature one year from the date of this order, unless extended on the terms of the DIP Agreement. All obligations and liabilities of the Debtor to DIP Lender that remain outstanding or are in existence on the last day of the term of the DIP Facility shall be due and payable on the Maturity Date. Nothing in this Order shall authorize the dissolution of any assets of the Debtor or the Estate or other proceeds therefrom outside the ordinary course of business, except as permitted under the DIP Facility and the DIP Loan Documents (subject to any required approval).

7.      **Payment of DIP Fees**. All reasonable and documented fees and expenses payable pursuant to the DIP Loan Documents are hereby approved and the Debtor is authorized to pay,

currently in cash or as otherwise provided in the DIP Loan Documents and Approved Budget, all reasonable and documented out-of-pocket costs, disbursements and expenses of DIP Lender incurred at any time, as provided by the DIP Loan Documents, Approved Budget and the terms of this Order.

8. **Post-petition Liens**. To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtor to the DIP Lender of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is hereby granted, effective as of the Petition Date and subject to the Carve Out, continuing, valid, binding, enforceable, non-avoidable, automatic and properly perfected security interests in and liens (collectively, the "DIP Liens") upon all DIP Collateral. Subject to the Carve Out, the DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, pursuant to Bankruptcy Code section 364(d), whether created consensually, by an order of the Court or otherwise.

9. **Carve Out.** The DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Superpriority Adequate Protection Claim shall be junior and subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve Out") an amount equal to the sum of the following:

> (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717;
>
> (b) fees and disbursements incurred by a chapter 7 trustee (if any) under Bankruptcy Code § 726(b) in an amount not to exceed $10,000;
>
> (c) accrued but unpaid fees and expenses of professionals retained by Borrower, incurred prior to an Event of Default; and
>
> (d) after the occurrence and during the continuation of an Event of Default,

allowed and unpaid professional fees and expenses incurred by (i) Borrower, in an amount not to exceed $200,000, and (ii) any official committee appointed pursuant to Bankruptcy Code § 1102, in an amount not to exceed $50,000; *provided, however*, that any amount hereby allocated to an official committee may be reallocated to Borrower in the event no official committee is appointed; provided further, that so long as no Event of Default shall have occurred and be continuing, the Carveout shall not be reduced by the payment of fees and expenses allowed by the Bankruptcy Court under Bankruptcy Code §§ 330 and 331 (including for the avoidance of doubt, fees and expenses incurred prior to an Event of Default that were allowable when incurred and allowed by the Bankruptcy Court after the occurrence and continuance of such Event of Default); provided further, that any payments of allowed professional fees incurred after an Event of Default shall reduce the amount of the Carveout by the amount of any such payment.

Any funding of the Carve Out shall constitute DIP Loans under the DIP Facility secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Order, the Bankruptcy Code and applicable law. The Carve Out shall not reduce the amounts payable to the DIP Lender under the DIP Facility. Nothing in this Order or in the 2019 Loan Agreements shall prohibit or restrict the payment of the fees and expenses of any professional.

10. **Enforceable Obligations**. The DIP Loan Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, the Estate and any successors thereto, including, without limitation, any trustee appointed in these Bankruptcy Case under chapter 7 of the Bankruptcy Code upon the conversion of the Bankruptcy Case, and its creditors and other parties in interest, in each case, in accordance with the terms of this Order and the DIP Loan Documents.

11. **Superpriority Administrative Claim Status.** The DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute the DIP Superpriority Claim to secure post-petition advances and extensions of credit under section 364(c)(1). Other than as provided in the DIP Loan Documents and this Order with respect to the Carve Out, and as to section 506(c) of the Bankruptcy Code, no costs or expenses of administration that have been or may be incurred in these proceedings, or in any successor case, and no priority claims are, or will be, senior

to, prior to or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of DIP Lender arising hereunder.

12. **Authorization to Use Proceeds of DIP Financing**. Pursuant to the terms and conditions of this Order, the DIP Facility and the DIP Loan Documents, and in a manner consistent with the Budget (as the same may be modified, supplemented or updated from time to time with the agreement of DIP Lender consistent with the terms and conditions of the DIP Loan Documents), the Debtor is authorized to use the advances under the DIP Facility. The Debtor's rights to use the proceeds of the DIP Facility shall terminate upon the earlier of (i) the indefeasible payment in full in cash of the obligations owing to the DIP Lender, or (ii) upon an Event of Default as set forth in the DIP Agreement. Nothing in this Order shall authorize the disposition of any assets of the Debtor or the Estate or other proceeds resulting therefrom outside the ordinary course of business, except as permitted under the DIP Facility and the DIP Loan Documents (subject to any required court approval).

13. **DIP Lender as Loss Payee or Additional Insured**. DIP Lender shall also be deemed to be the loss payee and/or additional insured under the Debtor's insurance policies and shall have all rights and powers attendant to that position (including, without limitation, rights of collection and enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Order and the other DIP Loan Documents.

14. **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Professionals or shall affect the right of DIP Lender to object to the allowance and payment of such fees and expenses.

15. **Events of Default.** Subject to the provisions of the DIP Loan Documents and this Order, unless and until all DIP Obligations are indefeasibly paid in full in cash (or other arrangements for payment of such amounts satisfactory (in its sole discretion) to DIP Lender have

been made), the protections afforded DIP Lender pursuant to this Order and under the other DIP Loan Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a chapter 11 plan or converting these Bankruptcy Case into a case under chapter 7, and the DIP Superpriority Claim shall continue in these proceedings and in any successor case, and such DIP Superpriority Claim shall maintain its respective priority as provided by this Order.

16. **Good Faith Under Section 364(e).** The DIP Lender is extending credit pursuant to this Order in good faith within the meaning of section 364(e) of the Bankruptcy Code, and the credit extended by DIP Lender pursuant to this Order, and in connection with the DIP Facility and the DIP Loan Documents shall be deemed to be extended in good faith within the meaning of section 364(e) of the Bankruptcy Code. The DIP Lender is entitled to, and is hereby granted, the full protections of section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of any advances made hereunder or the rights, claims, or priority authorized or created hereby. Notwithstanding any such potential modification, amendment or vacatur, any rights, claims or priorities granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacatur of the DIP Liens or DIP Superpriority Claims granted to the DIP Lender shall be governed in all respects by the original provisions of this Order, and the DIP Lender shall be entitled to all of the rights, priorities remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claims granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Financing Documents are made in reliance on this Order, the obligations owed to the DIP Lender prior to the effective date of any stay, modification or vacatur of this Order shall not, as a result or any subsequent order in the bankruptcy case or in any successor cases, be subordinated, lose their lien and/or superpriority administrative expense claim status, or be deprived of the benefit of the status of the claims granted to DIP Lender under this Order and/or the DIP Loan Documents.

17. **Section 506(c) Claims.** Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the case at any time shall be charged against the DIP Lender, or the interests of the DIP Lender in the DIP Collateral granted hereunder, whether under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

18. **Amendment.** The DIP Lender and the Debtor may enter into waivers, amendments or consents with respect to the DIP Loan Documents without the need for further Court approval provided that (i) the agreement as so modified is not materially different from that approved, (ii) notice of all amendments is filed with the Court, and (iii) notice of all amendments (other than those that are ministerial or technical and do not adversely affect the Debtor) are provided in advance to counsel for any Committee appointed in these Bankruptcy Case, all parties requesting specific notice and the United States Trustee.

19. **Binding Effect of Order**. Subject to terms hereof, this Order shall be valid and binding upon and inure to the benefit of Debtor, the DIP Lender, all other creditors of the Debtor or any Committee appointed in these Bankruptcy Case, and all other parties in interest and its respective successors and assigns, including any trustee or other estate representative appointed in this case or any successor case, *provided*, that the DIP Lender shall have no obligation to make DIP Loans or advances to any trustee or other estate representative appointed in this case or any successor case, other than all amounts relating to the Carve Out.

20. **Survival of Order**. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming a chapter 11 plan in these Bankruptcy Case, (ii) converting the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing the Bankruptcy Case;

(iv) withdrawing the reference of the Bankruptcy Case from the Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Bankruptcy Case in the Court. The terms and provisions of this Order, including the DIP Liens and the DIP Superpriority Claims granted pursuant to this Order and the DIP Loan Documents and any protections granted to the DIP Lender, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claims and protections for the DIP Lender shall maintain its priority as provided by this Order until all the DIP Obligations have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

21.     **Inconsistency**. In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Order, the provisions of the Order shall govern and control.

22.     **Enforceability**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such. This Order shall take effect and be fully enforceable immediately upon execution hereof.

23.     **Waiver of any Applicable Stay, including Bankruptcy Rule 6004(h).** Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

24.     **No Waiver or Modification**. Until and unless the repayment in full of the DIP Facility, Debtor irrevocably waive the right to seek, directly or indirectly without the prior written consent of the DIP Lender: (i) any modification, stay, vacatur or amendment to this Order; (ii) priority claim for any administrative expense or unsecured claim against Debtor or its estate (now

existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c) (subject to entry of the Final Order), 507(a) or 507(b) of the Bankruptcy Code) in the case, equal or superior to the DIP Superpriority Claims, other than the Carve Out; or (iii) any lien on any assets with priority equal or superior to the DIP Liens. Debtor irrevocably waive any right to seek any amendment or modification of this Order without the prior written consent, as provided in the foregoing, of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

25. **Expenses of Lender**. As provided in the DIP Loan Documents, the Debtor shall pay all reasonable expenses incurred by DIP Lender as set forth in the including in connection with the preparation, execution, delivery and administration of the DIP Loan Documents. Subject to the last sentence of this Paragraph, payment of such fees shall not be subject to allowance by the Court and shall not be required to comply with the U.S. Trustee fee guidelines.

26. **No Waiver**. The failure of DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Loan Documents, the DIP Facility, this Order or otherwise, as applicable, shall not constitute a waiver of any of DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights or remedies of DIP Lender under the Bankruptcy Code or under non-bankruptcy law.

27. **No Third-Party Rights**. as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

28. **Retention of Jurisdiction**. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, this Order, the DIP

Facility or the DIP Loan Documents.

Dated: _____, 2022

_____
HON. MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

## DIP Agreement

**DEBTOR IN POSSESSION LOAN AGREEMENT**

This DEBTOR IN POSSESSION LOAN AGREEMENT ("Agreement") is dated as of January 19, 2022, and is by and between 78-80 St. Mark's Place, LLC, a New York limited liability company and as debtor and debtor in possession ("Borrower"), and JEC Capital Partners SPV, LLC, a Delaware limited liability company ("DIP Lender").

WHEREAS, on December 29, 2021 ("Petition Date"), Borrower commenced a chapter 11 case in the U.S. Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), assigned Case No. 21-12139 (MG) ("Chapter 11 Case");

WHEREAS, Borrower is a debtor in possession under Bankruptcy Code sections 1107(a) and 1108;

WHEREAS, Borrower has requested that DIP Lender provide a multi-draw credit facility ("DIP Facility") to Borrower in an aggregate principal amount of $650,000, for the purposes described herein; and

WHEREAS, DIP Lender is willing to make the requested DIP Facility available only upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Borrower and DIP Lender agree as follows:

1.      **Definitions.**  The following capitalized terms used herein shall be defined as follows:

"Approved Budget" shall have the meaning set forth in Section 8(a).

"Authorized Agent" shall mean Lawrence V. Otway, the Manager and Sole Member of Borrower, or such other person designated by Borrower upon written notice to Lender.

"Availability Period" shall mean the period from the Closing Date to, but excluding, the Maturity Date.

"Borrowing Request" shall mean a Borrowing Request in the form attached hereto as Exhibit 1.

"Budget" shall mean the Initial Approved Budget and each subsequent Approved Budget.

"Carveout" shall mean, exclusive of the Carveout Exclusions, an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717; (b) fees and disbursements incurred by a chapter 7 trustee (if any) under Bankruptcy Code section 726(b) in an amount not to exceed $10,000; (c) accrued but unpaid fees and expenses of professionals retained by Borrower, incurred prior to an Event of Default; and (d) after the occurrence and during the continuation of an Event of Default, allowed and unpaid professional fees and expenses incurred by (i) Borrower, in an amount not to exceed $200,000, and (ii) any official committee appointed pursuant to Bankruptcy Code section 1102, in an amount not to exceed $50,000; provided, however, that any

amount hereby allocated to an official committee may be reallocated to Borrower in the event no official committee is appointed; provided further, that so long as no Event of Default shall have occurred and be continuing, the Carveout shall not be reduced by the payment of fees and expenses allowed by the Bankruptcy Court under Bankruptcy Code sections 330 and 331 (including for the avoidance of doubt, fees and expenses incurred prior to an Event of Default that were allowable when incurred and allowed by the Bankruptcy Court after the occurrence and continuance of such Event of Default); provided further, that any payments of allowed professional fees incurred after an Event of Default shall reduce the amount of the Carveout by the amount of any such payment.

"Carveout Exclusions" shall mean fees or expenses incurred by any party, including Borrower, any official committee or any professional employed by any of them, in connection with: (a) the investigation, initiation or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender in relation to the DIP Facility, or preventing, hindering or delaying the assertion of enforcement of any Lien, claim, right or security interest or realization upon any DIP Collateral by DIP Lender, (b) a request to use cash collateral without the prior consent of DIP Lender, (c) a request, without the prior consent of DIP Lender, for authorization to obtain debtor in possession financing or other financial accommodations pursuant to Bankruptcy Code section 364(c) or 364(d) that does not indefeasibly repay in full in cash the Obligations under the DIP Facility on terms and conditions acceptable to DIP Lender or (d) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender as set forth in the DIP Loan Documents, the DIP Financing Order or which results in the occurrence of an Event of Default, unless otherwise agreed by DIP Lender.

"Closing Date" shall mean the first business day following the satisfaction or waiver by DIP Lender of Conditions to Effectiveness set forth in Section 4 and the advance of funds by DIP Lender.

"Commitment" shall have the meaning set forth in Section 2(a).

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall mean, for any Loan, a fixed rate of twenty four percent (24%) per annum.

"DIP Collateral" means (a) the Premises and (b) all of Borrower's right, title and interest in and to any and all leases and rents in respect of the Premises, that are pledged to DIP Lender pursuant to Section 11(d).

"DIP Financing Order" means a final order of the Bankruptcy Court approving the DIP Facility, in form and substance satisfactory to DIP Lender in its sole discretion.

"DIP Lender Carveout" shall mean, on any date, an amount equal to the aggregate Carveout on such date.

"DIP Loan Documents" shall mean this Agreement, the DIP Financing Order and any other documents, instruments or agreements delivered as security or collateral for, or a guaranty of, the

Loans, or in connection with, or as support for, any of the foregoing, whether by Borrower or a third party, and any updates or renewals thereof.

"Event of Default" shall have the meaning set forth in Section 9.

"Excluded Taxes" shall mean taxes imposed on or measured by net income, franchise taxes and branch profits taxes, in each case imposed by the Federal government, or the jurisdiction where the DIP Lender's applicable lending office is located, and U.S. Federal withholding taxes imposed on amounts payable hereunder pursuant to laws in effect as of the date hereof, including Tax Code sections 1471-74.

"Existing Lender" shall mean St. Mark's Mixed Use LLC, a New York limited liability company, or such other person that is the assignee of the loan made by 80 St. Marks Place Funding LLC, a New York limited liability company, to Borrower on or about November 12, 2019, in the principal amount of $6.1 million, and their respective predecessors, successors and assigns.

"Indemnified Taxes" shall mean (a) taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under this Agreement or any other Loan Document and (b) without duplication of any taxes covered in subclause (a) of this definition, Other Taxes.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit 2.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code or administrative or judicial precedent or authority, including the interpretation or administration thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of and agreements with, any governmental authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other) or other security interest or preferential arrangement of any kind or nature whatsoever.

"Loans" shall have the meaning set forth in Section 2(a).

"Material Adverse Effect" shall mean, with respect to any material event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (a) the business, results of operations, financial condition, assets, liabilities or prospects of Borrower taken as a whole (other than the commencement or continuation of the Chapter 11 Case), (b) the ability of Borrower to perform any of its obligations under the DIP Loan Documents, (c) the rights and remedies of DIP Lender under any of the DIP Loan Documents, (d) the legality, validity or enforceability of any of the DIP Loan Documents (including the DIP Financing Order), (e) the value of the DIP Collateral or (f) the perfection or priority of the Lien granted pursuant to the DIP Loan Documents (including the DIP Financing Order).

"<u>Maturity Date</u>" shall mean the earliest of (a) one (1) year from the entry of the DIP Financing Order, (b) substantial consummation (as defined in Bankruptcy Code section 1101) of a chapter 11 plan that is confirmed in respect of Borrower in the Chapter 11 Case, (c) the closing of a sale of all or substantially all of Borrower's assets, pursuant to Bankruptcy Code section 363 and (d) the date of the acceleration of the Loans or termination of the Commitment pursuant to <u>Section 9</u>.

"<u>Obligations</u>" shall mean all amounts owing by Borrower to DIP Lender pursuant to or in connection this this Agreement or any other DIP Loan Document including, without limitation, all principal, interest, fees, expenses, indemnification, reimbursement payments, costs and expenses (including all reasonable fees and expenses of counsel to the DIP lender incurred pursuant to this Agreement or any other DIP Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder.

"<u>Other Taxes</u>" shall mean, collectively, all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt of security interests in or otherwise, with respect to this Agreement or any other DIP Loan Document.

"<u>Permitted Variance</u>" shall mean (a) any favorable variance, (b) an unfavorable variance of not more than 15% with respect to (i) any disbursement line item or (ii) the aggregate cash receipts and (c) an unfavorable variance of not more than 10% with respect to combined aggregate receipts and disbursements; provided, however, that it shall also be a Permitted Variance if there is an unfavorable variance of any amount with respect to aggregate receipts or combined aggregate receipts and disbursements for a monthly Testing Period as long as any unfavorable variance is not more than the 15% and 10% variance threshold described above for the respective cumulative Testing Period.

"<u>Premises</u>" means the following property, rights, interests and estates now owned or hereafter acquired by Borrower:

ALL those certain plots, pieces or parcels of land located in the County of New York and State of New York, commonly known by the address 78-80 St. Marks Place, New York , New York 10003, as more particularly described in <u>Schedule A</u> (collectively, the "<u>Land</u>");

TOGETHER with all additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land;

TOGETHER with all buildings, structures and improvements of every kind and nature whatsoever now or hereafter located, erected, or placed upon the Land, and all extensions, additions, improvements, betterments, renewals, substitutions and replacements of or to any of the foregoing (collectively, the "<u>Improvements</u>");

TOGETHER with all machinery, appliances, apparatus, decorations, piping, conduits, fixtures, chattels, articles of personal property and other property now owned or hereafter acquired and/or now or hereafter attached to or used in connection with the Premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, heating, ventilating and air conditioning systems, sprinkler systems, power

systems, washtubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, building materials and components, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing or hereafter erected on any of the Premises, together with any and all replacements thereof and additions thereto, proceeds or products thereof (collectively, the "Equipment"). The term "fixtures", as used herein, means all items that are physically attached to buildings, including, without limitation, items such as equipment used to supply air conditioning, heat, gas, water, light, laundry, drying, dishwashing, garbage disposal and other services;

TOGETHER with all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the improvements and every part and parcel thereof, with the appurtenances thereto;

TOGETHER with all awards heretofore and hereafter made to Borrower for taking by eminent domain the whole or any part of the Land or any easement therein;

TOGETHER with all right, title and interest of Borrower in and to all insurance or other proceeds of, and any unearned premiums on, any insurance policies required to be maintained by Borrower hereunder;

TOGETHER with the rents, income, issues and profits of all property constituting DIP Collateral which are assigned to DIP Lender. The term "rents, income, issues and profits" refer to any monies that Borrower may receive by using the Land for income producing purposes;

TOGETHER with all right, title and interest of Borrower in and to all other "general intangibles," "accounts" and "proceeds" (as such terms are defined in the UCC) arising with respect to the property constituting DIP Collateral and with respect to which DIP Lender shall have all of the rights and remedies of a secured party under the UCC; and

TOGETHER with, to the extent transferable by Borrower, all franchises, permits, licenses and other rights, respect the use, occupation and operation of the Premises and the activities conducted thereon and therein.

"Superpriority DIP Claims" shall mean all of DIP Lender's claims on account of the Obligations, which claims shall have priority over all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b), pursuant to Bankruptcy Code section 364(c)(1), and be secured by a Lien on the DIP Collateral that is senior to the Liens of the Existing Lender, pursuant to Bankruptcy Code section 364(d), subject to the DIP Lender Carveout.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended.

"Testing Period" shall have the meaning set forth in Section 8(i).

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"Variance Report" shall have the meaning set forth in Section 8(a).

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC, shall have the respective meanings provided in the UCC.

2.    **Borrowings, Conversions, Renewals and Payments.**

(a)    Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Section 4 and Section 5), DIP Lender agrees to make multi-draw term loans ("Loans") to Borrower, from time to time during the Availability Period, in an aggregate principal amount of $650,000 (the "Commitment").  During the Availability Period, Borrower shall be entitled to borrow and prepay Loans in accordance with the terms and conditions of this Agreement; provided, however, Borrower may not borrow any amounts hereunder should there exist an Event of Default, and Borrower may not reborrow Loans that have been repaid.

(b)    The Authorized Agent, on behalf of Borrower, shall give DIP Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 12:00 p.m. Eastern, not less than two (2) business days prior to the date of each requested borrowing of a Loan; provided, however, (i) no Loan shall be in an amount less than $50,000, (ii) Borrower shall not be permitted to deliver a Borrowing Request more frequently than once per calendar week and (iii) Borrower shall not be permitted to request Loans (and DIP Lender shall not be required to fund Loans) in excess of Borrower's cash needs for the four (4) calendar weeks immediately following the date of the Borrowing Request (as set forth in an Approved Budget, subject to any Permitted Variance).

(c)    Borrower hereby promises to pay to the order of DIP Lender the principal amount of all outstanding Loans on the Maturity Date, plus all accrued interest, fees and other Obligations then outstanding.

(d)    Borrower shall have the right to make prepayments of principal at any time or from time to time, provided that: (i) Borrower shall give DIP Lender irrevocable notice of each prepayment by 12:00 p.m. Eastern on the date of prepayment of a Loan; (ii) all prepayments shall be in a minimum amount of $100,000; and (iii) in the event Borrower should repay the DIP Facility prior to the Maturity Date, DIP Lender will be due all interest and fees based on amounts actually drawn on the DIP Facility as if it had been repaid on the Maturity Date.

(e)    Borrower may extend the Maturity Date for a period of one (1) year, absent the existence of an Event of Default.  Borrower shall request the foregoing extension at least thirty (30) days before the Maturity Date by sending a notice to the DIP Lender informing it of the exercise of this extension option.  Upon the exercise of this extension option, Borrower agrees to pay to DIP Lender an extension fee equal to six percent (6%) of the Commitment, which shall be fully earned on the exercise date and which shall be capitalized and added to the principal balance on such date.

3. **Interest and Fees.**

(a)     Borrower shall pay interest on the unpaid balance of the principal amount of each Loan for the period commencing with the date such Loan was made and ending on the Maturity Date at a fixed rate equal to fifteen percent (15%) per annum.  Interest shall accrue on the last business day of each month, and shall be capitalized and added to the principal balance of the respective Loans on such date.  After the occurrence of an Event of Default, all outstanding principal shall bear interest from and including the date of such Event of Default until paid in full at a rate per annum equal to the Default Rate, such interest to be payable on the last business day of each month, unless the Loans are declared accelerated and due as provided for herein.  Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.

(b)     All payments hereunder shall be made in lawful money of the United States and in immediately available funds.  Any extension of time for the payment of the principal of this Agreement resulting from the due date falling on a non-business day shall be included in the computation of interest.

(c)     Borrower agrees to pay to DIP Lender a commitment fee in an amount equal to three percent (3%) of the Commitment, which shall be fully earned on the Closing Date and added to the principal balance on such date.  Borrower also agrees to pay to DIP Lender an exit fee in an amount equal to three percent (3%) of the Commitment, which shall be fully earned immediately before the Maturity Date and added to the principal balance at such time.

4.     **Conditions to Effectiveness.**  DIP Lender's obligation to make Loans shall not become effective until the date on which the following conditions are satisfied (or waived, in the sole and absolute discretion of DIP Lender):

(a)     DIP Lender (or its counsel) shall have received the following: (i) a counterpart of this Agreement signed by Borrower; and (ii) a duly executed Borrowing Request with respect to any Loan made on the Closing Date.

(b)     All legal matters incident to this Agreement and the borrowings hereunder shall be satisfactory to DIP Lender, in its reasonable discretion.

(c)     All motions and other documents to be filed and submitted to the Bankruptcy Court in relation to the DIP Facility and the approval thereof shall be in form and substance satisfactory to DIP Lender in its reasonable discretion.

(d)     The Bankruptcy Court shall have entered the DIP Financing Order, in form and substance satisfactory to DIP Lender in its sole discretion.

(e)     DIP Lender shall have a valid and perfected, first priority Lien on and security interest in the DIP Collateral, on the basis and with the priority set forth in the DIP Financing Order, and such Lien shall be senior to all other Liens except as otherwise provided in the DIP Financing Order and Section 11.

5.     **Conditions to All Credit Extensions.**  The obligation of DIP Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of each of the conditions set forth in

<u>Section 4</u> on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a) Borrower shall have delivered to DIP Lender an appropriate Borrowing Request, duly executed and completed, by the time specified in, and otherwise as permitted by, this Agreement.

(b) The representations and warranties made by Borrower herein shall be true and correct in all material respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any Loans) except to the extent that they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date.

(c) No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of such Loan.

(d) The making of such Loan (and the use of proceeds therefrom) shall not violate any law and shall not be enjoined, temporarily, preliminarily or permanently.

(e) No Material Adverse Effect shall have occurred.

(f) The making of such Loan complies with the Budget, in all respects, or has otherwise been approved in writing by DIP Lender.

(g) With respect to any Loans made after the Closing Date, the DIP Financing Order shall have been entered approving the DIP Facility, in form and substance satisfactory to DIP Lender in its sole discretion, which DIP Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior consent of the DIP Lender.

(h) There shall not exist any law, ruling, judgment order, injunction or other restraint that, in the sole judgment of DIP Lender, prohibits, restricts or imposes a materially adverse condition on Borrower, the DIP Facility or the exercise by DIP Lender of its rights as a security party with respect to the DIP Collateral.

(i) Any borrowing hereunder shall be limited to the amount that is required to fund disbursements permitted under the Budget or otherwise available for use by Borrower.

The delivery of each Borrowing Request shall constitute a representation and warranty by Borrower of the correctness of the matters specified in subsections (b) through (i) above.

6.     **Indemnified Taxes.**  Borrower agrees that all payments made pursuant to or on account of this Agreement or any DIP Loan Document shall be made by Borrower free and clear and without deduction or withholding for any tax, except as required by applicable law.  If any applicable law requires the deduction or withholding of any tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such tax is an Indemnified Tax, then the sum payable by Borrower pursuant to or an account of this

Agreement or any other DIP Loan Document shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this Section 6) DIP Lender shall receive an amount equal to that it would have received had no such deduction or withholding been made. Borrower shall provide DIP Lender evidence of such payment to the relevant governmental authority within thirty (30) days thereof and shall also provide to DIP Lender any official tax receipt or other documentation issued by the appropriate governmental authorities with respect to the payment of Indemnified Taxes. Borrower hereby agrees that it shall indemnify and reimburse DIP Lender, on demand, for any loss, liability or expense incurred by DIP Lender as a result of any failure by Borrower to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant governmental authority. Borrower shall timely pay to the relevant governmental authority or, at the option of DIP Lender, reimburse it for Other Taxes.

7.     **Representations.** Borrower represents and warrants that to the best of its knowledge:

(a)     Upon approval of the Bankruptcy Court, the execution, delivery and performance of Borrower of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of proceeds of any of the Loans, do not and will not, except with regard to the liens of the Existing Lender: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge or encumbrance upon the property or assets of Borrower pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any DIP Collateral pursuant to any DIP Loan Document) to which Borrowers are a party or are bound or by which their properties may be bound or affected; or (ii) violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower.

(b)     Upon entry of the DIP Financing Order, no consent, approval or authorization of, or registration, declaration or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by Borrower of any DIP Loan Document.

(c)     Except for the Chapter 11 Case, and except for any other litigation identified to DIP Lender in writing, there are no actions, suits, investigations or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) Borrower that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or properties of Borrower or any part of the DIP Collateral (if any) under any DIP Loan Document; or (iii) any of the transactions contemplated by the DIP Loan Documents. There are currently no material judgments entered against Borrower, and Borrower is not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

(d)     Borrower is in compliance with the terms and conditions of the DIP Financing Order, which (from and after the date it is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the DIP Lender, in its sole

discretion, amended or modified, and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(e)     The proceeds from the DIP Facility will be used only: (i) for working capital and general corporate purposes of Borrower; and (ii) for payment of (1) administrative expenses incurred in the Chapter 11 Case, including professional fees, in each case in accordance with the then-current Budget, (2) bankruptcy fees under 28 U.S.C. § 1930 and (3) allowed unsecured claims upon the effective date of a chapter 11 plan in respect of Borrower.

(f)     A true and complete copy of the Initial Approved Budget as agreed to with DIP Lender as of the Closing Date is attached as <u>Exhibit 2</u>.

Each borrowing request by Borrower hereunder shall constitute a representation and warranty that the statements above are materially true and correct both on the date of such request and on the date of the borrowing.  Each borrowing request shall also constitute a representation that no Default or Event of Default hereunder has occurred and is continuing, or would result from such borrowing.

8.     **Covenants.**  Borrower agrees that so long as any Obligation hereunder or under any other DIP Loan Document (other than contingent indemnification obligations) remains unpaid:

(a)     Borrower shall provide to DIP Lender: (i) every six (6) weeks after the Closing Date, an updated thirteen (13) week cash flow forecast, in each case, in form and substance satisfactory to DIP Lender in its reasonable discretion (each such forecast approved by DIP Lender, an "<u>Approved Budget</u>") for the subsequent thirteen (13) week period, consistent with the form of the Initial Approved Budget; (ii) beginning on the twenty-fifth (25th) day of the month following the Closing Date and on the twenty-fifth (25th) day of the month for each month thereafter, a variance report ("<u>Variance Report</u>") setting forth actual cash receipts and disbursements of Borrower for the prior week and setting forth all variances, on a line-item and aggregate basis, from the amount set forth for such month as compared to the Initial Approved Budget or the most recent Approved Budget delivered prior to such Variance Report (as applicable) on a monthly and cumulative basis, and each such Variance Report shall include explanations for all material variances and shall be certified by the Authorized Agent.  Borrower will promptly provide notice to DIP Lender of any Material Adverse Effect, and shall have thirty (30) days from the date of such notice to cure the same.  If Borrower fails to provide notice of a Material Adverse Effect to DIP Lender, then Borrower shall have fifteen (15) days to cure the same after being notified by DIP Lender.

(b)     Borrower will provide to DIP Lender such other reports and information as may be reasonably requested by DIP Lender.  In addition, Borrower will use its reasonable efforts to cause its accountants, financial advisors, consultants and parties providing management services to Borrower to cooperate, consult with and provide to DIP Lender all such information as may be reasonably requested with respect to the businesses, results of operations and financial condition of Borrower.

(c)     Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, rent assignments and other documents) which

may be required under any applicable law, or which DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect or perfect the Liens created by this Agreement, the DIP Financing Order or other DIP Loan Documents, or the validity or priority of any such Lien, all at the expense of Borrower.

(d)     Except for and to the extent permitted under the DIP Financing Order and except for the Existing Lender's Liens, Borrower will not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense or Lien that is pari passu with or senior to the claims or Liens, as the case may be, of DIP Lender against Borrower hereunder or under the DIP Financing Order, or apply to the Bankruptcy Court for authority to do so.

(e)     Borrower will not, directly or indirectly, (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the DIP Financing Order, except for any modifications and amendments agreed to in writing by DIP Lender, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of DIP Lender) or (iii) seek authorization for or permit the existence of any claim that has priority over or is senior to or pari passu with the Superpriority DIP Claims or the DIP Lender's Liens, other than the DIP Lender Carveout.

(f)     Borrower shall not make or commit to make payments to critical vendors in respect of prepetition amounts in excess of the amount included in the Budget, except with the written consent of DIP Lender.

(g)     Except as otherwise provided herein or approved by DIP Lender in writing, Borrower will not, and will not permit any subsidiary to, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Order and the Budget, (ii) permit a disbursement that would cause any Budget variance that would not otherwise constitute a Permitted Variance, without the prior written consent of the DIP Lender or (iii) make any payment (as adequate protection or otherwise) on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in accordance with an Approved Budget.

(h)     No DIP Collateral or Loan proceeds may be used directly or indirectly by Borrower, any committee, any trustee or other estate representative appointed in the Chapter 11 Case or any other person or entity:

(i)     to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of DIP Lender or the Superpriority DIP Claims (except to the extent expressly set forth in this Agreement); or

(ii)    to prepare, assert, join, commence, support or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter seeking an order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Lender, its controlling persons, affiliates or successors and assigns, and each of their respective officers, directors, employees, agents, attorneys or advisors, with respect to any transaction, occurrence, omission, action or other matter

(including formal discovery proceedings in anticipation thereof), including without limitation (1) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (2) any so-called "lender liability" claims or causes of action, (3) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim or offset to, the Obligations, the Superpriority DIP Claims, the DIP Loan Documents or any Liens in favor of DIP Lender, (4) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or any Liens in favor of DIP Lender, (5) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted DIP Lender in the DIP Financing Order or any of the DIP Loan Documents or (6) objecting to, contesting or interfering with, in any way, DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred.

(i)     Borrower shall remain in material compliance with the Initial Approved Budget and any subsequent Approved Budget for each Testing Period. To comply with the Initial Approved Budget or any subsequent Approved Budget, Borrower (i) shall not exceed any disbursement line item set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, (ii) shall collect cash receipts (excluding proceeds of the DIP Facility that may be deemed a receipt) in an amount not less than the aggregate amount of such cash receipts in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for each Testing period (subject to the Permitted Variance). The Permitted Variance with respect to each Testing Period shall be determined and reported to DIP Lender not later than the 25th day of the month immediately following each Testing Period. Budget compliance shall be tested on a monthly and cumulative basis from the Closing Date (each, a "Testing Period").

(j)     Except as otherwise provided herein approved by DIP Lender in writing, Borrower will not use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with an Approved Budget and this Agreement.

(k)     If Borrower obtains any financing other than the DIP Facility for any reason whatsoever, the proceeds of such alternative financing must be used to first repay all outstanding amounts then due under the DIP Facility.

(l)     Borrower shall maintain adequate property and liability insurance coverage to protect against property losses and liabilities. Attached hereto as Schedule B is a listing of all insurance carried on Borrower as of the Closing Date. Borrower covenants not to make material changes to these insurance coverages without the prior written consent of DIP Lender. Borrower shall name the DIP Lender as an additional insured under all insurance policies issued in favor of Borrower, except for any policy marked as an "Excluded Policy" on Schedule B.

(m)     Borrower will preserve its corporate and legal existence and will not make any material changes to the nature or manner of its respective businesses and business activities.

9.     **Events of Default.** If any of the following events shall occur (each an "Event of Default"):

(a)     Borrower shall fail to pay (i) the principal amount of the Loans as and when due and payable, or (ii) interest on the Loans, or any other amount payable under this Agreement, as and when due and payable.

(b)     Any representation or warranty made or deemed made by Borrower in this Agreement, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any material respect on or after the date hereof.

(c)     Borrower shall fail to perform or observe any material term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed, and fails to cure said Event of Default within five (5) days following receipt of written notice from DIP Lender of a monetary Event of Default and fifteen (15) days following receipt of written notice from DIP Lender of a non-monetary Event of Default.

(d)     Borrower is involved in any proceeding which would reasonably be expected to result in a forfeiture of all or a substantial part of its assets, or a material judgment is entered against Borrower and such judgment is not stayed from enforcement.

(e)     Any Lien or security interest purported to be created by any DIP Loan Document or the DIP Financing Order shall cease to be, or shall be asserted by Borrower not to be, a valid, perfected, first priority (except as otherwise expressly provided in the DIP Financing Order, or any other DIP Loan Document) security interest in the assets or properties covered thereby.

(f)     Any of the following shall occur in the Chapter 11 Case:

(i)     filing of a chapter 11 plan in respect of Borrower that does not indefeasibly repay the Obligations in full in cash, unless otherwise consented to in writing by DIP Lender;

(ii)     filing of a motion or application by Borrower seeking to vacate or modify the DIP Financing Order without the prior written consent of DIP Lender;

(iii)     entry of an order without the prior written consent of DIP Lender amending, supplementing or otherwise modifying the DIP Financing Order;

(iv)     reversal, vacatur or stay of the effectiveness of the DIP Financing Order;

(v)     any violation of the terms of the DIP Financing Order;

(vi)     conversion or dismissal of the Chapter 11 Case, pursuant to Bankruptcy Code section 1112;

(vii)     appointment of a trustee, pursuant to Bankruptcy Code section 1104;

(viii)     Borrower seeks to sell any of its assets outside of the ordinary course of business, without advance consent of DIP Lender, other than a sale pursuant to a chapter 11 plan that proposes to indefeasibly repay the Obligations in full in cash;

(ix)     appointment of a responsible officer, or examiner, pursuant to Bankruptcy Code section 1104, with enlarged powers relating to the operation of the business of Borrower, without the prior written consent of DIP Lender;

(x)     granting of relief from the automatic stay in the Chapter 11 Case to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of Borrower exceeding $500,000 in value;

(xi)     any of Borrower's filing (or supporting another party in the filing of) a motion for an order granting any superpriority claim or Lien which is senior to or pari passu with the Superpriority DIP Claims, except as contemplated herein and other than the DIP Lender Carveout;

(xii)     payment or granting of adequate protection with respect to prepetition debt, other than as expressly provided herein, in the DIP Financing Order, approved in writing by the DIP Lender or as otherwise ordered by the Bankruptcy Court;

(xiii)     Borrower's failure to file a plan and disclosure statement, or relevant extension motion resulting in the termination of Borrower's exclusive period for filing or soliciting a chapter 11 plan, under Bankruptcy Code section 1121, within one (1) year after the Petition Date; or

(xiv)     cessation of the Liens of DIP Lender to be valid, perfected and enforceable in all respects.

(g)     Borrower shall use Loan proceeds for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any prepetition debt except as approved by the Bankruptcy Court or DIP Lender.

THEN, in DIP Lender's sole discretion, the automatic stay provided by Bankruptcy Code section 362 shall be vacated and modified as set forth herein. DIP Lender may file written notice with the Bankruptcy Court that the automatic stay provisions of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, effective ten (10) days following the filing of the notice, whereupon the automatic stay shall then be vacated and modified to permit DIP Lender to take, subject to the provisions of the DIP Financing Order, any or all of the following actions without further order of or application to the Bankruptcy Court:

(a)     declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

(b)     declare the unpaid principal of and any accrued interest in respect of all Loans and any and all other indebtedness or obligations of any and every kind owing by Borrower to DIP Lender hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower;

(c)     enforce any and all rights against the DIP Collateral, including without limitation disposition of the DIP Collateral reasonably for application towards the Obligations; and/or

(d)       take any other actions or exercise any other rights or remedies permitted under the DIP Loan Documents or applicable law to effectuate the repayment of the obligations, including for the avoidance of doubt enforcement rights under Article 52 of the New York Civil Practice Law and Rules.

Borrower shall cooperate fully with DIP Lender in its exercise of rights and remedies, whether against DIP Collateral or otherwise.  Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of DIP Lender set forth in the DIP Loan Documents.

In case any one or more of the covenants and/or agreements set forth herein or in any other DIP Loan Document shall have been materially breached by Borrower, and not cured within any applicable cure period, then DIP Lender may proceed to protect and enforce its rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or action for specific performance of any such covenant or agreement contained herein or in any other DIP Loan Document.  DIP Lender acting pursuant to this paragraph shall be indemnified by Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses).

10.       **Certain Bankruptcy Matters.**

(a)       Except to the extent provided otherwise in the DIP Financing Order, Borrower hereby agrees that the Obligations shall (i) constitute Superpriority DIP Claims, with priority over all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), pursuant to Bankruptcy Code section 364(c)(1), subject only to the DIP Lender Carveout and (ii) be secured by the DIP Collateral, pursuant to Bankruptcy Code section 364(d) and, to the extent provided in the DIP Financing Order, shall not be subject to any claims against the DIP Collateral, pursuant to Bankruptcy Code section 506(c), subject only to the DIP Lender Carveout.

(b)       Notwithstanding anything to the contrary contained herein or elsewhere:

(i)       DIP Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any DIP Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the DIP Collateral granted by or pursuant to this Agreement, the DIP Financing Order or any other DIP Loan Document.  If DIP Lender shall, in its sole discretion, from time to time, elect to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any DIP Collateral or take any other action to validate, render enforceable or perfect or all or any portion of DIP Lender's Liens on the DIP Collateral, then all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the DIP Financing Order is entered, and shall not negate or impair the validity or effectiveness of this Section 10(b)(i) or of the perfection of any other Liens in favor of DIP Lender on the DIP Collateral.

(ii)       Except as otherwise agreed to by DIP Lender, the Liens, lien priorities, Superpriority DIP Claims and other rights and remedies granted the DIP Lender pursuant

to this Agreement, the DIP Financing Order or the other DIP Loan Documents (specifically including but not limited to the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Borrower (pursuant to Bankruptcy Code section 364 or otherwise), or by dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever.

(c)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     Except to the extent provided in and subject to the DIP Financing Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of DIP Lender against Borrower in respect of any Obligations, subject to the DIP Lender Carveout.

(ii)     Other than as provided in the DIP Financing Order or other DIP Loan Documents, DIP Lender's Liens on the DIP Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other credit or other person.

(iii)     DIP Lender's Liens on the DIP Collateral shall continue to be valid, enforceable and perfected without the need for DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect DIP Lender's Liens under applicable nonbankruptcy law.

(d)     In connection with any sale of all or any portion of the DIP Collateral, including pursuant to Article 9 of the UCC, at any sale thereof conducted under the Bankruptcy Code, including Bankruptcy Code section 363 or as part of a chapter 11 plan under Bankruptcy Code section 1129(b)(2)(A) or at any sale or foreclosure conducted by DIP Lender, DIP Lender may credit bid the full amount of all Obligations in order to purchase, either directly or through one or more acquisition vehicles, all or any portion of the DIP Collateral. In connection with the foregoing, DIP Lender shall have the right to assign its right to purchase all or any portion of the Borrower's assets in connection with any such credit bid to a newly-formed acquisition vehicle that is an affiliate of DIP Lender.

(e)     As adequate protection for the Existing Lender's security interests, the DIP Financing Order may permit replacement liens on all property of Borrower's bankruptcy estates of the type in which the Existing Lender had valid, perfected, enforceable, non-avoidable and unsubordinated security interests as of the Petition Date ("Adequate Protection Liens"). The Adequate Protection Liens shall be junior in priority to DIP Lender's Liens on the DIP Collateral in the same types of property. No portion of the DIP Facility shall be used to make payments to the Existing Lender as and for adequate protection or for payments under Bankruptcy Code section 506(b), unless agreed to in writing by DIP Lender.

11. **Grant of Security.**

(a)     To secure the Obligations, effective immediately upon entry of the DIP Financing Order, DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition, first-priority security interests and Liens on all DIP Collateral, subject to the DIP Lender Carveout.

(b)     To the extent permitted by applicable law, Borrower hereby irrevocably authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to file in the name of Borrower or otherwise and without separate authorization or authentication of Borrower appearing thereon, such mortgages or UCC financing statements or continuation statements as DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of DIP Lender under this Agreement. Borrower shall pay the costs of, or incidental to, any recording or filing of any mortgage or UCC financing statements or continuation statements.

(c)     Borrower will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by DIP Lender in order to perfect DIP Lender's Lien on the DIP Collateral, all at the reasonable cost and expense of Borrower.

(d)     As further security for the payment of the Obligations, Borrower shall execute an Assignment of Leases and Rents in favor of DIP Lender, substantially in the form of that Borrower previously executed in favor of 80 St. Marks Place Funding LLC, a New York limited liability company, dated as of November 12, 2019.

12.     **Expenses.**  Borrower agrees to reimburse DIP Lender on a monthly basis for all reasonable costs, expense and charges (including, without limitation, reasonable fees and costs of counsel) in connection with the preparation of DIP Loan Documents, the performance or enforcement of the DIP Loan Documents or the defense or prosecution of any rights of DIP Lender pursuant to any DIP Loan Documents. The total sum of such expense reimbursement shall not exceed $25,000; provided, however, that such $25,000 limit shall not apply upon the occurrence of an Event of Default. Said costs, expenses and charges shall be capitalized and added to the principal balance on the date of each reimbursement request.

13.     **Governing Law.**  This Agreement shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws thereof, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable Federal law.

14.     **Waiver of Jury Trial.**  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

15.     **Miscellaneous.**

(a)     The provisions of this Agreement are intended to be severable. If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in ay jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such

invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)     No amendment, modification or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Borrower and DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)     No failure on the part of DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided under applicable law.

(d)     This Agreement shall be binding on Borrower and its successors and assigns and shall inure to the benefit of DIP Lender and its successors and assigns, except that Borrower may not delegate any of its obligations hereunder without the prior written consent of DIP Lender. With the consent of Borrowers, not to be unreasonably withheld, DIP Lender may assign all or a portion of its rights and obligations under this Agreement; provided, that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of DIP Lender or (iii) in connection with any merger or consolidation.

(e)     Anything herein to the contrary notwithstanding, the obligations of Borrower under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of law applicable to DIP Lender limiting rates of interest which may be charged or collected by DIP Lender.

(f)     Unless otherwise agreed in writing, notices given hereunder shall be given to DIP Lender and Borrower at their address set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other.  Notices to DIP Lender shall be effective upon receipt.

[Signature page to follow]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

| BORROWER: | DIP LENDER: |
|---|---|
| 78-80 ST. MARK'S PLACE, LLC | JEC Capital Partners SPV, LLC |
| By: _____ | By: _____ |
| Name: Lawrence V. Otway | Name: Michael Torok |
| Title: Sole Member and Manager | Title: Authorized Signatory |
| | |
| Address for notices: | Address for notices: |
| | |
| 78-80 St. Marks Place, LLC | JEC Capital Partners SPV, LLC |
| 80 St. Marks Place | 68 Mazzeo Drive |
| New York, NY 10013 | Randolph, MA 02368 |
| Attn: Lawrence V. Otway | Attn: Michael Torok |
| | |
| With a copy to: | With a copy to: |
| | |
| Mintz & Gold LLP | Amini LLC |
| 600 Third Avenue, 25th Floor | 131 West 35th Street, 12th Floor |
| New York, NY 10016 | New York, NY 10001 |
| Attn: Andrew R. Gottesman | Attn: Jeffrey Chubak |

# EXHIBIT 1

## Form of Borrowing Request

*[Date]*

JEC Capital Partners SPV, LLC
68 Mazzeo Drive
Randolph, MA 02368

Ladies and gentlemen:

Reference is made to that certain Debtor in Possession Loan Agreement ("Agreement") by and between 78-80 St. Mark's Place, LLC, as debtor and debtor in possession ("Borrower"), and JEC Capital Partners SPV LLC ("DIP Lender"). Terms defined in the Agreement are used herein with the same meanings. This notice constitutes a Borrowing Request, and the Authorized Agent, on behalf of Borrower, hereby requests a Loan under the Agreement from DIP Lender, and in that connection the Authorized Agent specifies the following information with respect to the Loan requested hereby:

| | |
|---|---|
| Aggregate principal amount of Loan:[1] | |
| Date of Loan (which is a business day): | |
| Location and number of Borrower's account to which Loan proceeds are to be disbursed: | |
| Purpose of Loan and use of proceeds therefrom: | |

The authorized Agent hereby represents and warrants that the conditions specified in Section 5(b) through 5(i) of the Agreement are satisfied as of the date hereof.

Very truly yours,

Authorized Agent

_____
Lawrence V. Otway
Manager and Sole Member of Borrower

---

[1] Not less than $50,000.

## EXHIBIT 2

### Initial Approved Budget

See attached.

# 78-80 ST MARKS LLC Budget

| Week ending | Week 1 12/30/21-12/31/21 | Week 2 1/7/2022 | Week 3 1/14/2022 | Week 4 1/21/2022 | Week 5 1/28/2022 | Week 6 2/4/2022 | Week 7 2/11/2022 | Week 7 2/18/2022 | Week 9 2/25/2022 | Week 10 3/4/2022 | Week 13 3/11/2022 | Week 12 3/18/2022 | Week 13 - 3/25/2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning CASH | $ - | $ 14,971.56 | $ 3,000.00 | $ - | $ - | $ 5,950.00 | $ 3,000.00 | $ - | $ - | $ 5,950.00 | $ 3,000.00 | $ - | $ - | $ 31,242.00 |
| Adv and promotion | $ - | $ - | $ 100.00 | $ - | $ - | $ - | $ 100.00 | $ - | $ - | $ - | $ 100.00 | $ - | $ - | $ 300.00 |
| Electricity/gas | $ - | $ - | $ 2,782.00 | $ - | $ - | $ - | $ 2,782.00 | $ - | $ - | $ - | $ 2,782.00 | $ - | $ 432.00 | $ 8,778.00 |
| Office mgt. and supplies | $ - | $ - | $ 20.00 | $ - | $ - | $ - | $ - | $ 20.00 | $ - | $ - | $ - | $ 20.00 | $ - | $ 60.00 |
| Bank fees | $ 25.00 | $ - | $ - | $ - | $ 25.00 | $ - | $ - | $ - | $ 25.00 | $ - | $ 25.00 | $ - | $ - | $ 100.00 |
| Equipment/Supplies | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 650.00 |
| Property Management | $ 2,080.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 14,125.00 |
| Property Tax | | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 35,175.60 |
| Property Insurance | | $ - | $ 3,837.00 | $ - | $ - | $ - | $ 3,837.00 | $ - | $ - | $ - | $ 3,837.00 | $ - | $ - | $ 11,511.00 |
| Water/sewer | | | $ 2,800.00 | $ - | $ - | $ - | $ 2,800.00 | $ - | $ - | $ - | $ 2,800.00 | $ - | $ - | $ 8,400.00 |
| IT/Security | $ - | $ - | $ - | $ 400.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 25.00 | $ - | $ - | $ 425.00 |
| Repairs and Maintenance | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 76,000.00 * | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 78,400.00 |
| Exterminating | $ - | $ 350.00 | $ - | $ - | $ - | $ 350.00 | $ - | $ - | $ - | $ 350.00 | $ - | $ - | $ - | $ 1,050.00 |
| **Operating Expenses totals** | **$ 2,355.00** | **$ 4,381.30** | **$ 13,570.30** | **$ 4,431.30** | **$ 80,471.30** | **$ 4,381.30** | **$ 13,550.30** | **$ 4,051.30** | **$ 4,671.30** | **$ 4,381.30** | **$ 13,600.30** | **$ 4,051.30** | **$ 5,078.30** | **$ 190,216.60** |
| Ch 11 Fees (filing) | $ 1,738.00 | | | | | | | | | | | | | $ 1,738.00 |
| UST Fees | | | $ 250.00 | | | | | $ 250.00 | | | | $ 250.00 | | $ 750.00 |
| Legal | | | | | $ 75,000.00 | | | | | | | | $ 75,000.00 | $ 150,000.00 |
| Accounting/FA | | | | | $ 25,000.00 | | | | | | | | $ 25,000.00 | $ 50,000.00 |
| **Restructuring Expense Total** | **$ 1,738.00** | **$ -** | **$ -** | **$ -** | **$ 250.00** | **$ 100,000.00** | **$ -** | **$ -** | **$ 250.00** | **$ -** | **$ -** | **$ -** | **$ 250.00** | **$ 100,000.00** | **$ 202,488.00** |
| **EXPENSE TOTAL** | **$ 4,093.00** | **$ 8,474.30** | **$ 22,044.60** | **$ 26,725.90** | **$ 207,197.20** | **$ 211,578.50** | **$ 225,128.80** | **$ 229,430.10** | **$ 234,101.40** | **$ 238,482.70** | **$ 252,083.00** | **$ 256,384.30** | **$ 361,462.60** | **$ 392,704.60** |
| Ending Cash | $ (4,093.00) | $ 6,497.26 | $ (19,044.60) | $ (26,725.90) | $ (207,197.20) | $ (205,628.50) | $ (222,128.80) | $ (229,430.10) | $ (234,101.40) | $ (232,532.70) | $ (249,083.00) | $ (256,384.30) | $ (361,462.60) | $ (361,462.60) |

*includes cost of new boiler and installation
Property tax paid in 2 installments  - January and June.
DNI potential funds for any unforseen repairs or non-default interest (9%) on senior lien in the event it becomes payable under 11 U.S.C § 362(d)(3)

**SCHEDULE A**
**DESCRIPTION OF PREMISES**

**Title No.**      S204235

**AMENDED 8/27/2019:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, known and designated as Lot Nos. 109 and 110 on a certain map entitled, "Map showing a division of a part of the real estate late of Nicholas W. Stuyvesant, deceased, among his heirs, situate in the 11th Ward of the City of New York", made by Samuel Doughty, C.S. dated May 1834 and filed in the Office of the Register of the County of New York on April 24, 1835, as Map No. 81. (now 81-B) and being more particularly bounded and described according to said map as follows:

BEGINNING at a point on the southerly side of St. Marks Place, distant 50 feet westerly from the corner formed by the intersection of the southerly side of St. Marks Place with the westerly side of First Avenue;

RUNNING THENCE westerly along the southerly side of St. Marks Place, 50.00 feet;

THENCE southerly parallel with the westerly side of First Avenue, a distance of **97.50 feet, actual and tax map (89.60 feet deed);**

THENCE easterly and parallel with the southerly side of St. Marks Place, a distance of 50.00 feet;

THENCE northerly parallel with the westerly side of First Avenue, a distance of **97.50 feet, actual and tax map (89.60 feet deed)** to the point or place of BEGINNING.

**SCHEDULE A**

<u>**SCHEDULE B**</u>

**Insurance Policies**

| Policy Term | Policy Type | Name of Carrier | Policy No. | Excluded |
|---|---|---|---|---|
| 10/21/202 | FIRE AND GENERAL LIABILITY | Wesco Insurance Company Liberty | WPP1663096 03 | |
| | | State Insurance | | |

## Exhibit B

### Approved Budget

# 78-80 ST MARKS LLC Budget

| Week ending | Week 1 12/30/21-12/31/21 | Week 2 1/7/2022 | Week 3 1/14/2022 | Week 4 1/21/2022 | Week 5 1/28/2022 | Week 6 2/4/2022 | Week 7 2/11/2022 | Week 7 2/18/2022 | Week 9 2/25/2022 | Week 10 3/4/2022 | Week 13 3/11/2022 | Week 12 3/18/2022 | Week 13 - 3/25/2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning CASH | $ - | $ 14,971.56 | $ 3,000.00 | $ - | $ - | $ 5,950.00 | $ 3,000.00 | $ - | $ - | $ 5,950.00 | $ 3,000.00 | $ - | $ - | $ 31,242.00 |
| Adv and promotion | $ - | $ - | $ 100.00 | $ - | $ - | $ - | $ 100.00 | $ - | $ - | $ - | $ 100.00 | $ - | $ - | $ 300.00 |
| Electricity/gas | $ - | $ - | $ 2,782.00 | $ - | $ - | $ - | $ 2,782.00 | $ - | $ - | $ - | $ 2,782.00 | $ - | $ 432.00 | $ 8,778.00 |
| Office mgt. and supplies | $ - | $ - | $ 20.00 | $ - | $ - | $ - | $ - | $ 20.00 | $ - | $ - | $ - | $ 20.00 | $ - | $ 60.00 |
| Bank fees | $ 25.00 | $ - | $ - | $ - | $ 25.00 | $ - | $ - | $ - | $ 25.00 | $ - | $ 25.00 | $ - | $ - | $ 100.00 |
| Equipment/Supplies | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 650.00 |
| Property Management | $ 2,080.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 850.00 | $ 850.00 | $ 850.00 | $ 1,465.00 | $ 14,125.00 |
| Property Tax | | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 2,931.30 | $ 35,175.60 |
| Property Insurance | | $ - | $ 3,837.00 | $ - | $ - | $ - | $ 3,837.00 | $ - | $ - | $ - | $ 3,837.00 | $ - | $ - | $ 11,511.00 |
| Water/sewer | | $ - | $ 2,800.00 | $ - | $ - | $ - | $ 2,800.00 | $ - | $ - | $ - | $ 2,800.00 | $ - | $ - | $ 8,400.00 |
| IT/Security | $ - | $ - | $ - | $ 400.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 25.00 | $ - | $ - | $ 425.00 |
| Repairs and Maintenance | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 76,000.00 * | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 200.00 | $ 78,400.00 |
| Exterminating | $ - | $ 350.00 | $ - | $ - | $ - | $ 350.00 | $ - | $ - | $ - | $ 350.00 | $ - | $ - | $ - | $ 1,050.00 |
| **Operating Expenses totals** | $ 2,355.00 | $ 4,381.30 | $ 13,570.30 | $ 4,431.30 | $ 80,471.30 | $ 4,381.30 | $ 13,550.30 | $ 4,051.30 | $ 4,671.30 | $ 4,381.30 | $ 13,600.30 | $ 4,051.30 | $ 5,078.30 | $ 190,216.60 |
| Ch 11 Fees (filing) | 1,738.00 | | | | | | | | | | | | | $ 1,738.00 |
| UST Fees | | | | 250.00 | | | | 250.00 | | | | 250.00 | | $ 750.00 |
| Legal | | | | | 75,000.00 | | | | | | | | 75,000.00 | $ 150,000.00 |
| Accounting/FA | | | | | 25,000.00 | | | | | | | | 25,000.00 | $ 50,000.00 |
| **Restructuring Expense Total** | $ 1,738.00 | $ - | $ - | $ 250.00 | $ 100,000.00 | $ - | $ - | $ 250.00 | $ - | $ - | $ - | $ 250.00 | $ 100,000.00 | $ 202,488.00 |
| **EXPENSE TOTAL** | $ 4,093.00 | $ 8,474.30 | $ 22,044.60 | $ 26,725.90 | $ 207,197.20 | $ 211,578.50 | $ 225,128.80 | $ 229,430.10 | $ 234,101.40 | $ 238,482.70 | $ 252,083.00 | $ 256,384.30 | $ 361,462.60 | $ 392,704.60 |
| Ending Cash | $ (4,093.00) | $ 6,497.26 | $ (19,044.60) | $ (26,725.90) | $ (207,197.20) | $ (205,628.50) | $ (222,128.80) | $ (229,430.10) | $ (234,101.40) | $ (232,532.70) | $ (249,083.00) | $ (256,384.30) | $ (361,462.60) | $ (361,462.60) |

*includes cost of new boiler and installation
Property tax paid in 2 installmemts - January and June.
DNI potential funds for any unforseen repairs or non-default interest (9%) on senior lien in the event it becomes payable under 11 U.S.C § 362(d)(3)