Steven H. Newman, Esq.
Robert A. Abrams, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
*Attorneys for St. Mark's Mixed Use LLC*

Hearing Date: March 2, 2022

At: 2:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

In re

      **78-80 ST. MARKS PLACE, LLC,**

                Debtor.

-------------------------------------------------------------------x

Chapter 11

Case No. 21-12139 (MG)

**OMNIBUS OBJECTION OF ST. MARK'S MIXED USE LLC TO (1) DEBTOR'S
MOTION FOR AN ORDER (A) AUTHORIZING DEBTOR TO OBTAIN
SUPERPRIORITY POST-PETITION FINANCING, (B) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (C) MODIFYING THE AUTOMATIC STAY; AND (D)
GRANTING RELATED RELIEF; AND (2) DEBTOR'S MOTION FOR A FINAL
ORDER APPROVING USE OF CASH COLLATERAL**

      St. Mark's Mixed Use LLC ("**Lender**"), by its undersigned counsel, respectfully submits

this omnibus objection to (1) the motion by 78-80 St. Marks Place, LLC (the "**Debtor**") for an

order: (A) Authorizing Debtor to Obtain Superpriority Post-Petition Financing, (B) Granting

Liens and Superpriority Claims, (C) Modifying the Automatic Stay; and (D) Granting Related

Relief (ECF No. 14) (the "**DIP Financing Motion**"); and (2) the motion by the Debtor for the

entry of a final order approving use of cash collateral (the "**Cash Collateral Motion**"; together

with the DIP Financing Motion; the "**Motions**") (ECF No. 15), and respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.      The DIP Financing Motion, which seeks the extraordinary relief of priming

Lender's first priority secured lien on the Real Property (defined below), must be denied because

the proposed debtor-in-possession loan (the "**DIP Loan**") from JEC Capital Partners SPV, LLC (the "**DIP Lender**") is entirely unnecessary and, in all events, if such DIP Loan is granted, Lender will not be adequately protected.

2.      The DIP Loan is unnecessary because Lender has not only agreed to extend to the Debtor use of Lender's cash collateral through March 2022 -- the outside date that the Debtor represented it needed to obtain a loan in an amount sufficient to payoff Lender's secured claim in full –, to the extent the Motions are denied, Lender is also willing to extend the Debtor's use of Lender's cash collateral through June 2, 2022. Moreover, Lender is further willing to make protective advances under its Loan Documents (as defined in the Leibowitz Declaration), at the reduced interest rate of 10% per annum, for any operating expense shortfalls of up to $90,000 during this same 90 day period (*i.e.*, through June 2, 2022). Thus, in addition to Lender's prior one year forbearance pursuant to a *Forbearance Agreement*, dated January 14, 2021 (the "**Forbearance Agreement**") and a *So-Ordered Stipulation of Settlement and Dismissal of Action*, dated November 29, 2021 (the "**Consent Order**"), Lender is willing to give the Debtor a lifeline of funds for carrying costs over the next 90 days while it continues its search for financing which it represented at the February 3, 2022 conference that it would obtain by the end of March 2022. Thus, there is absolutely no need for a priming DIP Loan. In 90 days' time, the Court will be in a better position to assess the viability of this Chapter 11 case. *See*, Point I.

3.      The Motions should also be denied because there is no legitimate need for this Debtor to be burdened with even more debt. Specifically, the evidence shows that the Debtor has historically been unable to generate profits and there is absolutely no showing as to how the Debtor's circumstances would be altered if the DIP Loan was approved. Indeed, the proposed budget ("**Budget**") attached as the last page to the proposed order (ECF No. 14-1) confirms that the proposed <u>DIP Loan is not being used to improve the Real Property but only to bleed the</u>

Debtor's estate, while interest and legal fees accrue on Lender's secured claim on a monthly basis, without even making any adequate protection payments to Lender. *See*, Point II.

4.        In all events, the DIP Loan, if approved, would leave Lender with insufficient adequate protection and severely prejudice Lender's collateral position. In the first instance, the true cost of the DIP Loan is not $650,000; rather, the Lender believes that the debt incurred under the proposed DIP Loan, if allowed, will on day one prime Lender by at least $974,000, and that the costs were not fully presented to the Court. For example, interest and fees are capitalized so the Debtor is paying the DIP Lender interest on its interest, fees and expenses. The obligations to the DIP Lender also include (i) obligations under any documents now or hereafter executed (*i.e.*, including documents not filed with the Court) and (ii) all of the DIP Lender's fees and costs for the originating the loan (which amounts are not disclosed), and costs and expenses (including legal) after the loan is originated. There is no cap on any of those fees and it is entirely uncertain what amounts the Debtor is liable for, all of which will prime Lender's first priority lien. Additionally, there is an **unlimited** carveout for the Debtor's professionals (prior to a default) and an additional minimum amount of $260,000 in more carveouts (before and after a default). If the Real Property is really worth what the Debtor claims, there is simply no need for any carve-out. The Lender estimates that if the DIP Loan is approved, Lender will be primed by **a minimum of over $974,000 on day one**. At bottom, the Debtor should not be allowed to "shift the risk" of the collateral value being insufficient to the Lender. *See*, Point III.

5.        Further, the Debtor materially overstates the value of its property and the amount of equity cushion therein. Importantly, the Debtor, by its sole owner, Lawrence V. Otway ("**Otway**" or the "**Individual Debtor**"),[1] failed to advise the Court that (i) Silver Arch Capital

---

[1] Otway, the Debtor's sole member, also filed a Chapter 11 case in this Court (Case No. 21-12140 (MG)) on the same date as the Debtor as a case related to the Debtor's case. The Debtor and the Individual Debtor are sometimes collectively referred to herein as the "**Debtors.**"

Partners, LLC ("**Silver Arch**"), a potential lender to the Debtor, commissioned Newmark Knight Frank Valuation & Advisory LLC ("**Newmark**"), a highly regarded valuation and advisory firm, to appraise the Debtor's sole real estate asset -- real property located at 78-80 St. Marks Place, New York, New York (the "**Real Property**") -- and that Newmark appraised the Real Property as of April 15, 2021 at only $9,800,000 (the "**Newmark Appraisal**") (or $3,880,000 *less* than the sum that the Debtor claims the Real Property was worth only eight months later);[2] and (ii) in April 2021, the Debtor retained Lee & Associates NYC (the "**Lee Firm**"), a real estate brokerage firm, which actively marketed the Debtor's Real Property from and after May 2021 at the unrealistic asking price of $13,500,000 (as demanded by Otway), and not surprisingly, received only a single offer of $9.3 million, which is $4,380,000 *less* than what the Debtor claims the market value of the Real Property was as of December 31, 2021. Better than any appraisal, the value of the Real Property was actually tested in the real-world marketplace. The market spoke and informed everyone that the Real Property's value is not anywhere close to $13,680,000.[3]

6. Lender also recently retained Leitner Berman ("**LB**"), a financial advisory and appraisal firm, to appraise the Real Property. According to LB, the Real Property has a market value as of February 9, 2022 of $10,200,000 (the "**LB Appraisal**").[4] The accuracy of the LB Appraisal is supported by both the Newmark Appraisal and the Debtor's 2021 attempt to sell the Real Property.

---

[2] A copy of the Newmark Appraisal is annexed as **Exhibit 1** to the Wendy Hwang Declaration (the "**Hwang Declaration**").

[3] *See*, Declaration of Vikram Jambu (the "**Jambu Declaration**"), the Debtor's former broker at the Lee Firm.

[4] A copy of the LB Appraisal is annexed as **Exhibit 1** to the Declaration of Joel Leitner (the "**Leitner Declaration**").

7.     The Lender's first priority secured claim is approximately $8,632,145 as of March 2, 2022.[5] In addition, such claim continues to accrue interest in the sum of $4,483.68 a day (or $134,510 per month), plus additional amounts for the Lender's legal fees, expenses and other amounts which continue to accrue. Therefore, the Debtor's contention that the Lender enjoys a $4,800,000,000 equity cushion is grossly overstated.

8.     Based on the LB Appraisal, the equity cushion is at best only $1,489,112[6] or 17% of the Lender's secured claim. In the event the Court grants the DIP Financing Motion, after subtracting $974,000 – the minimum amount that the DIP Loan will prime the Lender on day one - the equity cushion would immediately plummet to $515,112 or 6%. Neither the 17% nor the 6% equity cushion is sufficient to adequately protect Lender under the circumstances. Moreover, in just 6 months, the Lender's claim will rise to $9,825,904, the minimum amount of the DIP Loan priming Lender will rise to $1,031,975, and the equity cushion will be completely gone (and the total debt would be $10,857,879, exceeding the $10,200,000 value by $657,879). Stated differently, <u>should the proposed DIP Loan be approved, Lender's equity cushion will be completely eroded in less than 3 months</u>.[7] Thus, the amount of the current equity cushion is insufficient to adequately protect the Lender if the DIP loan is approved. *See*, Point IV.

---

[5] *See*, Declaration of Jason Leibowitz (at ¶ 32) submitted herewith (the "**Leibowitz Declaration**").

[6] $10,200,000 less $8,632,145, less $71,047 in outstanding real estate taxes, and less $7,696 in outstanding water charges.  Attached hereto as **Exhibit 1** are copies of statements from the NYC Department of Finance and the NYC Environmental Protection showing the outstanding charges.

[7] Further, if the Real Property needs to be sold, there will be closing costs of about 7% or $714,000 (such as broker's fees, transfer taxes, etc.) that would need to be paid and further erode the funds available to pay the Lender. Thus, factoring in such closing costs, the collateral's maximum net realizable value today is $9,486,000 (*i.e.*, $10,200,000 less $714,000) which is only $198,888 less than the $9,684,888 amount of total debt that would exist if the DIP Loan is approved (*i.e.*, the sum of (i) Lender's claim of $8,632,145, (ii) unpaid taxes and water charges of $78,743, and (iii) the $974,000 priming amount of the DIP Loan). Therefore, the Lender is not adequately protected and the DIP Loan cannot be approved.

9. In the unlikely event that the Court concludes that the value of the Real Property is significantly higher than $10,200,000, that there is a large enough equity cushion to adequately protect the Lender if the DIP loan is made, and that the Debtor actually needs a $650,000 loan and is otherwise willing to entertain the DIP Loan proposal from the DIP Lender,[8] then the Lender, solely to protect its first priority lien interest in the Real Property and avoid the substantial costs of the proposed DIP Loan, is willing to extend a DIP loan to the Debtor on terms set forth on a Term Sheet annexed hereto as **Exhibit 2**, which are significantly better and cheaper for the estate than those terms proposed by the DIP Lender. For example, the DIP Lender's proposal consists of a $650,000 loan, 15% interest rate (capitalized and compounded monthly), a $19,500 commitment fee (capitalized), a $19,500 exit fee, and a 1 year term. On the other hand, Lender proposes a $650,000 loan, 6% interest rate, a $6,500 commitment fee, a $6,500 exit fee, and a 6 month term. Because Lender's proposal offers better economic terms to the Debtor and is in line with the timeline for the Debtor to obtain its refinancing, the proposed DIP Loan should be rejected. *See*, Point V.

10. Lastly, we bring to the Court's attention that Otway's goals are different than the Debtor's goals and that Otway's business judgment should be closely scrutinized. Otway, his wife Eugenie Otway ("**OE**"), and his wholly owned affiliated non-debtors, including Scheib's Place, Inc. ("**SPI**") and American Gangster, Inc. ("**AGI**"; together with OE, Theatre 80, SPI, and AGI, the "**Affiliated Non-Debtors**") use and occupy a significant portion of the Real Property and have withheld substantial use and occupancy payments due to claimed financial hardship. The Debtor has made no effort to collect rent from Otway or his Affiliated Non-Debtors. Thus,

---

[8] We note that the Debtor never made any request for financing from Lender and therefore failed to satisfy § 364(d)(1)(A).

Otway and his Affiliated Non-Debtors continue to occupy the Real Property rent free and it is in their interests to continue to do so at the expense of the Debtor's creditors. *See*, Point VI.

11.     For these reasons, the additional reasons below and as set forth in the Leibowitz Declaration, the Leitner Declaration, the Hwang Declaration, and the Jambu Declaration, each submitted contemporaneously herewith, the Motions should be denied.

## BACKGROUND

**The Debtor, Otway, and His Affiliated Non-Debtors**

12.     On December 29, 2021 (the "**Petition Date**"), the Debtor and Otway each filed a petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York.

13.     The Debtor is a single purpose entity[9] and is a "single asset real estate" debtor (as defined in § 101(51B) of the Bankruptcy Code). Its sole property is the fee interest in the Real Property. Indeed, the Debtor has admitted that that the Debtor "does not operate any business other than ownership and maintenance of the [Real Property]". (ECF No. 6, ¶ 5). Despite such admission, to delay the Debtors' cases, Otway did not check the box on the Debtor's petition designating the Debtor to be a single asset real estate ("**SARE**").[10] Lender submits that the Debtor had no good faith basis for not declaring itself as a SARE case.

14.     Otway is an individual, is the sole member of the Debtor, and owns 100% of the membership interests in the Debtor. Otway also owns 100% of the membership interests of Theatre 80, SPI, and AGI.

15.     Otway, EO, and Otway's Affiliated Non-Debtors occupy the vast majority of the square footage of the Real Property. Pursuant to the Forbearance Agreement and the Consent

---

[9] *See*, Paragraph B 6 of the Mortgage where the Debtor agreed that at all times it shall be a single purpose entity.

[10] *See*, Debtor's Petition (ECF No. 1 at item 7).

7

Order, Otway, EO, and Otway's Affiliated Non-Debtors agreed that their tenancies were terminated and were required to vacate the Real Property. Contrary to their agreement, they failed to vacate the Real Property.

16. The Debtors are currently "operating" their estates as debtors-in possession and no trustee or creditors' committee has been appointed.

17. As of the date hereof, no committee of unsecured creditors has been appointed.

**The Loan Documents**

18. As more fully set forth in the Leibowitz Declaration, and as admitted by the Debtor, Otway and his Affiliated Non-Debtors in the Forbearance Agreement and the Consent Order, Lender is the owner and holder of the Loan, which is evidenced by a Promissory Note in the original principal balance of $6,100,000.00, dated as of November 12, 2019 (the "**Note**"), which Note is secured by, among other things, a Mortgage and Security Agreement, dated as of November 12, 2019 (the "**Mortgage**"), an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), a Guaranty by Otway dated as of November 12, 2019 (the "**Guaranty**"), and a Pledge and Security Agreement dated as of November 12, 2019 (the "**Pledge Agreement**").

19. The Loan fully matured by its terms on December 1, 2020 (the "**Maturity Date**"). However, the Debtor breached its obligations under the Loan by failing and omitting to pay in full all obligations under the Loan Documents on or before the Maturity Date.

**The January 2021 Forbearance Agreement**

20. After the Maturity Date (about 15 months ago), the Debtor advised the Lender that the Debtor expected to quickly refinance the Loan and requested that the Lender temporarily forbear from scheduling a UCC sale of, among other things, Otway's membership interests in the

Debtor. Far from aggressively pursuing its rights as the Debtor claims, the Lender bent over backwards to afford the Debtor with the time it claimed the Debtor needed to pay off the Loan.

21. Pursuant to the Forbearance Agreement, a true and correct copy of which is attached to the Leibowitz Declaration as **Exhibit 1**, the Lender agreed to temporarily forbear from further foreclosing under the Pledge Agreement to and including April 15, 2021 (the "**Forbearance Date**"). The Debtor represented that during this time, the Debtor would refinance the Loan. However, in the event that the Debtor failed to pay off the Loan by April 15, 2021, the Debtors agreed to market, list and advertise the Real Property for immediate sale at agreed upon list prices. The initial asking price for the Real Property was to be $13,500,000 and if no contract was (i) executed by May 15, 2021, the asking price would be reduced to $11,000,000; (ii) executed by June 15, 2021, the asking price would be reduced to $10,000,000; (iii) executed by July 15, 2021, the asking price would be reduced to $8,500,000. *See*, Leibowitz Declaration, **Exhibit 1**, Sections 2(j), (k), and (l). These listing prices were heavily negotiated and were a material part of the Forbearance Agreement. These agreed list prices are also indicative that the Real Property is worth substantially less than the $13,680,00 it now alleges in the DIP Financing Motion.

22. In sum, the Debtor and Otway were afforded four (4) months to refinance the Loan and in the event they failed to refinance, they were then afforded another four (4) months to conduct a sale of the Real Property.

**The Debtor Failed to Refinance the Real Property**

23. The Debtor repeatedly advised the Lender that a closing on a refinancing would occur prior to the Forbearance Date (*i.e.*, April 15, 2021). However, no refinancing materialized. Further, even after the Forbearance Date, the Debtors' then counsel, Joshua Wurtzel of Schlam Stone & Dolan LLP, made multiple promises on behalf of the Debtors that a refinancing was imminent. In fact, the Lender was lulled into believing that a closing was imminent because

between August 2021 and October 2021, the Debtor scheduled six closings (8/13; 8/16; 8/17; 9/15; 10/6; and 10/13) to refinance the Loan. However, all of them were cancelled (sometimes the evening before). During this timeframe, the Debtors' counsel continued to reassure the Lender that the Loan would be refinanced. For example, after the first four closings were aborted, the Debtors' counsel confirmed in a September 30, 2021 email that "We are FINALLY getting this deal done" and sought to close on October 6, 2021. *See*, **Exhibit 3** hereto (Emphasis in original). That closing was adjourned to October 13, 2021.

**Debtors Advised They Were at Least $100,000 Short on Funds Needed to Refinance**.

24.     Just prior to the adjourned October 13, 2021 closing, Debtors' counsel advised that the Debtor was "100k short" of funds to close and that unless Lender agreed to reduce the amount owed "the loan is not going to close and you'll have to do a UCC foreclosure sale." *See*, **Exhibit 4.** On October 12, 2021, the Debtors' counsel advised that the closing was postponed, without date. *See* **Exhibit 5**, hereto. The closing was never rescheduled.

**The Debtor Failed to Sell the Real Property**.

25.     In April 2021, the Debtor retained the Lee Firm to market and sell the Real Property and instructed the Lee Firm to list the Real Property on May 15, 2021 at an initial asking price of $13,500,000. Notably, the Debtors agreed in the Forbearance Agreement to list the Real Property for $11,000,000 by May 15, 2021. After the Lee Firm failed to receive any offers, the Lee Firm recommended to the Debtor to reduce the asking price to $10,000,000. Jambu Declaration, ¶ 10. Despite such recommendation, the Debtor expressly refused to reduce the asking price to a sum below $11,500,000. *Id.* at ¶ 11.

26.     The Lee Firm conducted a robust marketing campaign of the Real Property to several thousand potential purchasers over a period of several months. Jambu Declaration, ¶ 8.  However, during the term of Lee Firm's engagement, only one offer was received -- which was for $9,300,000

(*id.* at ¶ 12), substantially less than the $13,680,000 which the Debtor contends is the value of the Real Property as of December 31, 2021.[11] The Debtor never made a counter-offer to that offer.

27.    No contract was ever signed for the sale of the Real Property.

**Lender Scheduled a UCC Sale of the Pledged Collateral and the State Court Action**

28.    In light of the Debtors' repeated failure to refinance the Loan or sell the Real Property, on September 3, 2021, the Lender scheduled a public UCC sale of the Pledged Collateral (*i.e.*, Otway's membership interests in the Debtor) for November 18, 2021.

**Debtors Filed a Frivolous State Court Action To Delay the Sale**

29.    On November 11, 2021, the Debtor, Otway, and his Affiliated Non-Debtors commenced an action in the Supreme Court of the State of New York, New York County, under Index No. 656446/2021, seeking to enjoin the sale of the Pledged Collateral (the "**State Court Action**"). In its Complaint in the State Court Action, the Debtor represented, as it had represented to the Lender during the prior eleven months, that a refinancing of the Real Property was imminent and represented that "Plaintiffs expect a mortgage loan to come through within the next 90 days." (*i.e.*, by February 9, 2022). *See* Complaint, **Exhibit 6** ¶ 40.

**Debtors Signed a Consent Order Dismissing the State Court Action, With Prejudice**

30.    The State Court Action was promptly dismissed with prejudice (just 3 weeks after it was filed) pursuant to a Consent Order, a copy of which is annexed to the Leibowitz Declaration as **Exhibit 2**. Pursuant to the Consent Order, the Lender agreed to forbear from enforcing any of its remedies under the Pledge Agreement to December 30, 2021. Further, the Debtors confirmed, as they did in the Forbearance Agreement, the validity of Lender's liens, the

---

[11] The Debtor asserted in its Schedules that the Real Property was worth $15,000,000; however, just 20 days later, the Debtor submitted the December Gold Appraisal and asserts that the **value dropped** to $13,860,000. As explained herein, the Debtor's current alleged valuation is grossly overstated too.

amount owed as of November 30, 2021,[12] and that the Debtor's leases with Otway and all his Affiliated Non-Debtors (*i.e.*, Scheib's Place, Inc., Exhibition of the American Gangster, Inc., and Theatre 80, LLC) were (i) wrongfully created and (ii) terminated and that they would vacate the Real Property by December 30, 2021. Leibowitz Declaration, **Exhibit 2**, Recitals, ¶ 8.6(a), (c), (d), (e) and (d)-(g) (sic); ¶ 10(b).

**The Debtors File Bankruptcy Petitions**

31.    The Debtor failed to refinance the Real Property as promised and, to further hinder and delay enforcement of Lender's rights, each Debtor filed for Chapter 11 relief.

32.    Otway and his Affiliated Non-Debtors are still occupying the Real Property -- and paying little or no rent -- in breach of the Forbearance Agreement and the Consent Order.

**ARGUMENT**

**POINT I**

**LENDER HAS AGREED TO EXTEND USE CASH COLLATERAL AND
MAKE PROTECTIVE ADVANCES FOR DEBTOR'S OPERATING EXPENSE
SHORTFALLS OF UP TO $90,000 THROUGH JUNE 2, 2022**

33.    The Motions should be denied because the Debtor never made any request for financing from the Lender and, accordingly, cannot satisfy the requirements under §§ 364(c) or (d) of the Bankruptcy Code that the needed funds are not available without the proposed DIP Loan.

34.    Further, the Debtor has advised the Court at a February 3, 2022 initial case conference that it is in discussions with two potential lenders and expects to obtain a loan from either one of them by the end of February 2022 or March 2022 in an amount which will be sufficient to pay Lender's secured claim in full.

---

[12] Lender's liens were validated and the amount of its claim as of November 30, 2021 was fixed in the Consent Order. As such, any attempt in this case to challenge Lender's liens and claims is now barred by *res judicata*, collateral estoppel, and the *Rooker-Feldman* doctrine.

35.     As indicated above, pursuant to an Interim Order Concerning Use of Cash Collateral, dated February 3, 2022, Lender already authorized the Debtor to use its cash collateral of up to $33,000 through March 31, 2022.

36.     Further, to the extent the DIP Loan is denied, the Lender is prepared to extend the Debtor's use of cash collateral for 90 days from the hearing on the Motions (*i.e.*, through June 2, 2022) and, to the extent that the Debtor has insufficient receivables to cover its $27,000 of monthly operating expenses, Lender is willing to make, pursuant to an Order approved by the Court, protective advances of up to $90,000 under its existing Loan Documents, at a 10% interest rate per annum, to fund the Debtor's operating expenses through June 2, 2022.

37.     Because the Debtor has access to funds to cover its operating expenses beyond the period the Debtor even represented was necessary, consideration of the DIP Financing Motion, which would grant the extraordinary remedy of a priming loan, is entirely unnecessary.

38.     On or about June 2, 2022 (*i.e.*, after this 90 day period), the Court can re-evaluate the viability of this Chapter 11 case.

## POINT II
### NO LEGITITMATE NEED EXISTS FOR THE REQUESTED DIP LOAN

39.     In addition to the reasons set forth in Point I, the Debtor has no legitimate need for a DIP Loan because there is absolutely no showing that the Debtor's circumstances will change if the DIP Loan is approved. In this regard, we note that the Debtor's revenues for 2021 were not even listed on its Schedules; instead, the Debtor listed its revenues only for 2020, which were only $105,650. *See*, ECF No. 1, Statement of Financial Affairs, Part 1, Q. 1 (page 20 of 38). Per the proposed Budget (ECF No. 14.1), monthly rental income is only $8,950. At the February 3, 2022 initial case conference, the Debtor further represented that Otway's Affiliated Non-Debtors are currently operating on a very limited basis and, as a result, it appears that they will not be paying any use and occupancy to the Debtor. Thus, it appears that the DIP Loan, if

approved, will simply add more debt to a Debtor that is incapable of even paying adequate protection payments to Lender, much less pay its pre-petition secured debt. As noted, the Debtor was unable to refinance the Loan 15 months ago when the amount owed was only $6,245,653.65 as of December 31, 2020.[13] As of March 2, the debt will be approximately $8,662,145.

40.     Moreover, a simple glance at the uses for the DIP Loan, set forth in the Budget (*see* ECF No. 14.1), makes it crystal clear that <u>the DIP Loan is not being used to improve the Real Property</u>; rather, the monies are being used during the first three months of this Chapter 11 case for the purpose of lining the pockets of Otway and his professionals so as to allow Otway and his affiliates to remain at the Real Property rent free.

41.     First, Otway wants to pay himself a weekly management fee and the amount thereof is $14,125 for the three-month Budget. Such amount is egregious as the expected revenue during this same time period is only $26,850.

42.     Second, the Budget proposes to use the majority of the Debtor's DIP Loan proceeds to pay the Debtor's professionals. Indeed <u>$200,000 of the $392,700 proposed to be advanced (*i.e.*, 51%)</u> in the three-month Budget is proposed to be paid to the Debtor's professionals. Using any part of the DIP Loan to pay such professionals is not appropriate. If the Debtor believes there is sufficient equity in the Real Property to pay the Lender in full, then Debtor's counsel can get paid upon a refinancing after the Lender is paid in full. It is not appropriate for the Debtor to shift the risk of non-payment to the Lender.

43.     Third, the Debtor has submitted zero evidence that the DIP Loan will enable it to refinance the Lender's Loan. Rather, the Budget shows that if the DIP Loan is approved, the Debtor will merely limp along as it has done for the last 15 months while concurrently saddling

---

[13] *See*, Leibowitz Declaration, **Exhibit 1**, Forbearance Agreement, p. 4.

the estate with ever more debt as (i) the amount owed on the Lender's Loan will grow materially higher from accrued interest and legal fees, and (ii) the Debtor will be burdened by the DIP Loan and all its unknown and accruing costs. The DIP Loan is not a life-line -- it is a bomb.[14]

44.     Lastly, we note that the Debtor holds claims against Otway and other insiders in the hundreds of thousands of dollars of back rent. If the Debtor really needs funds over and above those proposed by Lender over the next 90 days, it should first have its insiders pay back what they owe and start paying use and occupancy.

**POINT III**

**THE TRUE COSTS OF THE PROPOSED DIP LOAN ARE
MATERIALLY HIGHER THAN THE AMOUNT THE DEBTOR REPRESENTED
AND ARE NOT FULLY DISCLOSED**

45.     The DIP Financing Motion should be denied because material information respecting the proposed DIP Loan has not been disclosed. Therefore, the Lender and other creditors have not been properly noticed of the transaction and the Court cannot make a fully informed decision.

46.     The proposed DIP Lender has been disclosed in name only, JEC Capital Partners SPV LLC. The DIP Financing Motion fails to advise who this entity is and who its owners and principals are.

47.     Also, the true amount of the proposed DIP Loan is not fully disclosed. First, the debt is not just the $650,000 claimed but rather all obligations under all "Loan Documents." The term "Loan Documents" is buried in small font in footnote No. 2 to the DIP Financing Motion and includes not just the agreement attached to the proposed order, but also "any and all other

---

[14] Further, the DIP Loan contains a number of event of defaults (including the conversion of the case or the appointment of a trustee), which have a reasonable prospect of occurring, especially given the Debtor's failure to demonstrate in its Motions that it will be able to soon pay off Lender's Loan and reorganize. Occurrence of an event of default will trigger the increased default rate of interest under the DIP Loan, and such additional charges would further prime Lender.

agreements, instruments, and documents now or hereafter executed by the Debtor in favor of DIP Lender." None of such "other" documents are disclosed. Moreover, the term Loan Documents is so broad to include "future" documents or even amendments (that could add additional terms and obligations). Furthermore, Paragraph 25 of the proposed order provides that the Debtor shall pay all expenses of the DIP Lender in connection with the preparation of DIP Loan and the "administration" of the Loan Documents and <u>that such fees and shall not be subject to allowance of the Court</u>. In other words, the DIP Loan contemplates a "blank check" being given to the DIP Lender. This is entirely improper and makes the amount of the proposed priming lien unknown.

48.     Second, the proposed DIP Loan contains an "unlimited" carveout to the Debtor's professionals prior to a default. *See,* DIP Financing Motion ECF No. 14 ¶12, summary of terms, "Carve Out" item (c) p.11. Thus, the Debtor can accrue an unknown sum of debt for professional fees which primes Lender's existing liens. That is an absurd request and should be stricken.

49.     Further, the Lender objects to any payments or carveout to the professionals whatsoever. If the Debtor truly believes the value of the Real Property is the amount it asserts and that such value is adequate to protect the Lender -- then there is simply no need for any carve-out for professionals. Indeed, the very fact that the substantial carve-out is requested supports the Lender's position that the value is not what the Debtor claims and that the Real Property's value is not high enough to adequately protect the Lender.

50.     Third, interest, $19,500 in up-front fees and at least $25,000 in other expenses are <u>capitalized and interested is compounded</u>, and another $19,500 in exit fees are owed. Thus, the effective interest rate on the DIP Loan is deceptively higher than 15% per annum.[15]

---

[15] Because fees are capitalized (rather than paid from the loan proceeds), and interest is also capitalized and compounded monthly, and additional amounts may be owed, the true cost of the DIP loan has not been disclosed. As set forth in the table in ¶52 below, after just one year the minimum obligation owed to the DIP Lender (not counting the unknown costs and additional legal fees, and not counting any carveouts) will be $827,304 or 27.3% of the principal amount.

51.     Fourth, the DIP Loan proposes an exorbitant amount of additional carve-outs: (i) all US trustee fees, and (ii) $10,000 for a chapter 7 trustee, and (iii) $250,000 to the Debtor's professionals after a default (and the amount thereof is not reduced by any payments received). These described carveouts will aggregate approximately $260,000 on day one and it is improper to burden the Lender for payment of same by allowing the DIP Lender to grant it. Again, like Otway, the proposed DIP Lender is happy to "give away" the Lender's collateral at the expense of Lender's first priority lien position. <u>However, the proposed DIP Lender has absolutely no right to give away Lender's collateral by granting any carveouts</u>. *See*, *In re Windsor Hotel, L.L.C.*, 295 B.R. 307 (Bankr. C.D. Ill. 2003) (debtor's request for leave to borrow on superpriority basis had to be denied as requiring creditors to suffer a further erosion of their secured positions in order to underwrite debtor's speculative prospects of reorganizing). In any event, the proposed amounts are wholly inappropriate and all carveouts should be denied.

52.     Without even including all the "unknown" and unlimited items discussed above, the minimum amount that the DIP Loan will prime the Lender is materially higher than the $650,000. On day one, it will be $974,000 (after the minimum carveouts are included), in 6 months it will be $1,031,975, and in 1 year it will be $1,093,576.  A summary showing the calculation of the foregoing minimum amounts is below:

| ITEM | DAY ONE | 6 MONTHS | ONE YEAR |
|---|---|---|---|
| Principal Sum | $650,000 | $650,000 | $650,000 |
| Origination Fee | $19,500 | $19,500 | $19,500 |
| Exit Fee | $19,500 | $19,500 | $19,500 |
| Origination Expenses (estimated) | $25,000 | $25,000 | $25,000 |
| Interest | | $54,975 | $113,304 |

| ITEM | DAY ONE | 6 MONTHS | ONE YEAR |
|---|---|---|---|
| Carveout | $260,000 | $263,000 | $266,272 |
| **TOTAL** | $974,000 | $1,031,975 | $1,093,576 |

53.     Upon full disclosure of the true pricing of the DIP Loan, it is evident that the amount claimed to prime the Lender's first priority liens will be significantly higher than what the Debtor represented or the minimum amounts set forth in the table above.

### POINT IV

### BOTH MOTIONS SHOULD BE DENIED BECAUSE
### THE DEBTOR CANNOT ADEQATELY PROTECT THE LENDER

54.     Section 364(d) upon which the Debtor relies provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee [*i.e.,* debtor in possession] is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

55.     "As a general principle, the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby." *In re Mosello,* 195 B.R. 277, 287 (Bankr.S.D.N.Y.1996). This policy is recognized by § 364(d) which permits the priming of an existing lien only as "a last resort." *In the Matter of Qualitech Steel Corp.,* 276 F.3d 245, 248 (7th Cir. 2001). *See, In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (denying priming loan; "granting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort"); *In re Seth Co.,* 281 B.R. 150,

153 (Bankr.D.Conn. 2002) (denying priming loan; "ability to prime is extraordinary"). Given the consequences to the existing creditor of a priming lien, the court must be "particularly cautious" when evaluating whether the subordinated creditor is adequately protected. *Mosello,* 195 B.R. at 289 (*quoting In re First South Savings Ass'n,* 820 F.2d 700, 710 (5th Cir.1987)).[16]

56.     Courts have noted that "while the policy underpinnings of Chapter 11 are quite important, 'Congress did not contemplate that a creditor could find its priority position eroded and as compensation be offered an opportunity to recoup dependent upon the success of a business with inherent risky prospects.'" *In re Stoney Creek Techs., LLC*, 364 B.R. at 891 *citing The Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552, 564 (3rd Cir. 1994). *See also In re Windsor Hotel, LLC,* 295 B.R. 307, 314 (Bankr.C.D.Ill. 2003) ("The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for the new, post-petition lender."),

57.     Here, the sole means of adequate protection proposed by the Debtor is an equity cushion. While there is equity in the Real Property today, the amount of the current equity cushion is far less than the Debtor represents since, among other things, the value of the Real Property is millions of dollars lower than the Debtor asserts and the amount owed to the Lender is much higher than the Debtor alleges, and is materially increasing each month. Any equity will evaporate in a matter of months. Further, the Debtor has little to no revenue, cannot even meet its post-petition administrative obligations (*e.g.*, taxes), and is admittedly bleeding losses. Under the

---

[16] *See also*, *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 889–90 (Bankr. E.D. Pa. 2007) (debtor failed to demonstrate that holder of first lien and security interest on all its assets would be adequately protected under plan to provide post-petition financing, even if there was a substantial equity cushion in DIP's real property and equipment, where DIP had historically been unable to generate profits, there was no showing as to how that circumstance would be altered by proposed DIP loan, it was likely that DIP would default on its obligations to DIP Lender, and creditor would be impaired by its second lien position from realizing value of its collateral).

facts of this case, the equity cushion is insufficient to adequately protect the Lender's secured claim and liens for either a priming loan or use of cash collateral. Accordingly, each of the Motions should be denied.

A. **The Real Property is Not Worth The Amount Debtor Asserts**

58.     According to the December Gold Appraisal, the value of the Real Property, based solely on a sales comparison approach, is $13,860,000 as of December 31, 2021.

59.     From and after April 2021, the Debtor retained the Lee Firm to market and sell the Real Property. The Debtor's initial asking price for the Real Property was $13,500,000. It later reduced the asking price to $11,500,000. However, the only offer for the Real Property was $9,300,000. *See*, Jambu Declaration, ¶12.

60.     In or about April 2021, the Debtor sought a loan from Silver Arch, a potential lender unaffiliated with Lender. Silver Arch commissioned Newmark to perform an appraisal in connection with a potential loan, and Newmark determined the value of the Real Property based on a combination of an income and sales comparison approach is $9,800,000 as of April 15, 2021. *See*, Hwang Declaration.

61.     In February 2022, the Lender commissioned LB to appraise the Real Property and LB concluded that the market value of the Real Property, based on a combination of an income and sales comparison approach, is $10,200,000. *See*, Leitner Declaration.

62.     The Debtor's valuation in the December Gold Appraisal of $13,860,000 is materially overstated and unreliable for a number of reasons.

### 1) The December Gold Appraisal Values
### The Real Property at $13,680,000

63.     For each of the following reasons and the reasons set forth in the Leitner

Declaration, the Debtor's appraisal attached to the DIP Financing Motion is simply not credible

and should not be relied upon by this Court.

64.     First, the appraiser, Ronald Gold, was retained by the Debtors -- not by a third

party like Newmark. He was first retained in early 2021 to perform an appraisal as the Debtor

was starting to go shopping for a new loan. Indeed, his first two appraisals state the intended

purpose of the appraisals was for "for mortgage financing purposes."[17] Unlike his prior two

appraisals, the December Gold Appraisal states that the purpose of such appraisal is "for

anticipated litigation" and the intended user is "Andrew Gottesman, Esq. and his advisors."[18]

65.     Second, Mr. Gold has already issued three appraisals in the last 9 months – and all

have flip-flopping valuations:

> a.  The March Gold Appraisal was dated as of March 5, 2021 and the value was
>     $13,500,000. A copy of such appraisal is attached hereto as **Exhibit 8**.
>
> b.  The August Gold Appraisal was dated as of August 1, 2021 and the value jumped
>     to $15,000,000. A copy of such appraisal is attached to the Debtor's Rule 1007
>     Affidavit ECF No. 2 at p. 19 of 102 and is annexed hereto as **Exhibit 9**.
>
> c.  The third appraisal was dated as of December 31, 2021 and the value dropped to
>     $13,680,000. *See*, ECF No. 14-3. (the "**December Gold Appraisal**"). A copy of
>     the December Gold Appraisal is annexed to the Gold Declaration as Exhibit A.
>     *See*, ECF No. 14.3.

66.     Third, as set forth in the Leitner Declaration, the December Gold Appraisal is

materially flawed in its analysis and methodology and inconsistent with the Uniform Standards

of Professional Appraisal Practice. Its flaws include, without limitation, (i) that it is premised on

---

[17] *See*, **Exhibit 8**, p. 73 (PDF p. 79 of 340) and **Exhibit 9**, p. 73. (PDF p. 96 of 355).

[18] December Gold Appraisal, Exhibit A to the Gold Declaration, ECF No. 14.3, p. 36 of 222.

an incorrect determination that the highest and best use of the Real Property is as its present use (*i.e.*, owner occupied and managed as a theater, museum, etc.) and fails to consider any alternative uses whatsoever, (ii) it claims to apply a "market value" methodology, however, in actuality, uses a "value in use" methodology[19] which does not necessarily determine value based on the highest and best use, (iii) it fails to value the property based on an income capitalization approach even though it is an investment property, (iv) the foundational errors in performing its sales comparison approach by, among other things (a) using comparable properties that are being used for different purposes than the Real Property, (b) failing to adjust for the fact that the comparable properties used are substantially renovated and improved, unlike the subject Real Property, (c) using comparables that are in different neighborhoods that command materially higher rentals and prices and failing to make any adjustments for such different pricing, and (d) failing to make any adjustments for the physical condition of the property.

67.     Further, Mr. Gold's first two appraisals stated that the value of the Real Property should be properly determined based on a combination of an income approach and a sales comparison approach.[20] Despite acknowledging twice that the value of the Real Property should properly include an income analysis approach, Mr. Gold's latest appraisal ignores such analysis and determined value solely based on a sales comparison approach.[21] *See, In re Menorah Congregation & Religious Ctr.*, 554 B.R. 675, 692 (Bankr. S.D.N.Y. 2016) ("The income capitalization approach is generally regarded as the preferential method for determining the value

---

[19] LB concludes that under the "value in use" methodology, the Real Property has a value of only $7,200,000.

[20] The March Gold Appraisal states: "…the appraiser has considered the Sales Comparison Approach and the Capitalization of Income Approach BOTH reliable indicators of value, in accordance with the purpose of this assignment." **Exhibit 8**, p. 168. (PDF p. 173 of 340) (Emphasis in original). *See also*, **Exhibit 9**, p. 203 (PDF p. 225 of 355), August Gold Appraisal ("The appraiser has deemed the CAPITALIZATION OF INCOME APPROACH to be a reliable indicator of value.") (Emphasis in original).

[21] December Gold Appraisal, Exhibit A to the Gold Declaration, ECF No. 14.3, p. 61 (PDF p. 75 of 222) ("…the Capitalization of Income Approach has been considered, but has not been utilized.").

of income producing property." *citing 41 Kew Gardens Road Assoc. v. Tybursky* (70 N.Y.2d 326 (1987)). Because the income approach is utilized to determine the fair market value in the open market, excluding such analysis presumes that the only intended use is, in fact, the current use of the Real Property. All of this demonstrates that the December Gold Appraisal, which was on its face prepared for litigation, is not a credible determination of the current market value.

68.     Lastly, we note that the Debtor has attempted to obtain a new loan since at least the date of the March Appraisal. If the Gold Appraisal was truly accurate and there really was a $4,800,000 equity cushion as the Debtor now claims, the Debtor should have easily obtained a loan in the 15 months since maturity. The Debtor's failure to get such loan (or obtain an offer for the sale of the Real Property anywhere close to the Debtor's $13,680,000 valuation) further underscores that the value asserted by Mr. Gold in all his appraisals is grossly overstated.

### 2)      An Independent Appraisal Values The Real Property At $9.8 Million

69.     An unbiased appraisal was prepared by Newmark on behalf of Silver Arch, a potential lender to the Debtor, which values the Real Property as of April 15, 2021 at $9,800,000. A copy of the Newmark Appraisal is attached as **Exhibit 1** to the Hwang Declaration. Thus, the Newmark Appraisal was prepared at the request of a true independent third party. For that reason alone, the Newmark Appraisal is far more credible than Mr. Gold's appraisal.  The Newmark Appraisal (utilizing a combination of an income and sales comparison approach) values the Real Property at $9,800,000 --- 27.4% lower than the March Appraisal performed almost at the same time.

### 3)      Lender's Appraisal Values the Real Property at $10.2 Million

70.     In February 2022, Lender commissioned LB to value the Real Property and LB concluded that the Real Property had a market value as of February 9, 2022 of $10,200,000. A copy of the LB Appraisal is annexed as **Exhibit 1** to the Leitner Declaration. The LB Appraisal

bases its valuation on a combination of an income and sales comparison approach. Such appraisal is directly in line with the Newmark Appraisal from April 2021.

### 4) The Real Property Was Actually Listed For Sale and Failed to Sell At $13.5 Million or at $11.5 Million

71.     Critically, the Real Property was actually listed for sale on May 15, 2021, by the Lee Firm at the list price of $13,500,000. The Lee Firm actively marketed the Real Property to over 3,000 potential purchasers. *See*, Jambu Declaration, ¶ 9. After the Lee Firm failed to receive any offers, it recommended to the Debtor that in order to effectuate interest in the Real Property, the asking price should be reduced to $10,000,000-- an amount entirely in line with the Newmark Appraisal and the LG Appraisal. *Id*. at ¶ 10.

72.     On June 17, 2021, the Debtors reduced the asking price of the Real Property to $11,500,000. Despite continued marketing by the Lee Firm, even at the reduced asking price during the Lee Firm's engagement, it received only one offer and that was for only $9,300,000 (*id.* at ¶ 12). Otway never responded to that offer. *Id.* at ¶ 12. Based on the foregoing, the market -- which we submit is more indicative of value than any appraisal -- has spoken. To the point, a loan could not be obtained despite Mr. Gold's March Appraisal and August Appraisal. Likewise, the Real Property failed to sell after being listed at $11,500,000, and the only offer to purchase the Real Property was for $9,300,000.

73.     Accordingly, the Lender submits the Real Property is worth, at best, $10,200,000.

### B.  The Amount of Lender's Claim is Higher Than Debtor Represented

74.     First, the Debtor agreed in a Consent Order duly entered in the State Court Action that Lender's claim as of November 30, 2021 was $7,980,855.65 (excluding legal fees and protective advances from and after November 21, 2021). *See*, Leibowitz Declaration, **Exhibit 2**. The Consent Order is *res judicata*.

75.     Second, since such date additional interest and additional legal fees and expenses have accrued. As of March 2, 2021, the Lender's claim is approximately $8,632,145 and interest accrues at $4,483.68 per day. *See* Leibowitz Declaration at ¶37. In six months, the Lender estimates is claim will rise to $9,825,904, and in one year it will rise to $11,049,191. *See*, Leibowitz Declaration at ¶38.

### C.  The Equity Cushion Is Not Sufficient To Adequately Protect the Lender

76.     Using the $10,200,000 valuation contained in the LB Appraisal, the equity cushion on March 2, 2022 is only $1,489,112. (*i.e.*, $10,200,000 less $8,632,145 owed to Lender less $78,743 in unpaid real estate taxes and water charges), or 17% of Lender's secured claim prior to the proposed DIP Loan.

77.     If the DIP Loan is approved, then -- on day one -- the equity cushion immediately drops to only $515,112 ($10,200,000 less (x) the minimum amount of the priming DIP Loan costs $974,000), less (y) unpaid real estate taxes and water charges of $78,743, and less (z) $8,632,145), which amount is only 6% of the Lender's current secured claim. *In re Strug-Div. LLC*, 380 B.R. 505, 513 (Bankr. N.D. Ill. 2008) (explicitly incorporating the amount of a proposed priming lien of at least $1.3 million into its total debts figure in determining that no equity cushion existed).

78.     The equity cushion will have melted away in less than 3 months. Indeed, at the end of just six months the total debt will be $10,857,879[22] (consisting of the (a) $1,031,975 for the priming amount of the DIP Loan plus (b) $9,825,904 for Lender's claim), which will exceed the $10,200,000 value of the Real Property by $657,879. Courts have consistently held that an equity cushion of less than 20% is not sufficient adequate protection, especially where, like here, a debtor's equity cushion is quickly eroding due to significant losses and the accrual of debt. *See,*

---

[22] And the amount could be higher if property taxes due in January and July 2022 are not paid in full.

*In re C.B.G. Ltd.,* 150 B.R. 570, 572 (Bankr. M.D. Pa. 1992) (concluding that pre-super priority lien equity cushion calculated at 16% and post-superiority lien equity cushion calculated at 14% would not offer adequate protection to permit debtor to grant super-priority lien under § 364(d)(1)(B)); *In re Shaw Indus., Inc.*, 300 B.R. 861 (Bankr. W.D. Pa. 2003) (it is inappropriate to foist the risk of loss on creditors whose liens would be primed where debtor's equity was rapidly eroding due to significant losses and the debtor's prospects were inherently risky); *Matter of Schaller,* 27 B.R. 959, 962 (W.D. Wisc. 1983) (holding equity cushion of 17% to 18% insufficient because the cushion was "being rapidly eroded by the large amount of interest becoming due each day"); *In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 749 (Bankr. S.D.N.Y. 2004) ("Even when a slight equity cushion exists, this does not constitute adequate protection where post-petition interest is accruing, and the debtor is not able to pay expenses as they come due."); *In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478, at *6 (Bankr. S.D.N.Y. July 6, 1993) (finding lack of adequate protection because interest accruing on the secured creditor's claim erodes the equity cushion and that "the equity cushion presently stands at 14.89% and is certain to decline in the immediate future").[23]

79.     Thus, even though there may be a cushion of 17% one day prior to the origination of the DIP Loan, after the DIP Loan closes the cushion falls immediately to 6%, which is insufficient under applicable law. Moreover, there is no equity cushion in less than 3 months after the DIP Loan is originated.

---

[23] The Debtor claims that the Court should not consider the ongoing accrual of interest and fees on Lender's claim and cites *In re Delta Res., Inc.*, 54 F.3d 722, 730 (11th Cir. 1995) and *In re Constr. Supervision Servs., Inc.*, No. 5:15-CV-434-FL, 2016 WL 2764328, (E.D.N.C. May 9, 2016). However, both cases are inapposite because neither one contemplates adequate protection in the context of a priming loan; rather, *Delta* concerns whether a secured lender is entitled to receive post-petition interest payments during a chapter 11 case, and *Construction Supervision* concerns a secured lender's entitlement to a superiority administrative expense claim after an asset was liquidated and was insufficient to pay more than the debt owed on the petition date. In any event such cases are inconsistent with the cases cited herein.

80.     For all the above reasons, there is insufficient equity in the Real Property to adequately protect the Lender's secured claim, and the DIP Financing Motion should be denied.

**POINT V**

**IN THE EVENT THAT THE COURT DETERMINES THAT THE VALUE OF THE REAL PROPERTY IS SIGNIFICANTLY HIGHER THAN $10.2 MILLION, A SUFFICIENT EQUITY CUSHION EXISTS, AND THE DEBTOR REQUIRES A $650,000 LOAN, LENDER IS WILING TO EXTEND A DIP LOAN ON TERMS BETTER THAN <u>THE TERMS PROPOSED BY THE DIP LENDER</u>**

81.     While Lender submits that (i) its proposal to permit the Debtor's use of Lender's cash collateral and funding operating expense shortfalls of up to $90,000 over the next 90 days is more than sufficient to enable the Debtor to locate its financing, and (ii) the equity cushion is insufficient to support the DIP Loan's priming of Lender's existing liens, in the event that the Court determines that the value of the property is significantly greater than $10.2 million, that Lender would be adequately protected by an equity cushion if the DIP loan is authorized, and that the Debtor actually needs a $650,000 loan over the next several months, the Court should still reject the proposed DIP Loan because Lender is willing to offer financing to the Debtor on substantially better economic terms than such terms proposed by the DIP Lender. A Term Sheet (the "**Term Sheet**") setting forth Lender's proposed financing is annexed as <u>**Exhibit 2**</u>.

82.     For example, the DIP Lender proposes to extend a $650,000 loan at a 15% interest rate (with all of the compounded interest and fees set forth in Point III above, including, without limitation, a capitalized $19,500 origination fee, $25,000 capitalized expense fee, and a $19,500 exit fee). However, as set forth in the Term Sheet, Lender is willing to extend a $650,000 loan at a 6% interest rate, with its origination fee and exit fee only 1%, or $6,500, and the six month maturity date set forth therein is in line with the Debtor's representation at the February 3, 2022 hearing that it will complete its refinancing by the end of March 2022.

83.     Because Lender's loan proposal is economically superior to that of the DIP

Lender's proposal, the DIP Financing Motion should be denied.

### POINT VI

### OTWAY'S BUSINESS JUDGMENT SHOULD BE DISREGARDED BECAUSE HIS INTERESTS CONFLICT WITH THE DEBTOR

84.     While "the business judgment rule generally 'bars judicial inquiry into actions of

corporate directors taken in good faith and in the exercise of honest judgment in the lawful and

legitimate furtherance of corporate purposes'….to the extent that they engaged in or authorized

the transactions that caused the Debtor's losses in the absence of good faith, disinterestedness, or,

as especially relevant here, due care, they may be held liable for the consequences." *In re Perry

H. Koplik & Sons, Inc.*, 476 B.R. 746, 795 (Bankr. S.D.N.Y. 2012), *adopted in part,* 499 B.R.

276 (S.D.N.Y. 2013), *aff'd,* 567 F. App'x 43 (2d Cir. 2014). Importantly, "When a corporate

director or officer has an interest in a decision, the business judgment rule does not apply." *Id.* at

795-796. *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled

law that when a corporate director or officer has an interest in a decision, the business judgment

rule does not apply").

85.     Here, the interests of the Debtor's estate, on the one hand, and the interests of

Otway's estate, on the other hand, are at odds with each other. Indeed, Otway admitted that in

the Debtor's Rule 1007 Statement that he filed in the Debtor's case to further his self-interest and

the interests of his wife and Affiliated Non-Debtors. *See* ECF No. 2, at ¶ 35.[24]

86.     Further, it cannot be credibly disputed that (i) Otway, his wife, and his Affiliated

Non-Debtors have failed to pay hundreds of thousands of dollars in rent or use and occupancy

payments to the Debtor going back years, and (ii) Otway, as a fiduciary of the Debtor, has done

---

[24] "[C]reditors at the [Affiliated Non-Debtors] would be irreparably harmed by such a sale because the entity with which they transact would no longer have a space in which to operate." *See,* ECF No. 2, at ¶ 35.

absolutely nothing to collect such monies on behalf of the Debtor. Indeed, the Debtor has not paid a dime to the Lender or to the City of New York for real estate taxes since the loan matured in December 2020 and the Debtor's Schedules reflect that the Debtor has $0 in cash. *See*, Doc No. 1, Schedule A/B, Part 1.

87. Moreover, we bring to the Court's attention that on July 13, 2021, Theatre 80 received $160,340 in a COVID-19 related grant[25] from the Small Business Administration so that Theatre 80 could pay rent. However, instead of causing Theatre 80 to pay outstanding rent or use and occupancy, Otway chose not to disclose such funds and those monies are unaccounted for. Further, since the Budget shows revenues of only $8,950 a month, it appears that the Debtor expects to receive little or no use and occupancy from Otway or his Affiliated Non-Debtors.

88. Troublingly, to hide from this Court the considerable use and occupancy receivables that Otway, his wife, and his Affiliated Non-Debtors plainly owe to the Debtor, the Debtor (by Otway) misleadingly stated in his Schedules that no monies are owed by any person to the Debtor (*see*, **Exhibit 10** attached hereto, ECF No.1, at Schedules A/B, Part 3, Q. 10; p. 10 of 38), and that the Debtor has no causes of action against Otway or his Affiliated Non-Debtors. (*See*, **Exhibit 10**, ECF No.1, at Schedules A/B, Part 11, Q. 74; p. 12 of 38).[26]

89. Otway's story fails to line up and makes no sense; if Otway and his many affiliates actually paid all the rent and use and occupancy charges owed, then the Debtor should have hundreds of thousands of dollars of cash on hand (since the Debtors failed to pay any debt service or property taxes for over 14 months). Therefore, it appears that either (i) Otway knowingly made a false statement in the Schedules (in that monies are actually owed by Otway

---

[25] The SBA maintains a website containing a spreadsheet that lists grants that it awarded under the Recipients of the Shuttered Venue Operators Grant. *See*, https://data.sba.gov/dataset/svog/resource/66dad48d-0618-4461-82fd-29464084da94?inner_span=True (last visited 1/24/22). Given its size, excerpts from the spreadsheet showing the SBA's grant to Theatre 80 on July 13, 2021 in the sum of $160,340 are attached as **Exhibit 7** hereto.
[26] The sole cause of action identified on the Schedules refers to a lawsuit by the Debtor against an entity not affiliated with the Debtor or Otway.

and his Affiliated Non-Debtors) and thereby committed perjury or (ii) Otway fraudulently

transferred the Debtor's revenues to himself or others.

90.     Otway committed a long list of other acts that were detrimental to the Debtor's

estate to further his own interests. Specifically, Otway caused the Debtor to wrongfully execute

below market leases to himself and his Affiliated Non-Debtors on the eve of the Maturity Date,

and thereby improperly encumbered the Real Property with burdensome long-term leases and

reduced the monthly rent to the debtor by $28,500 or 54% of the total payable by the Debtor's

affiliates. *See* Leibowitz Declaration ¶¶46--51, **Exhibits 11-18**. While the Debtor and his

Affiliated Non-Debtors agreed in the Forbearance Agreement and the Consent Order that all of

the Debtor's leases with Otway and his Affiliated Non-Debtors were terminated and they would

vacate the Real Property by June 1, 2021 (*see*, Leibowitz Declaration, **Exhibit 1**, Section

8.6(a)(i), (c), (e) and (d) (sic); and Leibowitz Declaration, **Exhibit 2**, ¶ 8.6(a)(i), (c), (e) and (d)

(sic)), the Debtor nevertheless stated in its Schedules that the Debtor has an existing lease with

its affiliate SPI (*i.e.*, the Tavern) and that such lease has 13 years remaining before it expires.

*See*, **Exhibit 10** hereto, ECF No. 1, at Schedule G, Q. 2.3; p. 17 of 38. Further, Otway and his

Affiliated Non-Debtors have refused to vacate the Real Property and continue to "squat" in the

Real Property, thereby reducing its market value.

91.     In short, because of the multiple hats that Otway wears the Court should wholly

disregard Debtor's so-called business judgment to obtain a DIP Loan when such loan serves no

legitimate purpose for the Debtor's estate.

**POINT VII**

**IF APPROVED, THE PROPOSED ORDER AND**
**LOAN AGREEMENT SHOULD BE MODIFIED**

92.     To the extent the Court grants the DIP Financing Motion, various provisions in

the loan agreement and proposed order should be modified. For example, the defaults in the

agreement include the appointment of a trustee, the conversion to chapter 7 or the appointment of an examiner. Given the many conflicts that Otway has and the many claims the Debtor has against insiders, and the false Schedules Otway caused to be filed, any of the foregoing default events is reasonably likely to occur and therefore they should be removed. Likewise, all carveouts to the Debtor's professionals should be removed.

93.     Further the proposed order should make clear that the Lender is also to be named insured on any insurance and prohibit the DIP Lender from disbursing any insurance or other funds it receives without a further Court order approving same.

94.     In addition, paragraph 25 of the proposed order should be deleted as any fees of the DIP Lender should be capped and not paid unless approved by the Court after a motion on notice to all parties including the Lender.

95.     Also Paragraph 23 should be modified such that the DIP Lender has relief from the stay to originate its loan. However, relief from the stay should not be granted for any other purpose, including without limitation, allowing the DIP Lender to foreclose and take other acts.

96.     Other changes to the loan agreement and proposed order are needed to address the Lender's objections set forth herein.

**POINT VIII**

**NO WAIVER OF BANKRUPTCY RULES 4001(A)(3)
AND 6004(H) SHOULD BE PERMITTED**

97.     Courts have made clear that "The purpose of Bankruptcy Rule[] 6004(h) is to 'provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale [or assignment] is closed in the absence of a stay, any appeal by an objecting party may well be moot.'" *In re Filene's Basement, LLC*, 2014 WL

1713416, at \*14 (Bankr. D.Del. Apr. 29, 2014). The *Filene's* court cited Collier on Bankruptcy and wrote:

> Neither the rule nor the Advisory Committee Note addresses the question of when a court should order otherwise and either eliminate or reduce the 14–day stay period. First, because the purpose of the rule is to protect the rights of an objecting party, the court should eliminate the 14–day stay period and allow the sale or other transaction to close immediately in all cases where there has been no objection to the procedure. Second, *if an objection has been filed and is being overruled, the court should eliminate or reduce the 14–day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14–day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.* If the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.

*Id.* (emphasis in the original).

98.     It is respectfully submitted that to the extent that the Court grants the DIP Financing Motion, the Lender's liens and claims will be adversely and irrevocably affected and not adequately protected. In that event, the Lender seeks to preserve its right to appeal and seek a stay pending appeal to protect its interests. Accordingly, the Court should not waive any stay expressly provided for under the Bankruptcy Rules as that would undermine the very purpose of the Rules.

99.     Moreover, the Debtor will not be irreparably harmed by enforcing the Bankruptcy Rules, since as set forth above there is no "emergency" necessitating the DIP Loan, let alone the immediate closing of same. On the other hand, the Lender's rights would be adversely affected and would be prejudiced if this Court grants the DIP Financing Motion and does not permit the Lender the opportunity to seek a stay pending appeal as expressly provided for under the Bankruptcy Rules.

**WHEREFORE**, for the foregoing reasons, it is respectfully requested that the Court deny the Motions and grant the Lender such other and further relief as is just and proper.

Dated: New York, New York
      February 11, 2022

Respectfully submitted,
**KATSKY KORINS LLP**

By: /s/ Steven H. Newman
    Steven H. Newman, Esq.
    Robert A. Abrams, Esq.
605 Third Avenue
New York, New York 10158
Telephone: (212) 953-6000
*Attorneys for St. Mark's Mixed Use LLC*