Steven H. Newman, Esq.
Robert A. Abrams, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
E-Mail: snewman@katskykorins.com
E-Mail: rabrams@katskykorins.com

*Attorneys for St. Mark's Mixed Use LLC*

Hearing Date: March 2, 2022
At: 2:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re

    78-80 ST. MARK'S PLACE, LLC,

                    Debtor.
-------------------------------------------------------------------x

Chapter 11

Case No. 21-12139 (MG)

## DECLARATION OF JOEL LEITNER

I, Joel Leitner, hereby declare under penalty of perjury as follows:

1. I am the founder and principal of Leitner Berman Inc. ("**Leitner Berman**"), am personally familiar with the facts and circumstances herein, and submit this declaration in support of the Objection of St. Mark's Mixed Use LLC (the "**Lender**") to (I) the motion by 78-80 St. Marks Place, LLC (the "**Debtor**") for the entry of an Order: (A) Authorizing Debtor to Obtain Superpriority Post-Petition Financing, (B) Granting Liens and Superpriority Claims, (C) Modifying the Automatic Stay; and (D) Granting Related Relief (ECF No. 14); and (II) the Debtor's motion for the entry of an Order Approving the Use of Cash Collateral (ECF No. 15).

2. Unless otherwise stated in this declaration, the facts stated herein are based on my personal knowledge, information and belief.

3. Attached hereto as **Exhibit 1** is a copy of an appraisal (the "**Appraisal**") that I prepared, which appraised the Debtor's real property located at 78-80 St. Marks Place, New York, New York 10003 (the "**Real Property**") as having a market value of $10,200,000 as of February 9, 2022.

4. I received a Master's degree in real estate investment, finance and valuation from New York University. I am a New York State certified appraiser, under license # 46-3011. I am also licensed appraiser in the states of New Jersey, Pennsylvania, Connecticut and Maryland. I have earned the designation as an MAI appraiser, as I am a Member of the American Appraisal Institute.

5. I have over 35 years of experience in real estate valuation, investment, analysis and consultation. From 1992 through 2012 I was an adjunct professor at New York University. I have served on the panel of neutral arbitrators maintained by the American Arbitration Association. I am on the list of fiduciary appraisers maintained by Part 36 of the New York State Supreme Court for New York County. A copy of my resume is included in the Appraisal.

6. I have been qualified as an expert to testify and provided reports, affidavits and given expert testimony as a witness regarding real estate appraisals and reports in at least 20 cases, including at least one case in the United States Bankruptcy Court for the Southern District of New York.

7. I am familiar with New York City and the nuances of its varied neighborhoods and the markets of each. I am an expert in the valuation of the New York City real estate market.

8. I am familiar with the East Village neighborhood in which the Real Property (defined below) is located and have performed over 500 appraisals of property in that neighborhood over my career.

9. Subject to the terms of the Appraisal, my professional opinion is that as of February 9, 2022 the Real Property has a market value of $10,200,000.

10. The methodology used in the appraisal process is described in detail in the Appraisal beginning on page 62 thereof. I considered three approaches in valuing the Real Property: the Sales Comparison Approach, the Income Capitalization Approach, and the Cost Approach. As set forth in the Appraisal, I determined that the Cost approach was not applicable and therefore did not utilize such approach in preparing the Appraisal.

11. As set forth in the Appraisal, I believe that the Income Capitalization Approach is the most reliable method of valuing the Real Property, because it is an investment property and almost all prospective purchasers would purchase such property for investment purposes rather than for personal occupancy.

12. I have reviewed the Declaration of Ronald Gold in Support of the Debtor's Financing ("**Gold Declaration**") and the appraisal of the Real Property he prepared and attached as Exhibit A thereto (ECF No. 14-3) (the "**December Gold Appraisal**"), which appraisal valued the Real Property at $13,680,000 as of December 31, 2021. In the Gold Declaration. Mr. Gold stated that his appraisal was prepared "in conformity with the *Uniform Standards of Professional Appraisal Practice*" (ECF No. 14-3,¶16). As set forth below, I believe the December Gold Appraisal is materially flawed and is inconsistent with the *Uniform Standards of Professional Appraisal Practice* (USPAP)[1] for a number of reasons, including, without limitation, the reasons set forth below.

13. First, the December Gold Appraisal is based on an incorrect conclusion as to the highest and best use of the Real Property and is inconsistent with Standards Rule 1-3(b) of the USPAP, since Mr. Gold did not analyze the relevant legal, physical, and economic factors to the

---

[1] A copy of the USPAP is attached hereto as **Exhibit 2**.

3

extent necessary to support his highest and best use conclusion. The Comment to Standards Rule 1-3(b) provides that the appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraiser's highest and best use conclusion(s). However, none of such analysis is contained in the December Gold Appraisal. Also, such appraisal does not present a highest and best use of the Real Property as if it were vacant land. A fundamental concept of highest and best use is the idea that highest and best use is viewed from two perspectives: (i) the use of the real estate based on the presumption that the parcel of land is vacant or can be made vacant by demolishing any improvements (i.e., as vacant or as if vacant); and (ii) the use that should be made of the real estate as it exists (i.e., as currently improved or as if improved as proposed). *See* The Appraisal of Real Estate (15th Edition, p. 307). Instead, Mr. Gold valued the Real Property only as it is currently improved. Importantly, in the Summary of Important Facts and Conclusions (*see* ECF No. 14-3, p. 13 of 222), the December Gold Appraisal notes the Highest and Best Use of the Real Property is its "present use" as a "Mixed-Use Walk-up Building, Ground Floor Bar and 74 Seat Cabaret Style Theater, 2 Commercial Spaces, 49 Outdoor Sidewalk Seating Restaurant Spaces and several upper floor residential apartments on the 2nd through 5th floors". Later in the report (*see* ECF No. 14-3, p. 54 of 222), Mr. Gold concludes that the highest and best use is that the Real Property be **owner occupied** (i.e., as if it was a single-family home or the only buyer would be the actual user of the Real Property):

> The appraiser is of the opinion that **the highest and best use of the subject property is as its present use**, that of a Mixed-Use Walk-up 5-Story + Cellar building with 2 owner-occupied commercial tenancies on the GROUND FLOOR LEVEL, several residential apartments, an owner-occupied Museum on the First Floor of 78 St. Marks Place and an owner-managed open plan Commercial Meeting Space (Owner-Leased) on the 3RD Floor of 78 St. Marks Place.

This conclusion assumes that the maximally productive use of the Real Property (including the most financially feasible use) is to utilize the building <u>in the exact way that it is currently utilized</u>

4

by ownership. However, given the retail nature of the St. Marks Place area, the most productive use of the ground floor is not a dual theater/museum space. Additionally, given residential market rents in the subject's immediate vicinity, it does not make sense to utilize a portion of the upper floor space as a "Commercial Meeting Space". Because the December Gold Appraisal does not consider any alternative uses whatsoever, its conclusion as to the Highest and Best Use of the subject Real Property is fundamentally erroneous and appears to be predetermined to justify the current owner's continued use and management of such property.

14. Second, while the December Gold Appraisal purports to value the "market value" of the Real Property, the methodology used throughout such appraisal is the "value in use"[2] -- not "market value."[3] In my Appraisal, for the purpose of illustrating the incorrect approach taken by Mr. Gold, I valued the Real Property's "value in use" and concluded that such value is only $7,200,000. In addition, I also valued the "market value" of the Real Property "as is" as a shell building and concluded that such value is $10,200,000. Therefore, the December Gold Appraisal's Highest and Best Use conclusion is not the highest and best use of the Real Property.

15. Third, the December Gold Appraisal <u>does not in any way utilize the Income Capitalization Approach to value</u>. Completely ignoring the Income Capitalization Approach is inconsistent with Standards Rule 1-4, which requires the collection, verification and analysis of all information necessary for credible assignment results. The December Gold Appraisal notes that all residential tenants are month-to-month and that there are no long-term leasehold or sub-

---

[2] "Value in Use" or "Use Value" is defined in The Appraisal of Real Estate (15th Edition p. 53) as "The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually".

[3] "Market Value" is defined in The Appraisal of Real Estate (15th Edition, p. 48) as "The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress".

5

leaseholds in effect at the subject property and therefore, Mr. Gold did not utilize the Income Capitalization Approach. (*See* ECF No. 14-3, p. 56 of 222)[4]. Such analysis incorrectly assumes that all potential purchasers would not in any way look at the subject property as an investment and how much income the property would generate, and that all purchasers would look at the property only for their personal use. The purpose of an appraisal, and specifically the Income Capitalization Approach, is to inform the reader what the fair market value of the subject property is on the open market. Excluding the Income Capitalization Approach presumes that any potential buyer would purchase the Real Property for its continued current uses and continue to operate the theater, live in the triplex, continue to utilize the 3rd floor space of 78 St. Marks Place as a commercial meeting space, and not re-let all of the units at market-oriented rents.

16. Today, there is virtually no buyer for the subject Real Property that would use such property in its current uses. The theater and museum markets have significantly struggled, even before the Covid onset, especially tertiary theaters and museums like the one at the subject Real Property. Further, there is also a limited market for a triplex apartment within a mixed-use walk-up building in the East Village. A potential purchaser of the Real Property would certainly approach the purchase of the Real Property as an investor and make assumptions as to what each component of the Real Property (retail, residential) could potentially be used for, rather than the current use. These assumptions help investors determine various investment criteria like IRR, equity multiples, and financing assumptions, and thereby inform the investors as to market value.

17. Excluding the Income Capitalization Approach is not appropriate appraisal methodology, as it does not paint a full picture of the Real Property's fair market value. One last

---

[4] In Mr. Gold's declaration he stated that he developed his opinion of value following his consultation with the Debtor's counsel. (*See* ECF No. 14-3, p. 3 of 222, ¶ 19). Further, I reviewed the appraisals prepared by Mr. Gold in March 2021 and August 2021 and note that in both of those appraisals Mr. Gold performed his valuations using both the income capitalization approach and sales comparison approach.

6

note: the December Gold Appraisal includes a statement setting forth the 2020 Building Expenses. (*See* ECF No. 14-3, p. 50 of 222). These expenses are reflective of the Real Property as an income-producing property. It is odd in the extreme that these expenses would be included in the appraisal and certified by the building owner, given that the Income Capitalization Approach was not even considered by Mr. Gold.

18. Fourth, the December Gold Appraisal's sole methodology, i.e., the Sales Comparison Approach, is flawed and misleading in how it was performed since the comparable properties used by Mr. Gold all are being used in ways that are materially different than the manner in which the Real Property is presently being used. Since Mr. Gold stated that the highest and best use of the subject Real Property is its "present" use, the comparable properties he should have used in performing the Sales Comparison Approach should have been similar properties that are "presently used in the same way" as the subject Real Property (i.e., theater, museum, bar, triplex, meeting space, etc.). However, that is not what Mr. Gold did. Instead, all the properties he used as "comparables" have completely different uses. The December Gold Appraisal uses comparison properties that have no theaters, entertainment spaces or meeting spaces and are simply traditional mixed-use buildings with ground floor retail and upper floor apartments. This is in direct contradiction to the December Gold Appraisal's Highest and Best Use. Furthermore, all of the sales utilized in the Sales Comparison Approach were sold for their "income-producing capabilities" (as the ground floor retail and upper floor apartments are leased), further underscoring the importance of the Income Capitalization Approach to properly value the subject Real Property.

19. Fifth, the December Gold Appraisal adjusts the comparable sales based only on whether they were located on a "corner" vs. "mid-block". However, <u>the December Gold Appraisal does not make any adjustment for, among other things, any of the following</u>: (i) the superior condition of the comparable properties selected, all of which are in far better condition than the

subject Real Property and have been substantially renovated and improved, unlike the subject Real Property, (ii) costs to lease up the subject Real Property (such as marketing and broker fees), or (iii) the time delay in construction, renovation, permitting, finding tenants, and the start date for tenants commencing the payment of market rent (during which period no rent will be received). Based the inspection of the Real Property on February 9, 2022, there are many items of deferred maintenance that indicate that the subject property is beyond its physical and economic life. The residential rental units across both buildings are in fair-to-poor condition and would require gut renovations as they are not presently up to a typical renter's standards. The units have wood and tile flooring which is outdated and would have to be replaced (*see* the pictures on pages 137-138 of the Appraisal). The kitchens have small, outdated gas stoves, refrigerators, and wood cabinetry, all of which need to be replaced (*see* the pictures on pages 138 of the Appraisal). The second-floor entrance of 78 St. Marks Place contains chipped wood on the door frame and peeled plaster paint that exposes the building's brick frame (*see* the pictures on pages 126-127 and 129 of the Appraisal). The 78 St. Marks Place museum space has a sloped ceiling, cracks in the finishes, and would require a gut renovation in order to convert the space to more typical commercial use (*see* the pictures on pages 128-129 of the Appraisal). The storage space on the third floor of 78 St. Marks Place is in fair-to-poor condition with a sloping ceiling and chipped painting (*see* the pictures on pages 130-135 of the Appraisal). The apartment the storage space has a sloped ceiling, skylights that need to be replaced, and a bathroom and kitchen that would require a gut renovation as they are not presently up to typical renter's standards (*see* the pictures on pages 136-138 of the Appraisal). The triplex unit at 80 St. Marks Place has two kitchens (one on the first and one on the third floor of the unit). Both kitchens would require a gut renovation as they contain outdated appliances (*see* the pictures on pages 143 and 147 of the Appraisal). The bathrooms within the triplex are outdated and unmaintained and would require gut renovations (*see* the pictures on pages

144-145 of the Appraisal). The bedrooms in the triplex contain water stains on the ceiling (*see* the pictures on page 146 of the Appraisal). The first floor of the triplex contains a front terrace that overlooks St. Marks Place showing the chipped painted brick exterior (*see* the pictures on pages 112-121 and 140-141 of the Appraisal). We were not provided access to the fifth-floor storage space as there was an immovable, broken sofa that ownership has left in the hallway, preventing access to the fifth-floor storage space, further underscoring the dilapidated state of the building (*see* the pictures on page 149 of the Appraisal). The inspection of the interior of the Real Property on February 9, 2022 made clear that subject Real Property's interior condition is substandard and therefore Mr. Gold should have made substantial adjustments of the renovated comparable properties that he used.

20. Sixth, and most notably, the December Gold Appraisal does not make any adjustments for Real Property's neighborhood location. The December Gold Appraisal repeatedly notes that the appraiser gathered sale information in the East Village, West Village, and Soho. However, **<u>none of the comparable properties used in the December Gold Appraisal are located in the East Village (which is where the Real Property is located) or the West Village</u>**. Critically, Sales 1 and 2 are located in Greenwich Village, Sale 3 is located in Noho (often considered part of Soho for rental/sale metrics), and Sales 4 and 5 are located in Soho. I analyzed the rental and sale markets for apartments the East Village and compared that with Greenwich Village and Soho, and determined that **Greenwich Village and Soho are materially different markets and reflect materially different values than a property located in the East Village**. As an example of my analysis, set forth below is the December 2021 Corcoran Report for Manhattan Rental Apartment properties.



The average monthly rent for an apartment in the East Village was $4,114, compared to $5,592 per month for Greenwich Village (a 36% premium) and $9,680 for Soho/Tribeca (a 135% premium).

21. Similarly, per a Costar analytic search, the chart below reflects the average sale price per unit for multifamily apartment buildings in the Greenwich Village and Soho markets, compared to the East Village.

| Neighborhood | Q4 2021 Sale Price/Unit | Premium |
|---|---|---|
| East Village (Subject) | $633,542 | |
| Greenwich Village (Sales 1 and 2) | $969,151 | 53% |
| Soho (Sales 3-5) | $903,021 | 43% |

Greenwich Village properties sold at an average 53% premium to East Village properties, while Soho multifamily properties sold at an average 43% premium to East Village properties. The above rent and sale metrics clearly necessitate the need for significant neighborhood location adjustments to the sales chosen in the December Gold Appraisal. However, no such adjustments were made[5].

22. Seventh, the photos included in the Gold December Appraisal include a significant number of pictures of other properties and locations (such as Cooper Union, public transportation, and non-subject block street scenes) rather than any pictures of the interior of the subject property.

---

[5] The December Gold Appraisal states that it made adjustments to comparable properties only for corner locations, however, no other adjustments were made. (*See*, ECF No. 14-3, p. 74 of 222).

10

The surrounding area is only a minor value contributor when compared to the actual property condition. Notably, the quality of the building's exterior, especially the building's rear, indicate that the effective age of the Real Property is beyond its physical and economic life and the December Gold Appraisal neglects to discuss how this affects value. *See* ¶20 above.

23. Eighth, the December Gold Appraisal offers no independent economic analysis, Covid analysis, neighborhood analysis, and residential market analysis. Rather, the December Gold Appraisal relies only on various publicized articles, highlighting areas of text without any original conclusions, assumptions, or how the underlying economic and market conditions would affect the subject property's value.

24. Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge information and belief.

Dated: New York, New York
       February 11, 2022

                                                            **JOEL LEITNER**