Steven H. Newman, Esq.
Robert A. Abrams, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
E-Mail: snewman@katskykorins.com
E-Mail: rabrams@katskykorins.com

*Attorneys for St. Mark's Mixed Use LLC*

Hearing Date: March 2, 2022
At: 2:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
In re

    78-80 ST. MARKS PLACE, LLC,

                  Debtor.
-----------------------------------------------------------------------x

Chapter 11

Case No. 21-12139 (MG)

**DECLARATION OF JASON LEIBOWITZ IN SUPPORT OF THE OBJECTION
BY ST. MARK'S MIXED USE LLC TO (A) DEBTOR'S MOTION
FOR AUTHORIZATION TO OBTAIN SUPERPRIORITY POST-PETITION
FINANCING (ECF No. 14 ); AND (B) DEBTOR'S MOTION FOR AUTHORIZATION
<u>TO USE CASH COLLATERAL (ECF No. 15)</u>**

    I, **JASON LEIBOWITZ**, hereby declare under penalty of perjury as follows:

    1.    I am a Manager of St. Mark's Mixed Use LLC ("**Lender**"), am personally familiar with the facts and circumstances herein, and submit this declaration in support of Lender's objection (the "**Objection**") to (I) the motion by 78-80 St. Marks Place, LLC (the "**Debtor**") for the entry of an Order: (A) Authorizing Debtor to Obtain Superpriority Post-Petition Financing, (B) Granting Liens and Superpriority Claims, (C) Modifying the Automatic Stay; and (D) Granting Related Relief (ECF No. 14) (the "**DIP Financing Motion**"); and (II) the Debtor's motion for the entry of an Order Approving the Use of Cash Collateral (ECF No. 15) (the "**Cash Collateral Motion**").

# PRELIMINARY STATEMENT

2. Prior to the filing of this bankruptcy proceeding, the Debtor twice acknowledged the validity of the Lender's liens against the Real Property (defined below) and the amount owed by the Debtor under the Loan (defined below). The Debtor first acknowledged the foregoing in a *Forbearance Agreement* dated January 14, 2021 (the "**Forbearance Agreement**"). It again acknowledged the validity of Lender's liens and the amount owed in a *So-Ordered Stipulation of Settlement and Dismissal of Action* dated November 29, 2021 (the "**Consent Order**") entered in the Supreme Court of the State of New York, New York County (the "**State Court**").

3. A key element of the Forbearance Agreement and the Consent Order was to afford the Debtor with time to either refinance its debt to Lender or to otherwise sell the Real Property. Specifically, after the maturity of the Loan on December 1, 2020 (approximately 15 months ago), the Debtor advised the Lender that it intended to promptly refinance the Loan and requested that the Lender forbear from exercising its rights. As an accommodation to the Debtor, the Lender agreed to forbear from exercising its rights through and including April 15, 2021. In the event that the Debtor failed to refinance its debt by such date, the Debtor further agreed that it would market and sell the Real Property. However, in the event the Debtor failed to sell or refinance the Real Property by August 15, 2021, Lender's agreement to forbear would terminate.

4. The Debtor was unable to refinance the Loan. Further, the Debtor retained Lee & Associates NYC as its broker and listed in May 2021 the Real Property for sale for $13,500,000. In June 2021, the Debtor reduced the asking price to $11,500,000. Despite Lee & Associates' robust marketing efforts, the highest offer for the sale of the Real Property was only $9,300,000. The Debtor never made a counteroffer.

5. On November 11, 2021, the Debtor commenced an action in the State Court to stay Lender's rights under a certain Pledge Agreement. In particular, the Debtor sought to stay

enforcement of Lender's UCC foreclosure of Otway's membership interests in the Debtor. In its complaint filed in the State Court, the Debtor alleged that the Debtor "expect[ed] a mortgage loan to come through within the next 90 days," or no later than February 11, 2022.[1] To resolve the State Court litigation, the Lender entered into the Consent Order which afforded the Debtor a stay of enforcement of Lender's rights under the Pledge Agreement through December 30, 2021.

6. Once again, the Debtor failed to refinance its debt. Instead, it filed a petition for relief in this Court. Notwithstanding its admissions in the Forbearance Agreement and the Consent Order, as "So Ordered" by the State Court, the Debtor incredulously listed Lender's secured claim on its Schedules as "disputed."

7. In light of the foregoing, the purpose of this Declaration is to set forth the Debtor's obligations under the Loan, the validity of the Lender's liens against the Real Property, the amount owed by the Debtor under the Loan, and the inability by the Debtor to demonstrate that it can provide adequate protection to the Lender in the event the Debtor's Financing Motion is approved.

8. Importantly, this Declaration is further submitted to address the fact that the proposed debtor-in-possessing financing (the "**Proposed DIP Financing**") by JEC Capital Partners SPV, LLC (the "**Proposed DIP Lender**") is entirely unnecessary and such financing will only burden the estate with significant extra debt that it cannot afford to pay.

9. Specifically, Lender's counsel has advised that at an initial case conference conducted before this Court on February 3, 2022, the Debtor represented to the Court that it (i) was in discussions with two potential lenders, and (ii) expected to obtain a loan from either one of them by the end of February 2022 or March 2022 to payoff the Debtor's indebtedness to Lender in full. The Debtor further represented in the DIP Financing Motion that its monthly

---

[1] A copy of the Debtor's Complaint in the State Court action is annexed to the Objection as **Exhibit 6**.

3

operating expenses are equal to approximately $27,000 per month. In this regard, Lender has already agreed to the Debtor's use of its cash collateral through the end of March 2022 to enable the Debtor to pay for its operating expenses (*i.e.*, heat, light, power, and insurance). Indeed, this Court has entered an Interim Stipulation Concerning the Use of Cash Collateral to this effect. *See*, ECF No. 22.

10. Moreover, to the extent that the Debtor has insufficient revenues from Otway and his affiliated non-debtors to pay for such operating expenses (since the Debtor concedes that Otway and his affiliates are paying little or no rent), <u>Lender is further willing to permit the Debtor's use of its cash collateral *and* to make protective advances for any operating expense shortfalls, at an interest rate of only 10% per annum, of up to $90,000 through June 2, 2022 (*i.e.*, 90 days from the return date of the DIP Financing Motion)</u>.

11. In other words, Lender will not have only consented to a one year forbearance while the Debtor searched for refinancing throughout 2021, but is prepared to provide the Debtor with sufficient funds for operating expenses during its continued search for a loan to pay off Lender for another 90 days (*i.e.*, through June 2, 2022, which is more than 5 months after the Petition Date).

12. The use of Lender's cash collateral together with its agreement to make protective advances through June 2, 2022, entirely eliminates the need for any financing from the Proposed DIP Lender. In the event that the Court considers and approves the extraordinary relief sought in the DIP Financing Motion, the little equity that the Debtor currently enjoys will eroded in a matter of months.

13. Indeed, as further detailed in Lender's Objection and below, the Debtor's incurrence of the significant amount senior debt and priming liens by the Proposed DIP Lender (if approved by the Court) will quickly erode the current equity cushion, and in less than 3

months, all equity will evaporate.

14. Moreover, the Proposed Dip Financing is not merely a $650,000 loan. Rather, it is a loan which seeks to prime Lender by an amount in excess of $974,000 on <u>day one</u> due to, among other things, origination and exit fees, and the capitalization of such fees into the principal amount owed, the monthly capitalization and compounding of interest, undisclosed obligations, and the substantial carveouts to the Debtor's professionals. Moreover, the $650,000 loan, if approved, will not go towards improving the value of the Real Property. For example, $200,000 of the $392,700 proposed to be advanced (*i.e.*, 51%) in the three month Budget is budgeted for professionals through the end of March 2022.

15. In other words, in addition to the fact that Lender will not be adequately protected to the extent the Court grants a priming loan to the Proposed DIP Lender, the fact is that the Proposed DIP Financing is entirely unnecessary if, in fact, the Debtor successfully closes on a new loan in the time period the Debtor represented to the Court.

16. Further, the DIP Financing Motion should be denied because, in the unlikely event that the Court concludes that the equity in the Real Property is significantly higher than $10.2 million and that the Debtor otherwise needs a $650,000 loan, Lender is willing to extend a $650,000 loan to the Debtor on far better economic terms than proposed by the DIP Lender. A copy of a proposed Term Sheet is annexed to the Objection as **<u>Exhibit 2</u>**. For this reason, too, the DIP Financing Motion should be rejected.

17. Under these circumstances, Lender submits that the DIP Financing Motion should be denied and that the Court revisit the viability of this Chapter 11 case on or about June 2, 2022.

# BACKGROUND

### A. Lender's Claims and Amounts Owed Are Admitted and Approved Pursuant to the Forbearance Agreement and the Consent Order

18. The Debtor has conceded in the Forbearance Agreement and the Consent Order that the Lender holds a first priority lien against, among other things, the Debtor's Real Property. True and correct copies of the Forbearance Agreement and the Consent Order are annexed hereto as **Exhibit 1** and **Exhibit 2**, respectively.

19. Further, the Debtor confirmed (i) in the Forbearance Agreement that Lender's claim against the Debtor under the Loan was $6,245,653.65 as of December 31, 2020 (with legal fees and protective advances calculated only through December 18, 2020) (*see*, **Exhibit 1**, p. 4), and (ii) in the Consent Order that Lender's claim against the Debtor under the Loan was $7,980,855.65 (with legal fees and protective advances calculated only through November 21, 2021). *See*, **Exhibit 2**, p. 5.

20. As a result of the admissions contained in the Forbearance Agreement and in the Consent Order entered in the State Court, any challenge to the validity of Lender's liens or the amount of Lender's claims are now barred.

### B. The Loan Documents

21. The Lender is the sole secured creditor of the Debtor and the current holder of that commercial mortgage loan Debtor in the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000.00) (the "**Loan**") that was made on November 12, 2019 by 80 St. Marks Place Funding LLC (the "**Funding LLC**"). The Loan is evidenced by a Promissory Note, dated as of November 12, 2019 (the "**Note**"), which Note was duly executed and delivered by the Debtor to Funding LLC. A true and correct copy of Note is annexed hereto as **Exhibit 3**.

22. In order to secure its obligations under the Note, the Debtor, as mortgagor, duly executed, acknowledged, and delivered to Funding LLC, as mortgagee, a Mortgage and Security

6

Agreement, dated as of November 12, 2019 (the "**Mortgage**"), which Mortgage was duly recorded with the New York City Register (the "**Register**") and encumbers the Debtor's Real Property known as 78-80 St. Marks Place, New York, New York 10003 (Block: 449, Lot: 28) (the "**Real Property**"). A true and correct copy of the Mortgage is annexed hereto as **Exhibit 4**. Pursuant to the Mortgage, among other things, the Debtor granted Funding LLC a valid first priority mortgage and lien on, among other things, the Real Property, the rents therefrom, accounts and general intangibles. Funding LLC perfected its security interest against the collateral granted under the Mortgage by, among other things, duly recording the Mortgage and also by duly filing a UCC-1 financing statement in all appropriate offices.

23. In order to further secure its obligations under the Note and Mortgage, the Debtor duly executed, acknowledged, and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), which ALR was duly recorded with the Register. A true and correct copy of the ALR is annexed hereto as **Exhibit 5**. Pursuant to the ALR, among other things, the Debtor absolutely assigned all its leases and rents to Funding LLC.

24. In order to further induce Funding LLC to make the Loan to the Debtor, Otway duly executed and delivered to Funding LLC a Guaranty dated as of November 12, 2019 (the "**Guaranty**"). Pursuant to the Guaranty, Otway absolutely, unconditionally, and irrevocably guaranteed to Funding LLC the payment to the Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents. A true and correct copy of the Guaranty is annexed hereto as **Exhibit 6.**

25. In order to further secure, among other things, the Debtors' obligations under the Note, the Guaranty, and the other Loan Documents (defined below), as applicable, Otway duly executed and delivered to Funding LLC that certain Pledge and Security Agreement dated as of

7

November 12, 2019 (the "**Pledge Agreement**"). Pursuant to the Pledge Agreement, Otway pledged to Funding LLC, among other things, all of his right, title, and interest in, to and under his membership interests in the Debtor and the other "Collateral", as that term is defined in the Pledge Agreement) (the "Collateral" as defined in the Pledge Agreement is referred to herein as the "**Pledged Collateral**"). A true and correct copy of the Pledge Agreement is annexed hereto as **Exhibit 7.**

26. Funding LLC perfected its security interest against the Pledged Collateral by, among other things, taking possession of the certificate of membership interests (the "**Certificated Interest**") in the Debtor pledged under the Pledge Agreement and also by duly filing a UCC-1 financing statement in the appropriate office. The Pledge Agreement, together with the Certificated Interest and the corresponding UCC-1, created a valid and perfected first priority lien on the Pledged Collateral.

27. On December 1, 2020, the Loan was duly assigned by Funding LLC to the Lender and the Note was duly endorsed by Funding LLC to the Lender pursuant to, among other things, an Allonge to Promissory Note, dated December 1, 2020 (the **"Allonge"**). A true and correct copy of the Allonge is firmly affixed to the Note (*see* **Exhibit 3** hereto).

28. On December 1, 2020, Funding LLC also assigned to the Lender, among other things, the Mortgage, as evidenced by an Assignment of Mortgage, dated as of December 1, 2020 (the "**Mortgage Assignment**"). A true and correct copy of the Mortgage Assignment is annexed hereto as **Exhibit 8**.

29. On December 1, 2020, Funding LLC assigned, among other things, the ALR to the Lender, as evidenced by an Assignment of Assignment of Leases and Rents, dated as of December 1, 2020 (the "**ALR Assignment**"). A true and correct copy of the ALR Assignment is annexed hereto as **Exhibit 9**.

30. Furthermore, pursuant to an Omnibus Assignment of Loan Documents dated as of December 1, 2020 (the "**Omnibus Assignment**"), a copy of which is annexed hereto as **Exhibit 10**, the Note, the Mortgage, the Guaranty, the Pledge Agreement, the ALR, the Certificated Interest, all UCC financing statements, and all other documents evidencing, securing, or guarantying the Loan, were each duly assigned by Funding LLC to the Lender. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage Assignment, the ALR Assignment, the Certificated Interest, all UCC financing statements, the Omnibus Assignment, and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively referred to herein as the "**Loan Documents**".

31. As a result of the above-described assignments, the Lender has possession of, and is now the owner and holder of the Loan Documents.

### C. Debtor's Indebtedness to Lender

32. As of March 2, 2022, the estimated amount owed to the Lender under the Loan Documents is $8,632,145, including estimated legal fees and expenses from February 1, 2022 through March 2, 2022. In six (6) months from March 2, 2022, the estimated amount owed to Lender under Loan Documents will increase to be $9,825,904. In one (1) year from March 2, 2022 the estimated amount owed to Lender under Loan Documents will increase to be $11,049,191. A summary showing the calculation of the foregoing is below:

| ITEM | 3/2/2022 | 6 MONTHS | ONE YEAR |
|---|---|---|---|
| Principal Sum | $6,100,000 | $6,100,000 | $6,100,000 |
| Interest | $1,858,467 | $2,606,733 | $3,342,800 |
| Protective Advances and interest thereon | $232,707 | $258,300 | $283,893 |

| ITEM | 3/2/2022 | 6 MONTHS | ONE YEAR |
|---|---|---|---|
| Attorneys' Fees and Expenses and interest thereon | $440,971[2] | $860,870[3] | $1,322,498[4] |
| TOTAL | $8,632,145 | $9,825,904 | $11,049,191 |

### D. The Value of the Real Property

33. Approximately ten (10) months ago, the value of the Debtor's Real Property was appraised at $9,800,000. Specifically, Silver Arch Capital Partners, LLC ("**Silver Arch**"), a potential lender to the Debtor, commissioned an independent third-party appraiser, Newmark Knight Frank ("**Newmark**"), a highly regarded valuation and advisory firm, to appraise the Debtor's Real Property and Newmark concluded that the market value of the Real Property as of April 15, 2021 was $9,800,000 (the "**Newmark Appraisal**"). The Debtor's counsel provided a copy of the Newmark Appraisal to the Lender during the forbearance period and Lender has maintained same in its business records in the ordinary course of the Lender's business. A copy of the Newmark Appraisal is attached to the Wendy Hwang Declaration as **Exhibit 1**,

34. Further, as confirmed by the Debtor's own real estate broker, Vikram Jambu of Lee & Associates NYC ("**L&A**"), who is now a Managing Member of Jones Lang LaSalle, the Debtor's valuation of the Real Property is grossly overstated. According to Mr. Jambu (whose declaration is made part of the Lender's Objection), as part of L&A's marketing of the Real Property, it received only a single offer and that offer was for $9,300,000. In other words, the

---

[2] Including $95,000 in estimated legal and expert fees and expenses from and after February 1, 2022.

[3] Including $350,000 in estimated legal fees during such 6-month additional period.

[4] Including $350,000 in estimated legal fees during such 6-month additional period.

10

market for the Real Property was tested and spoke that value was only $9,300,000 -- which is millions less than the amount the Debtor claims the Real Property is worth today.

35. Lender recently commissioned Leitner Berman ("**LB**"), a financial advisory and appraisal firm, to appraise the Real Property. According to LB, the Real Property has a market value as of February 9, 2022 of $10,200,000 (the "**LB Appraisal**"). A copy of the LB Appraisal is annexed to the Joel Leitner Declaration as **Exhibit 1**.

36. The fact is that the value of the Real Property is far from what the Debtor claims it to be, and as a result, there is an insufficient equity cushion to protect Lender's first priority lien should the Court approve the Proposed DIP Loan.

**E. Lender's Equity Cushion is Eroding at an Alarming Rate**

37. Based on the LB Appraisal, the market value of the Real Property as of February 9, 2022 is no more than $10,200,000. As of March 2, 2022, the Lender's first priority secured claim is approximately $8,632,145. In addition, such claim continues to accrue interest in the sum of $4,483.68 a day (or $134,510 per month), plus additional amounts for the Lender's legal fees, expenses and other amounts which continue to accrue. Therefore, the Debtor's contention that the Lender enjoys a $4,800,000 equity cushion is grossly overstated.

38. According to the LB Appraisal, the equity cushion is at best only $1,489,112[5] or 17% of the Lender's secured claim. In the event the Court grants the DIP Financing Motion, after subtracting $974,000 – the minimum amount that the DIP Loan will prime the Lender on day one - the equity cushion would immediately plummet to $515,112 or 6%. Neither the 17% nor the 6% equity cushion is sufficient to adequately protect Lender. Moreover, in just 6 months, the

---

[5] $10,200,000 less $8,632,145, less $71,047 in outstanding real estate taxes, and less $7,696 in outstanding water charges. Attached to the Objection as **Exhibit 1** are true and correct copies of statements from the NYC Department of Finance and the NYC Environmental Protection showing the outstanding charges.

Lender's claim will rise to $9,825,904 (inclusive of estimated legal fees and other charges), the minimum amount of the DIP Loan priming Lender will rise to $1,031,975, and the equity cushion will be completely gone (and the total debt would be $10,857,879, exceeding the $10,200,000 value by $657,879). Stated differently, <u>should the proposed DIP Loan be approved, Lender's equity cushion will be completely eroded in less than 3 months</u>.[6]

39. Based on the foregoing, the Lender is not adequately protected and the proposed DIP Loan cannot be approved.

### F. **The DIP Financing Loan Is Unnecessary**

40. In light of the Debtor's representations to the Court that it will have a loan in place to refinance its debt to Lender no later than the end of March 2022, there is no need for the Proposed DIP Financing.

41. Specifically, Lender has already agreed in an Interim Stipulation Concerning Use of Cash Collateral, as "SO ORDERED" by the Court on February 3, 2022 (*see*, ECF No. 22) for the Debtor's use of Lender's cash collateral through the end of March 2022.

42. Further, Lender has agreed to extend the Debtor's use of Lender's cash collateral through June 2, 2022, and to further make protective advances to the Debtor to fund any operating expense shortfalls (*i.e.*, for heat, light, power) of up to $90,000 through June 2, 2022. Inasmuch as the Debtor expects to have take-out financing by the end of March 2022 and the Debtor's operating expenses are only $27,000 per month (*see*, the Budget annexed to the proposed Order (ECF No. 14-1 – last page), the proposed protective advances being made available by Lender

---

[6] Further, if the Real Property needs to be sold, there will be closing costs of approximately 7% or $714,000 (such as broker's fees, transfer taxes, etc.) that would need to be paid and further erode the net funds available to pay the Lender. Thus, factoring in such closing costs, the collateral's maximum net realizable value today is only $9,486,000 (*i.e.*, $10,200,000 less $714,000), which is only $198,888 less than the total debt of $9,684,888 that would exist if the DIP Loan is approved (*i.e.*, the sum of (i) Lender's claim of $8,632,145, (ii) unpaid taxes and water charges of $78,743, and (iii) the minimum of $974,000 amount that the DIP Loan would prime Lender). $198,888 is not enough to adequately protect Lender if the DIP Loan if approved.

through June 2, 2022 are more than sufficient for the Debtor to maintain its operations while the Debtor obtains and closes on its financing.

43. At or around June 2, 2022, the Court will be in a better position to assess the viability of any loan proposal and this bankruptcy proceeding.

44. Based on the foregoing, the Debtor has no need for a DIP Loan and any approval of such a loan.

**G. To the Extent that the Court Finds that the Value of the Real Property is Significantly Higher than $10.2 Million and the Debtor Requires a $650,000 Loan, Lender is Willing to Extend a $650,000 Loan on Better Terms**

45. Lender submits that its agreement to extend to the Debtor use of its cash collateral and further advance any operating expense shortfalls of up to $90,000 over the next 90 days is more than sufficient time for the Debtor to obtain its financing. Lender further submits that it would not be adequately protected in the event the grants the DIP Financing Motion. However, in the event the Court concludes that the value of the Real Property is substantially more than $10.2 million and the Debtor actually needs a $650,000 loan, then Lender is willing to extend such loan on better terms than the terms set forth in the DIP Financing Motion. In that regard, attached to the Objection as **Exhibit 2** is a Term Sheet which demonstrates that Lender's loan is in the same amount, at a lesser interest rate (6% vs. 15%), and lesser fees ($6,500 commitment/exit fees vs. $19,500 commitment/exit fees). Because Lender's loan is offered on better economic terms than the terms proposed by the DIP Lender, the DIP Financing Motion should be denied.

**H. Otway Should Cause Himself and His Affiliated Non-Debtors To Pay Use and Occupancy**

46. To the extent that the Debtor claims that Lender's agreement to permit Lender to use cash collateral and to advance $90,000 over the next 90 days for operating expense shortfalls

is insufficient, Lender submits that the Debtor should cause Otway and his affiliated non-debtors to pay use and occupancy – which they have not done for at least one year.

47. In this regard, I note that at the time the Loan was originated the Debtor had one year leases with the Debtor's sole member, Lawrence Otway ("**Otway**") as follows:

(i) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Scheib's Place, Inc ("**SPI**"), as tenant (the "**2019 Scheib's Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 11**;

(ii) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Exhibition of the American Gangster, Inc. ("**AGI**"), as tenant (the "**2019 Museum Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 12**;
(iii) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and the Guarantor, as tenant (the "**2019 Otway Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 13**; and
(iv) That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Theatre 80 LLC ("**Theater 80**"), as tenant (the "**2019 Theatre Lease**"), which lease expired and terminated by its terms on November 12, 2020 a copy of which is annexed hereto as **Exhibit 14**. (The 2019 Scheib's Lease, the 2019 Museum Lease, the 2019 Otway Lease and the 2019 Theatre Lease, collectively the "**2019 Leases**").

48. On the eve of the maturity date of the Loan, Otway caused new leases to be signed in favor of himself and his affiliates, which encumbered the Real Property and which were for substantially less money to the Debtor than under the 2019 Leases, including the following:

(i) That certain Commercial Sublease Agreement dated as of November 12, 2020 between Scheibs Place LLC7, as sublessor, and Theatre 80, as subtenant, (the "**2020 Theatre Sublease**"), a copy of which is annexed hereto as **Exhibit 15**;

(ii) That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and SPI, as tenant, (the "**2020 Scheib's Lease**"), a copy of which is annexed hereto as **Exhibit 16**;

---

7 Scheibs Place LLC is not a legal entity. The reference to "Scheibs Place LLC" in the 2020 Theater Sublease was a typographical error and the correct name of the sublessor under the 2020 Theater Sublease is "Scheib's Place, Inc."

14

(iii) That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and AGI, as tenant, (the "**2020 Museum Lease**"), a copy of which is annexed hereto as **Exhibit 17**; and

(iv) That certain Lease Agreement dated as of November 12, 2020 between the Borrower, as landlord, and Otway and Mrs. Eugenie Otway, as tenants (the "**2020 Otway Lease**"), a copy of which is annexed hereto as **Exhibit 18**. (The 2020 Scheib's Lease, the 2020 Museum Lease, the 2020 Otway Lease and the 2020 Theatre Sublease, collectively the "**2020 Leases**").

49. A table illustrating the reduction in rent to the Debtor caused by the 2020 Leases is set forth below:

| Tenant | Monthly Rent to Debtor Under 2019 Leases | Monthly Rent to Debtor Under 2020 Leases | Loss to Debtor |
|---|---|---|---|
| Theatre 80 | $30,000 | $0 | $30,000 |
| AGI | $5,000 | $3,000 | $2,000 |
| Otway | $7,500 | $7,000 | $500 |
| SPI | $10,000 | $14,000 | + $4,000 |
| **TOTAL** | $52,500 | $24,000 | $28,500 |

50. Also, each of the 2020 Leases were for a number of years, whereas the 2019 Leases were each for only one year.

51. Thus, as result of the 2020 Leases, Otway encumbered the Real Property and caused the Debtor to suffer a reduction of its monthly rent by $28,500.

52. Under the Forbearance Agreement and Consent Order, the Debtor, Otway and his affiliates agreed (i) that the 2020 Leases were entered into in violation of the Loan Documents and without the consent of the Lender, (ii) that the 2020 Leases were terminated by Forbearance

15

Agreement and Consent Order and (iii) that they would vacate the premises.

53. Otway and his affiliated non-debtors failed to vacate the Real Property and continue to use same and are liable for use and occupancy.

54. Using the amounts set forth in the 2019 Leases, the Debtor, Theatre 80, AGI, and SPI would owe $840,000 for the period December 1, 2020 through March 2022. However, very little of that has been paid. To the extent the Debtor needs money over and above the $90,000 that Lender has agreed to advance for operating expenses through June 2, 2022, Otway should cause Theatre 80, AGI, and SPI to pay all their post-petition use and occupancy obligations.

55. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
February 11, 2022

Name: Jason Leibowitz
Title: Manager