Steven H. Newman, Esq.
Robert A. Abrams, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
E-Mail: snewman@katskykorins.com
E-Mail: rabrams@katskykorins.com

*Attorneys for St. Mark's Mixed Use LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re

      78-80 ST. MARKS PLACE, LLC,

                Debtor.

-------------------------------------------------------------------x

Chapter 11

Case No. 21-12139 (MG)

## DECLARATION OF JASON LEIBOWITZ IN SUPPORT MOTION FOR AN ORDER: (I) (A) CONVERTING THIS CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 PURSUANT TO 11 U.S.C. §§ 1112(b)(1) AND 1112(b)(4)(A), (B), AND (I); OR, ALTERNATIVELY, (B) APPOINTING A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(a)(1) AND (a)(2); AND (II) GRANTING RELATED RELIEF

     I, **JASON LEIBOWITZ**, hereby declare under penalty of perjury as follows:

     1.      I am a Manager of St. Mark's Mixed Use LLC ("**Lender**"), am personally familiar with the facts and circumstances herein, and submit this declaration in support of Lender's motion for the entry of an Order: (i) (A) converting the case of 78-80 St. Marks Place, LLC (the "**LLC Debtor**") to a case under Chapter 7 pursuant to 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4)(A), (B), and (I), or, alternatively, (B) appointing a Chapter 11 trustee for the LLC Debtor pursuant to 11 U.S.C. §§ 1104(a)(1) and (a)(2), and (ii) granting the Lender related relief (the "**Motion**").

## PRELIMINARY STATEMENT

1.      This Motion was precipitated by the Debtors reneging on a global settlement in principle that was entered into on the eve of a March 2, 2022 evidentiary hearing in connection with the LLC's Debtor's motions seeking, among other things, post-petition financing and use of cash collateral (collectively, the "**DIP Financing Motions**"). The terms of that settlement were memorialized in a Term Sheet (the "**Term Sheet**") and delivered to the Court under cover of a letter dated February 28, 2022, a copy of which is annexed hereto as **Exhibit 1**.

2.      Importantly, the Term Sheet set forth the road map to a consensual resolution of this Chapter 11 case. Among other things, the parties' agreed that: (i) the LLC Debtor would withdraw the DIP Financing Motions with prejudice, (ii) the LLC Debtor would be afforded until June 2, 2022 to refinance its indebtedness to the Lender, (iii) the LLC Debtor agreed to the amount of the Lender's claim, (iv) the Lender agreed to use of cash collateral as set forth therein, (v) the Lender agreed to allow a carve out of $180,000, and (vi) in the event that the LLC Debtor failed to refinance its indebtedness and pay the Lender in full by June 2, 2022, the LLC Debtor would immediately retain a broker, conduct a bankruptcy auction of its real property located at 78-80 St. Marks Place, New York, New York (the "**Real Property**") by August 5, 2022, and close no later than September 6, 2022.

3.      The understanding set forth in the Term Sheet mirrored the terms set forth in a *Forbearance Agreement* dated January 14, 2021 (the "**Forbearance Agreement**") which afforded the Debtors eight (8) months to either refinance or sell the Real Property (*i.e.*, from January 14, 2021 to August 15, 2021) and in a *So-Ordered Stipulation of Settlement and Dismissal of Action*, dated November 29, 2021 (the "**Consent Order**") which afforded the Debtors yet more time - to December 30, 2021 - to either refinance or sell the Real Property.

However, after more than sixteen (16) months since the loan matured, the Debtors failed to achieve either.

4.     Subsequent to delivering the Term Sheet to the Court, the parties began documenting a formal agreement containing the terms of the Term Sheet. However, the Debtors stalled and later balked claiming the LLC Debtor was not prepared to commit to its agreement.

5.     It is clear that the Debtors main objective is to delay at all costs at the Lender's expense and risk of nonpayment, and as a result the Debtors can no longer be trusted.

6.     For more than sixteen (16) months, and as documented in the Forbearance Agreement, the Consent Order, and now the Term Sheet, the LLC Debtor -- a single asset real estate debtor -- was afforded ample time to refinance or sell the Real Property by generous fixed deadlines. Each time the Debtors breached their agreement and instead opted for scorched earth litigation. Now, recognizing that a Bankruptcy Court Order implementing the Term Sheet submitted to the Court on February 28, 2022 would finally commit the LLC Debtor to its prior agreement to refinance or sell the Real Property, the Debtors opt for further delay for the simple reasons that: (i) they have not received a commitment from a third-party lender to make a loan sufficient to repay their indebtedness to Lender, and (ii) they are unwilling to sell the Real Property due to an emotional attachment to the Real Property.

7.     Regardless of the reasons why the LLC Debtor now refuses to commit to a timeline, the undisputed facts of this case demonstrate that cause exists to convert the LLC Debtor's case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code. Specifically, cause to convert this case exists for at least three (3) separate grounds: (i) there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, (ii) the LLC Debtor is unable to pay and, in fact, has *admittedly*

failed to pay, taxes owed after the date of the order for relief, and (iii) there is gross mismanagement of the estate.

8.      Further, the reasons for converting this case apply equally for the appointment of a Chapter 11 operating trustee. Additionally, cause exists for the appointment of a Chapter 11 trustee because this case cries out for "stewardship." The Individual Debtor has failed to refinance the Loan or otherwise sell the Real Property as it promised causing the LLC Debtor's indebtedness to Lender to balloon from $6,245,653,65 as of December 31, 2020 to at least $9,071,421.73 as of April 1, 2022 -- a staggering loss of $2,825,767.78.

9.      Further, since the commencement of this Chapter 11 case, the LLC Debtor has done nothing to improve its declining economic condition. The accrual of 24% default rate interest, legal fees and other charges on the Loan is not sustainable. Unlike the Individual Debtor who chooses to put blinders on, a Chapter 11 trustee will recognize the economic realities of this case and likely conduct a bankruptcy auction under a plan to take advantage of the tax savings provided for under the Bankruptcy Code.

10.     Under the agreements offered by the Lender, the LLC Debtor would have had nineteen (19) months to refinance its debt (from December 1, 2020 to June 2, 2022). However, since the LLC Debtor has rejected the Term Sheet, the Lender can no longer wait for the LLC Debtor's refinancing miracle to materialize because Otway and the LLC Debtor are improperly gambling with Lender's ability to recover on its secured claim.

11.     For the reasons set forth herein and in the accompanying memorandum of law, the Motion should be granted.

## BACKGROUND

**A.  General Background**

12. On December 29, 2021 (the "**Petition Date**"), (i) the LLC Debtor and (ii) Lawrence v. Otway a/k/a Lorcan Otway (the "**Individual Debtor**" or "**Otway**") each filed a petition under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). The LLC Debtor and the Individual Debtor are sometimes collectively referred to herein as the "Debtors".

13. The LLC Debtor is a single purpose entity and is a "single asset real estate" debtor (as defined in section 101(51B) of the Bankruptcy Code). Its sole property is the fee interest in the Real Property. Indeed, according to the LLC Debtor's Rule 1007-2 Affidavit, "The Debtor is the fee owner of real property located at 78-80 St Mark's Place (the "Property"). The Property is a mixed use property which holds three (3) residential units, meeting and storage space and four (4) operating businesses. The Debtor itself does not operate any business other than ownership and maintenance of the Property." A copy of the Rule 1007-2 Affidavit, without exhibits, is annexed hereto as **Exhibit 2**, ¶ 9.[1] Despite such admission, in an effort to mislead and delay these cases, the Individual Debtor did not check the box on the LLC Debtor's petition that the LLC Debtor is a "SARE" debtor.[2] The LLC Debtor, by the Individual Debtor, has no good faith basis for not declaring itself as a SARE case.

14. The Individual Debtor is the sole member of the LLC Debtor and owns 100% of the membership interests in the LLC Debtor.

15. Scheib's Place, Inc. ("**SPI**"), The Exhibition of the American Gangster, Inc. ("**AGI**"), and Theatre 80, LLC ("**Theatre 80**") are also wholly owned by the Individual Debtor.

16. The Individual Debtor, Eugenie Otway, Otway's wife ("**EO**"), SPI, AGI and

---

[1] The LLC Debtor expressly agreed in the Mortgage that at all times the LLC Debtor shall be a single purpose entity. *See*, **Exhibit 6** annexed hereto, ¶ B 6.

[2] *See*, **Exhibit 3** annexed hereto, item 7; ECF No. 1, item 7.

Theatre 80 occupy the vast majority of the square footage of the Real Property (approximately 85%) and have no legal right to occupy the Real Property. In fact, they <u>all</u> agreed (in both the Forbearance Agreement and the Consent Order) to vacate the Real Property many months ago, but in breach of their express agreements, failed to do so. A copy of the stacking plan for the Real Property is annexed hereto as **Exhibit 4**. EO, SPI, AGI and Theatre 80 are sometimes collectively referred to herein as the "**Affiliated Non-Debtors**."

B. **The Loan Documents**

17.     On or about November 12, 2019, 80 St. Marks Place Funding LLC (the "**Funding LLC**") made a loan (the "**Loan**") to the LLC Debtor in the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000.00), which Loan is evidenced by a Promissory Note, dated as of November 12, 2019 (the "**Note**"), which Note was duly executed and delivered by the LLC Debtor to Funding LLC. A true and correct copy of Note is annexed hereto as **Exhibit 5**.

18.     In order to secure its obligations under the Note, the LLC Debtor, as mortgagor, duly executed, acknowledged and delivered to Funding LLC, as mortgagee, a Mortgage and Security Agreement, dated as of November 12, 2019 (the "**Mortgage**"), which Mortgage was duly recorded with the New York City Register (the "**Register**") and encumbers the Real Property known as 78-80 St. Marks Place, New York, New York 10003 (Block: 449, Lot: 28). A true and correct copy of the Mortgage is annexed hereto as **Exhibit 6**. Pursuant to the Mortgage, among other things, the LLC Debtor granted Funding LLC a valid first priority mortgage and lien on, among other things, the Real Property, the rents therefrom, accounts and general intangibles. Funding LLC perfected its security interest against the collateral granted under the Mortgage by, among other things, duly recording the Mortgage with the Register and also by

duly filing a UCC-1 financing statement, naming the LLC Debtor as debtor in the appropriate governmental office.

19. In order to further secure its obligations under the Note and Mortgage, the LLC Debtor duly executed, acknowledged and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), which ALR was duly recorded with the Register. A true and correct copy of the ALR is annexed hereto as **Exhibit 7**. Pursuant to the ALR, among other things, the LLC Debtor absolutely assigned all its leases and rents to Funding LLC.

20. In order to further induce Funding LLC to make the Loan to the LLC Debtor, Otway duly executed and delivered to Funding LLC a Guaranty dated as of November 12, 2019 (the "**Guaranty**"). Pursuant to the Guaranty, Otway absolutely, unconditionally and irrevocably guaranteed to Funding LLC the payment to the Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents. A true and correct copy of the Guaranty is annexed hereto as **Exhibit 8.**

21. In order to further secure, among other things, the Debtors' obligations under the Note, the Guaranty and the other loan documents, as applicable, Otway duly executed and delivered to Funding LLC that certain Pledge and Security Agreement dated as of November 12, 2019 (the "**Pledge Agreement**"). Pursuant to the Pledge Agreement, Otway pledged to Funding LLC, among other things, all of his right, title and interest in, to and under his membership interests in the LLC Debtor and the other "Collateral", as that term is defined in the Pledge Agreement) (the "Collateral" as defined in the Pledge Agreement is referred to herein as the "**Pledged Collateral**"). A true and correct copy of the Pledge Agreement is annexed hereto as

**Exhibit 9**.

22.     Funding LLC perfected its security interest against the Pledged Collateral by, among other things, taking possession of the certificate of membership interests (the "**Certificated Interest**") in the LLC Debtor pledged under the Pledge Agreement and also by duly filing a UCC-1financing statement naming Otway as the debtor in the appropriate governmental office. A true and correct copy of the Certificated Interest is annexed hereto as **Exhibit 10**. The Pledge Agreement, together with the Certificated Interest and the UCC-1 naming Otway as debtor, created a valid and perfected first priority lien on the Pledged Collateral.

23.     On December 1, 2020, the Loan was duly assigned by Funding LLC to the Lender and the Note was duly endorsed by Funding LLC to the Lender pursuant to, among other things, an Allonge to Promissory Note, dated December 1, 2020 (the **"Allonge"**).  A true and correct copy of the Allonge is firmly affixed to the Note (*see* **Exhibit 5**).

24.     On December 1, 2020, Funding LLC also assigned to the Lender, among other things, the Mortgage, as evidenced by an Assignment of Mortgage, dated as of December 1, 2020 (the "**Mortgage Assignment**"). A true and correct copy of the Mortgage Assignment is annexed hereto as **Exhibit 11**.

25.     On December 1, 2020, Funding LLC assigned, among other things, the ALR to the Lender, as evidenced by an Assignment of Assignment of Leases and Rents, dated as of December 1, 2020 (the "**ALR Assignment**"). A true and correct copy of the ALR Assignment is annexed hereto as **Exhibit 12**.

26.     Furthermore, pursuant to an Omnibus Assignment of Loan Documents dated as of December 1, 2020 (the "**Omnibus Assignment**"), the Note, the Mortgage, the Guaranty, the

Pledge Agreement, the ALR, the Certificated Interest, the St. Marks UCC-1, the Otway UCC-1, and all of the other Loan Documents were each duly assigned by Funding LLC to the Lender. A true and correct copy of the Omnibus Assignment is annexed hereto as **Exhibit 13**.

27.     As a result of the above-described assignments, the Lender has possession of, and is now the owner and holder of, the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Certificated Interest and all of the other documents executed in connection with the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement and the Loan. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage Assignment, the ALR Assignment, the Certificated Interest, the UCC-1 financing statements against each of the Debtors,  and the Omnibus Assignment and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively referred to herein as the "**Loan Documents**."

**C.  The Terms of the Note and Debtors' Defaults**

28.     The Note obligated the LLC Debtor to pay to the holder of the Note, among other things, installments of interest, and the balance of the principal, interest, and all other sums due under the Loan Documents on the "Maturity Date" (*i.e.*, December 1, 2020). Similarly, the Mortgage provides that the LLC Debtor shall pay all of the indebtedness evidenced by the Note at the time and in the manner as provided for in the Note.

29.     The Debtors breached and defaulted on their respective obligations under the Note, the Mortgage, the Guaranty, the Pledge Agreement, and the other Loan Documents by, among other things, and without limitation, failing and omitting to pay in full all obligations under the Loan Documents on or before the Maturity Date. As a result of such non-payment, an "Event of Default" under the Note, the Mortgage, the Pledge Agreement and the other Loan

Documents occurred.

30.     As a result of, among other things, the Debtors' failure to pay all amounts due under the Loan Documents on the Maturity Date, the Loan is now immediately due and payable in full and, but for the Debtors' automatic stay under Section 362 of the Bankruptcy Code, the Lender is entitled to, among other things, foreclose on its collateral and exercise all of its rights and remedies under the Loan Documents.

**D.  The January 2021 Forbearance Agreement**

31.     After the Maturity Date, the Debtors advised the Lender that they expected to quickly refinance the Loan and requested that the Lender temporarily forbear from scheduling a UCC sale of the Pledged Collateral. Far from aggressively pursuing its rights, the Lender bent over backwards to afford the Debtors with the time they claimed they needed to pay off the Loan. Indeed, the Debtors, EO, the other Affiliated Non-Debtors, and the Lender executed the Forbearance Agreement dated as of January 14, 2021, a true and correct copy of which is attached hereto as **Exhibit 14**.

32.     Pursuant to the Forbearance Agreement, the Lender agreed, and did forebear from seeking foreclosure while watching (i) the Debtors' refinancing efforts fail not less than six (6) times, and (ii) the LLC Debtor fail to sell its Real Property which the Debtors expressly agreed to do under the Forbearance Agreement. Importantly, since December 1, 2020, the Debtors have not paid any monies to the Lender or paid any property taxes.

33.     The Forbearance Agreement contains the following material terms:

**(i)  The Debtors Admitted Their Indebtedness to Lender as of December 30, 2020**

34.     Pursuant to the Forbearance Agreement, among other things, the Debtors acknowledged, represented and agreed, among other things, that the Loan matured by its terms

on December 1, 2020, that interest began to accrue at the default rate (24% per annum) as of December 2, 2020, and that the Debtors were indebted to Lender, as of December 31, 2020, in the sum of $6,245,653.65, plus legal fees and protective advances from and after December 18, 2020. **Exhibit 14** hereto, pp. 3-4.

### (ii) The Debtors Agreed to Refinance by April 15, 2021 or Sell the Real Property by August 15, 2021

35. Pursuant to the Forbearance Agreement, among other things, the Lender agreed to temporarily forbear from further enforcing its remedies under the Pledge Agreement to and including April 15, 2021. This afforded the Debtors the time they said they needed to refinance the Loan.

36. Further, in the event that the LLC Debtor failed to pay off the Loan by April 15, 2021, the Debtors agreed to market, list and advertise the Real Property for sale at agreed upon list prices. The Debtors required that the initial asking price for the Real Property be $13,500,000. If no contract was (i) executed by May 15, 2021, the asking price would be reduced to $11,000,000; (ii) executed by June 15, 2021, the asking price would be reduced to $10,000,000; (iii) executed by July 15, 2021, the asking price would be reduced to $8,500,000. *See*, **Exhibit 14**, Sections 2(j), (k), and (l). These listing prices were heavily negotiated and were a material part of the Forbearance Agreement.

37. Further, the Debtors agreed that in the event a sale had not concluded by August 15, 2021, that the Lender may, from and after August 16, 2021, enforce its rights under the Loan Documents, including a foreclosure sale of the Pledged Collateral. **Exhibit 14**, § 2(m).

38. In sum, the LLC Debtor and Otway were afforded four months to refinance the Loan and, in the event they failed to refinance, the Debtors were then afforded another four months to market and sell the Real Property.

(iii) **The Debtors and Their Affiliated Non-Debtors Terminated The Insider Leases They Wrongfully Created on Eve of Loan Maturity and Agreed to Vacate By July 31, 2021**

39.   Also under the Forbearance Agreement, the LLC Debtor, Otway, and the Affiliated Non-Debtors each agreed that all of their leases signed in November 2020 (on the eve of the Loan's maturity) were created in violation of the Loan Documents, were immediately terminated and that they would all vacate the Real Property by July 31, 2021. *See* **Exhibit 14,** Sections 8.6 (a), (c), (d), (e), and (d)-(g) (sic); and Section 10(b).

40.   The Lender calls to the Court's attention that on November 12, 2020 -- just days prior to the Loan's Maturity Date -- Otway signed brand new leases, on behalf of the LLC Debtor, in favor of himself and his Affiliated Non-Debtors. The new leases created on the eve of the Maturity Date were wrongfully created by the Debtors to encumber the Real Property and hinder and delay the Lender, and these leases collectively gutted the LLC Debtor's rent roll by $28,500 a month (more than half of the rent roll under the prior leases). The termination of these leases, together with Otway's agreement that he and his affiliates would promptly vacate by July 31, 2021 were an integral part of the Forbearance Agreement.

41.   Moreover, each of the Debtors and the Affiliated Non-Debtors agreed that in the event that the Debtors and the Affiliated Non-Debtors failed to vacate the Real Property by July 31, 2021, time being of the essence, that they would be obligated to pay $200,000 as liquidated damages. **Exhibit 14**, ¶10(b).

(iv) **Debtors Breached the Forbearance Agreement**

42.   While the LLC Debtor listed the Real Property for sale after it failed to refinance, the LLC Debtor and Otway intentionally refused to comply with their time of the essence obligations to lower the asking prices to the agreed upon prices set forth in the Forbearance Agreement, thereby intentionally torpedoing any potential sale the Real Property. The LLC Debtor only received a

single offer of $9.3 million. The LLC Debtor did not respond to such offer. No contract was ever signed for the sale of the Real Property. Additionally, Otway and his Affiliated Non-Debtors also failed to vacate the Real Property by July 31, 2021 as agreed. Indeed, they continue to use and occupy the Real Property. As a result, the Debtors incurred an additional $200,000 of indebtedness to Lender. **Exhibit 14**, ¶10(b).

### E. To Create Further Delay, Debtors Repeatedly Represented That a Closing on a Refinancing was Imminent; At Least 6 Scheduled Closing Failed to Occur

43. Even after the expiration of the forbearance period in the Forbearance Agreement, the Debtors' then counsel, Joshua Wurtzel of Schlam Stone & Dolan LLP, made multiple promises on behalf of the Debtors that a refinancing was imminent. In fact, the Lender was lulled into believing a closing was imminent because between August 2021 and October 2021, the LLC Debtor scheduled six closings (8/13; 8/16; 8/17; 9/15; 10/6; and 10/13) to refinance the Loan. However, all of them were cancelled (sometimes the evening before) and the last closing was never rescheduled. During this timeframe, the Debtors' counsel continued to reassure the Lender that the Loan would be refinanced. For example, after the first four closings were aborted, the Debtors' counsel confirmed in a September 30, 2021 email that "We are FINALLY getting this deal done" and sought to close on October 6, 2021. *See*, **Exhibit 15** annexed hereto (Emphasis in original). That closing was moved to October 13, 2021.

44. Just prior to that closing, Debtors' counsel advised that LLC Debtor was "100k short" of funds to close and that unless Lender agreed to reduce the amount owed "the loan is not going to close and you'll have to do a UCC foreclosure sale." *See*, **Exhibit 16** annexed hereto. On October 12, 2021, the Debtors' counsel advised that the closing was postponed, without date. *See* **Exhibit 17** annexed hereto. The closing was never rescheduled and never occurred.

### F. Lender Scheduled a UCC Sale of the Pledged Collateral and the State Court Action

45.     In light of the Debtors' failure to finance the Loan, on September 3, 2021, the Lender sent a Notice of Disposition to the Debtors that the Lender scheduled a public UCC sale of the Pledged Collateral for November 18, 2021. *See*, **Exhibit 18** annexed hereto, ¶ 31; ECF No. 2, ¶ 31.

46.     On November 11, 2021, the LLC Debtor, Otway, and his Affiliated Non-Debtors commenced an action in the Supreme Court of the State of New York, New York County, under Index No. 656446/2021, seeking to enjoin the sale of the Pledged Collateral (the "**State Court Action**").

47.     In the State Court Action, the Debtors represented to the State Court, as they had represented to the Lender since December 2020, that a refinancing of the Real Property was imminent and represented that "Plaintiffs expect a mortgage loan to come through within the next 90 days." (*i.e.*, by February 9, 2022). *See* Otway's Affidavit sworn to on November 11, 2021, **Exhibit 19** annexed hereto, ¶ 36.

### G.  Debtors Signed a Consent Order Dismissing the State Court Action With Prejudice

48.     The State Court Action was dismissed with prejudice pursuant to a So-Ordered Stipulation of Settlement and Dismissal of Action dated November 29, 2021 (the "**Consent Order**"), a copy of which is annexed hereto as **Exhibit 20.**  Pursuant to the Consent Order, among other things, the Lender agreed, once again, to forbear from enforcing any of its remedies under the Pledge Agreement until December 30, 2021. Further, the Debtors confirmed, as they did in the Forbearance Agreement, that the LLC Debtor's 2020 leases with the Individual Debtor and each of the Debtors' Affiliated Non-Debtors (*i.e.*, EO, Scheib's Place, Inc., AGI, and Theatre 80, LLC) were (i) wrongfully created and (ii) terminated and that they would vacate the Real Property by December 30, 2021. **Exhibit 20**, ¶ 8.6(a), (c), (d), (e) and (d)-(g) (sic); ¶ 10(b).

49.     The Debtors further admitted that they were indebted to Lender, as of November 30, 2021, in the sum of $7,980,855.65, plus legal fees and protective advances from and after November 21, 2021. **Exhibit 20**, p. 5

50.     Once again, in breach of their representations, the Debtors failed to refinance the Real Property by December 30, 2021 and Individual Debtor and the Debtors' Affiliated Non-Debtors failed to vacate the Real Property by December 30, 2021.

**H.  The Debtors File for Bankruptcy**

51.     To further hinder and delay enforcement of Lender's rights, on December 29, 2021, the Debtors each filed for Chapter 11 relief. The Individual Debtor and the Debtors' Affiliated Non-Debtors are still occupying the Real Property -- rent free -- in contempt of the Consent Order.

52.     On January 19, 2022, the LLC Debtor filed a motion to approve (i) debtor-in-possession financing on a super priority basis which would prime the Lender's liens (ECF No. 14) and (ii) use of cash collateral (ECF No. 15) (collectively, the "**DIP Financing Motions**"). The DIP Financing Motions were originally scheduled to be heard on February 3, 2022, but were adjourned to March 2, 2022 for purposes of conducting an evidentiary hearing. The Lender objected to the DIP Financing Motions and incurred a significant amount of legal fees in connection therewith and preparing for an evidentiary hearing with multiple witnesses.

53.     On the eve of the March 2, 2022 evidentiary hearing, the parties agreed to resolve the DIP Financing Motions and the manner in which this Chapter 11 case would proceed to conclusion. Specifically, on February 28, 2022, the parties wrote the Court and provided the Court with a detailed Term Sheet which charted the course for the resolution of not just the DIP Financing Motions but the rest of the case. *See*, **Exhibit 1** annexed hereto.  In that regard, the

parties requested the March 2, 2022 evidentiary hearing be adjourned without date to allow the parties to complete documentation of a more fuller settlement agreement incorporating the Term Sheet and which agreement would be modeled upon the pre-petition Consent Order.

54.     The material terms of the Term Sheet include:

    a.   The DIP Financing Motions being withdrawn, with prejudice;

    b.   The LLC Debtor retaining a broker not later than June 5, 2022;

    c.   An auction of the Real Property by August 5, 2022;

    d.   A closing on the sale of the Real Property by September 6, 2022;

    e.   The LLC Debtor's use of Lender's cash collateral through June 2, 2022;

    f.   A $180,000 carve out for the Debtors counsel; and

    g.   The Debtors agreement that Lender holds a valid lien and secured claim as of March 2, 2022 in the sum of at least $8,632,144.78, together with default interest which continues to accrue, together with attorneys' fees and expenses.

**Exhibit 1.**

55.      In the term Sheet LLC Debtor agreed to use best efforts to embody the terms of the Term Sheet into a settlement agreement within two (2) business from February 28, 2022. However, the LLC Debtor breached the Term Sheet agreement as well. It first delayed responding to a draft settlement agreement and later balked and tried to renegotiate many of the substantive terms contained in the Term Sheet. After two weeks, the LLC Debtor stopped conversations and said it needed more time to decide how it wanted to proceed.

56.     Now more than ever it is obvious that the LLC Debtor is unable to obtain sufficient financing to repay Lender in full by June 2, 2022. The LLC Debtor is stalling, as it has done for the last sixteen months, to delay its commitment to conduct a sale of the Real Property.

While Lender has been patient, it can no longer permit the LLC Debtor to gamble with Lender's collateral and further risk Lender not being paid.

## A. CAUSE EXISTS TO CONVERT THIS CHAPTER 11 CASE TO CHAPTER 7

### (I) The LLC Debtor is Suffering Substantial or Continuing Loss to or Diminution of the Estate

57. The LLC Debtor continues to suffer substantial or continuing losses and such losses, together with the accrual of debt on the Loan, is causing a diminution of the estate. Indeed, both historically and currently, the LLC Debtor has negative cash flow and an inability to pay current operating expenses.

58. There is no doubt that the LLC Debtor is suffering losses. The Debtors admitted in the Forbearance Agreement that as of December 31, 2020, they were indebted to the Lender in the sum of $6,245,653.65. **Exhibit 14**, p. 4. They then admitted in the Consent Order that, as of November 29, 2021, they were indebted to the Lender in the sum of $7,980,855.65. **Exhibit 20**, p. 5. They further acknowledged in the Term Sheet that Lender's claim as of March 2, 2022 was at least $8,632,144.78. **Exhibit 1**. Further, at the LLC Debtor's request, Lender sent the LLC Debtor a letter setting forth the estimated amount owed as of April 1, 2022, a copy of which is annexed hereto as **Exhibit 21**. As set forth in such letter, the Debtors are indebted to the Lender in the sum of at least $9,071,421.73 as of April 1, 2022.[3] Thus, the LLC Debtor's equity in the Real Property has plummeted by more than $2,825,768.08 from December 31, 2020 to April 1, 2022.

59. Further, according to the LLC Debtor's Rule 1007-2 Affidavit, the Debtors' Affiliated Non-Debtors' businesses at the Real Property were not operating due to COVID-19.

---

[3] Such letter advised the LLC Debtor that it included attorneys' fees and expenses only through March 23, 2022 and additional attorneys' fees and expenses have accrued and continue to accrue and that such additional amounts will be added to the estimated payoff figure set forth in the letter.

*See*, **Exhibit 2**, ¶¶ 23-24; ECF No. 2, ¶¶23-24. Indeed, according to the LLC Debtor's Statement

of Financial Affairs, no revenues are listed for 2021, and only $105,650 in revenues are listed for

2020. *See*, **Exhibit 3** annexed hereto , Official Form 207, Part 1; ECF No. 1, Official Form 207,

Part 1 (p. 20 of 38).

60.     As of the Petition Date, the LLC Debtor had <u>no cash</u> on hand. *See*, **Exhibit 3**

annexed hereto, Schedule A/B, Part 1, Q. 1 and Part 12, Q. 80; ECF No. 1 (p. 10 of 38), Part 1,

Q. 1 and Part 12, Q. 80 (p. 13 of 38).

61.     Further, the Affiliated Non-Debtors, which continue to use and occupy

approximately eighty-five percent (85%) of the Real Property, have paid no post-petition rent

(based on the January 2022 Operating Report) and it appears that the Individual Debtor (who has

not paid any rent either) has no intention to demand and collect such rental obligations on behalf

of the LLC Debtor.

62.     The LLC Debtor's post-petition "operational" expenses significantly outpace its

revenues and the LLC Debtor cannot even pay its basic operating expenses. According to a

Declaration of Lawrence Otway dated January 19, 2022 (*see* **Exhibit 22** annexed hereto; ECF

No. 15-1), the LLC Debtor "expects to collect rent in the amount of approximately $8,950 each

month going forward" (*id*. at ¶ 11) while the LLC Debtor "will accrue monthly administrative

expenses of approximately $27,754.20, not including administrative costs and expenses

(including legal fees), which will accrue throughout the course of its chapter 11 case." (*id.* at ¶

9). Thus, by the LLC Debtor's own admission, the LLC Debtor has losses of approximately

$18,804 ($27,754 - $8,950) a month (or $225,648 per year).

63.     While the LLC Debtor had hoped to receive $8,950 in rental income a month (an

amount that is still insufficient to have positive income), this too proved lacking. According to

January 2022 Operating Report, the LLC Debtor received zero ($0) in receipts for January 2022. *See* **Exhibit 23** annexed hereto, Part 1(b); ECF No. 34, Part 1(b) (p. 2 of 13). Thus, the LLC Debtor's loss for January was actually $27,754 per month (*i.e.*, worse than projected).

64.     Moreover, the Lender submits that the substantial losses reported by LLC Debtor are grossly understated because the amounts exclude, *inter alia*, accruing interest and attorneys' fees owed to Lender under the Loan Documents. The LLC Debtor has acknowledged that interest accrues on its indebtedness to the Lender by at least $4,600 each day. *See*, **Exhibit 2**, ¶ 34; ECF No. 2, ¶ 34. Thus, approximately $138,000 in interest accrues under the Loan Documents on a monthly basis (or $1,656,000 annually), which amounts are not reflected or even contemplated in the LLC Debtor's estimate of monthly expenses. In other words, the LLC Debtor's monthly expenses is not the mere $27,754 per month as represented; the monthly expenses exceed $165,754 (*i.e.*, $138,000 + $27,754) -- not even counting the Lender's legal fees or the LLC Debtor's own administrative legal fees which continue to accrue. Thus, even if the LLC Debtor actually collected monthly rental income of $8,950, it still would have an actual loss of $156,804 (*i.e.*, $165,754 - $8,950), not even including the accrual of legal fees.

65.     Furthermore, the LLC Debtor has admittedly failed to pay its post-petition real estate taxes that were due on January 1, 2022. According to the January 2022 Operating Report, it failed to pay post-petition property taxes of $72,452. **Exhibit 23** annexed hereto, Part 6(f) and 7(f); ECF No. 34, Part 7(f) (p. 8 of 13). This fact is confirmed by the Department of Finance's tax records showing unpaid taxes of $72,452.48 as of March 30, 2022. *See*, **Exhibit 24** annexed hereto.

66.     In sum, the LLC Debtor continues to have substantial negative cash flow and cannot pay current administrative expenses resulting in a diminution of the LLC Debtor's estate.

**(II)**     <u>There Is No Reasonable Likelihood of a Rehabilitation</u>

67.    The totality of the facts, including but not limited to, the lack of revenues, the continuing losses, the Individual Debtor's emotional attachment to the Real Property and the Debtors' inability to exercise rational business judgment, overwhelmingly demonstrate that there is no likelihood of rehabilitation. The LLC Debtor has had more than 16 months to refinance the Loan but has failed to do so. It also reneged on its obligations to sell the Real Property that the LLC Debtor promised it would do during this same timeframe in the Forbearance Agreement and in the Consent Order.

68.    Further, even though the Forbearance Agreement, the Consent Order, and the Term Sheet combined would have given the LLC Debtor more than nineteen (19) months to finally refinance its indebtedness to Lender (*i.e.*, from the Maturity Date on December 1, 2020 to June 2, 2022), the LLC Debtor now refuses to proceed with the Term Sheet because it recognizes that it would be committed to sale of the Real Property by September 6, 2022 if it could not refinance the Loan by June 2, 2022 – a date which the LLC Debtor now apparently recognizes is not likely to occur.

69.    While the LLC Debtor wishes to hold out hope forever, it is doing so at the expense of the Lender and the LLC Debtor's other creditors. Default rate interest and other costs and expenses, including attorneys' fees, continue to accrue under the Loan and further delays in the sale of the Real Property will impair Lender's ability to recover its claim against the estate, leaving general unsecured creditors with little or no recovery on account of their claims.

70.    For the reasons set forth above, the case should be converted for cause pursuant to §§ 1112(b)(1) and 1112(b)(4)(A).

**(III)**     <u>The LLC Debtor Has Failed to Pay Post-Petition Taxes</u>

71.     It is undisputed that the LLC Debtor (i) filed its Chapter 11 case on December 29, 2021, and (ii) as reflected in the January 2022 Operating Report, failed to pay New York City real estate taxes in the sum of $72,452 which were due on January 1, 2022. *See*, **Exhibit 23** annexed hereto, Part 6(f)). Further, annexed hereto as **Exhibit 24** is a payment history obtained from the New York City Department of Finance's website showing the that the LLC Debtor owes post-petition real estate taxes in the amount of $72,452.48 as of March 30, 2022.

72.     There are no unusual circumstances here that excuse the LLC Debtor from complying with its basic post-petition administrative obligations. Indeed, the LLC Debtor cannot provide a reasonable justification for its failure to pay post-petition taxes or demonstrate that its failure to do so will be cured within a reasonable time. Further, due to the LLC Debtor's non-payment of such taxes, Lender's first priority lien is being subordinated to the City of New York to the extent of such unpaid real estate taxes and Lender is not being adequately protected.

**(IV)     Debtors Have Engaged in Gross Mismanagement**

73.     The Debtors' pre-petition and post-petition behavior supports a finding of gross mismanagement and incompetence. The Individual Debtor has breached and continues to breach his fiduciary duties to the LLC Debtor to further his self-interest.

74.     For example, prior to the maturity of the Loan, the Debtors terminated market leases and caused the LLC Debtor to enter into below-market leases with the Individual Debtor and its Affiliated Non-Debtors. Specifically, at the time the Loan was originated the LLC Debtor had one year leases as follows:

(i)     That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and SPI, as tenant (the "**2019 Scheib's Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 25**;

(ii)     That certain Commercial Lease dated as of November 12, 2019 between the

Borrower, as landlord, and Exhibition of the AGI, as tenant (the "**2019 Museum Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 26**;

(iii)  That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and the Individual Debtor, as tenant (the "**2019 Otway Lease**"), which lease expired and terminated by its terms on November 12, 2020, a copy of which is annexed hereto as **Exhibit 27**; and

(iv)  That certain Commercial Lease dated as of November 12, 2019 between the Borrower, as landlord, and Theatre 80, as tenant (the "**2019 Theatre Lease**"), which lease expired and terminated by its terms on November 12, 2020 a copy of which is annexed hereto as **Exhibit 28**. (The 2019 Scheib's Lease, the 2019 Museum Lease, the 2019 Otway Lease and the 2019 Theatre Lease, collectively the "**2019 Leases**").

75.     On the eve of the Maturity Date of the Loan, Otway caused the LLC Debtor to sign new leases in favor of himself and his affiliates, which encumbered the Real Property and which were for materially less money to the LLC Debtor than under the 2019 Leases, including the following:

(i)  That certain Commercial Sublease Agreement dated as of November 12, 2020 between Scheibs Place LLC[4], as sublessor, and Theatre 80, as subtenant, (the "**2020 Theatre Sublease**"), a copy of which is annexed hereto as **Exhibit 29**;

(ii)  That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and SPI, as tenant, (the "**2020 Scheib's Lease**"), a copy of which is annexed hereto as **Exhibit 30**;

(iii)  That certain Commercial Lease dated as of November 12, 2020 between the Borrower, as landlord, and AGI, as tenant, (the "**2020 Museum Lease**"), a copy of which is annexed hereto as **Exhibit 31**; and

(iv)  That certain Lease Agreement dated as of November 12, 2020 between the Borrower, as landlord, and Otway and Mrs. Eugenie Otway, as tenants (the "**2020 Otway Lease**"), a copy of which is annexed hereto as **Exhibit 32**. (The 2020 Scheib's Lease, the 2020 Museum Lease, the 2020 Otway Lease and the 2020 Theatre Sublease, collectively the "**2020 Leases**").

76.     A table illustrating the substantial reduction in rent payable to the LLC Debtor

---

[4] Scheibs Place LLC is not a legal entity. The reference to "Scheibs Place LLC" in the 2020 Theater Sublease was a typographical error and the correct name of the sublessor under the 2020 Theater Sublease is "Scheib's Place, Inc."

caused by the 2020 Leases is set forth below:

| Tenant | Monthly Rent to Debtor Under 2019 Leases | Monthly Rent to Debtor Under 2020 Leases | Loss to Debtor |
|---|---|---|---|
| Theatre 80 | $30,000 | $0 | $30,000 |
| AGI | $5,000 | $3,000 | $2,000 |
| Otway | $7,500 | $7,000 | $500 |
| SPI | $10,000 | $14,000 | + $4,000 |
| TOTAL | $52,500 | $24,000 | $28,500 |

77.    Also, each of the 2020 Leases were for a number of years, whereas the 2019 Leases were each for only one year. Thus, as result of the 2020 Leases, **Otway encumbered the Real Property and caused the LLC Debtor to suffer a reduction of its monthly rent by $28,500 -- a reduction of over 54% of the monthly rent**.

78.    Also, the LLC Debtor's Schedules contain false statements. For example, the LLC Debtor reported on its Schedules that it has no receivables. *See*, ECF No. 1, Schedule A/B, item No. 10. However, because the Schedules reflect no revenue at all for 2021, Otway and his Affiliated Non-Debtors must owe substantial sums for rent or use and occupancy for the past year (or more) and they continue to occupy the Real Property rent free. The LLC Debtor has taken zero steps to collect monies owed or otherwise evict Otway and his affiliates and replace them with actual paying tenants.

79.    Further, the LLC Debtor has no records, such as basic accounting software like

Quick Books, to track outstanding accounts receivables for its tenants. On February 3, 2022, Lender requested that the LLC Debtor provide, among other things, a schedule of all of its account receivables. *See*, **Exhibit 33** annexed hereto. However, the only document produced in response to our request for a schedule of accounts receivable is a 2 page word processing document showing rent owed by non-insiders. *See*, **Exhibit 34** annexed hereto. Notably, there is no record of monies owed by Otway and/or the Affiliated Non-Debtors. Accordingly, Lender submits that Otway's failure to maintain records on behalf of the LLC Debtor is being used by Otway to hide the full scope of the amounts that Otway and the Affiliated Non-Debtors owe to the LLC Debtor.

80.     The LLC Debtor's Schedules are also inaccurate for another reason. The LLC Debtor represented to the Court that the LLC Debtor has an existing lease with Otway's affiliate SPI (*i.e.*, the Tavern) and that such lease has 13 years remaining before it expires. *See*, **Exhibit 3** annexed hereto, ECF No. 1, at Schedule G (p. 17 of 38). However, in truth, the LLC Debtor, Otway and his Affiliated Non-Debtors (including SPI) agreed in both the Forbearance Agreement and the Consent Order that the lease with SPI was, in fact, terminated. *See*, **Exhibit 14** annexed hereto, Section 8.6(a)(i), (c), (e) and (d) (sic); and **Exhibit 20** annexed hereto, ¶ 8.6(a)(i), (c), (e) and (d) (sic).

81.     Further, the LLC Debtor listed Lender's claim against them was "disputed" on its Schedules. *See*, **Exhibit 3** annexed hereto, Schedule D, respectively. Specifically, the LLC Debtor asserted that the Lender holds a "disputed" $7,980,855.65 claim. However, the Debtors conceded in the Consent Decree that such exact amount is owed to the Lender as of November 30, 2021 and the Debtors waived all defenses thereto. *See*, **Exhibit 20** annexed hereto, p. 5. Thus, there is absolutely no good faith basis to dispute the Lender's claim.

82.     Lender submits that these misrepresentations alone constitutes a sufficient basis to convert the LLC Debtor's case.

## B. **CAUSE EXISTS TO APPOINT A CHAPTER 11 TRUSTEE**

83.     Alternatively, a Chapter 11 trustee should be appointed for the reasons set forth above and for the additional reason that this case requires stewardship. This case cannot afford to idle along as the Individual Debtor has permitted to do for the last sixteen months. Lender has no trust or confidence in either of the Debtors to rehabilitate the LLC Debtor. Indeed, due to the LLC Debtor's mismanagement and incompetence, the LLC Debtor's indebtedness to Lender has ballooned from $6,245,653,65 as of December 31. 2020 to at least $9,071,421.73 as of April 1, 2022, and additional default rate interest and other charges, including legal fees, continue to accrue. If the Individual Debtor maintains operational control of the LLC Debtor, he will continue to hold out hope -- all at the expense of Lender -- that some other lender will materialize with sufficient monies to pay off Lender's secured claim. However, while the LLC Debtor sits idle and collects no rent, the debt continues to mount. A Chapter 11 trustee should be immediately appointed to curb the growth of the debt by conducting a bankruptcy auction and obtaining the benefits of the Bankruptcy Code to alleviate any transfer tax burden for the benefit of LLC Debtor's creditors.

**WHEREFORE**, for the foregoing reasons, it is respectfully requested that the Court (i) convert this Chapter 11 case to a case under Chapter 7, or, alternatively, appoint a Chapter 11 operating trustee, and (ii) grant the Lender such other and further relief as is just and proper.

Dated: New York, New York
     April 4 , 2022

                                                         _____
                                                   JASON LEIBOWITZ