Steven H. Newman, Esq.                               Hearing Date: May 17, 2022
Robert A. Abrams, Esq.                                          At: 10:00 a.m.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
E-Mail: snewman@katskykorins.com
E-Mail: rabrams@katskykorins.com
*Attorneys for St. Mark's Mixed Use LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
In re                                               Chapter 11

     78-80 ST. MARKS PLACE, LLC,            Case No. 21-12139 (MG)

         Debtor.
---------------------------------------------------------------------x

**DECLARATION OF JASON LEIBOWITZ IN RESPONSE TO**
**DEBTOR'S OBJECTION TO THE CLAIM OF ST. MARK'S MIXED USE LLC**

I, **JASON LEIBOWITZ**, hereby declare under penalty of perjury as follows:

1.      I am a Manager of St. Mark's Mixed Use LLC ("**Lender**"), am personally

familiar with the facts and circumstances herein, and submit this declaration in support of

Lender's accompanying response ("**Response**") in opposition to the motion and objection (the

"**Motion**") by 78-80 St. Marks Place, LLC (the "**Debtor**")[1] to Lender's proof of claim, claim

number 4, and to Lender's additional claims that have accrued during the pendency of this

Chapter 11 case ("**Lender's Claim**").

**PRELIMINARY STATEMENT**

2.      The Debtor's Motion, together with a related application made pursuant to

---

[1] The Debtor's principal, Lawrence Otway ("**Otway**"), is also a Chapter 11 debtor. His case is pending in this Court under Case No. 21-12140 (mg). The Debtor and Otway are sometimes collectively referred to as the "**Debtors**."

1

Bankruptcy Rule 2004 (the "**Rule 2004 Motion**"), were filed by the Debtor as a tactical

maneuver in response to the motion filed by the Lender seeking an order converting the Debtor's

Chapter 11 case to a case under Chapter 7 or, alternatively, appointing a Chapter 11 trustee (ECF

No. 36) (the "**Conversion Motion**").

3.      The Conversion Motion was heard by the Court on April 27, 2022 and is *sub*

*judice*. However, at the hearing on the Conversion Motion, the Court indicated that unless the

parties reached a consensual global resolution to this case prior to May 17, 2022 (*i.e.*, the return

date on the Debtor's Motion), the Court was inclined to (i) grant the Conversion Motion and

appoint a Chapter 7 trustee, and (ii) deny the Rule 2004 Motion. In that event, consideration of

this Motion is likely to be adjourned pending a Chapter 7 trustee's review of the Lender's claims

in this case. However, inasmuch as the Motion remains pending, the Lender submits this

Declaration and the accompanying Response showing the amounts owed to the Lender as of

April 1, 2022.[2]

4.      In its Motion, the Debtor objects to Lender's entitlement to post-petition default

rate interest, all of its attorneys' fees, all of its protective advances, and liquidated damages for

Otway and his affiliates' failure to timely vacate the Debtor's Property time being of the essence.

Accordingly, the purpose of this Declaration is to: (i) provide the Court with a factual

background surrounding the Loan, the Debtor and Otway's defaults thereunder including the

Debtor's inability to refinance its indebtedness to Lender, and the reasonableness of the fees and

advances incurred and paid by the Lender; and (ii) place before the Court the relevant Loan

Documents (defined below), including, without limitation, the *Forbearance Agreement* dated

January 14, 2021 (the "**Forbearance Agreement**") and the *So-Ordered Stipulation of*

---

[2] Interest, advances, and attorneys' fees and expenses continue to accrue from and after April 1, 2022.

*Settlement and Dismissal of Action*, dated November 29, 2021 (the "**Consent Order**"),

evidencing, among other things, the Debtors' admissions that Lender is, in fact, entitled to the

very interest, fees and liquidated damage amount to which the Debtor now objects.

5.      Prepetition, (i) the Forbearance Agreement afforded the Debtors with eight

months to either refinance or sell the Property (as defined below) - from January 14, 2021 to

August 15, 2021, and (ii) the Consent Order afforded the Debtors yet more time - to December

30, 2021 - to either refinance or sell the Property. Importantly, as part of the Lender's agreement

to forbear, the Debtors, in both agreements, waived all claims against Lender and stipulated to

the amounts owed to the Lender including, without limitation, Lender's entitlement to default

rate interest, attorneys' fees, protective advances, and liquidated damages.

6.      During the pendency of this case, the Debtor filed motions seeking, among other

things, super priority financing that would prime the Lender's first priority liens[3] and use of cash

collateral (collectively, the "**DIP Financing Motions**"). The DIP Financing Motions sought to

materially impair Lender's liens and rights, involved several factual issues such as the value of

the Debtor's Property, the amount of the equity cushion the Debtor had therein, and required

extensive preparation for a trial thereon. On the eve of trial, the parties resolved the DIP

Financing Motions pursuant to a Term Sheet (the "**Term Sheet**") and delivered to the Court

under cover of a letter dated February 28, 2022, a copy of which is annexed hereto as **Exhibit 1**.

Importantly, the Term Sheet set forth the road map to a consensual resolution of this Chapter 11

case. Like the Forbearance Agreement and the Consent Order, in the Term Sheet: (i) the Debtor

stipulated to the amount of the Lender's claim as of March 2, 2022 (which included Lender's

---

[3] Further, the DIP loan itself was designed to hinder and delay the Lender. The loan proceeds were not primarily intended to improve the Property, since more than half of the loan proceeds were earmarked to pay Debtor's counsel and so-called management fees to Otway.

entitlement to default rate interest, attorneys' fees, protective advances, and liquidated damages after November 21, 2021), (ii) the Debtor would be afforded until June 2, 2022 to refinance its indebtedness and pay the Lender the full amount owed, and (iii) in the event that the Debtor failed to refinance its indebtedness and pay the Lender in full by June 2, 2022, the Debtor would immediately retain a broker, conduct a bankruptcy auction of its real property located at 78-80 St. Marks Place, New York, New York (the "**Property**") by August 5, 2022, and close no later than September 6, 2022.

7.    Subsequent to delivering the Term Sheet to the Court, Lender's counsel, Katsky Korins LLP (the "**Firm**"), prepared a formal settlement agreement containing the terms of the Term Sheet. However, the Debtor stalled and later walked away from the settlement advising the Lender it was not prepared to commit to its agreement.

8.    Given the Debtor's prior agreements and admissions as to the amounts owed to the Lender as set forth in the Forbearance Agreement, the Consent Order, and now the Term Sheet -- agreements spanning a period from January 14, 2021 to February 28, 2022 -- the Lender respectfully submits that the Motion is meritless and was only filed to pressure the Lender to voluntarily reduce its claim, delay the appointment of a trustee, and to engage in more scorched earth litigation.

9.    As set forth below and in the accompanying Response, the Consent Order is an order of the State Court and the doctrines of *res judicata* and *Rooker-Feldman* preclude the Debtor from altering the Consent Order and relitigating the fees, charges, and amounts set forth therein. Further, after the Consent Order and during the pendency of this Chapter 11 proceeding, the Lender has incurred, among other things, additional attorneys' fees and expenses and protective advances, all of which are reasonable and reimbursable under the Loan Documents.

Lastly, the Debtor, which by its own admission is solvent, has no legal or equitable basis to re-write the contractual bargained-for terms of the Loan Documents by downward adjusting Lender's entitlement to default rate interest to the non-default rate.

10.     For the reasons set forth herein and in the accompanying Response, the Debtor's Motion and objection to Lender's claim should be denied in its entirety.

## BACKGROUND

### A.  General Background

11.     On December 29, 2021 (the "**Petition Date**"), the Debtors each filed a petition under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

12.     The Debtor is a single purpose entity and is a "single asset real estate" debtor (as defined in section 101(51B) of the Bankruptcy Code). Its sole property is the fee interest in the Property. Indeed, according to the Debtor's Rule 1007-2 Affidavit, "The Property is a mixed use property which holds three (3) residential units, meeting and storage space and four (4) operating businesses. The Debtor itself does not operate any business other than ownership and maintenance of the Property." A copy of the Rule 1007-2 Affidavit, without exhibits, is annexed hereto as **Exhibit 2**, ¶ 9.[4] Despite such admission, in an effort to mislead and delay these cases, Otway did not check the box on the Debtor's petition that the Debtor is a "SARE" debtor.[5] The Debtors have no good faith basis for not declaring the Debtor as a SARE case.

13.     Otway is the sole member of the Debtor and owns 100% of the membership interests in the Debtor.

---

[4] The Debtor expressly agreed in the Mortgage that at all times the Debtor shall be a single purpose entity. *See*, **Exhibit 5** annexed hereto, ¶ B 6.

[5] *See*, **Exhibit 3** annexed hereto, item 7; ECF No. 1, item 7.

14.     Scheib's Place, Inc. ("**SPI**"), The Exhibition of the American Gangster, Inc. ("**AGI**"), and Theatre 80, LLC ("**Theatre 80**") are also wholly owned by Otway.

15.     Otway, Eugenie Otway, Otway's wife ("**EO**"), SPI, AGI and Theatre 80 occupy the vast majority of the square footage of the Property (approximately 85%) and have no legal right to occupy the Property. In fact, they ***all*** agreed (in ***both*** the Forbearance Agreement and the Consent Order) to vacate the Property many months ago, time being of the essence, but in breach of their express agreements, failed to do so. EO, SPI, AGI and Theatre 80 are sometimes collectively referred to herein as the "**Affiliated Non-Debtors**."

### B.  The Loan Documents

16.     On or about November 12, 2019, 80 St. Marks Place Funding LLC (the "**Funding LLC**") made a loan (the "**Loan**") to the Debtor in the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000.00), which Loan is evidenced by a Promissory Note, dated as of November 12, 2019 (the "**Note**"), which Note was duly executed and delivered by the Debtor to Funding LLC. A true and correct copy of Note is annexed hereto as **Exhibit 4**.

17.     In order to secure its obligations under the Note, the Debtor, as mortgagor, duly executed, acknowledged and delivered to Funding LLC, as mortgagee, a Mortgage and Security Agreement, dated as of November 12, 2019 (the "**Mortgage**"), which Mortgage was duly recorded with the New York City Register (the "**Register**") and encumbers the Property. A true and correct copy of the Mortgage is annexed hereto as **Exhibit 5**. Pursuant to the Mortgage, among other things, the Debtor granted Funding LLC a valid first priority mortgage and lien on, among other things, the Property, the rents therefrom, accounts and general intangibles. Funding LLC perfected its security interest against the collateral granted under the Mortgage by, among other things, duly recording the Mortgage with the Register and also by duly filing a UCC-1

6

financing statement, naming the Debtor as debtor in the appropriate governmental office.

18.     In order to further secure its obligations under the Note and Mortgage, the Debtor duly executed, acknowledged and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 (the "**ALR**"), which ALR was duly recorded with the Register. A true and correct copy of the ALR is annexed hereto as **<u>Exhibit 6</u>**.  Pursuant to the ALR, among other things, the Debtor absolutely assigned all its leases and rents to Funding LLC.

19.     In order to further induce Funding LLC to make the Loan to the Debtor, Otway duly executed and delivered to Funding LLC a Guaranty dated as of November 12, 2019 (the "**Guaranty**"). Pursuant to the Guaranty, Otway absolutely, unconditionally and irrevocably guaranteed to Funding LLC the payment to the Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents. A true and correct copy of the Guaranty is annexed hereto as **<u>Exhibit 7.</u>**

20.     In order to further secure, among other things, the Debtors' obligations under the Note, the Guaranty and the other loan documents, as applicable, Otway duly executed and delivered to Funding LLC that certain Pledge and Security Agreement dated as of November 12, 2019 (the "**Pledge Agreement**"). Pursuant to the Pledge Agreement, Otway pledged to Funding LLC, among other things, all of his right, title and interest in, to and under his membership interests in the Debtor and the other "Collateral", as that term is defined in the Pledge Agreement) (the "Collateral" as defined in the Pledge Agreement is referred to herein as the "**Pledged Collateral**"). A true and correct copy of the Pledge Agreement is annexed hereto as **<u>Exhibit 8.</u>**

21.     Funding LLC perfected its security interest against the Pledged Collateral by,

among other things, taking possession of the certificate of membership interests (the

"**Certificated Interest**") in the Debtor pledged under the Pledge Agreement and also by duly

filing a UCC-1 financing statement naming Otway as the debtor in the appropriate governmental

office. A true and correct copy of the Certificated Interest is annexed hereto as **Exhibit 9**. The

Pledge Agreement, together with the Certificated Interest and the UCC-1 naming Otway as

debtor, created a valid and perfected first priority lien on the Pledged Collateral.

22.      On December 1, 2020, the Loan was duly assigned by Funding LLC to the Lender

and the Note was duly endorsed by Funding LLC to the Lender pursuant to, among other things,

an Allonge to Promissory Note, dated December 1, 2020 (the "**Allonge**").  A true and correct

copy of the Allonge is firmly affixed to the Note (*see* **Exhibit 4** hereto).

23.      On December 1, 2020, Funding LLC also assigned to the Lender, among other

things, the Mortgage, as evidenced by an Assignment of Mortgage, dated as of December 1,

2020 (the "**Mortgage Assignment**"). A true and correct copy of the Mortgage Assignment is

annexed hereto as **Exhibit 10**.

24.      On December 1, 2020, Funding LLC assigned, among other things, the ALR to

the Lender, as evidenced by an Assignment of Assignment of Leases and Rents, dated as of

December 1, 2020 (the "**ALR Assignment**"). A true and correct copy of the ALR Assignment is

annexed hereto as **Exhibit 11**.

25.      Furthermore, pursuant to an Omnibus Assignment of Loan Documents dated as of

December 1, 2020 (the "**Omnibus Assignment**"), the Note, the Mortgage, the Guaranty, the

Pledge Agreement, the ALR, the Certificated Interest, the St. Marks UCC-1, the Otway UCC-1,

and all of the other Loan Documents were each duly assigned by Funding LLC to the Lender. A

true and correct copy of the Omnibus Assignment is annexed hereto as **Exhibit 12**.

26.     As a result of the above-described assignments, the Lender has possession of, and

is now the owner and holder of, the Note, the Mortgage, the ALR, the Guaranty, the Pledge

Agreement, the Certificated Interest and all of the other documents executed in connection with

the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement and the Loan. The Note,

the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage

Assignment, the ALR Assignment, the Certificated Interest, the UCC-1 financing statements

against each of the Debtors, and the Omnibus Assignment and all other documents evidencing,

securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively

referred to herein as the "**Loan Documents**."

### C.  The Terms of the Note and Debtors' Defaults

27.     The Note obligated the Debtor to pay to the holder of the Note, among other

things, installments of interest, and the balance of the principal, interest, and all other sums due

under the Loan Documents on the "Maturity Date" (*i.e.*, December 1, 2020). Similarly, the

Mortgage provides that the Debtor shall pay all of the indebtedness evidenced by the Note at the

time and in the manner as provided for in the Note.

28.     The Debtors breached and defaulted on their respective obligations under the

Note, the Mortgage, the Guaranty, the Pledge Agreement, and the other Loan Documents by,

among other things, and without limitation, failing and omitting to pay in full all obligations

under the Loan Documents on or before the Maturity Date. As a result of such non-payment, an

"Event of Default" under the Note, the Mortgage, the Pledge Agreement and the other Loan

Documents occurred.

29.     As a result of, among other things, the Debtors' failure to pay all amounts due

under the Loan Documents on the Maturity Date, the Loan is now immediately due and payable

in full and, but for the Debtors' automatic stay under Section 362 of the Bankruptcy Code, the Lender is entitled to, among other things, foreclose on its collateral and exercise all of its rights and remedies under the Loan Documents.

### D.  **The January 2021 Forbearance Agreement**

30.     After the Maturity Date, the Debtors advised the Lender that they expected to quickly refinance the Loan and requested that the Lender temporarily forbear from scheduling a UCC sale of the Pledged Collateral. Far from aggressively pursuing its rights, the Lender bent over backwards to afford the Debtors with the time they claimed they needed to pay off the Loan. Indeed, the Debtors, EO, the other Affiliated Non-Debtors, and the Lender executed the Forbearance Agreement dated as of January 14, 2021, a true and correct copy of which is attached hereto as **Exhibit 13**.

31.     Pursuant to the Forbearance Agreement, the Lender agreed, and did forebear from seeking foreclosure while watching (i) the Debtors' refinancing efforts fail not less than six (6) times, and (ii) the Debtor fail to sell its Property which the Debtors expressly agreed to do under the Forbearance Agreement. Importantly, since December 1, 2020, the Debtors have not paid any monies to the Lender or paid any property taxes.

32.     The Forbearance Agreement contains the following material terms:

**(i)      The Debtors Admitted Their Indebtedness
To Lender as of December 30, 2020**

33.     The Debtors acknowledged, represented and agreed, among other things, that the Loan matured by its terms on December 1, 2020 (**Exhibit 14,** ¶8.3), that interest began to accrue at the default rate (24% per annum) as of December 2, 2020 (*Id.* at ¶3(a) and ¶18.11), and that the Debtors were indebted to Lender, as of December 31, 2020, in the sum of $6,245,653.65, plus legal fees and protective advances from and after December 18, 2020 (*Id.* at ¶18.11) and

Lender is entitled to its additional legal fees in enforcing the Loan Documents (*Id.* at ¶18.8). *See also* Recitals at pp. 3-4 and ¶1.

    **(ii)**    **The Debtors Agreed to Refinance by April 15, 2021 or**
              **Sell the Property by August 15, 2021**

34.    The Debtors were afforded four months to refinance the Loan and, in the event they failed to refinance, the Debtors were then afforded another four months to market and sell the Property. Specifically, the Lender agreed to temporarily forbear from further enforcing its remedies under the Pledge Agreement to and including April 15, 2021. *Id.* at §2(b) This afforded the Debtors the time they said they needed to refinance the Loan.

35.    In the event that the Debtor failed to pay off the Loan by April 15, 2021, the Debtors agreed to market, list and advertise the Property for sale at agreed upon list prices. *Id.* at §§ 2(j), (k), and (l). The listing prices were heavily negotiated and were a material part of the Forbearance Agreement.

36.    The Debtors agreed that in the event a sale had not concluded by August 15, 2021, that the Lender may, from and after August 16, 2021, enforce its rights under the Loan Documents, including a foreclosure sale of the Pledged Collateral. *Id.* at § 2(m).

    **(iii)**    **The Debtors and The Affiliated Non-Debtors**
              **Terminated The Insider Leases They**
              **Wrongfully Created on Eve of Loan Maturity**

37.    On or about November 12, 2020 -- just days prior to the Loan's Maturity Date -- Otway signed brand new leases, on behalf of the Debtor, in favor of himself and his Affiliated Non-Debtors. The new leases created on the eve of the Maturity Date were wrongfully created by the Debtors to encumber the Property and hinder and delay the Lender, and these leases collectively gutted the Debtor's rent roll by $28,500 a month (more than half of the rent roll under the prior leases).

38.    The Debtors and the Affiliated Non-Debtors each agreed that all of their leases signed in

November 2020 were created in violation of the Loan Documents, were immediately terminated, and that

they would all vacate the Property by July 31, 2021. *Id.* at §§ 8.6 (a), (c), (d), (e), and (d)-(g) (sic); and §

10(b).

39.     The termination of these leases, together with Otway's agreement that he and the

Affiliated Non-Debtors would promptly vacate by July 31, 2021 were an integral part of the Forbearance

Agreement.

>   (iv)    **The Debtors Agreed to Liquidated Damages**
>           **In the Event the Affiliated Non-Debtors**
>           <u>**Failed to Vacate by July 31, 2021 Time Being Of The Essence**</u>

40.     At the time the Forbearance Agreement was entered into, the Debtors had advised

the Lender that Otway and the Affiliated Non-Debtors were paying very little or no rent whatsoever.

Further, at that time, New York State had enacted moratoriums preventing evictions from

proceeding.

41.     Critical to achieving a maximum sale price for the Property required that it be

delivered to an investor without encumbrances. Indeed, the market value of the Property would be

significantly depressed to the extent non-paying owner occupied and Affiliated Non-Debtor tenants

remained in possession during a global pandemic and while eviction moratoriums were in effect.

42.     Accordingly, each of the Debtors and the Affiliated Non-Debtors agreed that in the

event that Otway and the Affiliated Non-Debtors failed to vacate the Property by July 31, 2021, <u>time

being of the essence</u>, that the Debtors would be obligated to pay $200,000 as liquidated damages. *Id.*

at ¶10(b).

>   E.    <u>**The Debtors Breached the Forbearance Agreement**</u>

43.     While the Debtor listed the Property for sale after it failed to refinance, the Debtor

and Otway intentionally refused to comply with their time of the essence obligations to lower the

asking prices to the agreed upon prices set forth in the Forbearance Agreement, thereby intentionally torpedoing any potential sale the Property.

44.    Importantly, Otway and his Affiliated Non-Debtors also failed to vacate the Property by July 31, 2021 as agreed. Indeed, the Debtor *admits* in the Motion that "The tenants did not vacate on the appointed dates" (*see*, Motion, ¶ 30). The Affiliated Non-Debtors continue to use and occupy the Property. As a result, the Debtors incurred an additional $200,000 of indebtedness to Lender. *Id.*, ¶10(b).

**F.    To Create Further Delay, Debtors Repeatedly Represented That a Closing on a Refinancing was Imminent; At Least 6 Scheduled Closing Failed to Occur**

45.    Even after the expiration of the forbearance period in the Forbearance Agreement, the Debtors' then counsel, Joshua Wurtzel of Schlam Stone & Dolan LLP, made multiple promises on behalf of the Debtors that a refinancing was imminent. In fact, the Lender was lulled into believing a closing was imminent because between August 2021 and October 2021, the Debtors scheduled six closings (8/13; 8/16; 8/17; 9/15; 10/6; and 10/13) to refinance the Loan. However, all of them were cancelled (sometimes the evening before) and the last closing was never rescheduled. During this timeframe, the Debtors' counsel continued to reassure the Lender that the Loan would be refinanced. For example, after the first four closings were aborted, the Debtors' counsel confirmed in a September 30, 2021 email that "We are FINALLY getting this deal done" and sought to close on October 6, 2021. *See*, **Exhibit 14** annexed hereto (Emphasis in original). That closing was moved to October 13, 2021.

46.    Just prior to that closing, Debtors' counsel advised that LLC Debtor was "100k short" of funds to close and that unless Lender agreed to reduce the amount owed "the loan is not going to close and you'll have to do a UCC foreclosure sale." *See*, **Exhibit 15** annexed hereto. On October 12, 2021, the Debtors' counsel advised that the closing was postponed, without date. *See*

**Exhibit 16** annexed hereto. The closing was never rescheduled and never occurred.

### G.  **Lender Scheduled a UCC Sale of the Pledged Collateral and the State Court Action**

47.      In light of the Debtors' failure to finance the Loan, on September 3, 2021, the Lender sent a Notice of Disposition to the Debtors that the Lender scheduled a public UCC sale of the Pledged Collateral for November 18, 2021. *See*, **Exhibit 17** annexed hereto.

48.      On November 11, 2021, the Debtors and the Affiliated Non-Debtors commenced an action in the Supreme Court of the State of New York, New York County, under Index No. 656446/2021, seeking to enjoin the sale of the Pledged Collateral (the "**State Court Action**").

49.      In the State Court Action, the Debtors represented to the State Court, as they had represented to the Lender since December 2020, that a refinancing of the Property was imminent. Specifically, they claimed that "Plaintiffs expect a mortgage loan to come through within the next 90 days." (*i.e.*, by February 9, 2022). *See,* Otway's Affidavit sworn to on November 11, 2021, **Exhibit 18** annexed hereto, ¶ 36.

### H.  **The Debtors Signed the Consent Order Dismissing the State Court Action With Prejudice**

50.      The State Court Action was dismissed with prejudice pursuant to the Consent Order dated November 29, 2021, a copy of which is annexed hereto as **Exhibit 19**.  Pursuant to the Consent Order, among other things, the Lender agreed, once again, to forbear from enforcing any of its remedies under the Pledge Agreement until December 30, 2021.

51.      In addition, the negotiated Consent Order as "So-Ordered" by Justice Barry R. Ostrager found, and the Debtors and the Affiliated Non-Debtors agreed, among other things, that:

> (i)  The Debtors were indebted to Lender, as of November 30, 2021, in the sum of $7,980,855.65, plus additional amounts for legal fees and protective advances from and after November 21, 2021. *Id.* at Recitals p. 5  and ¶¶1 and

18.11;

(ii)  That interest accrues at the default rate (24% per annum) as of December 2, 2020 (*Id.* at ¶3(a) and ¶18.11);

(iii) The Lender is entitled to its additional legal fees in enforcing the Loan Documents (*Id.* at ¶18.8).

(iv) The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, all of the other Loan Documents, the Existing Forbearance Agreement and this Stipulation, have been duly executed and delivered by the Obligor Related Parties (as applicable) and constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms. *Id.* at ¶8.1;

(v)  The Debtors have no defenses, claims or counterclaims of any kind against Lender or its affiliates regarding the Loan Documents ("including, without limitation, the enforcement by the Lender of any of its rights and remedies under any or all of the Loan Documents or the [Forbearance Agreement])", and if any such defense, claim or counterclaim existed it was waived with prejudice. *Id.* at ¶8.2(b);

(vi)The Debtors released any and all claims and causes of action against Lender and its affiliates. *Id.* at ¶15.1;

(vii)  (a) The Debtor's 2020 leases with Otway and the Debtors' Affiliated Non-Debtors were wrongfully created and terminated, and (b) the Debtors and the Affiliated Non-Debtors were required to vacate the Property by December 30, 2021, time being of the essence. *Id.* at ¶ 8.6(a), (c), (d), (e) and (d)-(g) (sic); ¶ 10(b); and

(vi) In the event that the Debtors and the Affiliated Non-Debtors failed to completely vacate the Property by December 30, 2021, time being of the essence, they shall be jointly and severally  obligated to pay Lender $200,000 as liquidated damages "for the failure of the Obligor Related Parties to timely cause each of the Borrower, SPI, AGI, the Guarantor, EO, Theatre 80 … to timely vacate the Mortgaged Premises as required by this Section 10(b), time being of the essence." *Id.* at ¶10(b).

52.    Like the Forbearance Agreement, the liquidated damages clause contained in the Consent Order was a negotiated deal term and material inducement to Lender's agreement to enter into the Consent Order and further forbear from exercising Lender's rights. Also, at the time of the Consent Order, the Debtors were already obligated to pay $200,000 in liquidated damages under

the Forbearance Agreement for failure to vacate the Property by July 31, 2021.

53.    At the time of execution of both the Forbearance Agreement and the Consent Order, a global pandemic was declared, eviction moratoriums were in effect, and the Affiliated Non-Debtors were paying very little or no rent whatsoever, and therefore Lender's ability to get paid in full was at risk. Lender had an assignment of all the rents and the failure of such persons to pay their rent was reducing the value of Lender's collateral (i.e., cash from rents payable). Under these circumstances, the Lender believed that having the Property vacated and unencumbered by owner-occupied and non-paying tenants would increase the Property's market value as it could be rented to paying tenants. The exact amount of damages that Lender might sustain due to the failure of such persons to timely vacate was difficult to determine at the time of both the Forbearance Agreement and the Consent Order. Given that Otway and the Affiliated Debtors were obligated to pay monthly rent in the aggregate amount of $52,000 under the leases that expired in November 2020, the sum of $200,000 in liquidated damages (or a little less than 4 months' rent) is a reasonable amount. Had the Debtors not agreed to timely vacate and to the liquidated damages clause, Lender would not have agreed to the Forbearance Agreement or the Consent Order.

54.    Once again, in breach of their representations, the Debtors failed to refinance the Property by December 30, 2021 and Otway and the Debtors' Affiliated Non-Debtors failed to vacate the Property by December 30, 2021. Otway and the Affiliated Non-Debtors are still occupying the Property -- and are not paying the amounts owed -- in contempt of the Consent Order.

**I.    The Debtors Filed for Bankruptcy**

55.    To further hinder and delay enforcement of Lender's rights, on December 29, 2021, the Debtors each filed for Chapter 11 relief.

### a.   <u>The DIP Financing Motions and The Term Sheet</u>

56.     On January 19, 2022, the Debtor filed the DIP Financing Motions. The hearing on the DIP Financing Motions was originally scheduled to be heard on February 3, 2022, but was adjourned to March 2, 2022 for purposes of conducting an evidentiary hearing. The Lender's counsel was required to spend a substantial amount of time preparing for an evidentiary hearing, including (i) reviewing the DIP Financing Motions and the proposed loan documents annexed thereto, (ii) preparing objections to the DIP Financing Motions, (iii) reviewing multiple appraisals prepared for the Debtors and a potential lender within in the year prior to the petitions, and (iv) interviewing witnesses, finding and retaining experts, reviewing our appraiser's appraisal and working with the appraiser and other witnesses in drafting their declarations and preparing testimony of multiple witness and preparing for cross examination of the Debtor's witnesses.

57.     On February 28, 2022, just 48 hours prior to the March 2, 2022 evidentiary hearing, counsel for the Debtor contacted the Lender's counsel and advised that it requested an adjournment of the evidentiary hearing because Debtor's counsel was not prepared to proceed. Lender initially did not want adjourn the hearing since Lender's counsel had fully prepared to go forward, but Lender was willing to settle the case as a whole.

58.     The parties engaged in extensive conversations on February 28, 2022 and ultimately agreed to resolve the DIP Financing Motions and the manner in which this Chapter 11 case would proceed to conclusion. Specifically, on February 28, 2022, the parties jointly wrote the Court and provided the Court with a detailed Term Sheet which charted the course for the resolution of not just the DIP Financing Motions but the rest of the case. *See*, **<u>Exhibit 1</u>** hereto. In that letter, the parties requested the March 2, 2022 evidentiary hearing be adjourned without

date to allow the parties to complete documentation of a more fuller settlement agreement

incorporating the Term Sheet and which agreement would be modeled upon the pre-petition

Consent Order.

59.    The material terms of the Term Sheet include:

    a.    <u>The Debtors agreement that Lender holds a valid lien and secured claim as of
          March 2, 2022 in the sum of at least **$8,632,144.78**, together with default
          interest which continues to accrue, together with attorneys' fees and expenses</u>;

    b.    The Debtor's use of Lender's cash collateral through June 2, 2022, while it
          sought to refinance the Loan;

    c.    The Debtor retaining a broker not later than June 5, 2022;

    d.    An auction of the Property by August 5, 2022; and

    e.    A closing on the sale of the Property by September 6, 2022.
**Exhibit 1**.

60.     The Term Sheet also provided that the parties use **best efforts** to embody the

terms of the Term Sheet into a settlement agreement within two (2) business from February 28,

2022.

61.    The Firm memorialize the terms of the Term Sheet into a settlement agreement on

an expedited basis and delivered such agreement to the Debtor. However, the Debtor delayed

responding and then tried to renegotiate many of the substantive terms contained in the Term

Sheet. After two weeks, the Debtor stopped conversations and said it needed "more time" to

decide how it wanted to proceed. In other words, the Debtors once again reneged on its promises.

### b.    <u>The Conversion Motion</u>

62.    Because of the Debtors' propensity for not honoring their agreements as

contained in, among other things, the Forbearance Agreement, the Consent Order, and now the

Term Sheet, and with deepening concerns that the Debtor was adrift and jeopardizing Lender's

ability to be repaid what is owed, the Firm, on behalf of the Lender, drafted and filed the
Conversion Motion. The Conversion Motion was vigorously opposed by the Debtor which
necessitated the submission of a Reply and preparation for oral argument of the Motion.

63.     The cornerstone of the Debtor's objection to the Conversion Motion was a
conditional loan proposal made by Sachem Capital ("**Sachem**") as contained in a conditional
approval letter dated March 28, 2022. (the "**Sachem Letter**"). However, at the hearing on the
Conversion Motion, the Court, in colloquy, determined that the Sachem loan, even if it was
actually funded, would be insufficient to refinance the Debtor's indebtedness to Lender and leave
the Debtor without any ability to repay Sachem under its proposed loan due to substantial
increasing operating losses. The Conversion Motion is *sub judice*, but the Court indicated that it
would grant the Conversion Motion on May 17, 2022 in the event the parties were unable to
globally resolve their disputes.

### c.    The Lender's Claim as of April 1, 2022

64.     At the Debtor's request, the Lender provided the Debtor with a letter dated March
28, 2022 stating that the estimated amount of indebtedness owed under the Loan as of April 1,
2022 was $9,071,421,73, a copy of which is annexed hereto as **Exhibit 20** (the "**4/1/22 SOI**").
The 4/1/22 SOI included attorneys' fees and expenses only through March 23, 2022.

65.     Since issuing the 4/1/22 SOI, Lender's has incurred and continues to incur
additional attorneys' fees and expenses.  As of April 1, 2022, the amount owed to Lender is
$9,084,262.75, including attorneys' fees and expenses through March 31, 2022. Interest
continues to accrue at the rate of $4,565.80 a day[6] and additional legal fees and expenses have

---

[6] Thus, at the time of the May 17, 2022 hearing on the Objection another $210,026.80 in interest will have accrued
($4,565.80 x 46 days). On May 17, 2022 at least $9,294,289.55 will be owed, and additional amounts for attorneys'
fees and expenses after March 31, 2022 will also be owed. Since the Lender's attorneys' fees and expenses continue
to accrue and are ongoing, the Lender will seek at a future date Court approval of the Lender's  attorneys' fees and

been incurred since March 31, 2022 and continue to accrue, and interest thereon also continues to accrue.[7]

66.     As reflected in the Firm's detailed time records, a copy of which is annexed hereto as **Exhibit 21**, the Lender's counsel has devoted substantial time and recourses from and after November 21, 2022, in connection with enforcing and protecting Lender's rights and remedies, including preparing for an evidentiary hearing to protect Lender's first lien priority security interest in the Property from being subordinated by the proposed priming loan as contemplated by the DIP Financing Motions.[8]

67.     Set forth below is a chart that provides a breakdown of Lender's claim as of April 1, 2022[9] and the amounts that have accrued and been incurred since the Consent Order. The chart also itemizes the protective advances[10] of Lender and the attorneys' fees and expenses incurred by Lender, in both cases from the applicable dates in the Consent Order.

### ITEMIZATION OF THE LENDER'S CLAIM
### FROM AND AFTER THE CONSENT ORDER THROUGH 4/1/2022

| | |
|---|---|
| **Consent Order** | **$7,980,855.65** |
| *Amounts owing after the dates in the Consent Order* | |
| Interest on Principal 12/1/21 - 4/1/22 | $496,133.33 |
| Protective Advances 11/22/21 - 4/1/22 | $18,164.26 |
| Interest accrued 12/1/21 - 4/1/22 on all Protective Advances | $16,284.78 |
| Legal Fees & Expenses 11/22/21 - 3/31/22 | $358,361.35 |
| Interest accrued 12/1/21 - 4/1/22 on all Legal Fees & Expenses | $14,463.37 |

expenses for the period after March 31, 2022.

[7] Pursuant to ¶7.3 of the Note, the Debtor is obligated to pay interest on attorneys' fees and expenses at the default rate from the date same are incurred by Lender.

[8] The Firm's time records have been redacted, in part, to address attorney/client privilege concerns. To the extent necessary, the Lender will make available to the Court unredacted time records, *in camera*.

[9] Including attorneys' fees and expenses only through March 31, 2022.

[10] Pursuant to Section C ¶8(a) of the Mortgage, the Debtor is obligated to pay interest on protective advances at the default rate from the date same are advanced by Lender.

| | |
|---|---|
| Liquidated Damages | $200,000.00 |
| **Total Due** | **$9,084,262.75** |

**PROTECTIVE ADVANCES 11/22/21 - 4/1/22**

| Description | Advance |
|---|---|
| Title Search | $1,204.88 |
| UCC Sale Publication Expense | $4,099.38 |
| Broker fee - UCC Marketing | $12,500.00 |
| Title Search | $360.00 |
| **Total Protective Advances** | **$18,164.26** |

**LEGAL FEES & EXPENSES 11/22/21 - 4/01/22**

| Description | Advance |
|---|---|
| Legal Fees & Expenses 11.22-11.30 | $12,548.50 |
| Legal Fees & Expenses Dec 21 | $7,388.85 |
| Legal Fees & Expenses Jan 22 | $120,000.00 |
| Legal Fees & Expenses Feb 22 | $125,556.95 |
| Legal Fees & Expenses March 1-2, 22 | $6,718.50 |
| Legal Fees & Expenses March 3-23, 22 | $35,404.10 |
| Legal Fees & Expenses March 24-31, 22 | $14,944.45 |
| Appraisal & Expert Fees Feb 2022 | $25,000.00 |
| Appraisal & Expert Fees March 2022 | $10,800.00 |
| **Total Legal Fees & Expenses** | **$358,361.35** |

68.     The protective advances incurred by Lender between November 22, 2021 and

April 1, 2022 aggregates $18,164.26, and are largely in connection with the Lender's

adjournment and rescheduling of the scheduled UCC sale of the Pledged Collateral and consists

of the following: (i) a title search of $1,204.88, (ii) a UCC sale publication expense of $4,099.38,

(iii) a broker fee of $12,500, and (iv) a title search of $360.00. This sum, together with the

interest from December 1, 2021 through April 1, 2022 on all protective advances made since the

maturity date, aggregates $34,449.04, and is properly reimbursable under the Loan Documents.

69.     In addition, the Lender believes the Firm's attorneys' fees and expenses are more

than reasonable. With the exception of the Firm's fees and expenses for the period between

March 3, 2022 through March 23, 2022 (*i.e.*, $35,404.10), and the period between March 24,

2022 through March 31, 2022 (*i.e.*, $14,944.45),[11] all of the Firm's fees and expenses set forth

above have actually been paid, and with respect to the current amounts outstanding, the Lender

intends to pay the Firm's invoices in the ordinary course of business because the Lender believes

they are reasonable in amount for the services provided.

70.    It is noteworthy that prior to retaining the Firm in this case, the Lender requested

that the Firm reduce the standard hourly rates for the two principal attorneys responsible for this

matter. Specifically, the Lender requested and the Firm agreed that Steven Newman's standard

hourly rate be reduced from $785.00 to $565.00, and that Robert Abrams' standard hourly rate

be reduced from $730.00 to $500.00. This is approximately a 30% blended discount.

71.    During the period from November 22, 2021 through March 31, 2022, Lender's

counsel devoted an aggregate amount of 624.33 hours to this case, representing aggregate time

charges of $334,024.95. However, during the course of this period, the Firm voluntarily reduced

the number of hours actually billed to 608.63 hours, representing billed time charges of

$321,633.24 and billed expenses of $928.11, for an aggregate sum of $322,361.35, exclusive of

advances for appraisal and expert fees of $35,800.00. Had the Firm invoiced Lender at its non-

discounted rates, total time charges would have been $471,558.55, exclusive of expenses and

appraisal and expert fees. Thus, the Firm's time charges actually invoiced to the Lender (*i.e.*,

$321,633.24) represent approximately 68% of the Firm's standard hourly charges. A chart

summarizing the foregoing is set forth below:

| Attorney | Number of Actual Hours | Discounted Rates | Time Charges at Discounted Rates | Number of Hours Invoiced | Amount Invoiced | Standard Rates | Time Charges at Standard Rates | % of Invoiced Amount to Time Charges at Standard Rates |
|---|---|---|---|---|---|---|---|---|
| Robert A. Abrams | 260.10 | $500.00 | $130,050.00 | 244.40 | $120,638.25 | $730.00 | $189,873.00 | 63.54% |

[11] Also, as Lender has not made any advance yet for these attorneys' fees and expenses, the Lender is not yet
accruing interest on such amounts.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Benjamin Cohen | 11.0 | $400.00 | $4,400.00 | 11.0 | $4,239.35 | $400.00 | $4,400.00 | 96.35% |
| Steven H. Newman | 353.23 | $565.00 | $199,574.95 | 353.23 | $196,755.64 | $785.00 | $277,285.55 | 70.96% |
| Totals | 624.33 | | $334,024.95 | 608.63 | $321,633.24 | | $471,558.55 | 68.21% |

72.      Based on the terms of the Note, the Mortgage, the Forbearance Agreement, the

Consent Order, the related Loan Documents, and for the reasons set forth in the accompanying

Response, Lender submits that it is entitled to recover all of attorneys' fees and expenses,

protective advances, liquidated damages, and post-petition interest at the default rate.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

**WHEREFORE**, for the foregoing reasons, it is respectfully requested that the Court

deny the Motion and that the Court allow Lender's Claim in the amount of $9,084,262.75[12] as of

April 1, 2022, together with additional amounts for default rate interest accruing after April 1,

2022, and for reasonable attorneys' fees and expenses, default rate interest thereon accruing after

March 31, 2022, for all the reasons set forth herein and in the Leibowitz Declaration.

Dated: New York, New York
May 12, 2022

JASON LEIBOWITZ

---

[12] Since the Lender's default rate interest, attorneys' fees and expenses continue to accrue and are ongoing, Lender will seek at a future date Court approval of the additional amounts for default interest for the period after April 1, 2022 and for attorneys' fees and expenses and protective advances for the period after March 31, 2022.