Steven H. Newman, Esq.                                    Hearing Date: May 17, 2022
Robert A. Abrams, Esq.                                              At: 10:00 a.m.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 953-6000
Fax: (212) 953-6899
E-Mail: snewman@katskykorins.com
E-Mail: rabrams@katskykorins.com

*Attorneys for St. Mark's Mixed Use LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re

    78-80 ST. MARK'S PLACE, LLC,

                  Debtor.
-------------------------------------------------------------------x

Chapter  11

Case No. 21-12139 (MG)

## RESPONSE TO DEBTOR'S OBJECTION TO THE CLAIM
## <u>OF ST. MARK'S MIXED USE LLC</u>

      St. Mark's Mixed Use LLC ("**Lender**"), by its undersigned counsel, respectfully submits

this response to the motion and objection (the "**Motion**") by 78-80 St Marks Place, LLC

("**Debtor**") to Lender's proof of claim, claim number 4[1], and to Lender's additional claims that

have accrued during the pendency of this Chapter 11 case ("**Lender's Claim**"), and requests that

the Court allow Lender's Claim in the amount of $9,084,262.75 as of April 1, 2022, and

respectfully states as follows:

---

[1] Lender's Proof of Claim is annexed hereto as **Exhibit 1**.

## PRELIMINARY STATEMENT[2]

1.       The Debtor's Motion alleging that Lender is not entitled to reimbursement of *any* of its attorneys' fees and expenses, *any* of its protective advances, or *any* liquidated damages since the loan fully matured by its terms on December 1, 2020 borders on the sanctionable because the Debtor has already **admitted** to Lender's entitlement to, and the amount of, such charges in, among other things, the Consent Order as of November 21, 2021. Consequently, the Debtor's attempt to unwind all of its admissions  - - contained in, among other things, an Order of the New York Supreme Court - - is barred by judicial decree, *res judicata*, and the *Rooker-Feldman* doctrine.

2.       The Debtor's further contention that Lender is not entitled to interest at the contract default rate during the pendency of this proceeding is equally meritless under the facts of this case and governing decisional law in this Circuit, including this Court's decision in *In re Residential Capital, LLC*, 508 B.R. 851 (Bankr. S.D.N.Y. 2014) (Glenn, B.J.). Indeed, the Debtor's attempt to re-write the bargained-for contractual terms of the Loan Documents is especially brazen here because there is no dispute that the Debtor is admittedly ***solvent***.

3.       At the outset, we note that the Debtor already conceded in the Consent Order to Lender's entitlement to, and the amount of, Lender's attorneys' fees and expenses and protective advances as of November 21, 2021. Accordingly, only the reasonableness of Lender's attorneys' fees and expenses and protective advances incurred *after* November 21, 2021 and during the pendency of this Chapter 11 proceeding are subject to this Court's review.[3]

---

[2] All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Declaration of Jason Leibowitz, dated May 12, 2022 (the "**Leibowitz Declaration**"). Unless otherwise stated, references to exhibits herein refer to the exhibits annexed to the Leibowitz Declaration.

[3] In its Motion, the Debtor seeks to reduce Lender's claim by $885,034.22, or to $8,186,387.51. While the Debtor disputes Lender's entitlement to attorneys' fees, protective advances, liquidated damages, and post-petition default rate interest, the Debtor fails to explain how it calculates and arrives at $8,186,387,51. Lender has unable to discern the Debtor's math.

4.      As set forth below and in the Firm's detailed time records attached to the Leibowitz Declaration, Lender's legal fees and expenses and protective advances incurred are reasonable and fully allowable. The Debtor has engaged in scorched earth litigation necessitating Lender to incur expenses to protect its rights under the Loan Documents, the Forbearance Agreement, and the Consent Order. For example, Lender, among other things:

    a. Prepared responses and declarations of multiple witnesses in opposition to the DIP Financing Motions seeking to prime Lender's first priority liens, and was fully prepared for a trial thereon;

    b. Engaged in discovery respecting, *inter alia*, the DIP Financing Motions and the Debtor's and Otway's incomplete and inaccurate bankruptcy filings, including their respective Schedules of Assets and Liabilities and Statement of Financial Affairs;

    c. Drafted the Term Sheet and a settlement agreement in connection with resolution of the DIP Financing Motions;

    d. Upon the Debtor reneging on its settlement of the DIP Financing Motion, drafted, filed and argued the Conversion Motion on April 27, 2022;

    e. Drafted, filed and served a motion fixing a bar date for the filing of proofs of claims and thereafter served a bar date notice to all creditors (the "**Bar Date Motion**");

    f. Drafted an objection to the Debtor's motion seeking pursuant to Bankruptcy Rule 2004 authorization to issue unspecified discovery on Lender and its affiliates (the "**Rule 2004 Objection**"); and

    g. Responded and objected to the instant Motion.

5.      Importantly, as evidence of the reasonableness Lender's attorneys' fees and expenses and protective advances, all of such expenses have already been paid or otherwise agreed to be paid by Lender.

6.      The Debtor does not challenge Lender's entitlement to pre-petition default rate interest. Instead, the Debtor asks this Court to re-write the Loan Documents and downward adjust Lender's right to *post-petition* interest to the non-default rate. However, as detailed below, the Debtor concedes that the Debtor is solvent and that Lender is oversecured. Thus, the Debtor has utterly failed to rebut the "strong presumption" that the contract default rate of interest

should apply. Indeed, Courts within this Circuit (including this Court in *In re Residential Capital, supra* 508 B.R. at 857-858), have repeatedly confirmed that, given the importance of predictability with respect to the treatment of secured loans in bankruptcy, courts should only "sparingly" modify the contract rate, and only then, on equitable grounds.

7.    Here, there are no equitable grounds on which this Court should exercise its limited discretion to modify the post-petition default rate interest owed by the Debtor to Lender. As detailed below:

a.   The Debtor admits that it is solvent. (*See*, Motion at ¶ 37; "Based on the value of the Property alone, the Debtor is solvent."). As such, unsecured creditors are not harmed by the application of contractual default rate interest;

b.   The Debtor has not identified a single instance of Lender misconduct and resorts to nothing more than hypotheticals and rank speculation. (*See*, Motion at ¶ 39; "There is a *possibility*…"; "*If* the Secured Creditor took action…"; "The Secured Creditor may also have used information…"). Indeed, solely to harass and cause Lender to engage in further costly litigation, the Debtor filed with the Court a Bankruptcy Rule 2004 application[4] seeking expansive discovery against Lender "and its parent and other affiliates" because it "lacks information" as to whether *any* wrongful conduct "**if, in fact took place**". *See*, ECF No. 41, ¶ 14. Debtor's admissions that there are no facts supporting any wrongful conduct underscore that Debtor's assertion in the Motion of Lender's misconduct is meritless;

c.   The application of default rate interest at the rate of 24% per annum does not constitute an unenforceable penalty. Indeed, a 24% default rate of interest has repeatedly been found to be enforceable by this and other Courts in this Circuit – even in cases where a debtor has been found to be *insolvent. See, In re Residential Capital, LLC*, 508 B.R. at 857-858; and

d.   The Debtor's "fresh start" is also not implicated. The Debtor is a solvent single asset real estate entity and the application of default rate interest does not impact the Debtor's ability to operate its business or otherwise effect a significant number of jobs or supplier relationships. Rather, a reduction of the interest rate would only benefit the Debtor's sole member, Otway. The presumptive contract default rate should not be downward adjusted because, as this Court has recognized, such an adjustment would swallow up the rule that an oversecured creditor is entitled to the contract default interest rate.

---

[4] In connection with the hearing on the Conversion Motion held on April 27, 2022, in colloquy, the Court indicated that it would not permit the Debtor to engage in World War III discovery with Lender and that it intends to deny the Debtor's Rule 2004 Motion.

8.      The Debtor's motives for filing the Motion are transparent. The Debtor seeks to absolve itself for its failure to refinance the Loan over the past seventeen (17) months and its refusal to mitigate the accrual of debt by selling the Property as it agreed to do under the Forbearance Agreement, the Consent Order, and its aborted settlement as outlined in the Term Sheet.

9.      Rather than acknowledging that its equity eroded solely due the Debtor's failure to refinance and taking responsibility therefore, the Debtor seeks a "get out of jail free card" and once again lashes out and engages in frivolous (and expensive) litigation to gain some perceived leverage to cause Lender to make significant financial concessions to enable the Debtor to refinance.  However, that is not a basis to reduce Lender's Claim.

10.      As detailed herein and below, there is no factual or legal basis to disallow Lender's claim for (i) legal fees and expenses together with interest thereon, (ii) protective advances together with interest thereon, (iii) liquidated damages, and (iv) post-petition default rate interest. The Motion should be denied.

## STATEMENT OF FACTS

11.      The facts are set forth in the accompanying Leibowitz Declaration.

## ARGUMENT

## POINT I

## THE DEBTOR IS BARRED FROM
## COLLATERALLY ATTACKING THE CONSENT ORDER

12.      The Motion is a textbook example of a debtor improperly seeking to overturn a Consent Order in violation of settled principles governing judicial decrees, *res judicata* and the *Rooker-Feldman* doctrine.

### A.  The Consent Order is a Judicial Contract Enforceable in Accordance With its Terms

13.      The law is clear that consent orders are not only judicial orders subject to

enforcement by courts, they are also agreements between parties that "should be construed basically as contracts." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 998 F.2d 1101, 1106 (2d Cir. 1993). Consent decrees are "entered into by parties to a case after careful negotiation has produced agreement on their precise terms," and therefore "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.*

14.     Here, Lender and the Debtor resolved by settlement the State Court Action by entering into the Consent Order which was approved by Justice Barry R. Ostrager and entered on the State Court's docket on November 29, 2021. **Exhibit 19**.

15.     The Consent Order confirmed Lender's entitlement to, among other things, (i) legal fees and expenses as of November 21, 2021 in the sum of $194,400.73, inclusive of interest thereon (*see*, *id.* at p. 5 and ¶ 18.11 (setting forth the Payoff Amount exclusive of attorneys' fees and expenses and protective advances incurred after November 21, 2021 and acknowledging that interest continues to accrue at the default rate of 24% per annum), and (ii) protective advances as of November 21, 2021 in the sum of $202,121.59, inclusive of interest thereon. *id.* at p. 5 and ¶ 18.11. Because the Debtor expressly agreed to Lender's entitlement to attorneys' fees and protective advances as set forth in the Consent Order, the Debtor has no basis for challenging Lender's entitlement to, and the amount of, such charges in the context of a claims objection motion.

16.     Additionally, the Consent Order confirmed Lender's entitlement to liquidated damages. Paragraph 8.1 of the Consent Order provides that "The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, all of the other Loan Documents, the Existing Forbearance Agreement and this Stipulation…constitute legal, valid and binding obligations of the Obligor Related Parties [including the Debtor]…enforceable in accordance with their respective terms."

*Id.* at ¶¶ 8.1 and 13. One of the terms of the Forbearance Agreement includes a provision that in the event the Debtor failed to pay off the Loan in accordance with the terms thereof or otherwise entered into an Executed Sale Agreement by July 15, 2021, the Debtor and entities owned or controlled by the Debtor would vacate the Property by July 31, 2021, time being of the essence. Importantly, in the event the Debtor and entities owned or controlled by the Debtor failed to vacate the Property by July 31, 2021, the "Obligor Related Parties [including the Debtor] shall be jointly and severally liable to the Lender in the sum of $200,000 as liquidated damages…" *Id.* at ¶ 10(b).

17.     Here, the Debtor admits in the Motion that "The tenants did not vacate on the appointed dates." Motion, ¶ 30. Accordingly, the Debtor's contention that the liquidated damages provision contained in the Consent Order is a "penalty" (Motion at ¶ 32) and "unenforceable as a matter of law" (Motion at ¶ 33) flies in the face of the Debtor's agreement and Justice Ostrager's Consent Order that expressly finds that the Forbearance Agreement and the Consent Order constitute legal, valid and binding obligations of the Obligor Related Parties [including the Debtor]…enforceable in accordance with their respective terms." *Id.* at ¶¶ 8.1 and 13.

18.     Because the State Court found in its Consent Order that Lender is entitled to attorneys' fees, protective advances, and liquidated damages in the amounts set forth in the Consent Order, the Debtor's attempt to unwind its contractual agreement must be rejected.

**B.   The Debtor is Barred From Challenging The Consent Order on *Res Judicata* Grounds**

19.     Consent judgments are accorded *res judicata* effect, as they are exercises of judicial power. *Hoffenberg v. Hoffman & Pollok*, 288 F.Supp.2d 527, 537 (S.D.N.Y. 2003) *citing Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 639 (2nd Cir. 1987), *cert. denied*, 484 U.S. 992 (1987) ("The general rule is that a final consent decree is entitled to *res judicata* effect. This is so because the entry of a consent judgment is an exercise of judicial power, that is

entitled to appropriate respect and because of the policy favoring finality of judgments.")

(internal citations omitted). *See also*, *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 194

(Bankr. S.D.N.Y. 2012) (debtor barred under *res judicata* grounds to contest liquidated damages

that were included as part of a consent judgment); *In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R.

196, 207 (Bankr. E.D.N.Y. 2014) ("*Res judicata*, or claim preclusion, operates to prevent a party

from re-litigating a claim after the claim has already been decided by a court of competent

jurisdiction."). Thus, the Consent Order is entitled to *res judicata* preclusive effect as it is a final

order rendered by a court of competent jurisdiction.

20.     As noted, the Debtor admitted in the Consent Order to the enforceability of the

Loan Documents (including the Forbearance Agreement) and Lender's entitlement to, among

other things, attorneys' fees and expenses, protective advances, and liquidated damages. As such,

the Debtor is now barred from attempting to relitigate Lender's entitlement to, or the amount of,

such charges.

## C.  The Bankruptcy Court Lacks Subject Matter Jurisdiction To Reverse the Consent Order

21.     The *Rooker–Feldman* doctrine bars "cases brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d

454 (2005). "Underlying the *Rooker–Feldman* doctrine is the principle, expressed by Congress in

28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review

state-court decisions." *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.

2005).

22.     Bankruptcy courts have universally held that the "Application of the *Rooker–*

*Feldman* doctrine is especially applicable in the claims litigation process. Where a

debtor objects to a claim that is based on a state court judgment, thereby attempting to collaterally attack the judgment in bankruptcy court, the *Rooker–Feldman* doctrine bars that attack." *In re Al-Sedah*, 347 B.R. 901, 904 (Bankr. N.D. Ala. 2005) (debtor's objection to proof of claim based on judgment barred under *Rooker-Feldman*). *See also*, *In re Patterson*, 18-10443, 2019 WL 995717, at *3 (Bankr. M.D.La. Feb. 12, 2019) (debtor cannot use the claims objection process to re-litigate a state court judgment and thereby frustrate the *Rooker-Feldman* doctrine); *In re Campbell*, 12-80096, 2012 WL 4471536 (Bankr. M.D.N.C. Sept. 26, 2012) (refusing to sustain debtor's claim objection motion which would require review and reversal of a state court judgment).

23.     Here, the Debtor is improperly using the claims litigation process to object to Lender's entitlement to, and the amount of, all of Lender's attorneys' fees, protective advances, and liquidated damages as of November 21, 2021. Accordingly, any attempt by the Debtor to challenge such amounts is barred under the *Rooker-Feldman* doctrine.

***

24.     For all the above reasons, the Debtor's objection to (i) all of Lender's attorneys' fees and expenses, and interest thereon, (ii) all of Lender's protective advances, and interest thereon, and (iii) liquidated damages, is barred by a judicial contract and under the doctrines of *res judicata* and *Rooker-Feldman*.

**POINT II**

**LENDER IS ENTITLED TO POST-PETITION
CONTRACT DEFAULT RATE INTEREST AND ALL OF ITS REASONABLE FEES,
COSTS AND CHARGES PROVIDED FOR UNDER THE LOAN DOCUMENTS**

25.     The Consent Order is inviolate and the amounts set forth therein are not subject to collateral attack, including Lender's entitlement to liquidated damages as set forth in the Forbearance Agreement. Accordingly, Lender respectfully submits that the only amounts subject

to this Court's review are: (i) the post-petition default rate interest[5], (ii) Lender's legal fees and expenses from and after November 22, 2021, and (iii) Lender's protective advances from and after November 22, 2021. To the extent the Debtor would have this Court reverse the State Court's Consent Order respecting Lender's entitlement to liquidated damages, such claim is meritless, as explained in Point I and below.

26.    Section 506(b) of the Bankruptcy Code provides that an oversecured creditor is entitled to interest on its secured claim, "and any reasonable fees, costs or charges provided under the agreement under which such claim arose." *See*, 11 U.S.C. § 506(b); *In re Residential Capital, LLC*, 508 B.R. at 856.

27.    There is no dispute that the Loan Documents provide that:

a.    Lender is entitled to recover default rate interest of 24% per annum in the event of the Debtor's default;[6]

b.    Lender is entitled to recover its attorneys' fees and expenses, together with interest thereon at the Default Rate, until such expenses are paid;[7]

---

[5] The Debtor does not challenge Lender's entitlement to pre-petition default rate interest.

[6] *See*, **Exhibit 4**, ¶ 7.1 (the Note; "From and after the occurrence of an Event of Default, regardless of whether or not there has been a notice of default issued by the Note Holder, interest shall accrue on the outstanding Indebtedness, and shall be payable, at a rate equal to twenty-four percent (24.00%) per annum (the '**Default Rate**')…The Default Rate shall be in effect at all times after the maturity of the Indebtedness (whether on the Maturity Date, by acceleration or otherwise"); **Exhibit 5**, ¶ 15 (the Mortgage; "From and after the occurrence of an Event of Default…interest shall accrue on the outstanding Indebtedness, and shall be payable, at a rate equal to twenty-four percent (24%) per annum (the 'Default Rate'); **Exhibit 13**, ¶¶ 3(a) (Forbearance Agreement; "Interest shall continue to accrue at the default rate of 24% per annum provided in the Note from December 2, 2020 until the date the Obligors have indefeasibly paid and satisfied all of their obligations…"; *see also* ¶¶ 2(f) and 18.11; **Exhibit 19**, ¶ 3(a) (the Consent Order; "Interest shall continue to accrue at the default rate of 24% per annum provided in the Note from December 2, 2020 until the date the Obligors have indefeasibly paid and satisfied all of their obligations…"; *see also* ¶ 18.11).

[7] *See*, **Exhibit 4**, ¶ 7.3 (the Note; "Should the Indebtedness or any part thereof be collected at law or in equity, or in bankruptcy…or should this Note be placed in the hands of attorneys for collection, Borrower agrees to pay…all costs…, including attorneys' fees and expenses…together with interest thereon at the Default Rate."); **Exhibit 5**, ¶ 8(b) (the Mortgage; "If any action or proceeding is commenced by or against Mortgagee, including an action to…declare adjudicate any rights or obligations under this Mortgage…, Mortgagee may…retain counsel…and the costs thereof (including, without limitation, reasonable attorneys' fees…together with interest at the Applicable Interest Rate (or at the Default Rate if an Event of Default exists), shall be paid by Mortgagor…"); **Exhibit 13**, ¶ 18.8 (Forbearance Agreement; "…the Obligors shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, now or hereafter incurred by the Lender…in administering, enforcing, or effectuating any of the terms of this Forbearance Agreement and the other Loan Documents…such costs and expenses shall include all attorneys' fees and costs now or hereafter incurred by the Lender in connection with any

      c.    Lender is entitled to recover all of its protective advances, together with interest thereon at the Default Rate, until such protective advances are paid;[8] and

      d.    Lender is entitled to recover liquidated damages.[9]

## A.  **Lender is Entitled to Post-Petition Default Rate Interest**

28.     It is undisputed that (i) the Loan matured by its terms on December 1, 2020, (ii) the Debtor failed to pay all amounts owed on December 1, 2020, and (iii) Lender is entitled to pre-petition default rate interest of 24% per annum from and after December 2, 2020 through the Petition Date. The Debtor contends that Lender's claim for default rate interest from and after the Petition Date should be reduced from the contractual default rate of 24% per annum to the non-default rate of 10.25% per annum. *See,* Motion, ¶ 36 (Debtor seeking "reduction of the Claim by the full amount of the default rate interest which has accrued since the Petition Date"). However, it fails to set forth any legal or equitable basis for re-writing the Loan Documents and Lender's bargained-for right for contractual default rate interest.

29.     It is a well settled presumption, which Bankruptcy Judge Robert D. Drain recently

---

federal or state bankruptcy, insolvency, reorganization, foreclosure or other similar proceeding…"); **Exhibit 19**, ¶ 18.8 (Consent Order; same "Attorneys' Fees" provision as contained in the Forbearance Agreement).

[8] *See*, **Exhibit 5**, ¶ 6(d) (the Mortgage; "If Mortgagor fails to make any payment required by this Paragraph 6, Mortgagee may elect (but shall not be obligated) to make or advance the payment, together with any costs, expenses, fees or charges which be imposed by Mortgagee, at its sole option, Mortgagor shall, on demand, reimburse Mortgagee for any and all such amounts paid by Mortgagee and any such payments shall be deemed part of the indebtedness secured by lien on this Mortgage"); **Exhibit 5**, ¶ 8(a) (the Mortgage; "Mortgagor agrees to immediately pay upon ten business (10) days written notice, any sums advanced or paid by Mortgagee under any clause or provision of this Mortgage. Any such sum paid, until repaid, will be secured by this Mortgage and will bear interest at the Default Rate from the date it was advanced or paid pursuant to the terms of the Note."). *See also*, **Exhibit 13**, ¶¶ 2(f), 3(a), and 18.11 (the Forbearance Agreement; Debtor acknowledging that it is obligated to repay protective advances and that interest shall accrue thereon at the default rate of 24% per annum); **Exhibit 19**, ¶¶ 2(f), 3(a), and 18.11 (the Consent Order; Debtor acknowledging that it is obligated to repay protective advances and that interest shall accrue thereon at the default rate of 24% per annum).

[9] *See*, **Exhibit 13**, ¶ 10(b) (the Forbearance Agreement; "in the event that any of the Borrower, SPI, AGI, the Guarantor, EO, Theatre 80….fails to completely vacate the Mortgaged Premises by July 31, 2021…, time being of the essence, then the Obligor Related Parties [including the Debtor] shall be jointly and severally liable to the Lender in the sum of $200,000 as liquidated damages…"); **Exhibit 19**, ¶¶ 8.1, 13 (the Consent Order; "…the Existing Forbearance Agreement…[has] been duly executed and delivered by the Obligor Related Parties (as applicable) and constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms.").

explained that "most cases" described as a "strong presumption," that the "contract rate" will apply under § 506(b) of the Bankruptcy Code, subject to limited equitable considerations. *In re 53 Stanhope LLC*, 624 B.R. 573, 579 (Bankr. S.D.N.Y. 2021); *See also*, *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) ("there is nevertheless a rebuttable presumption that the oversecured creditor is entitled to default interest at the contract rate subject to adjustment based on equitable considerations."). The Debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition. *In re Residential Capital, LLC*, 508 B.R. at 856; *In re 785 Partners LLC*, 470 B.R. 134.

30.     This Court has acknowledged that bankruptcy courts have limited discretion and should only modify the contract rate "sparingly." *In re Residential Capital, LLC*, 508 B.R. at 857; *In re 785 Partners LLC*, 470 B.R. at 133 ("Section 506(b)…gives a bankruptcy court limited discretion to modify the amount of post-petition interest that an oversecured creditor may collect as part of its claim"); *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2nd Cir. 1998) ("The appropriate rate of pendency interest is therefore within the limited discretion of the court."). *See also, In re Madison 92nd St. Assoc. LLC*, 472 B.R. 189, 198 (Bankr. S.D.N.Y. 2012) ("The great majority of courts have concluded that the appropriate rate of interest should be the so-called 'contract rate' of interest.").

31.     In determining whether a court should exercise its limited discretion in modifying the contractual default rate of interest, the following equitable factors are considered: (i) whether the secured creditor is guilty of misconduct, (ii) whether the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start, or (iii) whether the contractual interest rate constitutes a penalty. *In re Residential Capital, LLC*, 508 B.R. at 857, *citing In re 785 Partners LLC*, 470 B.R. at 134. Here, the Debtor has failed to establish that any of foregoing equitable considerations apply.

**(i)**     <u>**The Debtor Failed to Submit Any Evidence that Lender is Guilty of Misconduct**</u>

32.     Disallowing interest on equitable grounds requires "credible and persuasive evidence of creditor misconduct." *In re Moshe*, 567 B.R 438, 449 (Bankr. E.D.N.Y. 2017). Here, the Debtor has set forth none.

33.     For example, the Debtor claims that Lender's filing of the Conversion Motion constitutes "misconduct" which requires a reduction of Lender's entitlement to default rate interest to the non-default interest rate. *See*, Motion, ¶ 39. However, the fact that Lender exercised a right expressly provided for under the Bankruptcy Code cannot constitute misconduct. *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 743-44 (Bankr. S.D.N.Y. 2019) (rejecting Debtor's argument that default interest should be equitably disallowed because lender pursued its right in the bankruptcy court to collect default interest). Moreover, at the conclusion of oral argument of the Conversion Motion, the Court indicated that it would grant the Conversion Motion on May 17, 2022 (the return date on this Motion) in the event that the parties were unable to reach a consensual resolution of this case. Thus, the fact that the Court indicated its intention to grant the Conversion Motion establishes that its filing does not amount to misconduct.

34.     The plain truth is that the Debtor fails to assert any fact whatsoever to support its claim that Lender engaged in any misconduct and further concedes in its recently filed Bankruptcy Rule 2004 application that it lacks any information in this regard.[10] Instead, it employs hypotheticals and is reduced to sheepishly alleging that "There is a *possibility* that the Secured Creditor has engaged in misconduct." *See*, Motion, ¶ 39 (emphasis supplied). It then alleges that "*if*" Lender took action to prevent the Debtor from paying its debt to Lender –

---

[10] During colloquy at the April 27, 2022 oral argument on the Conversion Motion, the Court indicated that it would not permit the Debtor to engage in discovery.

something that Lender has waited patiently for the Debtor to do since the Loan matured

approximately seventeen (17) months – that Lender would be guilty of misconduct. The Debtor's

suggestion that Lender would interfere with its refinancing efforts so that it could not pay off the

Loan is made out of whole cloth and defies logic. In this regard, we remind the Court that the

Forbearance Agreement, the Consent Order, and the Term Sheet each provided the Debtor with

the time it requested to refinance the Loan, and in the absence of a refinancing, the requirement

that the Debtor promptly sell the Property to satisfy its obligations under the Loan. To be sure,

Lender wants to be paid; it has no interest to delay satisfaction of the Loan and engage in

wasteful and costly litigation which this Debtor can ill afford.

35.     The Debtor has failed to present any credible and persuasive evidence of any

misconduct by Lender.[11]

**(ii)     Because the Debtor is Solvent, Unsecured Creditors
Are Not Harmed by Awarding Default Rate Interest**

36.     The Debtor admits that it is solvent. It boldly states: "Based on the value of the

Property alone, the Debtor is solvent." *See,* Motion, ¶ 37.[12] Consequently, unsecured creditors

will be paid in full even if the higher contract rate is allowed.

37.     Nevertheless, the Debtor complains that the Court should reduce the interest rate

from the default rate to the non-default rate so that it would be less difficult for the Debtor to

refinance the Loan. However, the Second Circuit found in *Ruskin v. Griffiths,* 269 F.2d 827 (2d

Cir.1959), *cert. denied,* 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960), that it would be

---

[11] Lender further emphasizes that to the extent the Debtor contends that any of its hypothetical bad act scenarios occurred prior to the Consent Order, any and all claims against Lender, including known and unknown claims, were expressly released by the Debtor in the Consent Order. *See*, **Exhibit 19**, ¶¶ 8.2, 15.1, 15.2, and 15.4.

[12] The Debtor argued in its DIP Financing Motion that the Property had a value of $13,680,000 as of December 31, 2021. ECF No. 14, ¶ 19. Lender's secured claim as of April 1, 2022 is $9,084,262.75 (Leibowitz Declaration ¶ ___) and according to the Debtor's Schedules of Assets and Liabilities, the total amount of priority and non-priority unsecured claims is $147,858.25. *See*, **Exhibit 3**. ECF No. 1, Official Form 206SUM, Part 2 (pdf p. 9 of 38). While Lender disputes that the value of the Property is as much as the Debtor claims, Lender does not dispute that the Debtor is solvent and has the ability to pay all creditors *in full*.

inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly

where the debtor was solvent and knowingly bargained for the terms of his contract. Indeed, in

*Ruskin*, the Court of Appeals held that it would be "the opposite of equity to allow the debtor to

escape the expressly-bargained-for result of its act," absent "any unjust delay in the proceedings"

caused by the creditor. *Id*. at 832. *See also*, *Citibank v. Nyland,* 878 F.2d 620 (2d Cir.1989)

("[N]o decision of this Court or any New York court has impaired the vitality of *Ruskin.*").

"Thus, the rule under *Ruskin* is that when the debtor is solvent and there is a contractual

provision, valid under state law, providing for interest on unpaid installments of interest, it is

enforceable with respect to installments due before and after the petition was filed." *Urban*

*Communicators PCS Ltd. P'ship v. Gabriel Cap., L.P.*, 394 B.R. 325, 340 (S.D.N.Y. 2008).

38.    Indeed, the Court in *In re Stanhope LLC* recently made clear that "It is fair to say,

however, that if the debtor is solvent and unsecured creditors will be paid in full even if the

higher contract rate is allowed, courts will allow the claim at the default rate under section

506(b)." *In re Stanhope LLC*, 625 B.R. at 580. *See also*, *In re Sultan Realty, LLC*, 2012 WL

6681845 (Bankr. S.D.N.Y. 2012) ("…since Sultan is solvent, no harm will befall its unsecured

creditors if it must pay interest at the Default Rate."); *Urban Communicators PCS Ltd. P'ship*,

394 B.R. at 339 ("it is not inequitable to cut down the interest of Debtors' shareholders by

interest payments at a default rate to which Debtors contractually agreed."); *In re 139-141*

*Owners Corp.*, 306 B.R. 763, 771 (Bankr. S.D.N.Y.), *aff'd in part, vacated in part,*

*remanded,* 313 B.R. 364 (S.D.N.Y. 2004) (awarding default rate interest where debtor is

solvent).

39.    Moreover, although the Debtor's solvency is not in dispute, we emphasize that

this and other Courts in this Circuit have held that an award of post-petition default rate interest

is appropriate even if a debtor is *insolvent*. In citing *In re Madison 92nd St. Associates LLC*, 472

B.R. 189 (Bankr. S.D.N.Y. 2012), this Court recognized the presumptive contract default rate should not necessarily be adjusted downward in insolvent debtor cases even though the unsecured creditors will not be paid in full: "Most chapter 11 cases involve insolvent debtors, and such an exception would swallow up the rule that the oversecured creditor is presumptively entitled to the 'contract rate.'" *In re Residential Capital LLC*, 508 B.R. at 858.

40.     This Court further recognized the economic consequences in the credit markets should a party's contractual rights be modified. This Court noted: "Refusing to enforce bargained-for default interest for oversecured creditors raises the risk that lenders will demand higher interest rates from all high risk borrowers to compensate for the potentially higher costs of collection and greater risk of loss once bankruptcy begins." *Id*. at 858. The same rational applies here. If the Debtor did not agree to pay default interest after a default occurred, it is likely the Loan would not have been made, or if so, made in the same amount or on the terms and at the non-default rate set forth in the Loan Documents.

41.     Because the Debtor is solvent and because general unsecured creditors will not be harmed by awarding Lender its contract default rate of interest, the Debtor has no basis to seek to unwind Lender's bargained-for contractual rights and such request should be denied.

**(iii)     Default Rate Interest of 24% Is Not a Penalty**

42.     The Debtor alleges that the default rate of 24% per annum is an unenforceable penalty. However, contrary to the Debtor's claim, under New York law, "[i]t is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty." *Jamaica Sav. Bank FSB v. Ascot Owners, Inc.*, 245 A.D.2d 20, 20, 665 N.Y.S.2d 858 (1st Dept. 1997). "A higher rate of default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee." *In re 785 Partners LLC*, 470 B.R. at 131. Indeed, default interest

"can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain." *Ruskin, supra.*, 269 F.2d at 832. Thus, courts have recognized that "[e]ven where the default rate strikes the judge as high, a court cannot rewrite the parties' bargained based on its own notions of fairness and equity." *In re 785 Partners LLC*, 470 B.R. at 132 (recognizing that the "requirement that the agreement must be enforced in accordance with its terms has even greater force in the context of real property transactions, where commercial certainty is a paramount concern").

43.     Here, the Debtor contends that the 24% default rate interest provided for under the Note, the Mortgage and related Loan Documents is unenforceable. However, numerous New York courts have held that contract terms that provide for a default rate of twenty-four percent (24%) are enforceable. *See, Dominion Fin. Corp. v. Haimil Realty Corp.*, 546 B.R. 257, 265 (Bankr. S.D.N.Y. 2016) (awarding interest at the 24 percent default rate and stating that "New York courts have enforced agreements that provide for similar default rates."); *In re Sultan, LLC*, 2012 WL 6681845 at *7 (awarding default rate interest of 24%; "while the default rate is about four times the non-default rate, it is nevertheless the presumptive rate, and Sultan has failed to offer any evidence, beyond the size of the Default Rate itself, to rebut the presumption."); *Urban Communications PCS Ltd. P'Ship, supra*, 394 B.R. at 342 (finding that the bankruptcy court erred in equitably reducing the award of interest from the contractual default rate of 38% down to 25%); *In re 139-141 Owners Corp.*, 313 B.R. at 365-369 (affirming award to secured lender of 24% default rate interest); *In re 53 Stanhope LLC*, 625 B.R. at 581 (24% default rate is not an unenforceable penalty); *In re Moshe*, 567 B.R. at 449 ("while Yeshivah understandably prefers to pay a smaller claim, the record likewise does not show that payment of post-petition interest, even at the 24 percent default interest rate, will prevent Yeshivah's fresh start or harm unsecured creditors.").

44.     Because Bankruptcy Courts enforce the default interest rate of 24% per annum and because this solvent Debtor has not put forward any valid reason to unwind Lender's contractual rights under the Loan Documents, the Court should award Lender interest at the default rate of 24% per annum.

**(iv)      The Award of Default Rate Interest Does Not Impact the Debtor's Fresh Start**

45.     The Debtor's fresh start is not impacted by the application of default rate interest. Otway, the sole member of the Debtor, will retain less equity in the Debtor. However, that does not mean that the Debtor's fresh start will be impacted. Indeed, the Debtor has acknowledged that it is solvent. *See*, *In re 53 Stanhope LLC*, 625 B.R. at 580, *citing Urban Communications PCS Ltd. P'Ship, supra* (solvent debtor's fresh start not implicated). Thus, the only issue is the allocation of value between the secured creditor, on the one hand, and the Debtor's sole equity holder, which *Ruskin v. Giffiths* long ago determined requires payment to the secured creditor at the higher default rate on equitable grounds. *In re 53 Stanhope LLC*, 625 B.R. at 580; *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 328 (Bankr. S.D.N.Y. 2011) (payment of default interest would neither inflict harm on other unsecured creditors nor impair GCP's fresh start because GGP was solvent when it emerged from bankruptcy).

46.     Further, because the Debtor is a solvent single asset real estate entity, any plan would not impact the Debtor's ability to operate its business or otherwise effect a significant number of jobs or supplier relationships. It would instead primarily preserve ownership of the Property in the current owner. *See, In re Stanhope LLC*, 625 B.R. at 590 (finding that the SARE debtor's fresh start was not impacted where jobs and supplier relations are not impacted).

***

47.     None of the equitable considerations exist under governing case law which would permit the Court to exercise its limited discretion in granting the extraordinary relief of re-

writing the parties' bargained-for contractual arrangement by adjusting downward Lender's entitlement to post-petition default rate interest rate of 24% to the non-default rate of 10.25% per annum.

### B. Lender is Entitled to Reimbursement for its Attorneys' Fees and Expenses

48.     As noted above, the Debtor has admitted -- and the State Court has determined and "SO-ORDERED" in the Consent Order -- that Lender is entitled to all of its legal fees and expenses, together with interest thereon, as of November 21, 2021 in the sum of $194,400.73. **Exhibit 19**, p. 5. Further, the Debtor agreed in the Consent Order that (i) "Additional legal fees and expenses and protective advances have accrued and continue to accrue after November 21, 2021 and such additional amounts are owed under the Loan Documents and shall be added to the Payoff Amount" (**Exhibit 19**, p. 5, n. 1) and (ii) Debtor shall pay all of Lender's attorneys' fees and costs in enforcing the Loan Documents, the Forbearance Agreement and the Consent Order, including all fees in connection with any reorganization or similar proceeding (**Exhibit 19**, p. 5, n. 1). As the Debtor is barred from challenging such findings in the Consent Order based on *res judicata* and the *Rooker-Feldman* doctrine, all of legal fees and expenses incurred by Lender from December 2, 2020 through November 21, 2021 cannot be collaterally attacked in a claims objection motion in this Court. *See,* Point I above.

49.     With respect to Lender's entitlement to attorneys' fees and expenses post-November 21, 2021, the Debtor's Motion is designed to confuse.

50.     First, the Debtor argues that there is "nothing in the record" supporting Lender's claim for legal fees and costs of $554,119.87 as of March 23, 2022. *See*, Motion, ¶¶ 21, 23. However, the Debtor blithely ignores the Consent Order which already fixed Lender's attorneys' fees and expenses, together with interest thereon, as of November 21, 2021, in the amount of $194,400.73. This amount is incorporated within the total amount of legal fees of which Lender

is entitled.

51.     Second, the Debtor misrepresents that Lender's attorneys' fees and expenses aggregate $554,119,87 as of March 23, 2022. The Debtor fails to inform the Court that this sum *includes* default rate interest that has accrued on advances made by Lender for its attorneys' fees and expenses from and after December 2, 2020 (*i.e.*, one day after the Loan matured by its terms). With respect to the relevant period at issue (*i.e.*, from November 22, 2021 through and March 31, 2022), Lender's *actual* (i) attorneys' fees of are $321,633.24, (ii) expenses are $928.11, and (iii) appraisal and expert fees are $35,800, for an aggregate sum of $358,361.35, exclusive of default interest thereon. Leibowitz Declaration, ¶ 67.

52.     Third, the Debtor contends that its attorneys' fees and expenses from the Petition Date through the March 31, 2022 are $192,615 where, "[a]s a measure of comparison," Lender's attorneys' fees and expenses are no less than $339,374.28 "over the same period." Motion, ¶ 24. The Debtor's so-called "comparison" is misleading because such fees and expenses do not actually cover "the same period."  The Consent Order determined Lender's attorneys' fees and expenses as of November 21, 2021. Accordingly, Lender's estimated attorneys' fees and expenses are for the period between November 22, 2021 through April 1, 2022 while the Debtor calculates its attorneys' fees and expenses only from December 29, 2021 to March 31, 2022.

53.     Fourth, the fact that the Lender's attorneys' fees and expenses may be more than the Debtor's professionals from and after November 22, 2021 does not suggest that such expenses are not reasonable or reimbursable. To the contrary, all of them were necessary to protect Lender's rights and remedies.[13]

---

[13] We also note that the Debtor's Motion inaccurately claims that the Debtor requested Lender's detailed time records. Contrary to the Debtor's contention, the Debtor requested only a breakdown of Lender's claim inclusive of legal fees, which breakdown was, in fact, provided to the Debtor prior to the scheduled trial on the DIP Financing Motions  and also in the April 1, 2022 statement of indebtedness (which is annexed as Exhibit C to the Debtor's Motion). A copy of the Firm's time records for the period between November 22, 2021 and March 31, 2022 is annexed to the Leibowitz Declaration as **Exhibit 21**.

54.     For example, the Debtor and its principal each filed a bankruptcy petition with incomplete and inaccurate Schedules of Assets and Liabilities and Statement of Financial Affairs. In this regard, Lender engaged in discovery and demanded documents from the Debtor and Otway, including requests to inspect the Property (which the Debtor refused until the Court directed the Debtor to permit same), requesting proof of insurance for the Property and a detail of the Debtor's outstanding account receivables. The Debtor first ignored Lender's requests and only produced the bare minimum to Lender after it was admonished by the Court. Lender's request for a schedule of the Debtor's outstanding account receivables – a very basic accounting request indeed - is *still* outstanding.

55.     Further, in connection with the contested DIP Financing Motions, Lender's counsel was fully prepared to proceed with an evidentiary hearing scheduled by the Court for March 2, 2022.[14] Such hearing involved, *inter alia*,  review of countless documents, analysis of 4 prior appraisals, interviewing proposed experts for Lender, retaining an appraiser for Lender and reviewing its appraisal, the preparation of four witnesses for Lender and preparation of cross examination of two witnesses for the Debtor. However, only two days prior to the evidentiary hearing, the Debtor's professionals requested an adjournment because they advised Lender that the Debtor was "not prepared" to proceed. Thus, the Debtor, on the one hand, attacks the attorneys' fees and expenses incurred by Lender for actually being prepared in defense of the DIP Financing Motions that sought to trample on Lender's first priority liens, and, on the other

---

[14] Central to the evidentiary hearing was the valuation of the Property and the impact of the potential DIP financing on Lender's secured claim. Accordingly, Lender analyzed with its professionals (i) three separate appraisals submitted by the Debtor, (ii) an appraisal produced by the Debtor from Newmark Knight Frank Valuation & Advisory, LLC which appraised the Property on behalf of a potential third-party lender, (iii) an appraisal by Leitner Berman Inc., and (iv) the onerous and hidden loan charges assessed by the Debtor's proposed DIP lender and contained in proposed loan documents attached to the DIP Financing Motion. Furthermore, Lender prepared its witnesses: (i) Joel Leitner (Lender's appraiser), (ii) Wendy Hwang (appraiser for a third-party lender), (iii) Vickram Jambu (Debtor's real estate broker), and (iv) Jason Leibowitz (Lender's Managing Member). Lender also prepared for its cross-examination of the Debtor's witnesses: (i) Ronald Gold (Debtor's appraiser), and (ii) Lawrence Otway (Debtor's principal). In other words, Lender was trial ready.

hand, touts that its legal fees were less at the same time that the Debtor's own professionals acknowledged that they were "not prepared" to prosecute the DIP Financing Motions.

56.    The DIP Financing Motions were resolved on the eve of the scheduled evidentiary hearing. Relying on the Debtor's good faith agreement in principle, Lender took the laboring oar in drafting the Term Sheet (which was ultimately submitted to the Court as part of a status report – *see*, **Exhibit 1**) and then a comprehensive settlement agreement. However, after negotiating and documenting the settlement agreement, the Debtor refused to proceed. In other words, the Debtor seeks to attack Lender's fees for drafting the Term Sheet and the settlement agreement that the Debtor lulled Lender into believing it would consummate.

57.    Because the Debtor rejected the bankruptcy exit strategy it previously agreed to (*i.e.*, a fixed time period to refinance the Property and, in the absence of such refinancing during this period, the requirement to sell the Property), Lender drafted and filed the Conversion Motion, responded to the Debtor's objection by filing a reply, and orally argued the merits of the Conversion Motion on April 27, 2022. At the conclusion of the hearing on the Conversion Motion, the Court indicated that it would grant the Conversion Motion on the return date of this Motion unless the parties globally resolved their differences.

58.    Further, in anticipation of Lender potentially filing its own plan of liquidation, Lender drafted, filed and served the Bar Date Motion and thereafter served, among other things, the approved bar date notice to all creditors.

59.    Moreover, Lender is now incurring additional attorneys' fees and expenses in defense of its claims asserted against the Debtor.

60.    All of Lender's attorneys' fees and expenses are reasonable and properly reimbursable. In fact, Courts in this Circuit as well as the New York State Courts repeatedly hold that payment by a sophisticated business entity of its attorneys' fees is a strong evidence of the

reasonableness of such fees where, like here, it paid its attorneys' invoices in connection with the

enforcement of its rights and remedies well in advance of prevailing and with no guaranty that its

fees would otherwise be recovered. *See, e.g., Bleecker Charles Co. v. 350 Bleecker St. Apartment*

*Corp.,* 212 F.Supp.2d 226, 230-31 (S.D.N.Y. 2002):

> "the Court is cognizant of the fact that the fees sought here are not hypothetical amounts
> prepared only for purposes of a fee application. Rather, they are embodied in invoices
> prepared as the litigation progressed, and actually paid by defendants, a sophisticated
> client familiar with the real estate and legal markets in New York. Defendants could not
> have been assured that it would be awarded fees at the end of the litigation; rather, in the
> event of a loss or a settlement, it would have had to bear those fees unreimbursed. As
> numerous courts have recognized, negotiation and payment of fees by sophisticated
> clients are solid evidence of their reasonableness in the market."

*accord Yurman Designs, Inc. v. PAJ, Inc.,* 125 F. Supp.2d 54, 58 (S.D.N.Y. 2000) ("the rates

sought by this application are the rates charged the client. Yurman is a sophisticated and

significant participant in the jewelry business. Its acceptance of the rates charged is in itself

substantial evidence of their reasonableness."), *aff'd*, 29 F. App'x 46 (2d Cir. 2002). *See also,*

*HSBC Bank USA Nat. Ass'n v. Strong Steel Door Corp.*, 954 N.Y.S.2d 759, 2012 N.Y. Slip Op.

51218(U), * 8 (Sup. Ct. Kings Co. June 27, 2012) (rejecting contention that a client's payment of

fees is not relevant); *515 Avenue I Corp. v. 515 Avenue I Tenants Corp.*, 29 Misc.3d 1229(A),

2010 WL 4904671, * 11 (Sup. Ct. Kings Co. Dec. 1, 2010) ("where contractual fee-shifting is at

issue, *the agreed upon fee or billing arrangement should control*") (emphasis supplied).

61.     Moreover, New York Courts conclude that fees are reasonable where a client

negotiated a discounted hourly rate prior to a law firm's engagement. *See, e.g., Prospect Capital*

*Corp. v. Enmon,* No. 08 Civ. 3271 (LBS), 2010 WL 2594633, *5 (S.D.N.Y. June 23, 2010)

(awarding full amount of attorneys' fees requested because sophisticated client negotiated

discounts and paid its bills in full; "finding fees reasonable where client paid bills in full and

"specially negotiated case-by-case discounts").

62.     Here, the principal attorneys handing this matter are Steven H. Newman and

Robert A. Abrams. Mr. Newman's standard hourly rate is $785.00 and Robert A. Abrams'
standard hourly rate is $730.00. However, in connection with this engagement, Lender
negotiated a discounted hourly rate of $565.00 for Mr. Newman and $500.00 for Mr. Abrams.
This is approximately a 30% blended discount. *See*, Leibowitz Declaration, ¶ 70.  Consequently,
Lender's negotiation of a discount of the fees billed to it further indicates the reasonableness of
the amounts it seeks to recover.

63.     Further, Lender has, in fact, paid the vast majority Lender's attorneys' fees and
expenses through March 31, 2022, and will pay the remaining amount in due course. *See*,
Leibowitz Declaration, ¶ 69.

64.     For these reasons, Lender's attorneys' fees and expenses incurred from 11/22/21
through 3/31/22 in the aggregate sum of $358,361.35 (inclusive of appraisal and expert fees of
$35,800), plus interest from 12/1/22 through 4/1/22 on all legal fees since maturity, in the sum of
$14,463.37, is reasonable and properly reimbursable under the Loan Documents.

C.  **Lender is Entitled to Reimbursement for its Protective Advances**

65.     Like Lender's attorneys' fees and expenses, the Debtor stipulated in the Consent
Order that Lender incurred protective advances, together with interest thereon, of $202,121.59 as
of November 21, 2021. **Exhibit 19**, p. 5. The Debtor further acknowledged that additional
protective advances have accrued and continue to accrue after November 21, 2021 and such
additional amounts shall be added to the Payoff Amount. *id.* at p. 5, n. 1. Because the Consent
Order is binding on the Debtor, Lender's entitlement to protective advances through November
21, 2021, together with interest thereon, is barred from challenge. *See*, Point I.

66.     In its Motion, the Debtor claims that Lender did not provide the Debtor with a
detailed accounting of the protective advances from and after November 22, 2021. Motion ¶ 25.
That is not true. In fact, an itemization of Lender's protective advances since entry of the

Consent Order was provided to Debtor's counsel not once, but *twice*.[15] Thus, any claim that Lender did not provide the Debtor with an itemization of the protective advances is false.

67.     In any event, the protective advances made between November 22, 2021 and April 1, 2022 aggregates $18,164.26 and is for: (i) title search fees of $1,204.88, (ii) a UCC publication expense of $4,099.38, (iii) a broker fee of $12,500 in connection with the UCC sale, and (iv) title searches of $360.00. *See*, Leibowitz Declaration, ¶ 67. This sum, together with the interest during the period 12/1/20-4/1/22, on all protective advances made since maturity, aggregates $34,449.04, and is properly reimbursable under the Loan Documents.

### D. **Lender is Entitled to Reimbursement for Liquidated Damages**

68.     As set forth in Point I above, the Consent Order expressly found that the terms and conditions of the Forbearance Agreement and enforceable in accordance with its terms. Specifically, Paragraph 8.1 of the Consent Order, entitled "Binding Obligations," provides, in part: "The Note…the Existing Forbearance Agreement and this Stipulation…constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms." **Exhibit 19**, ¶ 8.1 and ¶ 13.[16]

69.     In turn, Paragraph 10(b) of the Forbearance Agreement provides, in part, that

> The [Debtor], SPI, AGI, the Guarantor, EO, Theater 80 and Meeting Space, and all relatives of the Guarantor and all persons and entities directly or indirectly controlled by either of the Obligors shall completely vacate… the Mortgaged Premises…no later than July 31, 2021, time being of the essence. In the event that any of the [Debtor], SPI, AGI, the Guarantor, EO, Theater 80…fails to completely vacate the Mortgaged Premises by July 31, 2021, time being of the essence, then the Obligor Related Parties shall be jointly and severally liable to the Lender in the sum of $200,000 as liquidated damages…

---

[15] Prior to the hearing on the DIP Financing Motions Lender provided a breakdown of post 11/22/21 protective advances. Also, in an e-mail from Debtor's counsel dated April 1, 2022, counsel wrote "…I now recall your sending the protective advances made. I appreciate you resending."

[16] Section 8.1 of the Consent Order, entitled "Binding Obligations," provides in part: The Note…the Existing Forbearance Agreement and this Stipulation…constitute legal, valid and binding obligations of the Obligor Related Parties (as applicable), enforceable in accordance with their respective terms." *See also*, ¶ 13 entitled "Loan Documents Still in Force."

**Exhibit 13**, ¶ 10(b).

70.    In its Motion, the Debtor concedes that the entities owned and controlled by

Otway failed to vacate the Property by July 31, 2021. *See,* Motion, ¶ 30 ("The tenants did not

vacate on the appointed dates.").[17] For this reason alone, Lender is entitled to liquidated damages

in the sum of $200,000.

71.    Furthermore, because Otway and the Affiliated Non-Debtors failed to vacate the

Property by July 31, 2021, Lender required that the Debtor and its Affiliated Non-Debtors agree

in the Consent Order that the Affiliated Non-Debtors vacate the Property by December 30, 2021,

**time being of the essence**. **Exhibit 19**, ¶ 10(b). The Consent Order further provides that in the

event that the Affiliated Non-Debtors failed to vacate the Property by December 30, 2021, then

they and the Debtor would be jointly and severally liable to the Lender in the sum of $200,000 as

liquidated damages. *Id*. Without, the agreement to vacate and liquidation damage clauses, Lender

would not have entered into the Consent Order and Forbearance Agreement.

72.    It is undisputed that the Affiliated Non-Debtors did not vacate the Property by

December 30, 2021 either.

73.    Because (i) the State Court found in its Consent Order that the terms of the

Forbearance Agreement are binding and enforceable in accordance with its terms, (ii) the Debtor

concedes that the Debtor breached its obligations under the Forbearance Agreement as a result of

the Affiliated Non-Debtors not vacating the Property by July 31, 2021, and (iii) the Debtor

concedes that the Debtor breached its obligations under the Consent Order as a result of the

Affiliated Non-Debtors not vacating the Property by December 30, 2021, the Debtor's challenge

---

[17] The Debtor's contention that it had "no ability or duty to vacate the premises and could not force the vacation of the tenants" is absurd. *See*, Motion, ¶ 31. Apparently the Debtor is asking the Court to put blinders on and ignore the fact that the Debtor's principal is Otway and Otway owns and controls nearly all of the tenants at the Property. To the point, Otway willfully chose not to have himself and his tenants vacate the Property by July 31, 2021.

to Lender's entitlement to liquidated damages is barred by the Consent Order. *See*, Point I above;

*In re Madison 92nd Street Assoc. LLC*, 472 B.R. at 194 (debtor's objection to the allowance of a

prepayment premium is barred under the doctrine of *res judicata*).

74.    Even if *res judicata* does not bar the Debtor's challenge to the allowance of the

liquidated damages, the merits do.

75.    Whether a clause which prescribes liquidated damages is in fact an unenforceable

penalty is a question of state law. *In re United Merchants & Mfrs., Inc.,* 674 F.2d 134, 141 (2nd

Cir. 1982). A liquidated damages clause is valid under New York law if: (1) actual damages are

difficult to determine, and (2) the sum is not "plainly disproportionate" to the possible loss. *Id*. at

142 (*quoting Walter E. Heller Co. v. Am. Flyers Airline Corp*., 459 F.2d 896, 899 (2nd Cir.

1972). The enforceability of a liquidated damages provision must be decided based on the

circumstances existing at the time the parties entered into their agreement. *Walter E. Heller,* 459

F.2d at 898–99.

76.    Importantly, "The party seeking to avoid the liquidated damages clause bears the

burden of proving that it is a penalty and must demonstrate either that the damages… were

readily ascertainable at the time the parties entered into the lending agreement or the [liquidated

damages] is "conspicuously disproportionate" to the lender's foreseeable losses. *In re Madison

92nd St. Assocs. LLC*, *supra*. 472 B.R. at 196 *citing JMD Holding Corp. v. Congress Fin.

Corp.,* 4 N.Y.3d 373, 795 N.Y.S.2d 502, 828 N.E.2d 604, 609 (2005). This burden must be

considered in light of the admonition that the historical distinction between liquidated damages

and penalties has become increasingly difficult to justify, and courts should not interfere with the

parties' agreement regarding liquidated damages "absent some persuasive justification." *GFI

Brokers, LLC v. Santana,* No. 06 Civ. 3988 (GEL), 2009 WL 2482130, at *2 (S.D.N.Y. Aug.13,

2009) (internal citation and quotation marks omitted); *JMD Holding Corp.,* 795 N.Y.S.2d 502,

828 N.E.2d at 609–10.

77.    Far from providing any "persuasive justification," the Debtor makes no effort to demonstrate that the damages resulting from the failure to vacate the Property was readily ascertainable or that such damages were conspicuously disproportionate to Lender's foreseeable losses. Rather, the Debtor claims that such liquidated damages was included in the Forbearance Agreement "to provide a strong incentive for the tenants to vacate on the dates in question". Motion, ¶ 30. It further contends that because no sale of the sale of the Property occurred (because the Debtor breached that obligation to do so too), Lender suffered no damages as a result of the Debtor's failure to vacate or cause its Obligor Related Parties to vacate the Property. Motion, ¶ 31. The Debtor's arguments misses the mark.

78.    At the time the Forbearance Agreement was entered into (*i.e.*, the period in time that this Court must look to in considering the liquidated damages provision), a global pandemic was declared, eviction moratoriums were in effect, and the Debtor's affiliated tenants at the Property were not paying rent. Thus, to ensure a maximum sale price for the Property, Lender required that to the extent the Loan was not refinanced by April 15, 2021, the Debtor would retain a broker and list the Property for immediate sale (**Exhibit 13**, ¶2(g)) and that the Debtor's affiliated tenants would vacate the Property by July 31, 2021, time being of the essence. To be sure, a potential investor of the Property would not want to purchase a Property riddled with non-paying tenants owned and controlled by Otway in the midst of a global pandemic and subject to New York State's moratorium laws then in effect. Such a circumstance would surely drive down any valuation of the Property.

79.    The damages caused by the Debtor's affiliated entities for their failure to vacate the Property were plainly difficult to calculate at the time the Forbearance Agreement was entered into and not disproportionate to a loss because it was unknown how much *less* a ready,

willing and able purchaser would pay for the Property with non-paying tenants in possession while a moratorium on evictions were in effect. Clearly, the liquidated damages provision is not duplicative of Lender's rights under the Loan Documents since they do not compel the Debtor and its affiliates to vacate the Property absent a refinancing.

80.    Notably, other than its naked say so, the Debtor offers no evidence suggesting that the liquidated damages amount exceeds actual damages or that the damages were not disproportionate to the loss.

## **CONCLUSION**

81.     Accordingly, the Motion should be denied and Lender's Claim should be allowed in the amount of $9,084,262.75[18] as of April 1, 2022, and Lender is entitled additional amounts for default rate interest accruing after April 1, 2022, and for reasonable attorneys' fees and expenses, default rate interest thereon accruing after March 31, 2022, for all the reasons set forth herein and in the Leibowitz Declaration.

Dated: New York, New York
          May 12, 2022

Respectfully submitted,

**KATSKY KORINS LLP**

By: /s/ Steven H. Newman
       Steven H. Newman, Esq.
       Robert A. Abrams, Esq.
605 Third Avenue
New York, New York 10158
Telephone: (212) 953-6000

*Attorneys for St. Mark's Mixed Use LLC*

---

[18] Since the Lender's default rate interest, attorneys' fees and expenses continue to accrue and are ongoing, Lender will seek at a future date Court approval of the additional amounts for default interest for the period after April 1, 2022 and for attorneys' fees and expenses and protective advances for the period after March 31, 2022.