UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re: Chapter 11 78-80 ST. MARKS PLACE, LLC,

Case No.: 21-12139 (MG)

                            Debtor.

-----------------------------------------------------------x

MARIANNE T. O'TOOLE, ESQ., solely in her capacity as the Chapter 7 Trustee of the estate of 78-80 St. Marks Place, LLC, Plaintiff, Adv. Pro. No.: 22-_____ (MG)

-against

LAWRENCE V. OTWAY, a/k/a LAWRENCE LORCAN OTWAY, a/k/a LORCAN OTWAY, EUGENIE OTWAY a/k/a EUGENIE GILMORE-OTWAY a/k/a EUGENIE GILMORE, SCHEIB'S PLACE, INC. D/B/A WILLIAM BARNACLE TAVERN, EXHIBITION OF THE AMERICAN GANGSTER, INC., THEATRE 80, LLC, and JOHN DOE CORPORATIONS "1" THROUGH "100", OTHER JOHN DOE ENTITIES "1" THROUGH "100", Defendants.

-----------------------------------------------------------x

**Preliminary Statement**

Defendants submit this memorandum in response to Plaintiff Motion for Summary Judgment asking that the motion be denied because there are disputed triable issues of fact.

## SUMMARY JUDGMENT LEGAL STANDARD

It is well settled that a "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party must present "significant probative evidence" that a genuine issue of fact exists. Anderson, 477 U.S. at 249. "[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, The issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute

1

be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. *First National Bank of Arizona v. Cities Service Co.,* 391 U. S. 253 ,289-290. (1968)

## JUDICIAL ESTOPPEL

Defendants' arguments and responses should not be barred by judicial estoppel. Judicial estoppel, is an equitable doctrine invoked by a court at its discretion. *New Hampshire v. Maine,* 532 U.S. 742 (2001)

The Second Circuit has consistently limited the application of judicial estoppel to "situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced," *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 148 (2d Cir.2005) and to situations "where the risk of inconsistent results with its impact on judicial integrity is certain." *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 72 (2d Cir.1997).

Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States v. C.I.T. Constr. Inc.,* 944 F.2d 253, 259 (C.A.5 1991), and thus poses little threat to judicial integrity. Maine, 532 U.S 770, 750-51. Id.    It is not appropriate to apply judicial estoppel when a party's prior position was based on inadvertence or mistake. *Maine,* 532 U.S. at 753. *See also Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 n. 2 (2d Cir.1999) ("judicial estoppel does not apply when the first statement resulted from 'a good faith mistake or an unintentional error' " (citing *Simon,* 128 F.3d at 73)) Judicial estoppel is not applicable where there is no evidence that the "allegedly inconsistent statements were, when made, known to be false." *United States v. King,* 1998 U.S.App. LEXIS 28265, *4 (2d Cir. Nov. 9, 1998) (citing *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 73 (2d Cir.1997)

Mr. Otway did not realize that his tenancy had the protections of Rent Control. On consultation with lawyers with an expertise in tenants' rights, all agreed that Mr. Otway's tenancy is regulated by New York Rent Control.

There was no intention to mislead or hide anything from the court. There has been no determinations concerning any leases by this court and therefore there has been no "adoption by a tribunal in a prior proceeding". There was no "success" or advantage to Mr. Otway concerning not listing his leases on the schedule for leases. Without "success" such as having debts discharged, there would be no resulting risk of inconsistent court determinations. The court and the creditors were aware of the factual information that there are tenants in the building regardless of listing of leases. Mr. Otway has also made statements in testimony that he has lived and worked in the building since 1964.

Mr. Otway believed the correct way to fill out the lease section of the schedules was to not include leases where St. Marks Mixed Use had stated that the leases were void.   Hirschmark

Capital drafted and Included documents presented at the closing in 2019, including leases for Mr. Otway's residence, Theatre 80 LLC, Scheib's Place Inc. and the Exhibition of the American Gangster along with voluminous boiler plate documents to be signed.

St. Marks Mixed Use did not have the authority to remove or cause Mr. Otway to remove the rent control protections from his tenancy. 78-80 St. Marks Place LLC. as landlord did not have the authority to remove the rent control protections. Friarton Estates Corp. . City of New York 65 B.R. 586 (1986).

The court instructed Mr. Otway to retain two different lawyers as his person as an individual may well have divergent interests to his person as the CEO owning the building. In this instance, this is correct.

Ordering the landlord to raise the rent without informing Mr. Otway of his rights as a rent controlled tenant negates

any authority to the effectiveness of the document. Mr. Otway as the member of the corporation and as landlord inadvertently denied and withheld rights from Mr. Otway, the tenant. Starting with the 2019 lease, the raise in the amount of rent violated rent control regulation. There would be no right to remove Mr. Otway's tenancy as happened in 2020. Mixed Use did not have the right to remove Mr. Otway's rent control rights and did not have the right to remove his tenancy. Mr. Otway as the tenant could not waive rights since he was uninformed of those rights.

   Mr. Otway has a rent controlled tenancy. Rent control applies to buildings built before 1947. The building at 78-80 St Marks Place, New York, NY 10003 was built approximately 1830.

   There is a lease for Lawrence Lorcan Otway and Eugenie Gilmore Otway for 80 St. Marks Place, NY NY 10003. The lease is the Rent Controlled lease which Mr. Otway has had since 1970. Howard Otway, Mr. Otway's father gave Mr. Otway a lease whose terms provided that Mr. Otway who was an employee of Howard Otway's company The Musical Film Company would pay rent for an apartment in the building by deducting the rent from his salary from The Musical Film Company . Although Mr. Otway does not recall the amounts but approximates that in early 1970's, the rent was approximately $20 a month. The rent rose during the following years to approximately $300 a month. After Howard Otway's death in 1994, the building was owned and managed by Florence Otway, Mr. Otway's mother who continued to have Mr. Otway pay rent. The rent then was $300.00. There were writings of the leases which were kept on yellow pads in the box office. There came a time that the box office was held by a theatrical tenant. The original leases were likely discarded by the theatrical tenant. After his mother's death, Mr. Otway continued to take owner's draw of $400 as rent and put some of

that toward the building's expenses. He also brought groceries for the household. The leases ran for a year or two at a time and then were renewed with adjustments through the years based on the rise in cost of living and Mr. Otway's share of the family's maintaince.

Prior to obtaining the mortgage in November, 2019, Florence Otway, Mr. Otway's mother learned that Mr. Otway's brother had taken $500,000 from her account. She then attempted to give a portion of the building that she owned outright to Mr. Otway. His brother then challenged his mother's authority to have done so. The brother correctly alleged that Lorcan Otway was a tenant and was responsible for rent but incorrectly alleged that Mr. Otway was behind in his rent. As the settlement negotiations began immediately, Mr. Otway never had the chance or opportunity to put proofs of payment before the court in the form of an affidavit of his mother, the written lease or receipts for cash expenditures. Therefore Mr. Otway's partial ownership was under challenge until November, 2019 when his brother's estate settled the case without further claim to inheritance, and the contested property joined the rest of the property in the corporation 78-80 St Marks Place, LLC. Therefore the individual Mr. Otway never owned an uncontested share of the building now owned by the corporation.

Mr. Otway did pay rent as the terms of his lease required. Every time he received his pay from the Musical Film Company, he would pay his father the rent on the apartment. Later, he had the same arrangement with his mother, and then later with the corporation where he took cash and paid for building expenses.

Theatre 80 LLC has a sublease with Scheibs Place Inc. Theatre 80 would pay rent to Scheibs Place Inc and not to the building.

Scheibs Place Inc. has a lease that when the ownership changed to 78-80 St. Marks Place Inc. having full ownership, the lease would go to the new owner, or successor. There would be no right for a landlord to change the terms of the lease during the life of the lease including no right to shorten the duration or to void a lease.

Scheib's Place had been paying rent to 78-80 St. Marks Place Inc. since 78-80 St Marks Place LLC became the new owner. Due to New York State's Executive Orders, Scheib was required to shut down, by New York State as were Theatre 80 and the Exhibition of the American Gangster.

On March 7, 2020, Governor Cuomo issued EO 202, declaring a State Disaster Emergency in New York. On March 20, 2020, Governor Cuomo issued EO 202.6, which required all businesses to utilize, to the maximum extent possible, telecommuting or work-from-home procedures ("WFH") and reduce in-person workforce by 50% no later than March 20, 2020 at 8 p.m. The Governor then issued EO 202.8, which required nonessential businesses to reduce their in-person workforce by 100% by March 22, 2020. Id.

4

On May 5, 2021, New York Governor Andrew Cuomo signed a bill that extended the moratorium on evictions and foreclosures for residential tenants and small businesses to August 31, 2021. The previous moratorium expired May 1, 2021

.New York Extends Eviction and Foreclosure Moratorium

www.natlawreview.com/article/covid-19-update-governor-cuomo-extends-eviction-and-foreclosure-moratorium-until

www.natlawreview.com/article/covid-19-update-governor-cuomo-extends-evictio

Scheib's was allowed to reopen in a gradual fashion.  When it was allowed to do some business, it was only outdoor service so it was affected by weather By November of 2020, Scheib was building outdoor dining booths to try to shelter customers from the weather. People were still not allowed to come inside the tavern. When they finally came inside the tavern, it was very limited due to the required 6 foot distancing between guests, and the amount of people was severely limited because Scheibs is a very narrow bar which results in only a couple of chairs would be allowed. Restrictions required that patrons were not to approach bars or counter but walk directly to their socially distanced seating.  There were also rules about the amount of percentage of the business's capacity that were allowed to be admitted.

Scheib had been paying 78-80 St Marks but is still building up because of not having the Theater being fully booked. The Theater audience is an intended and vital and necessary part of the tavern's trade.

At the beginning of these bankruptcy proceedings, Reorganization was still hampered by the restrictions on reopening and businesses shut down by the state.  Mr. Otway was expecting a mortgage from a company that had promised to refinance the debt.

Projections were drafted to submit to potential Lenders. The Projections were not submitted as a reorganization plan because it could not be implemented to make all payments immediately . The projections were showing that it would take about eight months of the business building up from being closed to begin paying mortgage payments.

Mr. Otway realized that he had to plan the revitalization of the Theatre scheduling model to make mortgage payments. Mr. Otway was planning a reorganization of the scheduling of shows at Theatre 80 to take into account that the economy of theater would be more difficult Post Covid for those productions renting theaters and for the theater to contribute to its portion to Scheib's Place's so that mortgage payments and other expenses could be paid.  He was planning on multiple shows per day, approximately three, where there would be a faster turnover, more productions would be able to afford a smaller rent for a shorter time slot rather than the entire evening and would balance by having several a day.  In his experience,  increased audience attendance results in greater volume of bar receipts. The theater would be booked fully.  The audience would have the opportunity to go to the tavern before a show, during an intermission and after the show.  He was going to add several tour

5

slots for the Exhibition of the American Gangster which also goes through the theater and tavern as part of the tour to show parts of the building that pertained to Prohibition and other aspects of history in the building.

With the sudden withdrawal of an expected refinance of mortgage, the theater instituted a program of short minimal set entertainments including concerts and plays as well as studio use for film, television and audio recording.

The Trustee did not allow for a film shoot to go forward, despite all the Trustee's stated concerns being addressed and met, depriving the Theatre of $47,000 of rental fees which would have been to used for the Theatre's rent to Scheibs and then Scheib's rent to the building.

With all the above Covid factors, Scheib continued to pay rent when it could and then gradually was paying reduced amounts. A theater must be dependable in its bookings and its schedule in order to survive in the theater world. The Trustee's actions not only threatened the reputation and caused harm to this theater but every staff member that had interacted with the film company in this instance.

The capricious actions by the trustee expressed unreliability to industry professionals which can not be tolerated in theater . If the trustee had acted in this way as theater management, not one staff member would ever consider working for or with her again out of concern for their own reputation.

If the theater could operate as the Otways have run their business for the last 57 years, the theater and Scheib would be able to pay their rent.

The Exhibition of the American Gangster does not have a lease at the present time. It has not reopened since the Covid Shutdown. Mr. Otway prioritized opening the businesses at 78-80 St. Marks based on the cost to refit for Covid accommodations and potential return on the investments. The expectation has been that when the theater is fully operational, this will increase receipts in the bar which will increase and provide the seed money for the building to retrofit and reopen the museum, completing the successful business model recognized by Sports Properties Inc. and other affiants.


FORBEARANCE

The first Forbearance which was 2021, was without consideration.  Mr. Otway, Eugenie Otway , Theater 80 , Scheibs  Place and the  Exhibition of the American Gangster signed away rights and protections, upon being told by their own lawyer who also conveyed from opposing counsel representing St Marks Mixed Use. that they were in imminent danger of being evicted and property sold.  They were not told that there was a Moratorium that prevented them from being evicted at that time or the property sold.  After Mr. Otway did his own research and with the help of the Office of Councilperson Carlina Rivera, and was told that they had been protected under Moratorium.  It  was noticed that the Forbearance term ended at the same

time as the Moratorium , evidencing that the drafter knew that this protection existed and as such Defendants were signing away rights for no consideration.

On May 5, 2021, New York Governor Andrew Cuomo signed a bill that extended the moratorium on evictions and foreclosures for residential tenants and small businesses to August 31, 2021. The previous moratorium expired May 1, 2021

.New York Extends Eviction and Foreclosure Moratorium

www.natlawreview.com/article/covid-19-update-governor-cuomo-extends-eviction-and-foreclosure-moratorium-until

www.natlawreview.com/article/covid-19-update-governor-cuomo-extends-eviction

The debtor 78-80 St Marks Inc was expecting a loan to come through shortly. The debt was manageable at that time. When the loan did not come through although still expected, 78-80 St Marks filed for bankruptcy. It was believed that there would be a Constitutional right to file and have all contracts including the one with St Marks Mixed Use to be reviewed for the inappropriate nature of its terms and the forbearance agreement to also be reviewed in light of lack of consideration.

ADDITIONAL ISSUES SUPPORTING DEFENDANTS POSITION THAT SUMMARY JUDGEMENT SHOUD BE DENIED

In addition to the allegations and issues raised by the Trustee in her Motion, there are additional triable issues that prevent the motion from being granted.

Andrew Gottesman had submitted a motion which the court did not review or entertain to request the court review the claim of St. Marks Mixed Use. It is necessary in that it affected and continued to affect 78-80 St Marks to obtain a loan. Whether the numbers being asked were inflated.

At the time of the bankruptcy filing, the amount of the secured debt was still manageable to obtain a mortgage. There were lenders considering a loan. As time went on, due to the unconscionable interest being charged at a time of disaster, made obtaining a loan more difficult.

STATE AND FEDERAL PROTECTIONS

The United States and New York State have a legal obligation to protect citizens from harm during natural disasters.

This is not an average case, not remarkably because this is not an average property. Part of the uniqueness of the case, flows from the history of this building and dedication of the working people who run it. Since 1922, the focus on the building's economy has been a venue for public entertainment. The shutdown impacted on the building in that all but one of the tenants had difficulty in paying rent.

There are protections against state actions during , and in the aftermath of an emergency causing undue harm to the individual citizens and the community. If these proposed evictions do not take into account the role of the government in the face of one of the most inclusive and widespread public emergencies in the history of this country, then the court has ignored Constitutional protections breaking the most primary contract between the government and the governed.

The Constitution is conspicuously clear on several rights of citizenship that a single bankruptcy should not harm the future of a citizen with a history of being a productive member of society. Bankruptcy is meant to give a second chance, the examination of the circumstance of that bankruptcy is written into law. There are factors which case after case, courts have held must be examined by the court in determining whether or not and to what degree a debtor is held responsible for the totality of the cost of the debt. These factors include a balancing between the potential harm to the individual debtors against the harm to the debt holder.

The basic constitutional protection that when the default is caused by government action there must be a sharing of the harm and finally the universally accepted concept in American law when government action and an act of God renders a contract impossible to perform, it is void or modified.

The deprivation of property from real estate to earnings to the expectation of profits from investment is only allowable under the 5th Amendment if the citizen is fairly compensated.

U.S. Const. Amend. V provides in pertinent part: "[N]or shall private property be taken. for public use, without just compensation." The U.S. Const.

Amend. XIV, §1 provides: ".All person born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property. without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws:."

N.Y. Const. art. I, §7, cl. a provides: "Private property shall not be taken for public use without just compensation."

.” Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 375 (2d Cir. 2006).U.S. Const. Amend. V requires that the government give 'just compensation" to people whose property the government "takes" for "public use". U.S. Const. amend. V. In 1897, the U.S. Supreme Court held that the Fifth Amendment's "just compensation" requirement was incorporated into the Fourteenth Amendment, and that state governments also were bound by the "just compensation" requirement. See Chicago, Burlington & Quincy R.R. v. Chicago, 166 U.S. 226, 241 (1897). N.Y. Const. art. 1, §7, contains a similar requirement.

The New York State's shutdown of Debtor's businesses was a taking in the public good. Even when there is an Emergency taking that is justifiable there must be fair compensation. The total destruction by the Government of all value of the business, which constitutes compensable property, has every possible element of a Fifth Amendment "taking," and is not a mere "consequential incidence" of a valid regulatory measure. Armstrong v. United States, 364 US 40.

**To determine if there is a government taking, courts have used the** three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central Transportation Co., supra,* 438 U.S., at 124, 98 S.Ct., at 2659.   Regulatory takings are based on the principle that 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.' " Ganci v. New York City Transit Auth., 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005) (citing Pennsylvania Coal, 260 U.S. at 415, 43 S.Ct. 158). There are two types: categorical and non-categorical. A categorical regulatory taking involves "the extraordinary circumstance when *no* productive or economically beneficial use of [property] is permitted." See Tahoe-Sierra, 535 U.S. at 330, 122 S.Ct. 1465 (quoting Lucas v. S. Carolina Coastal Council, 505 U.S. 1003, 1017, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)) (emphasis in original). All other regulatory takings are non-categorical: those involving "[a]nything less than a complete elimination of value, or a total loss." Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

Analyzing non-categorical takings under Penn Central "requires an intensive *ad hoc* inquiry into the circumstances of each particular case." Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 375 (2d Cir. 2006). Three factors are weighed: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986). Analyzing non-categorical takings under Penn Central "requires an intensive *ad hoc* inquiry into the

9

Cir. 2006). Three factors are weighed: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986).

  The economic impact of the regulation to close each of the hospitality businesses caused an extreme impact on the building at 78-80 St. Marks, NY NY. Due to all Mr. Otway's businesses being shut down, there was no ability for the entities to pay full rent for the time of the shutdown. When it was time to refinance, all the businesses in the building were closed and it was not possible to get a refinance. Although there were moratoriums in connection with evictions, there were no protections from the government in failing to forbid penalties and exorbitant interest to be charged to those injured by government's policies meant to stop the spread of a deadly illness that has been recognized as an international natural disaster. The government did not put on hold, sales of loans resulting in sales to predatory entities that are profiteering in the midst of disaster.

  The buildings tenants were all in businesses enumerated in the shutdown orders, being theater, a tavern and museum. The businesses were only able to open gradually as discussed above. As the reopenings were happening, the building was seeking loans, however the exorbitant interest was making receiving a mortgage more difficult. Although businesses have been able to open, although many struggling, there is a continuing harm. That Mr. Otway's business is uniquely harmed by government action is evidenced by the report of New York State Comptroller Thomas DiNapoli whose report is quoted in the article in the Gothamist. See Attached Ex.

  The report states that employment in the arts, entertainment, and recreational sector was at its peak in 2019. Pandemic shutdowns in 2020 caused a 55 percent drop in employment, and the sector has yet to recover. *Gothamist*, by Katerina Barton December 1, 2022, "Owners Fight to Save to Save Historic Theatre 80 on St. Marks Place" Midsize independent theaters have been the hardest hit in this downturn which was caused by, as the Comptroller states, government action.

  The continued harm has impacted the investment expectations detrimentally. There is an expectation of profitability by the building in housing these various businesses. The theater had invested money to reconfigure the theater to both make more money and to be Covid compliant. It also invested in air filtration systems throughout all the publics areas of the ground floor as per standards set by the government before a business would be allowed to reopen. Spending had to be prioritized and there was not enough money to do the appropriate upgrades for the Museum. Scheib also invested money into outdoor dining sheds to cope with the weather changes. Part of the expectation of recovery was with real progress

on the theater's reopening plan, elements could prove that the reopening model could work with being able to show potential lenders that bar revenues were steadily rising because of the increased visibility. This confirmed Mr. Otway's vision was the correct model. However the starting of the building's economy was abruptly halted when the Trustee overstepped her authority and interfered with a film shoot and instructed that only she could decide on what productions were booked into the theater. , The government in the person of the trustee purposely frustrated that attempt then mislead the court, by intimidating that the business was unprofitable by its nature or management while neglecting to inform the court that is was her own involvement that had cost the business a minimum of $47,000. IN this specific case, the shutdown alone was not the sole government action which demands review and redress by the court.

Whether or not the totality of this should be seen as a taking requires an evidentiary examination including testimony on the intentions of the Trustee and testimony from members of state government whether or not to protect New York theaters were mistakenly overlooked. Under United States v. Armstrong 364 U.S. 40 (1960)

There is a question of what is fair compensation when the government has removed property from an individual for the public good in an emergency, Armstrong, the case which defines the fair compensation critically does not articulate that fair compensation in the form of simply having the government pay for the value of that property , Rather, Justice Black in Armstrong states that The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. A fair interpretation of this constitutional protection entitles these lienholders to just compensation here. Id. at p. 49.

There are solutions and issues for the Court to weigh and consider in keeping with the equitable and Constitutional protections that a trial would provide.

_____
Eugenie Gilmore, Attorney for Defendants

80 St Marks Place

New York, NY 10003