UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re: Chapter 11 78-80 ST. MARKS PLACE, LLC,

Case No.: 21-12139 (MG)

                          Debtor.

------------------------------------------------------------x

MARIANNE T. O'TOOLE, ESQ., solely in her capacity as the Chapter 7 Trustee of the estate of 78-80 St. Marks Place, LLC, Plaintiff, Adv. Pro. No.: 22-_____ (MG)

-against

LAWRENCE V. OTWAY, a/k/a LAWRENCE LORCAN OTWAY, a/k/a LORCAN OTWAY, EUGENIE OTWAY a/k/a EUGENIE GILMORE-OTWAY a/k/a EUGENIE GILMORE, SCHEIB'S PLACE, INC. D/B/A WILLIAM BARNACLE TAVERN, EXHIBITION OF THE AMERICAN GANGSTER, INC., THEATRE 80, LLC, and JOHN DOE CORPORATIONS "1" THROUGH "100", OTHER JOHN DOE ENTITIES "1" THROUGH "100", Defendants.

------------------------------------------------------------x

**AFFIDAVIT IN SUPPORT OF THEATRE 80'S RESPONSE TO PLAINTIFF'S MOTION TO DISMISS THEATRE 80 INC.'S COUNTERCLAIMS**

    I am Lorcan Otway being duly sworn, deposes and says:

1. I am the owner of 78-80 St. Marks Place, LLC, Theatre 80 LLC Scheibs' Place Inc, and the Exhibition of the American Gangster. I am a named defendant in these proceedings.

2. Growing up in a working family, and being treated as an adult worker in that family, things were a matter of course, both formally and informally, which I never thought of in terms of law. It was simply the traditional way old traditional working theater families operated.

3. There came a time when I was informed by this court that it was likely to send Marshalls to remove me from my home. While a law clerk, several decades ago, I worked for a firm of Somerstein and Pike, We shared a suite with Robert Grimble, a lawyer who then in the 1980's, already had

1

many years of practice exclusively in Landlord Tenant practice. He interviewed me extensively about the history of my tenancy at 80 St. Marks Place and informed me that he had no doubt my tenancy was protected by New York State Rent Control Guidelines. To make sure this was not just a rosy picture painted by a friend, though a friend with decades of litigation in this field, my wife contacted another to advise her on issues in this case who in turn consulted with several other landlord tenant practitioners who agreed that I have a classic case conforming to the protections of Rent Control and further that the only proper forum to consider putting my wife and I out of our home is the New York City Landlord Tenant Court.

4. I have lived in my apartment for 57 years, for 53 years of that time, I paid rent as my father felt I should have that responsibility and degree of privacy when he discovered that my girlfriend and I were carrying on an intimate relationship in our townhouse's guestroom where she lived and stayed for many years. Though the floor through was in the family's town house, we had a separate kitchen and were expected to cook for ourselves unless wereinvited to dine with my parents.

5. Starting in 1970, I was employed by the Musical Film Company. Prior to that I had been employed by Theatre 80 in various capacities. The average rent when we had tenants in the 1960's was between $20 and 25 dollars so based on that amount, my father as director of the Musical Film Company set my rent at somewhere in the low 20's per month. The rent rose during the following years to approximately $300 a month. After my father's death, the building was owned and managed by my mother, Florence Otway. The rent then was $300.00. There were writings of the leases which were kept on yellow pads in the box office. There came a time that the box office was held by a theatrical tenant. The original leases were likely discarded by the theatrical tenant. After my mother's death, I continued to take owner's draw of $400 as rent and put some of that toward the building's expenses. The leases ran for a year or two at a time and then were renewed with adjustments through the years based on the rise in cost of living and my share of the family's maintenance. See Otway Exhibit 1

6. After the Musical Film Company folded I paid my rent to the d/b/a/ which received rents for the building, generally in the form of direct cash on my payday or purchasing groceries or other building needs for my aging mother who was the sole

2

beneficiary of the trust which owned half the building. I continued this arrangement until the death of my mother at which point, I would use owners draw from my various businesses to put money into the immediate needs of the building which was always more than the $600 my pay had risen to over the years.

7. The independent proof that this arrangement existed is that when my mother learned my brother had misappropriated $500,000, she transferred a portion of the building to me. My brother contested my mother's transfer of property to me  He demanded of my mother and I in papers filed in the Surrogate Court, proof that I had paid the last 30 years of rent. He held I personally owed the building.
8. My mother assured me that the groceries I bought for her were credited to the rent owed to the d/b/a .
9. There was no intention to mislead or hide anything from the court. I did not know that this arrangement constituted a rent-controlled tenancy.

.10.  Hirschmark had drafted documents for me to sign at the closing in 2019. All of our residential tenants were holdovers from my mother's time as director here. The license for theatrical rentals was handled by our theater manager so I assumed that Hirschmark's documents were accurate and there were voluminous papers to sign. I had no knowledge at the time that my lease was protected. My lawyer at the closing was seriously ill and had to go to hospital after closing. He may have missed some of the details. He did not pick up any of the closing documents which were signed.. My lawyer in dealing with the 2020 leases did not advise me that St Marks Mixed Use, a subsidiary of Maverick Real Estate Partners did not have a right to change the terms of existing leases

11. On March 7, 2020, my hospitality businesses were all shut down by New York State.
12. Scheib's was allowed to reopen in a gradual fashion. When it was allowed to do some business, it was only outdoor service, so it was affected by weather By November of 2020, Scheib was building outdoor dining booths to try to shelter customers from the weather. People were still not allowed to come inside the tavern. When they finally came inside the tavern, it was very limited due to the required 6 foot distancing between guests, and the amount of people was severely limited because Scheibs is a very narrow bar which results in only a couple of chairs would be allowed. Restrictions required that patrons were not to approach bars or counter but walk directly to their socially distanced seating. There were also rules about the amount of percentage of the business's capacity that were allowed to be admitted.

Scheib had been paying 78-80 St Marks but is still building up because of not having the Theater being fully booked. The Theater audience is an intended and vital and necessary part of the tavern's trade.

At the beginning of these bankruptcy proceedings, Reorganization was still hampered by the restrictions on reopening and businesses shut down by the state. I was expecting a mortgage from a company that had promised to refinance the debt.

Projections were drafted to submit to potential Lenders. The Projections were not submitted as a reorganization plan because it could not be implemented to make all payments immediately. The projections were showing that it would take about eight months of the business building up from being closed to begin paying mortgage payments.

A lender had promised that with certain protections that our business plan was valuable enough to give us a bridge loan to refinance the loan and get us started again. After meeting all the conditions and demands he had made, I received an email from John Corse attached as Exhibit 2 informing that Mr. Corso had sat across the table from the table from a Director from Sachem who when John asked when the loan coming through, laughed and said he was not lending money to that lowlife who stole the building from his mother and brother, relying on my brother's allegations. Upon receiving this news, I realized that we had to expediate the reopening of the theater with as busy a schedule as possible to show potential lenders to keep up with loan payments. This was becoming increasingly possible because more and more Covid restrictions were being lifted from theater operations.

I was planning a reorganization of the scheduling of shows at Theatre 80 to take into account that the economy of theater would be more difficult Post Covid for those productions renting theaters and for the theater to contribute to its portion to Scheib's Place's so that mortgage payments and other expenses could be paid. I was planning on multiple shows per day, approximately three, where there would be a faster turnover, more productions would be able to afford a smaller rent for a shorter time slot rather than the entire evening and would balance by having several a day. In my experience, increased audience attendance results in greater volume of bar receipts. The theater would be booked fully. The audience would have the opportunity to go to the tavern before a show, during an intermission and after the show. I was going to add several tour slots for the Exhibition of the American Gangster which also goes through the theater and tavern as part of the tour to show parts of the building that pertained to Prohibition and other aspects of history in the building.

With the sudden withdrawal of an expected refinance of mortgage, the theater instituted a program of short minimal set entertainments including concerts and plays as well as studio use for film, television and audio recording.

The Trustee did not allow for a film shoot to go forward, despite all the Trustee's stated concerns being addressed and met, depriving the Theatre of $47,000 of rental fees which would have been to use for the Theatre's rent to Scheibs and then Scheib's rent to the building.

With all the above Covid factors, Scheib continued to pay rent when it could and then gradually was paying reduced amounts. A theater must be dependable in its bookings and its schedule in order to survive in the theater world. The Trustee's actions not only threatened the reputation and caused harm to this theater but every staff member that had interacted with the film company in this instance.

The capricious actions by the trustee expressed unreliability to industry professionals which can not be tolerated in theater . If the trustee had acted in this way as theater management, not one staff member would ever consider working for or with her again out of concern for their own reputation.

For the Motion to Dismiss, we intend to include an affidavit from the Location Manager about this event.

If the theater could operate as the Otways have run their business for the last 57 years, the theater and Scheib would be able to pay their rent.

13. The Exhibition of the American Gangster does not have a lease at the present time. It has not reopened since the Covid Shutdown. I prioritized opening the businesses at 78-80 St. Marks based on the cost to refit for Covid accommodations and potential return on the investments. The expectation has been that when the theater is fully operational, this will increase receipts in the bar which will increase and provide the seed money for the building to retrofit and reopen the museum, completing the successful business model recognized by Sports Properties Inc. and other affiants.

It has been alleged that the default was caused by my bad business practices and not by state action. I am providing the court with several affdavits that speak to the value and good management of this historic institution under my direction. See Otway Exhjbit 2

14. I signed the first forbearance because I was told by my attorney that was no choice but to sign. I was in imminent danger of being evicted and the property sold ; I was not told that there were State Moratorium protections available or as I have said, that I had rent control protections. The office of Councilwoman Carlina Rivera researched our situation and told me of the Moratorium protections. It was noticed by her office that the forbearance dates ran out the same time as the Moratorium before there were extensions. This showed that St. Marks Mixed Use/ Maverick Real Estate Partners were that these protections existed. My attorney did not tell me of the protections. I was told there was no choice or room to negotiate.

5

With the second Forbearance, I was expecting a loan shortly and again I was told I had no choice. When filing for bankruptcy I understood that the contracts with Hirschmark and St. Marks Mixed Use would reviewed for inappropriateness and overreaching.

_____
Lawrence Lorcan Otway

Sworn to before me

On the 9 of January, 2023

_____

Ganesh Ram Junior
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RA6418262
Qualified In Queens County
Commission Expires   June 7, 2025