# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

In re:                                                           Chapter 7

78-80 ST. MARKS PLACE, LLC,                                      Case No.: 21-12139 (MG)

          Debtor.

----------------------------------------------------------x

**STIPULATION PURSUANT TO BANKRUPTCY RULE 9019 AND SECTIONS 105, 362, 363, 364 AND 502 OF THE BANKRUPTCY CODE, (I) SETTLING AND ALLOWING THE CLAIM OF ST. MARK'S MIXED USE LLC; (II) DETERMINING THAT ST. MARK'S MIXED USE LLC HAS A VALID FIRST PRIORITY LIEN ON THE DEBTOR'S PROPERTY; (III) PROVIDING FOR USE OF CASH COLLATERAL; (IV) PROVIDING FOR ADVANCES TO BE MADE BY ST. MARKS MIXED USE LLC; (V) PROVIDING FOR A CARVE-OUT FROM THE LIENS OF ST. MARKS MIXED USE LLC IN CONNECTION WITH THE SALE OF THE REAL PROPERTY LOCATED AT 78-80 ST. MARKS PLACE, NEW YORK, NEW YORK 10003; AND (VI) GRANTING RELATED RELIEF**

This stipulation ("**Stipulation**") is entered into by and between (i) Marianne T. O'Toole, Esq., solely in her capacity as Chapter 7 Trustee ("**Trustee**") for 78-80 St. Marks Place, LLC ("**Debtor**"), and (ii) St. Mark's Mixed Use LLC ("**Lender**"). The Trustee and the Lender are sometimes collectively referred to herein as "**Parties**" and are sometimes each individually referred to as a "**Party**".

**RECITALS**

**I.**   **The Debtor's Ownership and Real Property**

A.   The Debtor is a limited liability company organized and existing under the laws of the State of New York with a principal place of business located at 80 St. Marks Place, New York, New York 10003.

B.   The sole member of the Debtor is Lawrence Otway ("**Otway**").

C.   The Debtor is the fee owner of the real property located at 78-80 St. Marks Place, New York, New York 10003 ("**Property**").

D.     The Property is a mixed-use property that holds three residential units, a meeting and storage space, and three businesses including Theatre 80 LLC ("**Theatre 80**"), Scheib's Place, Inc. d/b/a William Barnacle Tavern (the "**Tavern**"), and Exhibition of the American Gangster, Inc (the "**Museum**"; and together with Theater 80 and the Tavern, collectively the "**Businesses**"). The Businesses are owned and controlled by Otway. The Debtor itself does not operate any business other than the ownership and maintenance of the Property.

E.     Otway and his wife, Eugenie Otway, reside at the Property. The Debtor, Otway, Eugenie Otway, the Tavern, the Museum and Theater 80 are sometimes collectively referred to herein as the "**Obligor Related Parties**".

## II.     The Loan Against the Property

F.     On or about November 12, 2019, 80 St. Marks Place Funding LLC ("**Funding LLC**") made a loan ("**Loan**") to the Debtor in the principal sum of six million one hundred thousand and 00/100 dollars ($6,100,000), which Loan is evidenced by a Promissory Note dated as of November 12, 2019 ("**Note**"), which Note was duly executed by the Debtor and delivered by the Debtor to Funding LLC.

G.     In order to secure its obligations under the Note, the Debtor, as mortgagor, duly executed, acknowledged and delivered to Funding LLC, as mortgagee, a Mortgage and Security Agreement, dated as of November 12, 2019 ("**Mortgage**"), which Mortgage encumbers the Property. The Mortgage was duly recorded with the New York City Register ("**Register**") on November 22, 2019 at CRFN 2019000383130.

H.     In connection with the Note and Mortgage, the Debtor duly executed, acknowledged and delivered to Funding LLC an Assignment of Leases and Rents, dated as of November 12, 2019 ("**ALR**"), which ALR was duly recorded with the Register on December 4,

2019 at CRFN: 2019000395326. Pursuant to the ALR, among other things, the Debtor assigned all its leases and rents to Funding LLC.

I.      In order to induce Funding LLC to make the Loan to the Debtor, Otway duly executed and delivered to Funding LLC a Guaranty dated as of November 12, 2019 ("**Guaranty**"). Pursuant to the Guaranty, Otway absolutely, unconditionally and irrevocably guaranteed the payment to Lender of all amounts and obligations under the Note, the Mortgage and other Loan Documents (as defined below) when same become when due and payable, and the due and prompt performance of all obligations, terms, agreements and covenants under all of the Loan Documents.

J.      Otway is the sole member of the Debtor and owns 100% of the limited liability company membership interests in the Debtor, and in order to further secure, among other things, the Debtor's obligations under the Note and the other Loan Documents, Otway duly executed and delivered to Funding LLC that certain Pledge and Security Agreement dated as of November 12, 2019 ("**Pledge Agreement**"). Pursuant to the Pledge Agreement, among other things, Otway pledged to Funding LLC, among other things, all of his right, title and interest in, to and under his membership interests in the Debtor and the other "**Collateral**", as that term is defined in the Pledge Agreement) ("Collateral" as defined in the Pledge Agreement is referred to herein as "**Pledged Collateral**"). Funding LLC perfected its security interest against the Pledged Collateral by, among other things, taking possession of the certificate of membership interests ("**Certificated Interest**") and filing a UCC-1 financing statement naming Otway as the debtor (the "**UCC-1**"), which adequately described the Pledged Collateral, with the New York State Department of State ("**NYSOS**") on December 18, 2019, designated as File No. 201912180587574. The Certificated Interest and the UCC-1 constitute a valid and perfected first priority lien on the Pledged Collateral.

3

K.    On December 1, 2020, the Loan was duly assigned by Funding LLC to the Lender and (i) the Note was endorsed by Funding LLC to the Lender pursuant to, among other things, an Allonge to Promissory Note, dated December 1, 2020 ("**Allonge**"); (ii) the Mortgage was assigned to the Lender as evidenced by an Assignment of Mortgage dated as of December 1, 2020 (the "**Mortgage Assignment**"), which Mortgage Assignment was duly recorded with the Register on January 14, 2021 at CRFN 2021000015556; (iii) the ALR was assigned to the Lender, as evidenced by an Assignment of Assignment of Leases and Rents dated as of December 1, 2020 ("**ALR Assignment**"), which ALR assignment was duly was duly recorded with the Register on January 14, 2021 at CRFN 2021000015557; (iv) Funding LLC assigned, among other things, the UCC-1 to Lender, as evidenced by a UCC Financing Statement Amendment (the "**UCC-3**"), which UCC-3 was duly filed with the NYSOS on June 8, 2021; and (v) pursuant to an Omnibus Assignment of Loan Documents dated as of December 1, 2020 ("**Omnibus Assignment**"), the Note, the Mortgage, the Guaranty, the Pledge Agreement, the ALR, the Certificated Interest, the UCC-1 and all of the other Loan Documents were each duly assigned by Funding LLC to the Lender. The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Allonge, the Mortgage Assignment, the ALR Assignment, the Certificated Interest, the UCC-1, the UCC-3, the Omnibus Assignment and all other documents evidencing, securing, or guaranteeing the Loan and/or the assignment thereof to the Lender are collectively referred to herein as the "**Loan Documents**".

L.    As a result of the above-described assignments, the Lender has possession of, and is now the owner and holder of, the Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, the Certificated Interest and all of the other Loan Documents.

M.    Pursuant to the Loan Documents the Loan matured on December 1, 2020 (the "**Maturity Date**").

N.      The Debtor failed to pay in full all obligations under the Loan Documents on or before the Maturity Date (i.e., December 1, 2020), which failure constitutes an "Event of Default" as defined in the Note and the Mortgage (the "**Maturity Default**"). The Loan is now immediately due and payable in full.

O.      Without limiting in any manner any other existing defaults, the Debtor and Otway (collectively the "**Obligors**") are now in default under the Loan Documents based upon the Maturity Default and the Obligors' failure to pay the property taxes due on and after January 1, 2021 with respect to the Property.

### III.   The Forbearance Agreement

P.      The Debtor, Otway, Eugenie Otway (Otway's wife), the Tavern, the Museum, Theatre 80, and the Lender executed a Forbearance Agreement dated as of January 14, 2021 ("**Forbearance Agreement**") pursuant to which the Obligor Related Parties agreed, among other things, that the Loan matured on its terms on December 1, 2020, that interest began to accrue at the default rate (24% per annum) as of December 2, 2020, and that the Lender was owed $6,245,653.65 as of December 31, 2020, plus legal fees and protective advances from and after December 18, 2020.

Q.      Under the Forbearance Agreement, among other things, if the Debtor failed to repay the Loan by April 15, 2021, the Debtor was required to list the Property for sale at $11,000,000 with the price decreasing each month through July 15, 2021, to a final listing price of $8,500,000. If the Property was not sold by August 15, 2021, the Forbearance Agreement provided that the Lender would have the right to foreclose without opposition.

R.      The Property was not sold in accordance with the Forbearance Agreement.

S.       On September 3, 2021, the Lender issued a Notice of Disposition of Collateral

providing for a public auction on November 18, 2021.

**IV.    The State Court Action**

T.       Prior to the scheduled public auction, the Debtor, Otway, Eugenie Otway, the

Tavern, the Museum and Theater 80 commenced an action in the Supreme Court of the State of

New York, New York County (the "**State Court**"), under Index No. 656446/2021 ("**State Court**

**Action**") and contemporaneously filed a motion seeking to preliminarily enjoin the auction sale

("**Stay Motion**").

U.       On November 29, 2021 the State Court "So-Ordered" a Stipulation of Settlement

and Dismissal of Action, dated as of November 29, 2021, signed by the Debtor, Otway, Eugenie

Otway, the Tavern, the Museum, Theatre 80, and the Lender (the "**Consent Order**"), which was

duly entered by the State Court on November 29, 2021 (NYSCEF Dkt. No. 35). Pursuant to the

terms of the Consent Order, among other things, (i) the State Court Action and the Stay Motion

were dismissed with prejudice, (ii) the Obligor Related Parties agreed to the amount owed to

Lender under the Loan Documents and released all claims against Lender, and (iii) Lender agreed

not to conduct a sale of the Pledged Collateral pursuant to the New York UCC prior to December

30, 2021.

V.       Pursuant to the Consent Order, the State Court ordered, and the Obligor Related

Parties agreed that, among other things:

     i.       As of November 30, 2021, there was due and owing to the Lender under the Note,
the Mortgage, the Guaranty, the Pledge Agreement and the other Loan Documents
the sum of $7,980,855.65, plus additional amounts for legal fees and expenses and
protective advances from and after November 21, 2021.

    ii.       Interest accrues at the default rate of 24% per annum (the "**Default Rate**") as of
December 2, 2020, and interest at the Default Rate until the date that the Debtor
and Otway have indefeasibly paid and satisfied all of their obligations under each
of the Loan Documents and the Consent Order;

6

iii.     Lender is entitled to its additional legal fees and expenses and protective advances from and after November 21, 2021, together with interest thereon at the Default Rate;

iv.     The Note, the Mortgage, the ALR, the Guaranty, the Pledge Agreement, all of the other Loan Documents, the Forbearance Agreement and the Consent Order were duly executed and delivered by the Obligor Related Parties and constitute legal, valid and binding obligations of the Obligor Related Parties, enforceable in accordance with their respective terms;

v.     The Obligor Related Parties have no defenses, claims or counterclaims of any kind against Lender or its affiliates directly or indirectly relating to the Loan or any or all of the Loan Documents or the Forbearance Agreement and, if any such defense, claim or counterclaim existed, it was waived with prejudice. The Obligor Related Parties released all claims against the Lender, and the Lender' past present and future officers, directors, shareholders, agents professionals and the other "Released Parties" (as defined in the Consent Order);

vi.     The Debtor's 2019 leases with (i) Otway and Eugenie Otway, (ii) the Museum, (iii) the Tavern, and (iv) Theatre 80 expired and terminated on November 12, 2020 and are no longer in effect;

vii.     The Debtor's 2020 leases with (i) Otway and Eugenie Otway, (ii) the Museum, (iii) the Tavern were wrongfully created and terminated. The 2020 sublease between the Tavern and Theatre 80 was wrongfully created and terminated;

viii.     The Oral Sublease and the Oral Sub-Subleaase (each as defined in the Consent Order) were forever terminated and are void and of no effect whatsoever;

ix.     The Debtor, Eugenie Otway, the Tavern, the Museum and Theatre 80 had no legal right to use any part of the property as of June 1, 2021 and each of them were required to vacate the Property by December 30, 2021, time being of the essence;

x.     In the event that the Debtor and the other Obligor Related Parties failed to completely vacate the Property by December 30, 2021, time being of the essence, they shall be jointly and severally obligated to pay Lender $200,000 as liquidated damages.

W.     The Debtor failed to sell or refinance the Property in accordance with the Consent Order.

X.     The Debtor and other Obligor Related Parties failed to vacate the Property by December 30, 2021, wrongfully remain in possession of the Property as of the date hereof, and each of them is in violation of the Consent Order.

7

## V.   The Debtor's Bankruptcy Filing

Y.      On December 29, 2021 ("**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**" or "**Court**").

Z.      On January 19, 2022 the Debtor filed (i) a Motion for Entry of an Order: (A) Authorizing Debtor to Obtain Superpriority Post-Petition Financing, (B) Granting Liens and Superpriority Claims, (C) Modifying the Automatic Stay; and (D) Granting Related Relief (the "**DIP Financing Motion**") [ECF No. 14]; and (ii) a Motion for the Entry of an Order Approving the Use of Cash Collateral (the "**Cash Collateral Motion**"; and together with the DIP Financing Motion , collectively, the "**Financing Motions**") [ECF No. 15]. On February 11, 2022, the Lender filed an Omnibus Objection to both Financing Motions and four declarations in support thereof [ECF Nos. 24-28] (collectively, the "**Financing Objection**]. On February 22, 2022, the Debtor filed an Omnibus Reply to the Financing Objection [ECF No. 30] (the "**Reply**").

AA.     An evidentiary hearing on the Financing Motions was scheduled for March 2, 2022 at 2:00 pm.

BB.     According to the Lender, the Debtor and Lender reached a settlement in principle of the contested issues raised in the Financing Motion and of other disputes in the case, but that settlement was not consummated.

CC.     By motion dated April 4, 2022, the Lender sought entry of an Order converting the Debtor's Chapter 11 case to one under Chapter 7 of the Bankruptcy Code or, alternatively, appointing a Chapter 11 Trustee pursuant to sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code ("**Lender's Conversion Motion**"). The Debtor opposed the Lender's Conversion Motion.

On April 27, 2022, the Bankruptcy Court held a hearing on the Lender's Conversion Motion, at which hearing the Bankruptcy Court advised it would grant the Lender's Conversion Motion unless the Debtor agreed with the Lender as to, among other things, the timing and all issues involved with a sale of the Property.

DD.     On March 29, 2022, the Lender timely and properly filed a proof of claim against the Debtor's Estate as a secured claim in the amount of $8,326,870.38 as of the Petition Date, plus Default Rate interest, attorneys' fees and expenses and protective advances, and other amounts owed as set forth therein, all of which continue to accrue, which proof of claim was assigned claim number 4 on the claims register maintained by the Bankruptcy Court ("**Claim 4**").

EE.     On April 11, 2022, the Debtor filed an objection to Claim 4 ("**Claim Objection**") [ECF No. 39]. On May 12, 2022 the Lender filed a response to the Claim Objection and declaration in support of such response [ECF Nos. 53 and 54].

FF.     On May 17, 2022 the Bankruptcy Court held an adjourned hearing on the Lender's Conversion Motion. By Order dated May 17, 2022, the Bankruptcy Court directed the appointment of a Chapter 11 Trustee for the Debtor. The Bankruptcy Court, inter alia, found cause to convert the Debtor's case pursuant to sections 1112(b)(4)(A) and 1112(b)(4)(I) of the Bankruptcy Code.

GG.     On May 23, 2022, the United States Trustee filed a notice of appointment of Marianne T. O'Toole, Esq. as the Chapter 11 Trustee for the Debtor. On May 24, 2022, the Bankruptcy Court signed an Order approving the appointment of Marianne T. O'Toole, Esq. as the Chapter 11 Trustee for the Debtor.

HH.     On June 17, 2022 the Trustee filed a motion seeking the entry of an Order converting the Debtor's case to one under Chapter 7 of the Bankruptcy Code (the "**Trustee's Conversion Motion**").

II.    Pursuant to a stipulation between the Trustee and the Lender that was "So Ordered" by the Bankruptcy Court on June 30, 2022, the Trustee was authorized through and including July 21, 2022 to use cash collateral generated from the Property to pay invoices for the operation and maintenance of the Property.

JJ.    By Order dated July 25, 2022, the Bankruptcy Court converted the debtor's case to Chapter 7 of the Bankruptcy Code [ECF No. 71]. On July 25, 2022, the United States Trustee filed a notice of appointment of Marianne T. O'Toole, Esq. as the Chapter 7 Trustee for the Debtor.

KK.    Pursuant to a Memorandum Opinion and Order entered on September 30, 2022 in Otway's individual Chapter 11 case [Case No.: 21-12140-MG, ECF No. 39], the Bankruptcy Court granted the Trustee's motion for relief from the automatic stay in Otway's Chapter 11 case to permit the commencement of an adversary proceeding in the Debtor's case.

LL.    On September 30, 2022, the Trustee filed a complaint against Otway, Eugenie Otway, the Tavern, the Museum and the Theatre by which the Trustee seeks, inter alia, an order and judgment directing the turnover of possession of the Property to the Trustee.

MM.    The Trustee intends to sell the Property in accordance with, inter alia, section 363 of the Bankruptcy Code and subject to further Order(s) of the Bankruptcy Court.

NN.    The Trustee and the Lender recognize and agree that the proceeds from the sale of the Property may be insufficient to satisfy the Mortgage held by the Lender and all administrative costs and expenses associated with such sale.

OO.    The Trustee has determined that she requires funds to maintain the Property pending its sale. The Trustee does not have any unencumbered funds in the estate.

PP.    The Trustee and the Lender are desirous of resolving all issues between them, including the Claim Objection, and providing for the terms and conditions of the prompt

liquidation of the Property. The Trustee and the Lender have engaged in communications and discussions concerning the relative merits of the Parties' positions, resulting in the agreement set forth in this Stipulation.

**NOW THEREFORE**, the Parties hereby stipulate and agree, through their undersigned counsel, and intending to be bound, as follows:

1.      **Incorporation of Recitals**. The foregoing recitals are hereby incorporated herein by reference hereby, are expressly acknowledged and agreed to by the Parties, and shall have the same force and effect as if in the body of this Stipulation.

2.      **Bankruptcy Court Approval**. This Stipulation is subject to entry of an Order of the Bankruptcy Court approving this Stipulation, in the form of the Order attached as <u>Exhibit 1</u> hereto (the "**Approval Order**") and without any changes (other than such changes that are acceptable to each Party). If the Approval Order is not entered by the Bankruptcy Court, prior to **January 31, 2023** then this Stipulation shall be void <u>ab</u> <u>initio</u>.

3.      **Allowance of The Lender's Claim and Liens**.

(a)      The Trustee has reviewed and investigated the Loan Documents and Claim 4 and has determined in her business judgment that it is in the best interest of the Debtor and the Debtor's bankruptcy estate (the "**Estate**") to enter into this Stipulation.

(b)      The Lender's claim against the Debtor under the Loan Documents, Forbearance Agreement, Consent Order and Claim 4 is hereby permanently settled, fixed, liquidated and allowed in the following sums (the aggregate amount set forth in subclauses (i) through (iv) below in this Paragraph 3(b) is hereinafter referred to as the "**Allowed Secured Claim**"): (i) sum of $8,326,870.38 (the "**Base Claim Amount**") as of the Petition Date, **PLUS** (ii) all protective advances made by the Lender on and after the Petition Date (including, without

11

limitation, all Lender Advances [as defined below]), **PLUS** (iii) interest on the Base Claim Amount

at the rate of 24% per annum from the Petition Date until the date that all amounts owed under the

Loan Documents, the Forbearance Agreement, the Consent Order and Claim 4 are received by

Lender from the Trustee and the Debtor's Estate, **PLUS** (iv) all fees, costs, expenses, and

reasonable attorneys' fees and expenses incurred by the Lender on and after the Petition Date, plus

interest thereon at the rate of 24% per annum from the date of payment thereof or advance by

Lender until the date that all amounts owed under the Loan Documents, the Forbearance

Agreement, the Consent Order and Claim 4 are received by Lender from the Trustee and the

Debtor's Estate. The amounts described in subclauses (iii) and (iv) immediately above are referred

to herein as the "**Claim Additions**".

(c)    The amount of Claim Additions from the Petition Date through and

including October 31, 2022 is hereby fixed in the sum of $1,887,308.

(d)    To the extent that "Collateral Value" (as defined below) is less than the

Allowed Secured Claim, then (i) the amount of the Allowed Secured Claim shall be reduced to an

amount equal to the Collateral Value and (ii) Claim Additions shall not be allowed to the extent

that including them in the amount of the Allowed Secured Claim would cause the amount of the

Allowed Secured Claim to exceed the Collateral Value. The term "Collateral Value" shall mean a

sum equal to the (i) value of the Property (which if the Property is sold shall be the amount of

"Sales Proceeds" [as defined below]), **PLUS** (ii) the amount of all rents and Other Proceeds (as

defined below) received by, or payable to, the Debtor, the Trustee or the Debtor's Estate (as

defined below) from and after the Petition Date (such amount in this clause (ii) being the "**Post-
Petition Other Proceeds**").

(e)    The amount of the Post-Petition Other Proceeds from May 24, 2022 through

12

and including October 31, 2022 is hereby fixed in an amount not less than $67,064.00.

(f)    The Allowed Secured Claim hereby forever constitutes an allowed, legal, valid, binding, enforceable and non-avoidable claim and obligation of the Debtor and the Debtor's Estate, and is not subject to any offset, setoff, defense, counterclaim, recoupment, deduction, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law. Neither the Debtor, the Debtor's Estate nor the Trustee possess or will assert any claim, counterclaim, setoff or defense of any kind, nature, or description which would in any way affect the validity, amount, enforceability, and non-avoidability of any part of the Allowed Secured Claim.

(g)    Nothing in this Stipulation shall in any way whatsoever limit or reduce Lender's claims against Otway or any other guarantor or person or entity concerning or with respect to the Loan Documents, the Forbearance Agreement, the Consent Order or the Lender's Allowed Secured Claim including, without limitation, for any interest, fees, expenses, and attorneys' fees and expenses accruing under the Loan Documents after the Petition Date. The Lender expressly reserves any and all rights to pursue any and/or all claims against any third parties, including without limitation, Otway or any other guarantor or person or entity concerning or with respect to the Loan Documents, the Forbearance Agreement, the Consent Order or the Lender's Allowed Secured Claim, and to assert the full amount owed under such documents. Any compromise in the amount of the Lender's claim pursuant to this Stipulation is not intended to, and shall not, inure to the benefit of Otway or any guarantor of the Loan.

(h)    As of the Petition Date, the Allowed Secured Claim is secured pursuant to the Loan Documents by valid, perfected, enforceable and non-avoidable first priority security interests, mortgage and liens granted by the Debtor to the Lender upon all of the collateral and

13

mortgaged property (including, without limitation, the Property) described in the Loan Documents existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof whether generated, arising or existing prior to or after the Petition Date (collectively, together with any other property of the Debtor's Estate (as used herein "**Estate**" shall include all items included under section 541 of the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender (or Funding LLC) prior to the Petition Date, being referred to herein as "**Pre-Petition Collateral**"), which liens of the Lender are senior to all other liens on the Pre-Petition Collateral (other than the lien of the City of New York ("**NYC**") for unpaid property taxes and water/sewer charges with respect to the Property). The Trustee, the Debtor and the Debtor's Estate will not assert any claim, counterclaim, setoff, or defense of any kind, nature or description which would in any way affect the validity, amount, enforceability and non-avoidability of any part of the Allowed Secured Claim, or any of the Lender's claims, liens, mortgages, or security interests in any of the Pre-Petition Collateral. Without limiting the foregoing, (i) all proceeds of any sale of the Property (including, without limitation, any proceeds substitutions and replacements of the Property, including without limitation, from any closing of a sale of the Property, any contract rights with respect to any contract to sell the Property, and any deposits and other amounts to which the Trustee is entitled from any contract or attempt to sell the Property); and (ii) all rents, fees and/or use and occupancy amounts from any tenants or any other persons with respect to the Property (collectively, "**Other Proceeds**"), in each case (i) and (ii) whether existing or arising before, on or after the Petition Date constitute part of the Lender's Pre-Petition Collateral and the Lender has a perfected, non-avoidable first priority security interest, mortgage and lien therein and thereon.

    (i)  As adequate protection to the Lender for the liens, rights, priorities, claims

14

and protections granted to it pursuant to the Loan Documents, the Forbearance Agreement, the

Consent Order and this Stipulation, the Lender is hereby granted: (a) replacement liens on all

property of the Debtor's Estate, including without limitation, the Property, Other Proceeds, contract

rights, deposits, cash collateral, and bank accounts of the Debtor and its Estate (whether in the name

of the Debtor or the Trustee, and including, without limitation, the Other Proceeds Account, as

defined below) all whether existing or arising before, on or after the Petition Date (collectively,

"**Replacement Liens**"), to secure the Allowed Secured Claim and the Lender's claims hereunder,

which Replacement Liens (i) shall be and shall continue to be first and senior in priority to all other

interests, security interests, mortgages, liens and encumbrances of every kind, nature and description

(other than the lien of NYC for unpaid property taxes and water/sewer charges with respect to the

Property), and (ii) shall not at any time whatsoever be made subject or subordinate to, or made <u>pari</u>

<u>passu</u> with, any other lien, security interest or claim against any property of the Debtor's Estate,

whether any such liens now exist or are hereafter created, pursuant to sections 363 or 364 of the

Bankruptcy Code or otherwise; and (b) a priority administrative expense claim pursuant to section

507(b) of the Bankruptcy Code in the amount of any decline in the value of any Other Proceeds paid

by the Trustee to any third person from and after the date of this Stipulation ("**Adequate Protection**

**Administrative Claim**") having priority over all any and all other unsecured obligations, liabilities,

indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the

Debtor or the Trustee (or any successor trustee in this case), including, without limitation, any and

all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328,

330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy

Code, and shall at all times be senior to the rights of the Trustee, any successor trustee, or any

creditor or other party in interest in this case or any subsequent proceedings or cases under the

15

Bankruptcy Code; **provided, however**, the Replacement Liens and the Adequate Protection Administrative Claim shall be subject and subordinate in all respects to the Carve-Out Expenses (as defined in Paragraph 7 below), and shall not apply to the proceeds of any causes of action of the Debtor's Estate arising under Chapter 5 of the Bankruptcy Code.

(j)    This Stipulation shall be sufficient and conclusive to effectuate the priority, perfection, and validity of the security interests and liens granted hereby, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, possession or control with respect to the Other Proceeds and Other Proceeds Account (as defined below) or other act to validate or perfect such security interest, mortgage, or liens including, without limitation, any control agreements with any financial institutions, banks or securities intermediary holding any depository, brokerage, or securities account consisting of any collateral of the Lender.

4.    **Sale of the Property**. The Trustee will proceed expeditiously with the marketing and sale of the Property (the "**Sale**") pursuant to section 363 and other applicable provisions of the Bankruptcy Code in a manner that will maximize the value of the Property and liquidate the Property as quickly as possible, but subject to the terms and provisions set forth in Paragraph 10 below in all respects. The terms of sale will be subject to the Lender's consent and the Bankruptcy Court's approval. The Trustee will seek the Bankruptcy Court's approval of the proposed sale mechanics and procedures.

5.    **Retention of Brokers**. Subject to the Bankruptcy Court's approval, the Trustee will seek entry of an amended Order retaining Maltz Auctions, Inc. ("**Maltz**") and Cushman & Wakefield ("**CW**"; and together with Maltz collectively, the "**Brokers**") to market and sell the Property as co-brokers on the economic terms set forth below in this Paragraph 5 (the "**Amended**

16

**Broker Retention Order**"). The Brokers will be entitled to compensation (inclusive of reimbursement of expenses) in the aggregate amount of no greater than: (a) a buyer's premium of four (4%) percent of the amount of the successful bid at an auction of the Property, if the Property is sold to a person that is not the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party), or (b) a commission (inclusive of reimbursement of expenses) in the aggregate amount of one (1%) of the amount of the successful bid at an auction of the Property solely if the Lender who is the party to this Stipulation (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party) acquires the Property by a Lender Credit Bid (as defined below). The terms of sale for any Sale of the Property shall provide, among other things, that all bidders other than the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party) shall pay a buyer's premium of four (4%) percent of the sale price.

6.    **Management of the Property Pending Sale.**

(a)    Operation of the Property. The Trustee will manage the Property until such time as the Sale is consummated, the case is dismissed or the Property is abandoned. The Trustee will create and propose to the Lender a budget to operate the Property. Notwithstanding anything to the contrary, the Lender cannot be compelled to make any Lender Advance (as defined below) without the Lender's express prior written consent, and the Trustee cannot be compelled to manage the Property in the absence of necessary Lender Advances.

(b)    Rental Income. All rents, proceeds and other funds generated from the Property shall constitute "cash collateral" (as defined in section 363(a) of the Bankruptcy Code)

17

part of Lender's Pre-Petition Collateral, and the Lender shall also have a Replacement Lien thereon. All rents, proceeds and other funds generated from the Property shall be held in a segregated estate account maintained by the Trustee ("**Other Proceeds Account**"). For the avoidance of doubt, the Trustee hereby grants the Lender a first priority lien on all Other Proceeds collected after the Petition Date and all proceeds thereof (including without limitation all funds) in the Other Proceeds Account and the Lender hereby has a perfected and unavoidable lien and security interest in all cash collateral and the Other Proceeds Account, which liens secure the Lender's Allowed Secured Claim. The Trustee shall not deposit any monies except any Other Proceeds into the Other Proceeds Account. The Trustee is authorized to pay expenses related to the Property directly from the rents deposited in the Other Proceeds Account, provided that Lender approves, in its sole discretion, in writing any such payments.

(c)    Protective Advances. In the event the Other Proceeds are insufficient to pay an expense that the Trustee requests to pay in order to sell or preserve the value of the Property, then in the Lender's sole and absolute discretion the Lender may advance the Trustee the funds to pay such item, and any such expenses advanced by the Lender shall be deemed to be a necessary protective advance pursuant to the Loan Documents (each a "**Lender Advance**"). Pursuant to and in accordance with the Loan Documents, any and all Lender Advances shall accrue interest at the Default Rate of 24% per annum, and shall be automatically part of, and increase the amount of, the Lender's Allowed Secured Claim, provided that such interest accrual is subject to the limitation set forth in Paragraph 3(c) above.

7.    **Carve-Out of Liens**. The Lender's liens, claims and security interests in the Property shall be subject only to the right of payment of the following expenses ("**Carve Out Expenses**"):

(a)    In the event of a closing of a sale of the Property, the sum of all unpaid

18

property taxes and water/sewer charges owed to NYC as of the date of the closing of the sale (the "**NYC Liens**");

(b)    In the event of the closing of a sale of the Property, the Brokers will be entitled to compensation (inclusive of reimbursement of expenses) of no greater than: (i) a buyer's premium in the aggregate sum of four (4%) percent of the amount of the successful bid at an auction of the Property, if the Property is sold to a person that is not the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party), or (ii) a commission of one (1%) of the amount of the successful bid at an auction of the Property solely if the Lender who is the party to this Stipulation (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party) acquires the Property. The applicable amount set forth in this Paragraph 7(b) is referred to herein as the "**Broker Carve Out**";

(c)    The aggregate sum of $380,000 (the "**Trustee and Professionals Carve Out**") for: (i) the statutory commissions of the Trustee, but in an amount no less than $275,000, and reimbursement of out-of-pocket expenses of the Trustee ("**Allowed Trustee Fees**"); and (ii) the reasonable fees and expenses actually incurred and approved by a final order of the Bankruptcy Court pursuant to sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, "**Allowed Professionals Fees**") by any professionals retained under section 327 of the Bankruptcy Code by the Trustee (collectively, the "**Professionals**"); and

(d)    The sum of $75,000 for payment of allowed claims in accordance with the Bankruptcy Code (the "**Estate Pot**").

19

8.      **Prohibited Uses of the Trustee and Professionals Carve Out**. Notwithstanding anything to the contrary in this Stipulation, the Trustee and Professionals Carve Out shall not be used, in whole or any part, to pay any Allowed Professionals Fees incurred in connection with any of the following: (a) a request to use any cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of the Lender, (b) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise other than from the Lender unless such other financial accommodations repay to the Lender the Lender's Allowed Secured Claim and all other amounts owed to the Lender, indefeasibly and in full, simultaneously within the closing of any such other financial accommodations, (c) the investigation, commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Lender or any of its respective officers, directors, members, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under Chapter 5 of the Bankruptcy Code, or (d) any act which has or could have the effect of materially and adversely modifying or compromising any of the rights and remedies of the Lender, or which is contrary, in a manner that is material and adverse to the Lender to any term or condition set forth in or acknowledged by this Stipulation or any of the Loan Documents.

9.      **Effect of Payment of Carve Out Expenses**. (a) Payment of any Carve Out Expenses, whether by or on behalf of the Lender (or by or on behalf of the Trustee), shall not, and shall not be deemed to, reduce the amount of the Lender's Allowed Secured Claim and shall not, and shall not be deemed to, subordinate (i) any of the Lender's liens and security interests in the Pre-Petition Collateral or other collateral granted hereby or (ii) the Lender's Adequate Protection Administrative Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of

any other party. Except as otherwise provided herein with respect to the Carve Out Expenses, the

Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees or

disbursements of the Trustee or any Professionals incurred in connection with this case (or any

subsequent case under any Chapter of the Bankruptcy Code), and nothing in this Stipulation shall

be construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses

of the Trustee or any Professionals, or to ensure that the Trustee or the Estate has sufficient funds

to pay such compensation or reimbursement.

(b)     In the event that the actual aggregate amount of the Allowed Trustee Fees

and Allowed Professionals Fees (such aggregate amount being the "**Allowed**

**Trustee/Professionals Fees**") of the Trustee and her Professionals are less than the sum of

$380,000, then the sum of $380,000 less the amount of the Allowed Trustee/Professionals Fees

shall be paid to the Lender up to the amount of the Lender's Allowed Secured Claim and any

excess shall be retained by the Trustee for the benefit of the Debtor's Estate.

10.    **Terms of Sale**. Unless otherwise agreed by the Lender:

(a)     The Trustee shall seek Bankruptcy Court approval of the terms of sale in

the form set forth in **Exhibit A** hereto.

(b)     Unless the Trustee and the Lender agree otherwise, if by the date that is 60

days after the date the Bankruptcy Court enters the Amended Broker Retention Order approving

the Trustee's retention of both Maltz and CW, as the Trustee's co-brokers, the Trustee has not

entered into an a written agreement to sell the Property to a person or entity as a stalking horse

purchaser for the Property for a purchase price and on terms acceptable to Lender (subject to

conducting an auction for higher and better offers and Bankruptcy Court's approval of such an

agreement) and received a 10% deposit from such prospective purchaser, then the Trustee shall schedule a public auction sale of the Property.

11.    **Lender's Right to Credit Bid**.

(a)    Notwithstanding anything to the contrary whatsoever, the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party) may, at any Sale of all or any part of the Property, credit bid (a "**Lender Credit Bid**") all or any part of its Allowed Secured Claim, up to the full amount of the Allowed Secured Claim (including, without limitation, the amount of all Claim Additions asserted by the Lender accruing from November 1, 2022 through the date of the scheduled auction) pursuant to any terms of sale. Not less than seven (7) days prior to the first scheduled date of an auction of the Property, Lender shall provide the Trustee's counsel with an estimated amount of any Claim Additions accruing from November 1, 2022 through the date of the scheduled auction (the "**Post 10/31/22 Claim Additions**"). If the Trustee and Lender cannot agree on the amount of the Post 10/31/22 Claim Additions to be included in the Lender's Allowed Secured Claim for purposes of the maximum amount that Lender may credit bid at the auction, then the Trustee may schedule a hearing with the Bankruptcy Court to estimate such amounts for purposes of estimating the amount of Post 10/31/22 Claim Additions that Lender may include in a credit bid at an auction of the Real Property. Furthermore, notwithstanding anything to the contrary, the Lender (or its designee or assignee) shall not be required to deliver any deposit to the Trustee or to pay any buyer's premium at any time. In the event that any Lender Credit Bid is deemed the highest and best offer and the Sale is made to the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or

22

controlled by an unrelated third party), then any fees and expenses due to the Brokers will be paid

by the Trustee from the funds paid by the Lender pursuant to Paragraph 11(b) immediately below.

(b)    If and only if the Lender (or any designee or assignee thereof, provided such

designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated

third party) is the successful bidder at a Sale of the Property on account of a Lender Credit Bid,

then:

i.    At the actual closing of the Sale of the Property, (i) the Trustee shall

execute and deliver to the Lender a Trustee's Deed for the Property and all applicable

governmental transfer forms, (ii) the Trustee shall deliver to the Lender via a wire transfer a

payment equal to all Other Proceeds collected and then held by the Trustee with respect to the

Property, (iii) the Lender shall deliver to the Trustee via a wire transfer a payment in the amount

of (X) 1% of the Lender's Credit Bid (i.e., the applicable Broker Carve Out), plus (Y) the sum of

$455,000 (i.e., the aggregate sum of (a) the Trustee and Professionals Carveout and (b) the Estate

Pot), plus (Z) the sum of all unpaid NYC Liens; and

ii.    Not later than one (1) business day after the Trustee's receipt of the

funds for the sum of all unpaid NYC Liens the Trustee shall initiate payment of such NYC Liens

to NYC.

12.    **Payment of The Lender's Allowed Secured Claim and Lender's Deficiency
Claim.** If the Property is sold to any person other than the Lender (or any designee or assignee

thereof, provided such designee or assignee is affiliated with the Lender and is not owned or

controlled by an unrelated third part), then not later than one (1) business day following the

Trustee's receipt and clearance of any proceeds of sale of the Property (including any buyer's

premium) (collectively the "**Sale Proceeds**"), the Trustee shall:

(a)    Initiate a wire transfer payment[1] to the Lender (pursuant to such wire instructions as the Lender shall provide to the Trustee) in an amount equal to the gross amount of all the Sale Proceeds, plus all Other Proceeds collected and then held by the Trustee with respect to the Property, less (i) the sum of $455,000 for the Trustee and Professionals Carve Out and the Estate Pot; (ii) the sum of the unpaid NYC Tax Liens as of the date of the closing; and (iii) the buyer's premium paid by or on behalf of the buyer of the Property for the Brokers (the amount to be paid to the Lender pursuant to this Paragraph 12 being referred to herein as "**Lender Payment**").

(b)    Initiate a wire transfer payment (or ACH transfer or other electronic payment) of the unpaid NYC Tax Liens to NYC.

13.    **Lender's Deficiency Claim**. In the event that the Sale Proceeds or any credit bid by the Lender is not sufficient to pay the Lender's Allowed Secured Claim in full as of the date of payment to the Lender, then the Lender shall automatically have an allowed deficiency claim ("**Deficiency Claim**") under the Loan Documents, the Forbearance Agreement, the Consent Order, and this Stipulation in the amount equal to the sum of:

(a)    The Allowed Secured Claim including, without limitation, any Claim Additions (up to the gross amount of any Sale Proceeds plus all Post-Petition Other Proceeds received by the Debtor, the Trustee, and/or the Debtor's Estate through and including the date Lender receives the Lender Payment), **PLUS**

(b)    The aggregate amount of all Carve-Out Expenses; **LESS**

---

[1]    The Trustee has explained to the Lender the United States Trustee's general limitations on the use of wire transfers pursuant to Section 5(F)(2) of the United States Trustee's Handbook for Chapter 7 Trustee, effective October 1, 2012, and requested to make this payment by estate check. The Lender insisted that the payment be made by wire and that it was a material condition to entry into this Stipulation.

(c)    (i) if the Property is sold to a third party, the amount of the Lender Payment received by Lender, or (ii) if the Property is sold to the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party), the amount of its credit bid.

(d)    The Deficiency Claim shall be an allowed claim against the Debtor and the Debtor's Estate. Lender, Otway and any other obligors shall retain all their respective rights, defenses and offsets, if any, under and with respect to the Loan Documents and the underlying agreements affecting any or all of such parties or persons, with respect to any amounts owed by Otway and/or any other obligors. The Deficiency Claim against the Debtor and the Estate shall have the following priorities in the Debtor's Chapter 7 bankruptcy case:

(i)    Lender shall have an administrative claim under section 507(b), 507(a)(2), and 364(c), subject only to the Carve Out Expenses, in the amount of all protective advances made by the Lender from and after the Petition Date (including, without limitation, the aggregate amount of all Lender Advances) and in the amount of all cash used by the Debtor or the Trustee from and after the Petition Date, which claim shall be senior to all other administrative claims in the Debtor's Chapter 7 case; and

(ii)    the balance of the amount of the Deficiency Claim in excess of the amount set forth in subclause (i) immediately above in this Paragraph 13, will be a general unsecured claim in the Debtor's Chapter 7 case.

14.    The Lender shall not be entitled to share in the Estate Pot on account of its Deficiency Claim unless and until all other allowed claims are paid in full. For the avoidance of doubt, the Lender shall be entitled to share in all other assets of the Estate and receive distributions on account of its Deficiency Claim.

25

15.  **Trustee's and Trustee's Professionals Administrative Costs and Compensation.** Except for the Carve Out Expenses, no costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the Lender or any of the Lender's collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the Lender.

16.  **Trustee and Trustee Professionals' Reservation of Rights.** In the event that both (a) the Property is sold to any party other than the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender and is not owned or controlled by an unrelated third party), and (b) the Sale Proceeds exceed the sum of (i) the sums due to the Lender on account of the Lender's Allowed Secured Claim (including, without limitation, all Claim Additions); plus (ii) the amount of Carve Out Expenses plus (iii) the amount of the NYC Liens, then: (x) any additional proceeds of sale shall be retained by the Trustee for the benefit of junior lien holders (if any) and other creditors holding allowed claims including, but not limited to, ECB liens, mechanic's lien holders (if any), and administrative, priority and general unsecured creditors with allowed claims; and (y) notwithstanding anything contained herein, the Trustee and her retained professionals reserve their respective rights to seek the maximum commissions and compensation from such additional proceeds of sale, as may be allowable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the Southern District of New York.

17.  **Sale Shall Be Free and Clear of Otway Related Persons.** The Trustee shall file a motion ("**Sale Free and Clear Motion**") in the Debtor's case seeking authorization to sell the Property free and clear of any alleged lease and/or any possessory rights of Otway, Eugenie Otway,

and their affiliates and/or family members including, but not limited to, Theatre 80, the Tavern and the Museum (collectively, "**Otway Family and Affiliates**").

18.    **Sale of Property Free and Clear of Any Rights of Otway Related Persons**. This Stipulation is subject to the occurrence of the "Free and Clear Condition". The term Free and Clear Condition shall mean that both (a) the Bankruptcy Court has entered an order approving the Sale Free and Clear Motion on or before **March 31, 2023**; and (b) that the Property is delivered to the purchaser upon consummation of Sale, free and clear of (i) any alleged lease and/or possessory rights of the Otway Family and Affiliates, and (ii) the Otway Family and Affiliates. The Free and Clear Condition may be waived by the Lender in the Lender's sole and absolute discretion, provided that such waiver must be expressly made in a writing. If the Free and Clear Condition does not occur or has not been expressly waived by the Lender in writing, then this Stipulation shall be void ab initio.

19.    **Binding Terms**. The Lender's Allowed Secured Claim shall constitute: (a) an allowed claim, not subject to subordination, reduction or avoidance, for all purposes in this case. The prepetition and post-petition liens of the Lender, are hereby deemed legal, valid, binding, perfected liens and obligations of the Debtor and the Estate, are not subject to any defense, claim, counterclaim, re-characterization, offset of any kind, subordination, and otherwise unavoidable, and shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's Estate against the Lender all of which have been forever waived and released.

20.    **Amendment and Waivers**. This Stipulation may not be modified, amended, waived, changed or terminated orally, but only by an agreement in writing, signed by all Parties and approved by order of the Bankruptcy Court.

21.    **Complete Agreement.** This Stipulation constitutes the entire agreement and understanding between and among the Parties relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings (written or oral), among the parties hereto with respect to such subject matter.

22.    **Binding Effect.** Upon Bankruptcy Court approval of this Stipulation, this Stipulation will be binding upon the Trustee, the Debtor's Estate and the Lender, and their successors and assigns, including, without limitation, any successor trustee of the Debtor. The provisions of this Stipulation, and any and all rights, remedies, privileges, and benefits in favor of the Lender provided or acknowledged in this Stipulation, and any actions taken pursuant thereto, shall be effective immediately upon entry of an order by the Bankruptcy Court approving this Stipulation pursuant to Bankruptcy Rules 6004 and 7062 (and any stay is hereby dispensed with), shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation, any Order which may be entered by the Bankruptcy Court, including any Order dismissing this case or abandoning the Property.

23.    **Choice of Law and Jurisdiction.** This Stipulation shall be construed, and the rights and liabilities of the Parties hereto shall be determined, in accordance with the laws of the State of New York and applicable federal law. The Parties hereby consent to the resolution of any and all disputes arising under, in connection with or relating to this Stipulation, and any claims or actions based upon this Stipulation, by and under the jurisdiction of the Bankruptcy Court.

24.    **Headings/Interpretation.** Paragraph and subparagraph headings are for convenience of reference only, are not part of this Stipulation and shall not affect the construction of, or be taken into consideration in interpreting, this Stipulation. For purposes of this Stipulation: (a) the term "including" shall be deemed to mean "including, without limitation,"; (b) the term

"person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or association, or trustee; and (c) whenever the context of this Stipulation reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Stipulation shall not be construed against any of the Parties as the person who prepared or drafted this Stipulation.

25.    **Execution in Counterparts.** This Stipulation may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. This Stipulation may be executed by electronic signatures, including without limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

26.    **Successors and Assigns.** This Stipulation shall be binding on and inure to the benefit of the successors and assigns of each of the Parties, including, without limitation, any subsequent trustee of the Debtor.

[Signatures appear on the next page]

29

Dated: December 22 , 2022
Bedford Hills, New York

### MARIANNE T. O'TOOLE, CHAPTER 7 TRUSTEE

By: _____

    Marianne T. O'Toole, as Chapter 7 Trustee of
    the Estate of 78-80 St. Marks Place, LLC

### LaMONICA HERBST & MANISCALCO, LLP
Counsel to Marianne T. O'Toole, Esq., as Chapter 7 Trustee

By: _____

    Holly R. Holecek, Esq.
    Salvatore LaMonica, Esq.
    3305 Jerusalem Avenue, Suite 201
    Wantagh, New York 11793
    Telephone: (516) 826-6500

Dated: December 22, 2022
New York, New York

### ST. MARK'S MIXED USE LLC

By: _____

    Name: Thomas Hooker
    Title: Manager

### KATSKY KORINS LLP
Counsel to St. Mark's Mixed Use LLC

By: _____

    Steven H. Newman, Esq.
    605 Third Avenue
    New York, New York 10158-0038
    Telephone: (212) 716-3235

Dated: December 22, 2022
Bedford Hills, New York

MARIANNE T. O'TOOLE, CHAPTER 7 TRUSTEE

By: _____
Marianne T. O'Toole, as Chapter 7 Trustee of
the Estate of 78-80 St. Marks Place, LLC

LaMONICA HERBST & MANISCALCO, LLP
Counsel to Marianne T. O'Toole, Esq., as Chapter 7 Trustee

By: _____
Holly R. Holecek, Esq.
Salvatore LaMonica, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

Dated: December 22, 2022
New York, New York

ST. MARK'S MIXED USE LLC

By: _____
Name: Thomas Hooker
Title:  Manager

KATSKY KORINS LLP
Counsel to St. Mark's Mixed Use LLC

By: _____
Steven H. Newman, Esq.
605 Third Avenue
New York, New York 10158-0038
Telephone: (212) 716-3235

30

**Exhibit 1**

**Form of Approval Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                    Chapter 7

78-80 ST. MARKS PLACE, LLC,                               Case No.: 21-12139 (MG)

        Debtor.

-----------------------------------------------------------x

## ORDER APPROVING STIPULATION BETWEEN THE CHAPTER 7 TRUSTEE AND ST. MARK'S MIXED USE LLC

Upon the motion ("Motion") [ECF No. ____] of Marianne T. O'Toole, solely in her capacity as the Chapter 7 Trustee ("Trustee") of the estate of 78-80 St. Marks Place, LLC ("Debtor"), seeking entry of an Order pursuant to section 105(a) of title 11 of the United States Code ("Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (i) approving the stipulation ("Stipulation") between the Trustee and St. Mark's Mixed Use LLC ("Lender"); and (ii) granting related relief; and upon the hearing conducted on January ____, 2023 ("Hearing"); and upon the record of the Hearing; and the Court having determined that the Stipulation is a fair and reasonable settlement of the disputes at issue, a proper exercise of the Trustee's business judgment in light of the risks and costs of further litigation and the circumstances of this case, and is in the best interests of the Debtor's estate; and no additional notice being necessary or required;

**IT IS HEREBY FOUND[1] THAT:**

A.    This Court has jurisdiction to consider the Motion and relief requested therein pursuant to 28 U.S.C. §§157 and 1334 and the matter is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and(O).

B.    Adequate notice of the Motion has been given and no further notice is required.

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate. See FED. R. BANKR. P. 7052.

C.      The Stipulation was negotiated at arm's-length and in good faith.

D.      The settlement set forth in the Stipulation falls above the lowest point in the range of reasonableness.

E.      The Stipulation and the relief requested in the Motion represent a fair and reasonable exercise of the Trustee's business judgment.

**NOW, THEREFORE,** upon the Motion of the Trustee, the record of the Hearing, the record in the Debtor's case, and good cause shown, it is hereby

**ORDERED** that the Stipulation, a copy of which is annexed as <u>Exhibit A</u>, is approved in its entirety, and each of the Terms and Conditions set forth in paragraphs 2 through 26 are hereby deemed So Ordered and have the same effect as if set forth herein; and, it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order and/or the Stipulation; and, it is further

**ORDERED** that this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated: _____, 2023
        New York, New York

                                        _____
                                        Hon. Martin Glenn
                                        Chief United States Bankruptcy Judge

2

**Exhibit A**

**Terms of Sale**

## TERMS AND CONDITIONS OF SALE

1.   These Terms and Conditions of Sale are promulgated in connection with the public sale ("Sale") of the real property and improvements known as and located at 78-80 St. Marks Place, New York, New York 10003 ("Property").

2.   The Sale will be conducted on _____, **2023 at 11:00 a.m.** The Sale will be conducted virtually via Zoom.

3.   The seller of the Property is Marianne T. O'Toole, Esq., solely in her capacity as Chapter 7 Trustee ("Trustee") of the estate of 78-80 St Marks Place, LLC ("Debtor"). The Debtor's Chapter 7 bankruptcy case is pending in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") under case no. 21-12139 (MG).

4.   The Property is encumbered by first priority liens belonging to St. Mark's Mixed Use LLC ("Lender"), including, without limitation, a mortgage ("Mortgage") held by the Lender. The Lender is represented by Katsky Korins LLP, 605 Third Avenue, New York, New York 10158. The Trustee and the Lender entered into a certain stipulation of settlement, which, among other things, allowed the Lender's secured claim ("Lender Stipulation").

5.   The Sale is being conducted pursuant to an Order of the Bankruptcy Court dated _____, 202___ ("Authorization Order") and sections 363 (b), (d), (f) and (m) of title 11 of the United States Code ("Bankruptcy Code").

6.   In accordance with the Authorization Order and the Lender Stipulation, the Lender may credit bid for the Property at the Sale pursuant to section 363(k) of the Bankruptcy Code. The Lender: (a) shall in all events be deemed a qualified bidder at the Sale and be permitted to bid at the Sale; (b) shall not be required to pay a Qualifying Deposit (as defined below in ¶7) or any other Deposit (as defined below in ¶11) of any kind whatsoever, and (c) shall not be required to pay a Buyer's Premium (as defined below in ¶10).

7.   To register for the Sale and bid on the Property, on or before 5:00 p.m. the day before the Sale each prospective bidder (other than the Lender) must deliver to the Trustee: (a) a certified or bank check payable to "Marianne T. O'Toole, Esq., as Trustee" in the amount of nine hundred and fifty thousand dollars ($950,000) ("Qualifying Deposit"), which amount shall serve as a good faith deposit against payment of the purchase price for the Property; and (b) these Terms and Conditions of Sale, executed by such prospective bidder. The Trustee reserves the right to reject any bidder (other than the Lender) who, in the sole discretion of the Trustee, the Trustee believes is not financially capable of consummating the purchase of the Property.

8.   At the conclusion of the Sale, the first highest bidder ("Highest Bidder") and the second highest bidder ("Second Highest Bidder") for the Property must also execute, and thereby agree to be bound by, a Memorandum of Sale in the form annexed hereto.

9.   At the conclusion of the Sale, the Trustee or her representative will return the Qualifying Deposits to all bidders except the Highest Bidder and the Second Highest Bidder. The Second Highest Bidder's Qualifying Deposit will be returned within two business days after the Highest Bidder posts the entire Deposit (as defined below in ¶11).

10. In accordance with the Authorization Order, the Highest Bidder or, as applicable, the Second Highest Bidder (other than the Lender) shall be solely responsible to pay the Trustee's retained co-brokers, Maltz Auctions, Inc. and Cushman and Wakefield, U.S. Inc., four (4%) percent of the amount bid by the Highest Bidder or, as applicable, the Second Highest Bidder at the Sale (such percentage amount being the "Buyer's Premium"). The sum of the amount bid at the Sale and the Buyer's Premium is defined herein as the "Purchase Price".

11. Within 48 hours after conclusion of the Sale, the Highest Bidder (other than the Lender) shall deliver to the Trustee, by certified check, bank check, or wire transfer an amount equal to 10% of the Purchase Price minus the amount of the Qualifying Deposit, as and for a good faith deposit (such amount, plus the Qualifying Deposit, hereinafter "Deposit").

12. The Highest Bidder (other than the Lender) must pay the balance of the Purchase Price to the Trustee, by wire transfer at the closing of title to the Property ("Closing").

13. The Highest Bidder must close title to the Property on or before **5:00 p.m. on
_____ ("Closing Date"), TIME BEING OF THE ESSENCE as to
the Highest Bidder,** although such date may be extended solely by the Trustee. The Closing shall take place on or before the Closing Date at the offices of the attorneys for the Trustee, LaMonica Herbst & Maniscalco LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793 or by mail, as elected by the Trustee.

14.    Real estate taxes, water and sewer charges will be apportioned as of 12:00 a.m. on the Closing Date. There will be no other apportionments pertaining to the Property.

15.    The Highest Bidder shall pay, on the Closing Date, any and all city, county, state or other transfer taxes incurred by or in connection with the transfer of the Property.

16.    In connection with the Closing and Closing Date, the Highest Bidder is hereby given notice that **TIME IS OF THE ESSENCE against the Highest Bidder and the failure of the Highest Bidder to close for any reason whatsoever (except as otherwise provided below), including its failure to pay the balance of the Purchase Price on the Closing Date, will result in the Trustee retaining the Deposit and the termination of the Highest Bidder's right to acquire the Property under these Terms and Conditions of Sale.** The Trustee's right to retain the monies paid including, without limitation, the Deposit, is not a penalty but rather liquidated damages and it is hereby agreed and acknowledged by the parties hereto that the amount of damages sustained by the Trustee are difficult to determine and the liquidated damages set forth herein are reasonable under the circumstances. The Highest Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Highest Bidder to cancel or avoid its obligation under these Terms and Conditions of Sale other than the Trustee's inability to deliver insurable title to the Property. Further, the Highest Bidder shall have demonstrated, to the sole satisfaction of the Trustee, evidence of its ability to conclude the transaction upon these Terms and Conditions of Sale without delay. **Expenses incurred by the Highest Bidder, or any competing bidder, including concerning any due diligence, such as obtaining title reports, shall be the sole responsibility of such bidder and under no circumstances shall the Trustee, the estate or the Trustee's professionals be responsible for, or pay, such expenses.**

17.    In the event that the Highest Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these Terms and Conditions of Sale, the Trustee, at her sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice, without giving credit for any Deposit forfeited by the Highest Bidder, and upon such other terms and conditions as the Trustee deems appropriate in consultation with the Lender. Should the Second Highest Bidder fail to close on the Property within such time as the parties may agree but not to exceed 45 days after notice from the Trustee to the Second Highest Bidder, the Trustee shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice. In either event, the Second Highest Bidder or the next highest or best bidder shall be deemed to be "Highest Bidder" under these Terms and Conditions of Sale and shall be bound by these Terms and Conditions of Sale.

18.    The Trustee and her professionals, including the Trustee's retained co-brokers, Maltz Auctions, Inc. and Cushman and Wakefield, U.S. Inc., have not made, and do not make, any representations or warranties of any kind, including, but not limited to, as to the physical condition, expenses, operations, leases, rents, tenancies, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property that might be pertinent to the purchase of the Property, and including, without limitation: (a) the current or future real estate tax liability, assessment or valuation of the Property; (b) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (c) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (d) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (e) the current or future use of the Property; (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (g) the ownership or state of title of any personal property on the Property; (h) the presence or absence of any laws, ordinances, rules or regulations issued by any governmental authority, agency or board and any violations thereof; (i) any present or future issues concerning subdivision or non-subdivision of the Property; or (j) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property. Each bidder hereby expressly agrees and acknowledges that no such representations or warranties have been made. The Trustee and her professionals, including the Trustee's retained co-brokers, Maltz Auctions, Inc. and Cushman and Wakefield, U.S. Inc., are not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, or any real estate broker, agent, employee, servant or other person or professional representing or purporting to represent the Trustee unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Trustee.

19.    The Property is being sold:

(a)    "AS IS" "WHERE IS", "WITH ALL FAULTS," without any representations, covenants, guarantees or warranties of any kind or nature

3

whatsoever;

(b)    free and clear of any and all monetary interests of whatever kind or nature including, but not limited to, liens, claims, encumbrances, judgments and/or mortgages (collectively, "Interests"), with such Interests, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the entry of the Order for Relief against the Debtor; provided however if the Highest Bidder or, as applicable, the Second Highest Bidder and the Lender each agree in writing, each in their sole and absolute discretion, that the Property shall be sold subject to the Mortgage of the Lender, the agreement that the Property is sold subject to Mortgage shall be conclusively evidenced if the Lender, in its sole and absolute discretion, executes and delivers an assignment of the Mortgage to Highest Bidder (or a designee of the Highest Bidder) or, as applicable, the Second Highest Bidder (or a designee of the Second Highest Bidder) as assignee. For avoidance of doubt, notwithstanding this paragraph 19(b), the Highest Bidder or, as applicable, the Second Highest Bidder must pay the entire Purchase Price (less the Deposit paid) to the Trustee at the Closing;

(c)    free and clear of the occupancies of Lawrence V. Otway, a/k/a Lawrence Lorcan Otway, a/k/a Lorcan Otway, Eugenie Otway a/k/a Eugenie Gilmore-Otway, a/k/a Eugenie Gilmore, Scheib's Place, Inc. d/b/a William Barnacle Tavern, Exhibition Of The American Gangster, Inc., and/or Theatre 80, LLC; and

(d)    subject to, among other things:

(i) any other occupancies;

(ii) any state of facts that an accurate survey may show;

(iii) any state of facts a physical inspection may show;

(iv) any covenants, restrictions and easements of record;

(v) any building or zoning ordinances or other applicable municipal regulations and violations thereof;

(vi) environmental conditions; and

(vii) any and all non-monetary violations existing on the Property as of the Closing Date.

20. By delivering Qualifying Deposits, each bidder acknowledges that it has had the opportunity to review the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigation of the Property in making its bids. Neither the Trustee nor any of her representatives, including the Trustee's retained co-brokers, Maltz Auctions, Inc. and Cushman and Wakefield, U.S. Inc., make any representations or warranties with

4

respect to the permissible uses of the Property, including, but not limited to, the zoning of the Property. Each bidder acknowledges that it has conducted its own due diligence in connection with the Property and is not relying on any information provided by the Trustee and her professionals.

21.    The Trustee shall convey the Property by delivery of a Trustee's Deed. The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. The Trustee may at her option arrange for the issuance of a title insurance policy by such a company at the Highest Bidder's sole cost and expense.

22.    Any notices to the Highest Bidder, Second Highest Bidder or the Trustee hereunder shall be sufficient if sent by email to (i) counsel for such party; or (ii) to such party, and shall be deemed given on the date sent.

23.    Signatures delivered by electronic mail or facsimile shall have the same force and effect as original signatures.

24.    Except as may be authorized by an Order of the Bankruptcy Court, neither the Trustee nor the estate are liable or responsible for the payment of fees of any broker for any bidder including, but not limited to, the Highest Bidder.

25.    Nothing contained in these Terms and Conditions of Sale is intended to supersede or alter any provisions of the Lender Stipulation, the Bankruptcy Code or otherwise interfere with the jurisdiction of the Bankruptcy Court. The Lender and the Trustee shall retain all of their respective rights under the Lender Stipulation. Without limiting the foregoing: (a) if the Lender (or its designee) is the Highest Bidder or the Second Highest Bidder and takes title to the Property, the Lender's Mortgage on the Property shall not merge with any deed to the Property granted by the Trustee to the Lender (or its designee); and (b) following the Closing of Property sale to any person, the Lender shall have a deficiency claim under the Loan Documents (as defined in the Lender Stipulation) in the amount set forth in the Lender Stipulation. All of the terms and conditions set forth in these Terms and Conditions of Sale are subject to modification as may be directed by the Trustee, after consultation with the Lender, provided that any such modification is not inconsistent with the Lender Stipulation, or by the Bankruptcy Court. The Trustee reserves the right to modify these Terms and Conditions of Sale at the Sale or thereafter to maintain consistency with the provisions of the Bankruptcy Code and/or prior orders of the Bankruptcy Court.

26.    These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property. By making a bid for the Property, each bidder will be deemed to have acknowledged having read these Terms and Conditions of Sale and agreed to be bound by them.

27.    If the Trustee is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever, her only obligation will be to refund the Deposit to the Highest Bidder and, upon such refund, the Highest Bidder shall not have any claim or recourse whatsoever against Property or the Trustee, the Debtor's estate, the Trustee's professionals, or the Lender.

28.    The Trustee reserves her right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reason whatsoever, as she deems necessary or appropriate.

29.     The Sale of the Property is subject to confirmation by the Trustee. Prior to the Closing, the Bankruptcy Court may enter an Order confirming the results of the Sale.

30.     Each bidder represents and warrants that it is capable of performing its obligations under these Terms and Conditions of Sale and has the financial wherewithal to perform its obligations under these Terms and Conditions of Sale.

31.     Except as disclosed below, each bidder represents and warrants that it has no connections to the Debtor, the Debtor's sole member (Lawrence Otway a/k/a Lorcan Otway), the Lender, the Trustee and/or the Trustee's professionals and that is has never been affiliated in any manner whatsoever, or held any interest in, the Debtor:

_____

_____

_____

32.     The Bankruptcy Court shall determine any disputes concerning the Sale of the Property. By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes.

I have read these Terms and Conditions of Sale and agree to be bound by them.

Dated: _____, 2023

_____
PRINT NAME

_____
SIGNATURE

_____
TITLE (if entity)

Bidder contact information:                    Attorney name and contact information (if any):

_____            _____
ADDRESS                                         NAME

_____            _____
EMAIL                                              FIRM

_____            _____
TELEPHONE                                     EMAIL

_____
TELEPHONE

## MEMORANDUM OF SALE- HIGHEST BIDDER

The undersigned has this ____ day of _____, 2023, agreed to purchase the real property and improvements located at 78-80 St. Marks Place, New York, New York 10003 ("Property"), vested in Marianne T. O'Toole, solely in her capacity as Chapter 7 Trustee for the bankruptcy estate of 78-80 St. Marks Place, LLC, and being sold for the sum of $_____, and hereby promise and agree to comply with the terms and conditions of the sale of said property, as set forth in the annexed Terms and Conditions of Sale.

_____     _____
PRINT NAME OF PURCHASER               PRINT NAME OF PURCHASER

_____     _____
PURCHASER SIGNATURE                   PURCHASER SIGNATURE

_____     _____
PURCHASER TITLE (if entity)           PURCHASER TITLE (if entity)

_____     _____
ADDRESS                               ADDRESS

_____     _____
E-MAIL                                E-MAIL

_____     _____
TELEPHONE NUMBER                      TELEPHONE NUMBER

_____     _____
FAX NUMBER                            FAX NUMBER

### ATTORNEY INFORMATION
Name:        _____
Address:     _____
E-Mail:      _____
Phone:       _____

This verifies that the highest bid in the above sale was for the sum of $_____ and received from _____ the sum of $_____, as a non-refundable deposit for the purchase of the Property pursuant to the Terms and Conditions of Sale.

_____
Marianne T. O'Toole, Esq., Chapter 7 Trustee
c/o LaMonica Herbst & Maniscalco LLP
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500 Phone
(516) 826-0222 Fax

## MEMORANDUM OF SALE - SECOND HIGHEST BIDDER

The undersigned has this ____ day of _____, 2023, agreed to purchase the real property and improvements located at 78-80 St. Marks Place, New York, New York 10003 ("Property"), vested in Marianne T. O'Toole, solely in her capacity as Chapter 7 Trustee for the bankruptcy estate of 78-80 St. Marks Place, LLC, and being sold for the sum of $_____, and hereby promise and agree to comply with the terms and conditions of the sale of said property, as set forth in the annexed Terms and Conditions of Sale.

_____        _____
PRINT NAME OF PURCHASER                  PRINT NAME OF PURCHASER

_____        _____
PURCHASER SIGNATURE                      PURCHASER SIGNATURE

_____        _____
PURCHASER TITLE (if entity)              PURCHASER TITLE (if entity)

_____        _____
ADDRESS                                  ADDRESS

_____        _____
E-MAIL                                   E-MAIL

_____        _____
TELEPHONE NUMBER                         TELEPHONE NUMBER

_____        _____
FAX NUMBER                               FAX NUMBER

### ATTORNEY INFORMATION
Name:      _____
Address:   _____
E-Mail:    _____
Phone:     _____

This verifies that the second highest bid in the above sale was for the sum of $_____ and received from _____ the sum of $_____, as a non-refundable deposit for the purchase of the Property pursuant to the Terms and Conditions of Sale.

_____
Marianne T. O'Toole, Esq., Chapter 7 Trustee
c/o LaMonica Herbst & Maniscalco LLP
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500 Phone
(516) 826-0222 Fax